**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                     *Plaintiff*,<br><br>v.<br><br>ENERGY SOLUTIONS, INC.,<br>ROCKWELL HOLDCO, INC.,<br>ANDREWS COUNTY HOLDINGS,<br>INC.,<br><br>and<br><br>WASTE CONTROL SPECIALISTS<br>LLC,<br><br>                   *Defendants*. | Civil Action No.: |

## <u>COMPLAINT</u>

The United States of America, acting under the direction of the Attorney General of the United States, brings this civil antitrust action to enjoin EnergySolutions, Inc. ("ES"), a wholly owned subsidiary of Rockwell Holdco, Inc. ("Rockwell"), from acquiring Waste Control Specialists LLC ("WCS"), a wholly owned subsidiary of Andrews County Holdings, Inc.  The United States alleges as follows:

## I.       INTRODUCTION

1.       ES's proposed acquisition of WCS would combine the only two licensed commercial low-level radioactive waste ("LLRW") disposal facilities for 36 states (including

Delaware), Puerto Rico, and the District of Columbia (the "Relevant States"[1]).  By eliminating the most significant disposal competitor ES has faced since it began operations, the proposed acquisition would lead to higher prices, lower quality service, and less innovation in the commercial LLRW disposal industry.

2.      Eliminating competition between ES and WCS would have wide-ranging effects throughout the United States.  Nuclear power plants produce 20% of the electricity generated in the United States, and are a key component in policy efforts to achieve air quality and carbon emissions goals.  Moreover, the proposed transaction would create a near-monopoly for the disposal of commercially generated LLRW in the Relevant States at a time when utilities are preparing to bid out nuclear reactor decommissioning projects worth billions of dollars.  As the map below illustrates, the majority of operating nuclear reactors and near-term decommissioning projects are located in the Relevant States.

---

[1] The "Relevant States" are the following 36 states plus the District of Columbia and Puerto Rico, which are considered "states" under the applicable regulatory scheme (*see* 42 U.S.C. § 2021b(14)): Alabama, Arizona, Arkansas, California, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, New Hampshire, New York, North Carolina, North Dakota, Ohio, Oklahoma, Pennsylvania, Rhode Island, South Dakota, Tennessee, Texas, Vermont, Virginia, West Virginia, and Wisconsin.



3.      When utilities incur higher operating costs, such as higher LLRW disposal rates, those costs are passed on to businesses and consumers in the form of higher utility bills.  Higher LLRW disposal rates also threaten the use of nuclear technologies for medical, pharmaceutical, and research purposes.

4.      For a number of years, ES was the only LLRW disposal facility available to commercial LLRW generators in the Relevant States.  Then, in 2012, after investing several hundred million dollars and 19 years to build and obtain the necessary licenses for a state-of-the-art LLRW disposal facility, WCS began to compete with ES to dispose of LLRW generated by nuclear power plants, hospitals, and research facilities in the Relevant States.

5.      ES has repeatedly tried to neutralize the most significant source of competition it has ever faced.  For example, in February 2014, ES executives considered whether to "[k]eep margins as high as possible competing with WCS (winning some losing some)" or "just go to war" with WCS by undercutting it on price and taking market share for the disposal of certain types of LLRW.  ES hoped that "~12 months of take the gloves off war" would force WCS "to

sit down and listen, or weaken them to the point we can acquire them."

6.      In the face of aggressive competition from WCS, ES decided to eliminate the
threat by seeking to acquire it.  During March 2014 acquisition discussions, one of ES's
investors urged ES to make WCS an all-cash offer, writing: "These guys are scary – just give
them the $275 [million]."

7.      After WCS rebuffed ES's overtures in January 2015, ES tried a different
approach.  In a February 10, 2015 letter, ES threatened to sue WCS for alleged antitrust
violations, asserting that WCS was violating the antitrust laws by trying to eliminate ES as a
competitor for the disposal of certain LLRW.  This threat led to litigation between the two
companies (the "Prior Litigation").

8.      Like ES, WCS recognized that the two rivals were at "war."  According to a WCS
internal report in March 2015: "ES is attacking on every front, Texas legislation, Commission,
South Carolina, and market place. . . . It is believed that ES is rolling the prices back to 2008
levels."

9.       As 2015 progressed, competitive pressure from WCS increased.  In May 2015,
ES reduced its prices for the dispositioning of certain LLRW "to combat the recent road tour by
WCS a few weeks ago when they lowered the price."  An ES internal report warned that "WCS
continues to devalue the market."  In a June 2015 document, an ES executive fretted that "[w]e
needed to change pricing approach in order to compete with WCS continued price spiral
downward." An ES senior executive aptly captured this pricing war when he testified:  "WCS
gave the customer the lowest possible price and we followed suit and gave the customers the
lowest possible price."

10.     Unable to shake off its competitor, and following the unsuccessful August 2015

mediation of the Prior Litigation, ES again sought to acquire its rival by approaching WCS's parent company about a possible merger.  Those negotiations ultimately led to the announcement of this transaction in November, 2015.  This transaction would, as the parties' internal documents acknowledge, allow ES to acquire its primary competitor.

11.     This Court should enjoin ES's proposed acquisition of WCS because it will likely lead to a substantial lessening of competition in the LLRW industry in the Relevant States in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.  The elimination of this competition – which has delivered significant benefits to customers in the Relevant States – would come at a critical time in the LLRW industry, given that decommissioning projects worth billions of dollars will be awarded in the coming years.

## II.      DEFENDANTS AND THEIR UNLAWFUL PROPOSED TRANSACTION

12.     Defendant ES is a Delaware corporation headquartered in Salt Lake City, Utah with over $1 billion in annual revenues.  ES is a vertically integrated international nuclear services company that offers generators of nuclear waste a wide range of services, including the decommissioning and remediation of nuclear sites and facilities, management of spent nuclear fuel, transportation of nuclear material, and LLRW disposal and processing.  ES's customers include commercial, industrial, and government LLRW generators throughout the world.  ES earns roughly $112 million annually from LLRW disposal in the United States.  ES is wholly owned by Rockwell, a Delaware corporation.

13.     Defendant WCS is a Delaware limited liability company headquartered in Dallas, Texas.  WCS provides LLRW disposal services to commercial, industrial, and government LLRW generators throughout the United States.  In 2015, WCS earned revenues of approximately $45 million.  WCS is wholly owned by Andrews County Holdings, a Delaware

corporation.

14.     On November 18, 2015, Rockwell and Andrews County Holdings entered into a
Purchase Agreement under which ES would acquire WCS and its assets in a transaction valued
at $367 million.

### III.     INDUSTRY OVERVIEW

#### Regulatory Framework

15.     LLRW is a catchall category comprising all nuclear waste that is not spent nuclear
fuel, high-level waste, transuranic waste, or uranium mill tailings.  LLRW is an inevitable
byproduct of nuclear power generation, essential scientific and medical research, and life-saving
medical treatments.  LLRW includes such items as personal protective clothing, tools, water
purification filters and resins, hardware from nuclear power plants, soil, construction debris, and
equipment from medical and research institutions.

16.     The Atomic Energy Act of 1954 ("AEA"), Pub. L. No. 83-703, requires LLRW
produced by commercial generators – such as nuclear power plants and medical and research
institutions – to be disposed of in a facility licensed by either the Nuclear Regulatory
Commission ("NRC") or by a state that has entered into an agreement with the NRC
("Agreement State").  Each Agreement State has the authority to regulate the disposal of
commercial LLRW generated within that state and, if allowed under its regulations, received
from out-of-state generators.  Agreement State regulations must be compatible with NRC
regulations.

17.     NRC regulations prohibit the disposal of LLRW without a license from the NRC
or an Agreement State.  Licensing requirements for a commercial LLRW disposal facility are
rigorous, as set forth in 10 C.F.R. Part 61.  The NRC's LLRW disposal regulations are designed

to protect the general population and workers from releases of radioactivity.  Toward that end, the regulations impose more rigorous disposal requirements on waste containing higher concentrations of radionuclides than on waste containing lower concentrations of radionuclides. NRC regulations create three general waste classifications that attach to a package of LLRW at disposal.  "Class A" LLRW is the least radioactive category of LLRW.  "Class B" and "Class C" LLRW have higher levels of radioactivity and are subject to more robust disposal requirements.[2]

18.     Nuclear power plants operated by utilities generate most of the commercial LLRW in the United States.  The most voluminous types of LLRW are soil, construction debris, dry active waste such as protective clothing, large components such as steam generators, resins, and filters.  Different LLRW types often require different disposal protocols.  For example, resins – which are used to filter the water used in nuclear reactors – may not be directly dumped into a landfill but instead must be disposed in containers.  In contrast, soil is the easiest and least expensive waste type to dispose, because it compacts easily and can be placed directly into a disposal facility.   Dry active waste, soil, and construction debris tend to be less radioactive than other types.  Resins and filters, on the other hand, which are used to remove radioactive contaminants from water, tend to accumulate higher levels of radioactivity and therefore are typically subject to more demanding disposal requirements.

19.     Waste is not classified as Class A, B, or C until it is packaged for disposal.  Most waste, however, is processed before being packaged for disposal.  Certain processing techniques, including but not limited to downblending, are used to alter the radioactivity of the waste, and therefore affect the ultimate disposal category of the waste.  For example, resins with radioactivity levels that would receive a Class B or C classification if immediately prepared for

---

[2] For purposes of this Complaint, LLRW does not include waste commonly referred to as "Greater than Class C (GTCC)," which is waste containing radionuclides in such concentrations that the waste cannot be disposed of as Class C waste.  There are currently no commercial disposal facilities licensed to dispose of GTCC waste.

disposal can instead be "downblended" with resins of lower radioactivity until the resulting

mixture meets the waste acceptance criteria for a Class A LLRW disposal facility.  The resulting

mixture is officially classified as Class A LLRW when packaged for disposal.  Other methods for

manipulating LLRW up and down the waste classification scale include concentration averaging,

encapsulation, sorting and segregating, packaging, shredding, and segmentation.

20.     "Higher Activity LLRW" is LLRW that contains radionuclides of such types and

in such concentrations that, if directly disposed of, would be classified as Class B LLRW or

Class C LLRW. (Alternatively, such LLRW is often processed for disposal as Class A LLRW.)

"Lower Activity LLRW" is all LLRW that is not Higher Activity LLRW.

### The Compact System for Commercial LLRW Disposal

21.     Congress enacted the LLRW Policy Act of 1980, Pub. L. No. 96-573, and its

replacement, the LLRW Policy Amendments Act of 1985, Pub. L. No. 99-240, 42 U.S.C.

§§ 2021b–2021j (the "Act"), to encourage states to develop more disposal sites for LLRW.  For

decades, however, efforts to increase LLRW disposal capacity have been stymied by a host of

barriers, including political opposition to the development of new disposal facilities, geological

limitations, and the considerable investment of time and money required to develop a LLRW

disposal facility and obtain the necessary licenses to operate it.  Thus, as one federal circuit court

of appeals has observed, the Act "has been less than entirely effective in reaching its goals of

encouraging new LLRW disposal sites." *Energy Solutions, LLC v. Utah*, 625 F.3d 1261, 1268

(10th Cir. 2010).

22.     Under the Act, each state is responsible for providing, either on its own or in

cooperation with other states, for the disposal of commercial LLRW generated within its

boundaries.  The Act authorizes the states to form interstate compacts, which in turn have the

8

legal authority to restrict access to their regional disposal facilities.  Thus, a commercial generator's access to LLRW disposal depends on where the generator is located.



23.    There are four licensed LLRW disposal facilities in the United States.  The facilities located in Richland, Washington and Barnwell, South Carolina only accept waste from commercial generators located in Northwest Compact and Rocky Mountain Compact states (Richland) or Atlantic Compact states (Barnwell).  Commercial generators located in all other states (*i.e.*, the Relevant States) have access only to the other two licensed LLRW disposal facilities: ES's Clive facility in Utah ("Clive") and WCS's Andrews facility in Texas ("Andrews").

24.    Clive is licensed to dispose of Class A LLRW.

25.    Andrews is licensed to dispose of Class A, B, and C LLRW.

## IV.    COMPETITION BETWEEN ES AND WCS

26.    As the only two licensed LLRW disposal facilities available to commercial generators in the Relevant States, ES and WCS each have competed to serve broader ranges of

commercial generators' LLRW disposal needs by innovating and diversifying into the other's

area of relative strength.  ES, long dominant in the disposal of Lower Activity LLRW, has

expanded – through innovative methods such as concentration averaging and downblending – its

ability to compete for Higher Activity LLRW traditionally disposed of at facilities licensed to

accept Class B and C waste.  WCS, a start-up whose Andrews facility is the most robust

commercial LLRW disposal facility ever built, expanded its capabilities in 2014 to dispose of

Lower Activity LLRW more cost effectively.  Over the past three years, customers have used the

intense competition between ES and WCS to secure lower prices and better service.

27.     Before WCS opened Andrews, ES negotiated long-term contracts, often called

"life-of-plant" or LOP agreements, with the utilities that operate most of the commercial nuclear

reactors in the United States.  ES derives approximately $50 million per year in LLRW disposal

revenues from these LOP agreements.  Today, at least 72 of the 90 operating commercial nuclear

reactors in the Relevant States have such agreements with ES.  The LOP agreements typically

have an initial term of 10 years, with "off-ramps" that permit ES and the utility to renegotiate

price and other terms every 5 or 10 years.  ES interprets its LOP agreements to require customers

to use ES exclusively for the processing and disposal of all LLRW that can be processed to meet

the waste acceptance criteria for disposal at ES's Clive facility.

<u>Competition for the Disposal of Lower Activity LLRW</u>
<u>Has Substantially Benefited Commercial Generators in the Relevant States</u>

28.     Because Texas is an Agreement State under the AEA, the Texas Commission on

Environmental Quality ("TCEQ") has regulatory authority over WCS's Andrews facility.  TCEQ

regulations require WCS to charge commercial generators from states other than Texas and

Vermont (the Texas Compact states) a higher rate to dispose of their waste at Andrews.  During

the first two years of WCS's operation, the TCEQ's pricing regulations hampered WCS's ability

to compete effectively with ES for the disposal of Lower Activity LLRW generated within the Relevant States but outside the Texas Compact.

29.     In early 2014, WCS sought to overcome this competitive disadvantage by offering an innovative service for a substantial subset of Lower Activity LLRW.  Specifically, WCS obtained a license from the TCEQ to dispose of Lower Activity LLRW in its Resource Conservation and Recovery Act ("RCRA") landfill, also known as its "Exempt Cell," adjacent to its Andrews facility.  Under the license, LLRW that meets the waste acceptance criteria for WCS's Exempt Cell is exempted from the requirement that it be buried in a licensed LLRW disposal facility.  Because the TCEQ does not regulate the pricing of WCS's Exempt Cell, this innovation improved WCS's ability to compete with ES for the disposal of Lower Activity LLRW from the Relevant States.

30.     According to WCS's internal documents, up to 95% of Lower Activity LLRW generated by operating commercial nuclear reactors and 85% of Lower Activity LLRW resulting from the decommissioning of commercial nuclear reactors qualifies for disposal in WCS's Exempt Cell.

31.     The ability to offer lower prices for disposal of certain LLRW in its Exempt Cell enhances WCS's competitiveness for the full spectrum of LLRW through bundled pricing.  As WCS's president and CEO told the TCEQ, "[w]e believe that customers who previously had not shipped higher activity waste to WCS, because of cost, will ship both exempt waste and higher activity waste to WCS for a combined lower cost."

32.     ES immediately viewed WCS's Exempt Cell as the most significant threat to its dominance to emerge in years.  An ES internal report in March 2014 observed that the "[f]riendly regulatory environment in Texas has allowed WCS to dispose of much higher levels

11

of radioactive wastes as exempt in their RCRA site."  The report warned that the new WCS

Exempt Cell "[c]an affect ~90% by volume of Clive bulk waste disposal up to $50M/yr."

33.     ES's concerns intensified as the LOP contracts it had negotiated before WCS's

entry began to come up for renewal.  In an April 2014 internal document, ES warned that: "WCS

disposal availability will likely cause customers to reevaluate their long-term exclusive LOP

contracts with market price checks."  A month later, ES forecasted "lower pricing due to WCS

exempt cell" and "[i]ncreased pressure from competition" in a competitive landscape that was

"new for Energy Solutions."  Another May 2014 ES document stated that: "We have developed a

pricing strategy for LOP that competes with the WCS Exempt Cell.  Approximately 80% of our

utility business is at risk."

34.     In response to competition from WCS's Exempt Cell, ES agreed in the first

quarter of 2015 to discount a utility's LOP contract prices by 9% over the next 5 years, for an

annual savings of approximately $1 million per year.  ES's senior executives supported the price

reduction because "the alternative is WCS."

35.     In May 2016, another customer was able to extract from ES, in LOP contract

renegotiations, an 8% discount for sorting, segregating, and disposing of a segment of Lower

Activity LLRW for which WCS was competing heavily.

36.     In addition to making concessions to customers in LOP renegotiations, ES has

responded to competition from WCS by offering project-specific discounts on Lower Activity

LLRW disposal opportunities "to avoid competitive bidding."  For example, fearing that

competition from WCS's Exempt Cell would jeopardize the renewal of one utility's LOP

contract, ES "agreed that for high volume, low activity waste that would result in a price greater

than $100,000 [the customer] could competitively bid out the waste, as long as [ES] had the final

opportunity to match or better [the customer's] best quoted price."

Competition for the Dispositioning of Higher Activity LLRW<br>
Has Substantially Benefited Commercial Generators in the Relevant States

37.     In July 2008, the Barnwell disposal facility in South Carolina closed to generators from all states except those in the Atlantic Compact.  As a result, commercial LLRW generators in the Relevant States were left with Clive as their sole option for the disposal of Lower Activity LLRW, and no option for the direct disposal of Higher Activity LLRW until WCS opened in 2012.

38.     To provide generators in the Relevant States an option for managing Higher Activity LLRW after Barnwell's closure, ES in 2011 entered into a joint venture called SempraSafe with the firm Studsvik.  ES and its joint venture partner refined the downblending process by which Higher Activity LLRW (typically resins) are mixed with Lower Activity LLRW until the resulting mixture qualifies for disposal as Lower Activity LLRW at ES's Clive facility.  The residual portion of the waste that could not be downblended was sent to WCS – initially for storage, and later for disposal – after Andrews became operational in 2012.

39.     In early 2014, ES acquired Studsvik and renamed the SempraSafe operation Erwin ResinSolutions ("Erwin").  Over time, ES has become more effective at downblending materials with higher levels of radioactivity.

40.     After WCS began operations, commercial LLRW generators in the Relevant States had two options for the dispositioning of certain Higher Activity LLRW: (i) processing by ES at Erwin plus disposal at ES's Clive facility or (ii) direct disposal at WCS's Andrews facility. The introduction of competition had a significant impact on prices for the dispositioning of Higher Activity LLRW.  As one of ES's senior executives wrote in a December 2014 email, "[w]e saw resins prices drop by what 50%?"

13

41.     To combat the "WCS intrusion," ES offered its customers discounts and "blue light specials."  In the spring of 2015, ES lowered its Higher Activity resin dispositioning prices for a number of key customers "to combat the recent road tour by WCS a few weeks ago when they lowered the price."  After ES gave another customer "quite a big discount" on Higher Activity resin dispositioning, one of ES's executives noted that "[w]e had to meet the WCS rates so this was a no brainer."

42.     By June 2015, ES had overhauled its pricing structure for Higher Activity resin dispositioning "in order to compete with WCS continued price spiral downward."  As one of ES's senior executives testified, "WCS gave the customer the lowest possible price and we followed suit and gave the customers the lowest possible price."

43.     Between early 2013 and May of 2015, competition between ES and WCS caused prices for the dispositioning of Higher Activity resins to fall from approximately $5,000 per cubic foot to approximately $2,000 per cubic foot.

### Absent the Merger, Competition between ES and WCS Will Likely Intensify as the Number of Commercial Nuclear Reactor Decommissionings Increases

44.     When a utility retires a nuclear reactor, the facility must be decommissioned by safely removing it from service and reducing the site's residual radioactivity to a level that permits the release of the property for other uses, in accordance with NRC regulations.

45.     The average age of the currently operating commercial nuclear reactors in the United States is approximately 30 years.  Utilities have begun to retire some of these aging nuclear reactors, and this trend – along with the accompanying surge in demand for commercial LLRW disposal services – is expected to accelerate within the next five to ten years.

46.     Over the next five years, the decommissioning of commercial nuclear reactors in the United States is expected to generate $10 to $12 billion in revenue, 20% to 25% of which

will consist of the packaging, transportation, and disposal of Lower Activity and Higher Activity LLRW.

47.     As of November 15, 2016, the NRC's website identified 15 commercial nuclear sites in varying stages of the decommissioning process.  Fourteen of those sites are in the Relevant States.

48.     As commercial nuclear reactor decommissionings accelerate, the benefits of having two meaningful competitors for the commercial disposal of LLRW in the Relevant States will only increase.

49.     Given the unique nature of decommissioning waste, of which soil and construction debris comprise the largest portion, WCS's Exempt Cell makes it particularly competitive for decommissioning projects.  As WCS explained to the NRC and the TCEQ in January 2016, the Exempt Cell is "[i]deal for disposal of nuclear power plant decommissioning waste – Expect that 80%+ of the D&D [decontamination and decommissioning] waste will qualify."

50.     In a December 2015 internal document outlining its decommissioning disposal bid for a three-plant project, WCS estimated that approximately 8.8 million of the 9 million cubic feet of LLRW to be disposed would qualify for its Exempt Cell.

51.     In a February 2016 presentation to one of its customers, WCS projected that 80% of commercial decommissioning waste would qualify for disposal in its Exempt Cell.  A WCS senior executive affirmed this projection in deposition testimony.  Industry participants concur that 80% to 90% of Lower Activity LLRW associated with decommissionings of commercial nuclear reactors would likely qualify for disposal in WCS's Exempt Cell.

52.     WCS and ES are actively bidding on both Lower Activity and Higher Activity

LLRW associated with upcoming commercial decommissioning projects.  In fact, WCS – as part

of a bidding team – was recently awarded the Lower Activity and Higher Activity LLRW

disposal component of a large commercial nuclear reactor decommissioning project in Vermont.

ES was the only other competitor for this project.  Participants in the commercial nuclear reactor

decommissioning industry view WCS as the only meaningful alternative to ES for the disposal of

LLRW associated with near-term commercial decommissioning projects.

## V. THE RELEVANT MARKETS

### Relevant Product Markets

53.     *Commercial disposal of Lower Activity Operational LLRW.*  Commercial disposal

of Lower Activity Operational LLRW is a relevant product and a line of commerce under

Section 7 of the Clayton Act.  This line of commerce includes the disposal of Lower Activity

LLRW generated by operational commercial nuclear reactors, hospitals, and research facilities.

No reasonable substitutes exist for the commercial disposal of Lower Activity Operational

LLRW.  Commercial disposal of Lower Activity Operational LLRW satisfies the "hypothetical

monopolist" test set forth in the U.S. Department of Justice and Federal Trade Commission

Horizontal Merger Guidelines (2010).  A hypothetical monopolist of commercial disposal of

Lower Activity Operational LLRW would likely be able to profitably impose at least a small but

significant and non-transitory increase in price.  Neither self-storage of Lower Activity

Operational LLRW by generators nor processing of Lower Activity Operational LLRW without

disposal is a reasonable alternative to disposal to a sufficient degree that such a price increase

would be unprofitable to the hypothetical monopolist.

54.     *Commercial disposal of Lower Activity Decommissioning LLRW.*  Commercial

disposal of Lower Activity Decommissioning LLRW is a relevant product and a line of

commerce under Section 7 of the Clayton Act.  This line of commerce includes the disposal of

Lower Activity LLRW associated with the decommissioning of commercial nuclear reactors.

No reasonable substitutes exist for the commercial disposal of Lower Activity Decommissioning

LLRW.  Commercial disposal of Lower Activity Decommissioning LLRW satisfies the

hypothetical monopolist test set forth in the Horizontal Merger Guidelines.  A hypothetical

monopolist of commercial disposal of Lower Activity Decommissioning LLRW would likely be

able to profitably impose at least a small but significant and non-transitory increase in price.

Neither self-storage of Lower Activity Decommissioning LLRW by generators nor processing of

Lower Activity Decommissioning LLRW without disposal is a reasonable alternative to disposal

to a sufficient degree that such a price increase would be unprofitable to the hypothetical

monopolist.

55.     *Commercial dispositioning of Higher Activity Operational LLRW.*  Commercial

dispositioning of Higher Activity Operational LLRW is a relevant product and a line of

commerce under Section 7 of the Clayton Act.  This line of commerce includes the

dispositioning of Higher Activity LLRW generated by operating commercial nuclear reactors,

hospitals, and research facilities.  No reasonable substitutes exist for the commercial

dispositioning of Higher Activity Operational LLRW.  Commercial dispositioning of Higher

Activity Operational LLRW satisfies the hypothetical monopolist test set forth in the Horizontal

Merger Guidelines.  A hypothetical monopolist of commercial dispositioning of Higher

Activity Operational LLRW would likely be able to profitably impose at least a small but significant and

non-transitory increase in price.  Neither self-storage of Higher Activity Operational LLRW by

generators nor processing of Higher Activity Operational LLRW without disposal is a reasonable

alternative to disposal to a sufficient degree that such a price increase would be unprofitable to

17

the hypothetical monopolist.

56.     *Commercial dispositioning of Higher Activity Decommissioning LLRW.*
Commercial dispositioning of Higher Activity Decommissioning LLRW is a relevant product
and a line of commerce under Section 7 of the Clayton Act.  This line of commerce includes the
dispositioning of Higher Activity LLRW associated with the decommissioning of commercial
nuclear reactors.  No reasonable substitutes exist for the commercial dispositioning of Higher
Activity Decommissioning LLRW.  Commercial dispositioning of Higher Activity
Decommissioning LLRW satisfies the hypothetical monopolist test set forth in the Horizontal
Merger Guidelines.  A hypothetical monopolist of commercial dispositioning of Higher Activity
Decommissioning LLRW would likely be able to profitably impose at least a small but
significant and non-transitory increase in price.  Neither self-storage of Higher Activity
Decommissioning LLRW by generators nor processing of Higher Activity Decommissioning
LLRW without disposal is a reasonable alternative to disposal to a sufficient degree that such a
price increase would be unprofitable to the hypothetical monopolist.

57.     The disposal of LLRW generated by federal entities is excluded from each of the
relevant markets.  Federal government generators are subject to a different regulatory scheme
than commercial generators, and federal generators have access to LLRW disposal facilities that
commercial generators do not.  Both ES and WCS dispose of some waste from federal
generators, but distinguish them from commercial generators in their ordinary course of business.

58.     Disposal of non-radioactive waste and naturally occurring radioactive material is
excluded from each of the relevant product markets.  Generators of non-radioactive waste and
naturally occurring radioactive material have disposal options that are not available for their
LLRW.

**Relevant Geographic Market**

59.     The relevant geographic market is the Relevant States.  Due to the restrictions of the LLRW compact system, commercial LLRW generators in the Relevant States have access to only two licensed commercial LLRW disposal facilities – ES's Clive facility and WCS's Andrews facility.  Indeed, ES alleged that the Relevant States are a relevant geographic market in the Prior Litigation.

60.     A hypothetical monopolist of each relevant product market would likely be able to profitably impose at least a small but significant and non-transitory increase in price on commercial generators located in the Relevant States.  Thus, the Relevant States are a relevant geographic market under Section 7 of the Clayton Act for each of the four relevant product markets.

## VI.   THE MERGER WOULD ELIMINATE COMPETITION AND HAVE HARMFUL EFFECTS

**The Merger is Presumptively Illegal**

61.     ES's proposed acquisition of WCS is presumptively illegal because it would substantially increase market concentration in each of the four relevant markets.  Each of the relevant markets is already highly concentrated.  Moreover, for two of the relevant markets – the commercial dispositioning of Higher Activity Operational LLRW and Higher Activity Decommissioning LLRW – ES and WCS are the only two competitors.

62.     Although limited, there are two additional participants in the market for disposal of the least radioactive Lower Activity LLRW.  First, commercial generators of Lower Activity Operational and Decommissioning LLRW in the Relevant States may send the least radioactive Lower Activity LLRW to four Tennessee municipal landfills through the Bulk Survey for Free Release ("BSFR") program.  ES receives over 50% of the revenues associated with the BSFR

19

program, as its processing facilities handle the majority of waste accepted through the program.

A senior executive from ES testified that the BSFR program can be used to dispose of only a

limited portion of Lower Activity LLRW, that Tennessee is the only state with a BSFR program,

and that none of the municipal landfills participating in that program are capable of accepting the

full range of Lower Activity LLRW that ES can accept at its Clive facility.  Likewise, the

radiological limits set forth in the waste acceptance criteria for WCS's Exempt Cell are many

times higher than the limits imposed on waste that can be accepted under the BSFR program.

63.    Second, commercial generators in the Relevant States may in limited

circumstances send lower-level Lower Activity Decommissioning LLRW to be disposed in the

RCRA hazardous waste landfill operated by U.S. Ecology in Grand View, Idaho ("U.S. Ecology

Idaho").  In order to do this, generators must apply to the NRC under 10 C.F.R. § 20.2002 for a

project-specific exemption from the requirement that LLRW be disposed in a licensed LLRW

disposal facility.  After obtaining a "20.2002 exemption," which typically requires six to nine

months, waste specifically deemed "exempt" by the NRC may be disposed at U.S. Ecology

Idaho.  Because of transaction costs, time, and other factors associated with obtaining a 20.2002

exemption, U.S. Ecology Idaho does not compete for the disposal of LLRW generated by

operating commercial nuclear reactors, hospitals, and research facilities.

64.    Given the limitations of U.S. Ecology Idaho and the Tennessee BSFR program –

particularly in comparison to the newly opened WCS Exempt Cell – industry participants do not

view them as close competitors of ES and WCS for the disposal of Lower Activity

Decommissioning LLRW or Lower Activity Operational LLRW.  WCS internal documents

show, and a WCS senior executive testified, that WCS can accept for disposal a higher

percentage of Lower Activity Decommissioning LLRW in its Exempt Cell than could be

accepted by U.S. Ecology Idaho or municipal landfills through the Tennessee BSFR program.

**Loss of Competition Between ES and WCS Would Likely Increase Prices and Reduce Quality and Innovation in Each of the Relevant Markets**

65.     ES and WCS are engaged in vigorous head-to-head competition in each of the relevant markets, and that competition is only expected to increase in the coming years.

66.     In contrast to the years in which ES was the only option for commercial LLRW disposal in the Relevant States, the competition between ES and WCS has enabled utilities operating nuclear power plants to extract lower pricing and better terms from ES in LOP contract renegotiations, to obtain lower pricing from ES in accordance with right-of-first-refusal provisions in those contracts, and to obtain lower pricing or better service for individually bid disposal projects.  The proposed merger would eliminate this substantial competition in each of the relevant markets.

67.     According to ES internal documents, 15 utilities have LOP contracts – worth a total of approximately $20 to $30 million annually – up for renewal in the next three years.  The elimination of WCS as a competitor would leave the utilities only one meaningful option for commercial LLRW disposal in the Relevant States, severely undermining their bargaining power to negotiate price, service, and other terms.

68.     Internal ES documents show that prices for the dispositioning of Higher Activity resins fell after WCS entered the commercial LLRW disposal market in 2012, and continued to decline thereafter.  As an ES senior vice president testified, prices declined from $5,000 per cubic foot in early 2013 to approximately $2,000 per cubic foot by May of 2015.  This decline resulted from competitive pressure from WCS, which would be eliminated if the merger is allowed to proceed.

69.     WCS has offered customers unique non-price benefits such as the immediate

transfer of title to the waste from the customer to the state of Texas upon disposal.  According to

an ES internal report, "[c]ustomers are telling ES that they like [Texas] taking title to waste

[disposed of at WCS] better than ES taking title."  As a result of this competition, ES has offered

non-price concessions to commercial generators in the Relevant States, such as agreeing to take

title to a customer's waste upon acceptance at ES's Erwin processing facility, free cask usage,

and special transportation pricing.

70.     The savings and improved service that commercial generators have received in

recent years would likely disappear after the proposed merger.  An analysis ES prepared in

February 2014 when it was contemplating a merger with WCS assumed that the combined firm

would implement significant price increases and capture those price increases as earnings before

interest, taxes, depreciation, and amortization.

71.     Like ES, customers know that the elimination of WCS as a competitor will

provide ES with significant power to raise prices.  As one commercial LLRW disposal customer

bluntly described the effect of ES's proposed acquisition of WCS: "Now EnergySolutions has a

monopoly on burial sites. And we were thinking that we would be able to get away from those

guys."  After the merger was announced, another industry participant told WCS: "Looks like ES

is going to have a monopoly on disposal."

72.     Like the utilities that operate nuclear power plants, other commercial generators

of LLRW in the Relevant States, including biomedical researchers and hospitals, would be

significantly harmed by the loss of competition between ES and WCS.

73.     If the merger were allowed to proceed, owners of commercial nuclear reactors

and decommissioning general contractors would be left with only one meaningful option for the

disposal of decommissioning LLRW, and the prices for such disposal would likely increase.

74.     The burden of higher prices for LLRW disposal associated with the decommissionings of nuclear power plants ultimately would be borne by utility ratepayers, including consumers and businesses.

75.     As a result, the proposed acquisition would likely lead to a substantial lessening of competition in each of the relevant product markets, and harm to consumers.

## VII. ABSENCE OF COUNTERVAILING FACTORS

76.     New entry or expansion in the relevant product markets in the Relevant States is highly unlikely to occur in a timely manner or on a scale sufficient to counteract the competitive harm that the merger would produce.  No other entity can offer the range of commercial LLRW disposal services currently offered by ES and WCS to commercial generators in the Relevant States.  In its federal court filings in the Prior Litigation, ES claimed that "[r]egulatory barriers to entry limit competition in the markets for disposal of Class A, B, and C waste" and that "[i]t is extremely expensive and time-consuming to enter the LLRW disposal market."  This was seconded by WCS's CEO when he told *The New York Times* that "[t]here's an incredibly high barrier to entry" in the LLRW disposal industry.  Barriers to entry and expansion in each of the relevant product markets include: (a) the rigorous, time-consuming, and costly LLRW disposal licensing process; (b) the widespread lack of political support for entry and expansion of LLRW disposal facilities; and (c) a decades-long history of prior failed entry attempts.

77.     The proposed acquisition is unlikely to generate verifiable, merger-specific efficiencies that would offset the planned acquisition's likely anticompetitive effects in each of the relevant product markets in the Relevant States.

## VIII.   JURISDICTION AND VENUE

78.     The United States brings this action, and this Court has subject matter jurisdiction

23

over this action, under Section 15 of the Clayton Act, as amended, 15 U.S.C. § 25, to prevent and restrain Defendants from violating Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18.

79.     Defendants are engaged in, and their activities substantially affect, interstate commerce.  ES and WCS accept for disposal, through interstate commerce, LLRW produced by generators throughout the United States.  They are engaged in a regular, continuous, and substantial flow of interstate commerce, and their LLRW disposal activities have a substantial effect upon interstate commerce.

80.     Venue is proper under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. §§ 1391(b) and (c).

81.     This Court has personal jurisdiction over each Defendant.  ES, Rockwell, and Andrews County Holdings all are incorporated in the State of Delaware and are inhabitants of this District.  WCS is a Delaware limited liability company and an inhabitant of this District. The proposed acquisition would have effects throughout the Relevant States, including in this District.

## IX.     VIOLATION ALLEGED

82.     The United States alleges and incorporates paragraphs 1 through 81 as if set forth fully herein.

83.     ES's proposed acquisition of WCS is likely to substantially lessen competition in each of the relevant product markets in the Relevant States, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

84.     Unless enjoined, the proposed acquisition would likely have the following anticompetitive effects, among others, in each of the relevant product markets in the Relevant States: (a) eliminate present and future competition between ES and WCS; (b) generally lessen

competition; (c) cause prices to rise for customers; and (d) cause a reduction in service, quality, and innovation.

## X.      REQUEST FOR RELIEF

85.      The United States requests that:

(a)      The acquisition of WCS by ES be adjudged to violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

(b)      Defendants be permanently enjoined and restrained from carrying out the planned acquisition of WCS by ES or any other transaction that would combine the two companies;

(c)      The United States be awarded its costs of this action; and

(d)      The United States be awarded such other relief as the Court may deem just and proper.


Dated this 16th day of November, 2016.

Respectfully submitted,

FOR PLAINTIFF UNITED STATES:

_____
RENATA HESSE
Acting Assistant Attorney General


_____
JUAN A. ARTEAGA
Deputy Assistant Attorney General


_____
JONATHAN SALLET
Deputy Assistant Attorney General


_____
PATRICIA A. BRINK
Director of Civil Enforcement


_____
AARON D. HOAG
Acting Chief
Networks and Technology Enforcement
Section


_____
DANIELLE HAUCK
MATTHEW C. HAMMOND
Assistant Chief
Networks and Technology Enforcement
Section

CHARLES M. OBERLY, III
United States Attorney


_____
JENNIFER HALL (#5122)
Assistant United States Attorney
United States Attorney's Office
1007 Orange Street, Suite 700
Wilmington, Delaware 19801
(302) 573-6277
jennifer.hall@usdoj.gov


_____
JULIE ELMER
JOHN LINDERMUTH
TRAVIS CHAPMAN
JENNIFER WAMSLEY
VITTORIO COTTAFAVI
KATHLEEN BRADISH
BINDI BHAGAT
ANURAG MAHESHWARY

Attorneys for the United States

U.S. Department of Justice
Antitrust Division
Networks & Technology Enforcement
450 Fifth Street NW, Suite 7100
Washington, DC 20530
Telephone: (202) 598-8332
Facsimile: (202) 616-8544
julie.elmer@usdoj.gov