1                    - PORTION UNDER SEAL -

2                      - VOLUME 1 -

3              IN THE UNITED STATES DISTRICT COURT

4              IN AND FOR THE DISTRICT OF DELAWARE

5                         - - -

6
    UNITED STATES OF AMERICA,      :   CIVIL ACTION
7                                  :
                   Plaintiff,      :
8                                  :
        vs.                        :
9                                  :
    ENERGY SOLUTIONS, INC.,        :
10   ROCKWELL HOLDCO, INC.,         :
    ANDREWS COUNTY HOLDINGS,       :
11   INC., and WASTE CONTROL        :
    SPECIALISTS LLC,               :
12                                  :
                   Defendants.  :   NO. 16-01056-SLR
13

14                        - - -

15                            Wilmington, Delaware
                            Monday, April 24, 2017
16                            9:00 o'clock, a.m.

17                        - - -

18   BEFORE:  HONORABLE SUE L. ROBINSON, U.S.D.C.J.

19                        - - -

20   APPEARANCES:

21            JENNIFER LYNNE HALL, ESQ.,
            Assistant United States Attorney
22

23                    -and-

24
                            Valerie J. Gunning
25                            Official Court Reporter

1    APPEARANCES (Continued):

2

3                    UNITED STATES DEPARTMENT OF JUSTICE
                     BY: PATRICIA SINDEL, ESQ.,
4                        JULIE S. ELMER, ESQ.,
                         AARON COMENETZ, ESQ.,
5                        TRAVIS R. CHAPMAN, ESQ. and
                         JOHN D. LINDERMUTH, ESQ.
6                        (Washington, D.C.)

7                        Counsel for Plaintiff
                         United States of America
8

9

10                   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                     BY:  PAUL J. LOCKWOOD, ESQ.

11

12                       -and-

13                   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                     BY: JOSEPH O. LARKIN, ESQ.,
14                       TARA L. REINHART, ESQ.,
                         KENNETH B. SCHWARTZ, ESQ.,
15                       STEVEN C. SUNSHINE, ESQ.
                         PAUL ECKLES, ESQ.,
16                       JOHN THORNBURGH, ESQ. and.
                         CHARLES CHURCHILL, ESQ.
17                       (Washington, D.C.)

18

19                       Counsel for Defendants
                         EnergySolutions Inc. and Rockwell Holdco,
20                       Inc.

21

22                   MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                     BY:  DONALD E. REID, ESQ.

23

24                       -and-

25

```
 1    APPEARANCES (Continued):

 2

 3              BAKER BOTTS LLP
               BY:  JOSEPH OSTOYICH, ESQ. and
 4                  HUGH M. HOLLMAN, ESQ.
                    (Washington, D.C.)
 5

 6                      -and-

 7              BAKER BOTTS LLP
               BY:  VAN H. BECKWITH, ESQ.
 8                  (Dallas, Texas)

 9

10              Counsel for Defendants
               Andrews County Holdings, Inc.,
               and Waste Control Specialists LLC
11

12                   -  -  -

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2

 3              (Proceedings commenced in the courtroom,

 4   beginning at 9:00 a.m.)

 5

 6              *** (REPORTER'S NOTE: The transcript contains a

 7   portion under seal.)

 8

 9              THE COURT:  And I don't know whether we want to

10   have some reintroductions of the major players before we get

11   started or whether there are any introductory issues that we

12   need to address before we get started with openings.  You

13   can let me know.  Introductions would probably be good.

14              MS. ELMER:  Your Honor, Julie Elmer for the

15   United States, and with me at counsel table is Patricia

16   Sindel, Aaron Comenentz, Travis Chapman and John Lindermuth.

17              THE COURT:  All right.  Thank you.  Welcome.

18              MS. ELMER:  Thank you, your Honor.

19              MR. LARKIN:  Your Honor, good morning.  Joe

20   Larkin from Skadden for EnergySolutions.

21              With me at counsel table and behind me is my

22   colleague in Delaware, Paul Lockwood.  My colleague, Tara

23   Reinhart.  My colleague, Steve Sunshine.  My colleague,

24   Kevin Schwartz.  And from the Baker Botts team for WCS, Mr.

25   Reid from Morris Nichols, and Mr. Beckwith from Baker Botts,
```

1  your Honor.

2           THE COURT:  Good morning.

3           MR. LARKIN:  And my partner, Joe Ostoyich, from

4  Baker Botts, your Honor.

5           MR. OSTOYICH:  Good morning your Honor.  Nice to

6  see you again.

7           THE COURT:  All right.  Good morning.  Any

8  introductory or issues that we need to address before we go

9  right into opening statements?

10          MS. ELMER:  No, your Honor, I don't think so.

11          THE COURT:  All right.  Let's start with the

12  Government.

13          MS. ELMER:  May it please the Court, my name is

14  Julie Elmer, and I represent the United States.

15          The United States has brought this action under

16  Section 7 of the Clayton Act.  Section 7 prohibits a merger

17  if it is likely to lead to anticompetitive effects in any

18  relevant market.  This merger is an illegal horizontal

19  merger.  The defendants are direct competitors in the

20  relevant markets.

21          The Court has asked for clarification on whether

22  our case is about a horizontal merger or a vertical merger.

23  We are challenging this transaction as a horizontal merger

24  between the closest competitors in the relevant markets.

25          Like most cases where a larger rival buys a

1    smaller rival, their services are not entirely overlapping,

2    but that does not change the fact that these two defendants

3    are the two most significant competitors for the commercial

4    disposal of low level radioactive waste in 36 states, the

5    District of Columbia, and Puerto Rico.

6           These two competitors are EnergySolutions, long

7    dominant in the industry, and Waste Control Specialists,

8    also called WCS, a recent entrant.

9           This case concerns the disposal of low level

10   radioactive waste generated by commercial customers such as

11   nuclear power plants, research universities and hospitals.

12          For customers located in states in yellow on

13   this map, EnergySolutions' Clive, Utah facility and WCS's

14   Andrews, Texas facility are the only licensed low level

15   radioactive waste disposal facilities available.  As your

16   Honor has noted, this geographic market is not in dispute.

17          The evidence is expected to show that

18   EnergySolutions and WCS face very little competition other

19   than each other for commercial customers in most of the

20   country.  EnergySolutions has been dominant in low level

21   radioactive waste disposal for decades.  When WCS entered in

22   2012, after spending hundreds of millions of dollars and

23   nearly 20 years to enter, EnergySolutions immediately viewed

24   WCS's entry as a threat.  That threat intensified when WCS

25   expanded its disposal capabilities in January 2014.  Unable

1    to eliminate WCS as a competitor, EnergySolutions instead

2    decided to buy it.  At the same time, to maximize its

3    leverage, EnergySolutions pursued a relentless campaign to

4    undermine WCS, going so far as to file a federal antitrust

5    claim against WCS.

6             The Court will hear testimony that

7    EnergySolutions pursued WCS and was repeatedly rebuffed by

8    WCS and its parent company, Valhi, for over two years.

9             Finally, in the fall of 2015, EnergySolutions

10   increased the price that it was willing to pay to a price

11   that WCS's parent company could not refuse, $367 million.

12            The Government will present documentary and

13   testimonial evidence that EnergySolutions and WCS are

14   horizontal competitors in the relevant markets.  Soon after

15   WCS's entry, EnergySolutions catalogued WCS's competitive

16   impact.  EnergySolutions worried that WCS was offering

17   customers lower disposal prices and that this had led to

18   market price erosion.

19            Ordinary course of business documents make clear

20   that EnergySolutions considered this price competition from

21   WCS to be a threat in all of the relevant markets.  On the

22   one hand, EnergySolutions responded by competing vigorously

23   with WCS in the marketplace, offering improved terms and

24   better prices to customers.  At the same time,

25   EnergySolutions worked feverishly behind the scenes and

1    sometimes overtly to undermine WCS's ability to compete,

2    including lobbying against WCS before the Nuclear Regulatory

3    Commission and Texas State regulators.

4            The defendants now try to argue that the

5    competitive overlap between EnergySolutions and WCS is

6    minimal, but their own course of business documents and

7    their prior Federal Court pleadings overwhelmingly

8    demonstrate that the contrary is true.

9            As the Court will hear when Assef Azadeh, a

10   Senior Vice President at EnergySolutions testifies,

11   EnergySolutions overhauled its pricing approach for an

12   entire category of waste in direct response to pricing

13   pressure from WCS.  The business decisions that the

14   defendants have made in response to competition from each

15   other should be given much greater weight than their post

16   hoc litigation arguments.  The Court will hear from

17   different types of customers that they have benefited from

18   customers between WCS and EnergySolutions and that they need

19   for that competition to continue.

20           Utility customers Arizona Public Service, and

21   Tennessee Valley Authority, both of whom operate nuclear

22   power plants that provide electricity to millions of

23   consumers and businesses, will testify that head-to-head

24   competition between EnergySolutions and WCS resulted in

25   significant cost savings.

1          The Court will hear from processor customer

2     PermaFix that WCS's entry and challenge to EnergySolutions'

3     dominance dramatically reduced PermaFix's waste disposal

4     costs.  And the Court will hear from North Star, a

5     decommissioning contractor, that teaming with WCS has

6     enabled it to challenge dominant player EnergySolutions for

7     a number of nuclear power plant decommissioning projects.

8     These types of projects are expected to increase

9     exponentially as aging nuclear power plants are shut down.

10          Now, nuclear power plants still produce about

11    20 percent of the electricity in the United States, and

12    these plants are the largest source of commercially

13    generated nuclear waste.  The waste that these plants

14    generate during their operation includes dry active waste,

15    such as protective clothing, and the resins and filters used

16    to clean the water used in operating nuclear reactors.

17          When a plant is shut down at the end of its

18    useful life, it generates different types of waste.  For

19    example, the nuclear reactor itself must be dismantled and

20    disposed of.  The dismantling of the containment building

21    and surrounding structures requires the disposal of large

22    amounts of construction debris and soil with lower levels of

23    radio activity.

24          The Government expects the evidence to show that

25    many nuclear power plants are expected to begin shutting

1    down in the coming years.  Professor Mayo, the Government's

2    economic expert, will explain, and defendants' own course of

3    business documents show, that as the industry moves away

4    from nuclear power generation to decommissioning, the demand

5    for nuclear waste disposal is expected to surge.

6         At the pretrial conference, your Honor

7    recognized that nuclear power is losing popularity, and that

8    is an important fact here.  Although nuclear power plants

9    may be slowly disappearing, the waste that they have created

10   is not.  Ironically, the more unpopular nuclear power

11   becomes, the greater the need for fairly priced nuclear

12   waste disposal options.

13        More than ever, the industry needs safe and

14   cost-effective options to put that waste to bed for good.

15   Your Honor will hear testimony that EnergySolutions and WCS

16   are the two best options for disposing of the low level --

17   large volumes of waste from decommissionings of nuclear

18   reactors.  The evidence is expected to show that the merger

19   would likely increase the cost of decommissioning nuclear

20   power plants and that is part of the harm that the

21   Government seeks to prevent.

22        Now, the Nuclear Regulatory Commission

23   classifies low level waste according to the levels of

24   radioactivity in that waste.  Most waste is Class A, the

25   lowest level of radioactivity, and Class A waste is the

1    easiest and the least expensive to dispose of.  That's

2    because it poses less of a danger to the public.

3              Class B and C waste have higher levels of

4    radioactivity and they require more robust disposal methods.

5    As a result, it is more expensive to dispose of Class B and

6    C waste.  Waste is classified as A, B or C at the time of

7    disposal, and for this reason it is possible to process that

8    waste to reduce the level of radioactivity prior to

9    disposal.  The Court will hear testimony that

10   EnergySolutions uses a variety of methods to process Class B

11   and C waste so that it can be disposed of as A waste.

12             So given the different levels of radioactivity

13   in waste and the fact that operational waste differs from

14   decommissioning waste, the Government has alleged and

15   Professor Mayo will testify that the proposed merger would

16   impact four relevant product markets.  Each of these

17   markets, lower activity operational, lower activity

18   decommissioning, higher activity operational and higher

19   activity decommissioning has unique competitive conditions,

20   and in each of them, EnergySolutions and WCS compete head to

21   head.

22             The evidence is expected to show that for these

23   four markets, EnergySolutions and WCS are either the only

24   two or the two primary competitors.  And if the Court finds

25   that the merger of EnergySolutions and WCS will likely lead

1    to anticompetitive effects in any one of these markets, such

2    a finding would be sufficient to enjoin the merger.

3              The Court will hear evidence that there are

4    other options for the disposal of the lowest levels of

5    waste, but the evidence will show that these alternatives

6    are fringe players.  Unlike EnergySolutions' Clive, Utah

7    facility and WCS's Andrews facility, the first such

8    alternative, U.S. Ecology Idaho, is not a licensed low level

9    radioactive waste disposal facility.  It is a hazardous

10   waste landfill.  U.S. Ecology Idaho does not participate in

11   three out of four of the relevant markets, and the evidence

12   will show that it's limited in its ability to compete in the

13   fourth, lower activity decommissioning.

14             The other alternative, the Tennessee Bulk Survey

15   For Release Program, is not an option at all in two out of

16   the four relevant markets, the higher activity markets, and

17   that's because the program applies only to waste of such low

18   levels of radioactivity that the waste can be disposed of in

19   an ordinary municipal landfill.  The bulk survey for release

20   program is not a cost-effective alternative in a third

21   market, lower activity decommissioning, because of service

22   and regulatory limitations.  Thus, at best, the program is a

23   fringe player in the fourth market, lower activity

24   operational.  But EnergySolutions itself accounts for

25   approximately half of the revenue earned by the four firms

1    participating in the BSFR program.  Thus, half of this

2    alleged additional competition is EnergySolutions itself.

3          The Government expects the evidence to show that

4    customers will not be able to replace the lost competition

5    between EnergySolutions and WCS by storing their radioactive

6    waste at their own places of business long term.  The

7    evidence will show that storage has no application to three

8    out of the four relevant markets.  For the fourth market,

9    higher activity operational, not only is storage highly

10   undesirable as a matter of public policy, but it is also

11   economically unreasonable.

12         As Professor Mayo will explain, even if

13   utilities have the will or the capacity to store their

14   operational waste, they cannot escape the monopoly pricing

15   that would result from the merger.  When the plants are shut

16   down, they will face increased disposal cost for their

17   decommissioning waste.  Thus, utilities will be forced to

18   pay monopoly pricing for their operational waste today, or

19   if they stored it, they pay monopoly pricing for their

20   decommissioning waste tomorrow.

21         The Court will also hear from customers that the

22   many costs and risks associated with storing waste long term

23   at a customer's own place of business eliminated as a

24   realistic option for disposal.

25         Now, the loss of head-to-head competition

1    between EnergySolutions and WCS would be particularly

2    harmful because there is no firm waiting in the wings to

3    enter.  The cost and length of time required to enter this

4    market, the unique geological characteristics that a

5    disposal site requires, the political opposition to nuclear

6    waste in most communities, and a history of doomed entry

7    attempts confirm what WCS's president and CEO, Rod Baltzer,

8    himself told the New York Times a few years ago.  There is

9    an incredibly high barrier to entry.  Given such high

10   barriers to entry, the anticompetitive effects of this

11   merger are likely to persist for decades.

12            Now, defendants will throw out a number of

13   different theories as to why they claim this merger will not

14   be harmful, but their ordinary course of business documents

15   tell a much different story.

16            The Court will hear from defendants that claimed

17   efficiencies would counterbalance any anticompetitive

18   effects.  Assuming an efficiencies defense is even available

19   in this circuit, which is far from certain, the defendants

20   will not be able to establish its key elements as described

21   in the horizontal merger guidelines and the case law.  The

22   evidence will show that the claimed deficiencies are not

23   quantified, not verified, not unique to the proposed merger,

24   or not within the relevant markets.  Therefore, they should

25   not be credited.

1          Moreover, any claimed deficiencies are not

2    likely to be passed on to consumers. EnergySolutions' own

3    course of business documents reflect an intent to retain

4    alleged synergies as profit. The Court will hear from the

5    defendants that the merger should be allowed regardless of

6    anticompetitive effects because WCS is a so-called failing

7    firm. This failing firm defense is highly disfavored under

8    the law. This affirmative defense for which defendants bear

9    the burden of proof was manufactured after the DOJ began its

10   merger investigation and it should be met with deep

11   skepticism.

12          Defendants' counsel is presenting your Honor

13   with a false dilemma, arguing that EnergySolutions must buy

14   WCS for $367 million, leaving a single dominant player in

15   the relevant markets, or that the assets WCS operates would

16   imminently exit the market. It defies logic that this false

17   dichotomy is the only option. In fact, the evidence will

18   show that this Hobson's choice is far from reality. WCS's

19   course of business documents do not indicate affirmative

20   vision and eminent danger of exiting the market. To the

21   contrary, they show that the cost WCS and its parents of

22   exiting are very high, and that the economic incentive to

23   keep those assets in the market are even higher.

24   Ultimately, the evidence will show that WCS is behaving like

25   any recent entrant, aggressively competing for business and

1    investing in its future.

2           In sum, the Government expects to present

3    evidence that EnergySolutions and WCS are each other's

4    closest rivals for the commercial disposal of low level

5    radioactive waste disposal.  We will offer evidence that

6    this rivalry has benefited customers in the four relevant

7    markets, and we will offer evidence that other firms are not

8    likely to replace the competition lost as a result of this

9    horizontal merger.

10          Now, under Section 7 of the Clayton Act, the

11   Government need not prove that the effect of the merger will

12   be to substantially lessen competition, only that the effect

13   of the merger may be to substantially lessen competition.

14   And that distinction is helpful to understand how truly

15   remarkable is the merger before your Honor.  In already

16   highly concentrated markets with extremely high barriers to

17   entry, the two most meaningful and closest rivals seek to

18   become one.  Such evidence is more than sufficient to meet

19   the Government's burden to show a probability of harm.

20          If, after hearing all of the evidence, the Court

21   finds that the merger of EnergySolutions and WCS is likely

22   to have an anticompetitive effect in any relevant market,

23   the United States respectfully requests that the merger be

24   enjoined.

25          Your Honor, thank you for your time and your

1    consideration.

2                    THE COURT:  All right.  Thank you very much.

3                    MS. REINHART:  Good morning, your Honor.

4                    THE COURT:  Good morning.

5                    MS. REINHART:  Tara Reinhart speaking on behalf

6    of defendants.

7                    May it please the Court, I'm going to focus on

8    three fatal flaws in the Government's case, but before I do

9    that, I want to mention a word about perception versus

10   reality.

11                   Your Honor has been shown some of defendants'

12   documents and you will see more, and they show that

13   EnergySolutions certainly was concerned in 2012 and in 2014

14   when WCS made its entry.  That was the perception.  The

15   reality, which the company learned over time, is that WCS

16   cannot compete as advertised.  They did not pan out.  The

17   data shows that.  You'll hear testimony from the experts

18   about that.  But it's an important thread through the entire

19   story.  Reality trumps perception.

20                   I'm going to address these three fatal flaws,

21   and Mr. Beckwith on behalf of WCS is going to spend just a

22   few minutes talking about the history of WCS and its likely

23   future.

24                   So as I said, there are three fatal flaws.  The

25   first is that the Department of Justice has failed to

1    properly define any relevant market in which this merger can

2    be analyzed for likely competitive effects.

3              The second is that there have been very few

4    incidents of actual competition between these two companies

5    in this time frame in which WCS has been part of the market.

6    And you can actually look at the past incidents to show that

7    effects are not likely.  That is a fatal flaw.

8              And, finally, the Government ignores that WCS is

9    actually failing.

10             We have to start with the basics, the regulatory

11   situation.  When I put my residential waste out at the curb

12   every week, my county requires me to separate the waste.

13   The green can is for yard waste, and I cannot put that yard

14   waste into the black can.  The black can is for kitchen

15   waste, and I cannot put that kitchen waste into the blue

16   can.  The blue is for recycling.  It's not any different

17   from what these companies face in this industry.

18             Class B/C waste cannot be disposed of in the

19   Class A facility.  And the large portion of Class A waste

20   cannot be disposed of in what we're calling the very low

21   level waste facilities, and when I say that, I mean those

22   facilities that are recognized by law as having an exemption

23   so that Class A waste can actually go into RCRA landfills.

24   We'll hear a lot about that.  But the bottom line is that

25   WCS's compact waste facility, that's a mouthful, but it's

1    the hole in the ground that takes Class B/C waste.  That

2    does not compete with anything in EnergySolutions.

3    EnergySolutions does not compete for that waste.  If it is

4    class B/C waste, if it is characterized that way, it has to

5    go to WCS.

6              Let's look at this now in context of the markets

7    that have been alleged, and for purposes of understanding,

8    I'm going to leave out the distinction between operational

9    and decommissioning waste for the moment.

10             The Government has defined higher activity waste

11   as that which is, if it were to be disposed of directly,

12   meaning without processing, it would have to go into the WCS

13   class B/C facility.

14             Now, we've got Class A that's also regulated and

15   we've got the very low level waste.  It's regulated as well.

16   There are certain sites that can take it.  But what the

17   fatal flaw is with the Department of Justice's higher

18   activity relevant markets is that they seek to combine part

19   of Class A waste with Class B/C.  There are a couple of

20   problems with that.

21             Well, first of all, the large portion of higher

22   activity waste cannot go.  It's not a substitute when it

23   goes into the WCS facility.  It can't be -- it's not a

24   substitute for the Class A disposal.  So, in other words,

25   those two, the EnergySolutions Class A facility and the WCS

1    facility, are not functional substitutes for each other.

2    And so by defining higher activity waste as a relevant

3    market, the Department of Justice is actually providing a

4    misleading picture of the potential competitive effects.

5    And that's what antitrust cares about.  When defining a

6    market, you're supposed to look at those areas where the two

7    companies actually compete to see how will the market be

8    affected post merger, and here, the DOJ includes a

9    significant portion of commerce that cannot possibly be

10   subject to competition, and instead there is a small slice

11   of Class A waste that is Class A waste because it is

12   processed.  If it hadn't been processed, it would have to be

13   disposed of at WCS.  EnergySolutions and other companies can

14   process waste, a very small portion of it.  Resins, filters

15   in particular, so that they can be put in the more

16   cost-effective option.

17            Now, the Department of Justice also defines

18   lower activity markets, and, again, the problem with lower

19   activity markets, they are trying to combine Class A

20   disposal with all other Class A disposal that can be -- that

21   can be taken care of in these RCRA landfills.  In other

22   words, there's a large chunk of Class A waste which has a

23   hotter concentration of radioactivity.  It has to be

24   disposed of in EnergySolutions.  It has to be disposed of at

25   Clive.

```
 1                    So what they try to do here, your Honor, is say
 2          that when WCS entered in 2014 with its RCRA facility, it
 3          gained the ability to compete with EnergySolutions for that
 4          true Class A waste, but what we have seen, the reality, is
 5          that it has not been able to do so.
 6                    And so WCS certainly is a competitor for very
 7          low level waste, Class A waste, that is true, but it's the
 8          low level waste that OTHERS are also able to dispose of, the
 9          BSFR program.  That's four landfills.  That's not a
10          monolith.  It's four separate competitors.  U.S. Ecology,
11          and then other RCRA landfills that could get federal
12          approval project by project to dispose of waste.  Those are
13          the options.
14                    So the problem with the higher activity markets
15          that have been attempted to be defined is that the reality
16          is this large portion of waste, the categories on the left
17          side, can only go to WCS.  We see at the bottom, we call
18          them hotter resins and HOTTER filters.  You think about your
19          car and the liquids that run through your car and the
20          filters that you have in your automobile and how they have
21          to be changed out.  That's what we're talking about here.
22          In the nuclear power plant, these things have to be changed
23          out.  Some of them are cooler.  In fact, there are some
24          resins and filters that can be disposed of in
25          EnergySolutions without processing.  That's not part of
```

1    their higher activity market.  The majority are so hot, that

2    only WCS can handle them.  EnergySolutions cannot.  You will

3    hear even from Dr. Mayo, the Department of Justice's

4    economist, about what large portion of this waste is not

5    competitive between the two companies.

6            Now, the resins and filters that are at issue

7    are a very small portion.  It's the cooler resins, the

8    cooler filters.  Those are the ones that can be down blended

9    by a processor, like EnergySolutions, and put into the

10   EnergySolutions landfill.

11           The higher activity markets also are flawed

12   because they exclude storage as an option.  And you heard

13   from Ms. Elmer that storage is not a realistic possibility.

14   It's not a functional equivalent.  But the reality is, you

15   will hear, your Honor, from a number of utilities, including

16   the Department of Justice's very first witness, that they do

17   store waste instead of disposing of it as a matter of

18   course, as an alternative.  In fact, what you're looking at

19   here is a 2012 policy statement from the NRC.  The NRC

20   encourages alternative methods of managing waste instead

21   of disposal, including short-term storage, long term

22   storage.

23           Utilities stored as waste during operations,

24   they actually also can store it after shut down.  The vast

25   majority of utilities after they shut their plants down go

1    into a condition called safe store.  They can keep it there

2    for 60 years.  The point is this, your Honor.  They can

3    store, they do store, they have historically, they will in

4    the future.  The fact of the ability already constrains

5    pricing by these companies today.  That condition will not

6    change.  Storage is a functional alternative, and because

7    the DOJ has not included it as an alternative, their market

8    definition is improper.

9            Now, as for lower activity waste, Ms. Elmer

10   understates the role of market participants in what we call

11   the very low level waste disposal.  U.S. Ecology considers

12   itself a leader, a leader in the industry for disposal of

13   low level nuclear waste.  It has been in business for

14   60 years.  You will hear from Mr. Joe Weismann.  The BSFR

15   program, it's just one possibility.  Other states besides

16   Tennessee can allow disposal of low level nuclear waste and

17   have.

18            You will hear testimony that low level nuclear

19   waste has gone to a RCRA landfill in Kansas, for example.

20   You will hear from Toxco, one of a number of processors.

21   They dispose of millions of pounds a year.  They handle

22   operational waste and they handle decommissioning waste.

23   They bring in waste from all over the country.  They're not

24   a fringe player, your Honor.  They are a true market

25   participant.

1              You will also hear from Bionomics, which is a

2      broker for this low level waste.  They handle waste for very

3      small users, the universities, and the hospitals.

4              Now, this figure, your Honor, is blacked out

5      because it does contain some confidential information.

6      With the Court's permission, I would hand up the particular

7      page.

8                    THE COURT:  All right.  Thank you.

9                    (Ms. Reinhart handed a document to the Court.)

10                   MS. REINHART:  What you are looking at here,

11     your Honor, is a graph from the Department of Justice's own

12     economist, and it relates to where low level waste was

13     disposed of, particularly Class A waste, in the year 2015.

14     And it was offered purportedly to show that EnergySolutions

15     and WCS compete for Class A waste.  But here's what you see.

16     I will describe it for the courtroom in general.

17             The X axis is the hotness of the waste, the

18     concentration of radioactivity from lower on the left up to

19     the hotter waste to the right.  And there are bars that show

20     the amount of Class A waste that was disposed along that

21     spectrum.  And so the waste gets hotter as you go to the

22     right.  And what you see, the blue bars are EnergySolutions.

23     The gray bars are U.S. Ecology.  The orange bars are WCS.

24             Now, we take exception to this graphic in a

25     couple of respects because we think Dr. Mayo has

1    oversimplified things and he has left out BSFR, and so

2    forth.  We'll explain that when he testifies.

3              But for now, if your Honor draws a line from the

4    point 01 straight up, you see a dividing line.  From that

5    point on, as the waste gets hotter, WCS doesn't have the

6    ability to play a role.  They don't dispose of the waste.

7    EnergySolutions is the choice.  And if you look to the left

8    of that line, there are other choices.  U.S. Ecology, front

9    and center, disposing of very large volumes of waste there.

10   And BSFR is on that side of the line as well.

11             EnergySolutions and WCS are completely different

12   companies, your Honor.  EnergySolutions is a market

13   participant in many levels, all levels of commerce.  These

14   generators, utilities and the smaller players as well, meet

15   all different manner of services from processing,

16   decommissioning contractors.  Decommissioning isn't just

17   about putting waste in the ground.  There are a lot of

18   services.  Disposal is one small part.  And so we see WC --

19   pardon me.  We see EnergySolutions in each level of

20   commerce.  We see WCS only as one of a number of disposal

21   options.

22             EnergySolutions, as I said, provides this wide

23   range of services.  They do everything for their customers.

24   Under their contracts with utilities, they take operational

25   waste, they take it all, even that which they can't dispose

1    of in their own site, and some of it will go to a facility

2    in Tennessee called Erwin.  At Erwin, they will take the

3    small part of the higher activity waste that can be

4    downblended and they will downblend it and then send that on

5    to their Class A disposal side in Clive.  The rest of it

6    they send to WCS for disposal because it's too hot to do

7    anything else with.  In fact, EnergySolutions is one of

8    WCS's biggest customers.

9         They send all the lower activity waste to a

10   facility called Bear Creek, also in Tennessee, and there,

11   the EnergySolutions folks -- first of all, they separate the

12   waste.  Some of it can be incinerated or evaporated or put

13   into a recycling sequence so that it does not have to be

14   disposed of at all.  Some of it can be sorted and segregated

15   and sent to one of the four BSFR landfills.  They do that.

16   EnergySolutions chooses the most cost-effective solution for

17   its customers, and then whatever it can't dispose of in

18   those RCRA landfills in Tennessee, it sends to its Class A

19   facility in Utah.

20        EnergySolutions, also very important here, is a

21   transportation company.  They own their own truck fleet.

22   They own their own railcars specifically designed to handle

23   this kind of waste.  WCS does not.  In fact, this is WCS.

24   This is the compact waste facility.  This is the Class B/C

25   facility.

1           And, your Honor, one of these things is not like

2     the other.  This is the theme here.  These companies are

3     complements largely.  They are largely not competitors.

4           WCS does not have the capabilities to provide

5     the services that ES does and they will not, and we'll get

6     into that in just a few minutes.  In fact, one of the

7     primary rationales for this deal is to bring

8     EnergySolutions' services and capabilities to these assets,

9     to make them well managed and operational, to make them as

10    fully functional as they can be.

11          And this transaction would bring significant

12    benefits to the customers, because right now WCS, if it has

13    to provide any service other than disposal, something like

14    transportation, they have to contract with a third party to

15    do it.  That means there's an extra charge for the customer

16    and that means that there's an extra margin there.  So this

17    deal will eliminate that extra margin, that extra cost for a

18    customer.  And this also is why we're not going to see

19    anticompetitive effects in this deal, your Honor.

20          Well, let me sum up very quickly the relevant

21    market issues.  As for the higher activity markets that DOJ

22    has attempted to define, they are too broad in that they

23    include -- they include a significant chunk of Class B/C

24    waste that cannot be disposed of except at WCS.  That means

25    the two companies are not competitors, cannot be.  They're

1    also too narrow because they do not include storage as an

2    alternative.  You will hear a lot of testimony about this,

3    your Honor.

4            As for the lower activity markets, they, too,

5    are too broad.  They include this chunk of Class A waste

6    that cannot be disposed of anywhere except EnergySolutions,

7    and they are also too narrow because the Department of

8    Justice considers these other options as fringe players when

9    they are actually full-fledged market participants who

10   should be considered.

11           Now, as for effects, go back to my theme.

12   Reality trumps perception.  The Department of Justice is

13   going to show evidence that it says shows that there was

14   competition that affected prices on the higher activity side

15   as well as lower activity side when WCS came in.  We will

16   rebut that evidence, your Honor, with what actually

17   happened.  What actually has happened is WCS is not getting

18   waste.  They are not taking it in.  It's not being shipped

19   from the customers.  And we'll show you the reasons for

20   that.

21           What the EnergySolutions documents show is a

22   fair amount of confusion when WCS entered.  They were

23   concerned, no doubt about it, that this would be a

24   formidable competitor.  It didn't pan out.  It did not pan

25   out.  And the data will confirm that.

1          In the example, your Honor, this relates to the

2     higher activity waste, that small portion of cooler resins

3     and filters that can possibly be downblended and disposed of

4     at EnergySolutions instead of WCS.

5          This is another exhibit from Dr. Mayo,

6     Department of Justice's expert.  An important thing to look

7     at, your Honor, is the line, the second blue line that has

8     the $4,276 under it.  That's 2012.  What this purports to

9     show is that when WCS entered in 2012 with a compact waste

10    facility, the one that handles only higher activity waste,

11    that prices went down, but they didn't.  They did not go

12    down.  In fact, this is not an entry study at all.  An entry

13    study would look at, what were the prices before intro and

14    what were the prices after.  What it does show, prices

15    stayed the same.  They only went down -- you see the dotted

16    blue line in the green shaded area -- in conjunction with an

17    NRC policy shift that made it easier for customers to blend

18    waste.  In other words, customers can get into the game.

19    Everyone can blend waste.  That's when you see the prices

20    going down.

21          We also see prices go down for this higher

22    activity waste because volumes decreased.  This is another

23    exhibit from Dr. Mayo.  The volumes of those cooler resins

24    that possibly can be downblended decreased by 55 percent

25    until course prices followed as well.

```
 1            As for the lower activity -- pardon me.  We'll
 2   go back here.  As for the lower activity waste, and the
 3   evidence, your Honor, the Department of Justice will talk a
 4   lot about life of plant contracts that EnergySolutions has
 5   with utilities.  They are long-term contracts that were
 6   entered into years before EnergySolutions even knew that WCS
 7   would be entering the market, and they were entered as
 8   long-term contracts to give certainty to the utilities.  The
 9   utility wanted to know that 20 years down the road they
10   would have capacity to dispose of their waste.  They also
11   wanted certainty as to pricing.
12            So these contracts have been in place.  They
13   have been coming up for renegotiation in 2014, 2015, 2016.
14   There are more this year as well.  And this is where the
15   Department of Justice will show you Energy Solutions'
16   documents where Energy Solutions expressed concern about the
17   possibility of WCS taking the business.  The reality, which
18   trumps perception, is that these customers did not leave
19   Energy Solutions even though they had a chance to.  Pricing,
20   the most recent renegotiations, just the same as it always
21   was.  Discounts that were given to these customers are of
22   the same magnitude they were on any other job that Energy
23   Solutions did with these customers.
24            Now, if the WCS product was this great
25   innovation that was going to change the market, you would
```

1    see these customers taking the opportunity to go.  They

2    didn't do it.  They didn't do it because, as you will hear,

3    your Honor, it takes ten times as long to dispose of waste

4    at WCS as it does at EnergySolutions.  They had very strict

5    limitations on the Class A waste that can be disposed of at

6    their RCRA facility, and so it's not unusual for customers

7    to ship their operational waste to, or pardon me, their

8    waste to a processor and then the processor gets stuck with

9    it.  It sits there months, a year, while WCS is trying to

10   figure out, does it comply with limitations that it has been

11   granted in it's exemption?  You will hear from these three

12   witnesses, and this, your Honor, is why WCS is failing.

13            You might be wondering, how did this all come to

14   pass?  There was a Texas billionaire 20 years ago who was in

15   oil and gas, and he saw that nuclear power was the future

16   and so he spent a lot of money, a lot of time building these

17   WCS facilities and then, guess what?  Nuclear power is now

18   disfavored.  Plants have been decommissioning for years and

19   years.  The nuclear renaissance never materialized.  And so

20   now Mr. Simmons is gone.  He passed a few years ago.  The

21   company is held in family trust.  The family trust does not

22   have the passion that Mr. Simmons had for this business.

23            You will hear details about how WCS is not

24   surviving without money from its owners.  There's no doubt

25   about it.  In fact, the Department of Justice's own

1    financial expert agrees, the company would not survive alone

2    without the money from the parent.

3         The Department of Justice says that

4    decommissioning projects are going to save WCS and turn

5    things around.  Well, you will hear testimony that these

6    projects, while expected over the next 50 years -- and I

7    believe that the DOJ's chart shows that there's going to be

8    a steep increase, but not for at least 10, 15, 20 years.

9    For the next six years or so, it's pretty stable.  But these

10   are lumpy, they're unpredictable.

11        Even when a company decides to shut down a

12   plant, it doesn't mean that it's going to go into active

13   decommissioning.  The vast majority go into this safe store

14   condition, where they are locked down.  They are secured.

15   And the trust funds that the utilities require to be able to

16   do the eventual decommissioning gain in value.  It's not

17   unusual to have safe go on for 10, 12 or more years.  They

18   could do it for up to 60 if they wanted to.  The question

19   is:  What's the cost?

20        You will also see there are rapid developments

21   on decommissioning.  Just six months ago, there were two

22   plants in Illinois belonging to Exelon that were scheduled

23   to shut down until the Illinois legislature stepped in and

24   said, no, we don't want to lose these jobs, and they

25   convinced Exelon to keep going.  The plant shut down, it had

1    already been announced.  These companies were already

2    looking to get into decommissioning.  Changed their minds.

3    A failing firm cannot bet its fortune on something so

4    unpredictable.

5              Your Honor, you will hear a fair amount of

6    detailed testimony about the likelihood that WCS will

7    survive.  The owners of the company recently retained a

8    financial consultant and did a very detailed analysis,

9    multiple scenarios from pessimistic to optimistic, and you

10   see the line with all the years there.  That's zero dollars.

11   And so under these scenarios, your Honor will hear a lot

12   more about this.  They are not going to break even the next

13   five years.

14             And, in fact, WCS did have some plans to

15   diversify.  They were going to seek a license so they could

16   build a facility to house spent fuel on an interim basis,

17   because there's no facility in the country, no commercial

18   facility where utilities can put their spent fuel once their

19   operations are shut down.  It's a potential innovation.

20             Just last week WCS pulled this application

21   because it couldn't afford the fee and it had entered a

22   partnership with another company in the industry and that

23   broke up.  If EnergySolutions and WCS join forces, they

24   can do this kind of innovation.  This will benefit the

25   industry.

1              The owners of WCS have been public about the

2    problem and about the choices that they face in the next

3    couple of years.  And, in fact, it is clear, and you will

4    hear more detailed testimony about this, that if this deal

5    is blocked, in all likelihood, the company will have to plan

6    for shut down and liquidation of the assets.

7              So there's no doubt based on the facts that WCS

8    is a failing firm and in a troubled industry, your Honor,

9    WCS isn't the only one struggling here.  Just look at

10   Westinghouse.  But the facts also give great support to our

11   argument that the Department of Justice cannot prove a

12   substantial lessening of competition.  Ms. Elmer said, they

13   just have to show that maybe there will be a substantial

14   lessening.  No, no.  The standard is likely.  They need to

15   show it's probable.  And then, finally, of course, they have

16   not defined a relevant market, any of their four relevant

17   markets, in which it is appropriate to analyze the potential

18   competitive effects of this deal.

19             And so, your Honor, we respectfully request that

20   after all of the evidence has been assessed, this Court will

21   find just one of these flaws to have been proved.  Any one

22   of them will do.  And this case must be dismissed in favor

23   of the defendants.

24             THE COURT:  Thank you very much.

25             MR. BECKWITH:  Your Honor, good morning.  My

 1    name is Van Beckwith.  My partner, Joe Ostoyich and I, look

 2    forward to presenting this case to you.  As we go forward

 3    today, I do want to introduce Rob Baltzer, the Chief

 4    Executive Officer at WCS.  If you could stand.  Corey

 5    Johnson Reilly, the chief legal officer, are here as well.

 6    Your Honor, I think it's important for you to see the people

 7    behind this.

 8              I do represent WCS.  It is important to hear

 9    from the seller.  I have been threatened with my life that

10    I'd better be quick and so I will try to be such.

11              I do represent a company that is out in Andrews,

12    Texas.  I am going to take you there and show you.  And all

13    it is is a state of the art, and we're proud of that fact,

14    low level radioactive waste landfill.  That's what it is.

15    It has been called a hole in the ground in this case.  We

16    don't take offense to that.  Some have called it a field of

17    dreams like in the old Costner movie, and in many ways, it

18    was.  It was Harold Simmons' field of dreams.  The problem

19    is, every night when he would go out and turn on the lights,

20    the customer didn't show up to watch the game, and this

21    market, which took 20 years to fully build this facility and

22    get it operational, collapsed during that time.  You are

23    going to see that.

24              So what we're left with today is really

25    impossible choices, your Honor.

1           So where is this Andrews, Texas?  Andrews, Texas

2    is out there by the end Of midland.  Far, far West Texas,

3    almost to the border of New Mexico.  It's a nice town.  It's

4    a true Americana town.  There's 12,100 people who live

5    there.  It is hot, dry and dusty.  I don't think they would

6    take offense at that.

7           The way they make money out there is when oil

8    and gas prices are high, they drill for it.  They make money

9    at WCS when 200 employees have a paycheck from WCS, even

10   though it is a failing firm, and I'm going to show you that.

11   And they make money at the only the second Kirby Vacuum

12   facility in the company.  That's how they make money in

13   Andrews, Texas.

14          Now, you saw from the DOJ slides, it's about a

15   $700 million facility.  I was going to say hundreds and

16   hundreds of millions.  But here's Andrews, Texas.  It's

17   right near Frankel City, right near the New Mexico border.

18          And in Andrews, Texas, Harold Simmons, in

19   1993, had a dream.  He had a dream to build a landfill for

20   nuclear and low level radioactive waste and he did.  He did,

21   as nice as you could for $700 million.  It better be for

22   $700 million.

23          And this is Andrews, Texas.  It's a small town

24   that is home to this landfill.  That's what it looks like on

25   a normal day.  I guess that's the holiday time.  You can see

```
 1    some holiday decorations.  People out there drive trucks

 2    because trucks make money.  Cars don't make money.  And

 3    those people out there work hard every day.  We're proud of

 4    our employees.  There's 160 to 180 women and men who work at

 5    WCS.  It was a higher number before this merger.  There was

 6    about 200, but we've been working on this merger case since

 7    November 2015, and about 20 people have lost their jobs in

 8    the process.

 9              And WCS is a key contributor to that economy.

10    So here's WCS.  If that's Andrews, about 31.2 miles,

11    according to Google Earth, there is the facility.  This is

12    it.  This is not an integrated business.  WCS does not get

13    up every day and help these waste processors figure out how

14    to generate less waste.  They don't do that for a living.

15    There are companies that do that.

16              And, by the way, these waste processors, which

17    have billions and billions of dollars in revenue and

18    hundreds of millions of dollars in net revenue, those

19    companies actually have whole staffs of employees who figure

20    out how to lower waste.  If you were paying for your own

21    trash to be deposited by the pound, you probably would try

22    to lower that waste, too.  As I said to somebody this

23    morning, composting wouldn't be just for gardeners.  But

24    Waste Control Specialist, it has got these facilities where

25    you can deposit this waste.  They actually put it in these
```

1    concrete vaults.

2            Now, Waste Control Specialist does not help

3    volume reduce the waste.  It doesn't help burn it up.  It

4    doesn't help store it in place.  It doesn't help find other

5    places for the waste.  None of those things.  It doesn't

6    transport it for a profit.  It's just when people bring it

7    to this West Texas facility, it puts the waste in these

8    concrete vaults where it will stay forever.

9            So what are the impossible choices?  I want you

10   to meet in this case two people, Rob Graham, the chairman

11   and CEO of Valhi.  He's a brand-new chairman and CEO.  He

12   took over in January of this year, and part of his job this

13   year is trying to figure out what the in the world to do

14   with this WCS if your Honor were to, in the unlikely event,

15   enjoin this merger.  And Amy Samford, the CFO.  You're going

16   to hear from both of them.  They do face very impossible

17   choices.

18           Valhi is the parent company.  It's a public

19   publicly traded company and it faces real cash liquidity

20   problems.  These aren't made up litigation tactic problems.

21   These are real problems and it's real cash.  And it happens

22   to be Valhi's cash.

23           They have this choice, these impossible choices.

24   They can keep dumping the money.  You saw the slide of the

25   money going in a hole.  It's actually a pretty good slide.

```
 1    But that has the potential to imperil Valhi.  That is not an

 2    option.  That is not something that's required under the

 3    law.

 4              Second, they can sell to EnergySolutions.  They

 5    happen to be the only buyer who ever offered money for WCS

 6    in the form of a contract.  And there's no real mention in

 7    the DOJ opening.  There's talk about this same firm defense

 8    on two of the 20 slides, but no facts behind it.  Those are

 9    the facts.  No other buyer has stepped forward with a

10    contract to purchase WCS, and Valhi has real cash liquidity

11    problems.

12              And the third choice is these American citizens

13    who live out in Andrews, Texas can lose their jobs, 160 to

14    180.  They can go to the regulators and they can tell the

15    regulators, it's time to bring the concrete trucks in and to

16    power the concrete out and to forever entomb this facility.

17    And in that sense, our United States will lose a

18    state-of-the art LLRW facility.

19              So what do I have to back that up?  Well, in

20    WCS's 2013 plan for sales versus historical experience,

21    here's actually what has happened.  If you look at these

22    gold bars here, these are the sales needed to cover costs.

23    You've got to make that much money.  So how much is it?  Amy

24    Samford, the CFO, is going to come and testify to you and

25    share with you it's about 65 to $80 million to keep this
```

1  hole in the ground, this field of dreams open.

2        So in 2013, she said she became very frustrated

3  with the people at WCS because this was their plant.  It

4  looked like a good plant.  We're going to make 80 million in

5  2013.  We're going to make 120 million in 2015.  We're going

6  to make 140 million.  We're going to pay back that

7  $700 million that has been dumped into the earth.

8        Well, what happened?  That's what actually

9  happened.  2015, a little over 40 million.  2016, a little

10  over $40 million.  That is the stark reality that the

11  hundred 60 to 180 employees out in Andrews face.  It is a

12  failing firm.  There's no doubt about it.  It started as a

13  glimmer in Harold Simmons' eye in 1993, your Honor, and it

14  did not get opened until 2012, $700 million later.  And when

15  it takes you that long to build something, something

16  sometimes happens, which is markets move.  People decide

17  that they'd better reduce this waste because they don't want

18  to spend the money to deposit this expensive waste into the

19  ground.  They'd better store it in place.  They'd better

20  incinerate it.  They had better do something.  And today,

21  and what you are going to hear from the testimony, is about

22  50 percent less B and C waste, which is what this facility

23  was designed to accomplish, is deposited and needs to be

24  deposited.

25        The Government says, well, you could just

1    declare bankruptcy.  Well, it actually doesn't work quite

2    that way.  Mr. Graham will come and talk to you about it.

3    He has experience.  He has been through the bankruptcy

4    restructuring process.  And the problem with this facility

5    is, it has long-term leases.  It has fixed costs.  It has

6    regulatory commitments with the Texas Commission on

7    Environmental Quality, which is the EPA in Texas.  It has a

8    contract with the City of Andrews and the County of Andrews

9    that cannot be restructured in bankruptcy, and that's the

10   advice that Valhi has been given.  And so they can

11   liquidate.  There is a Bankruptcy Code provision.  It's

12   called liquidation, and that is not very palatable.

13           And then, third, the failing firm requires that

14   there be no other buyers, and there are none.  The only

15   contract to come forward is EnergySolutions.  But these

16   financials, they get worse, unfortunately.  Here are the

17   losses, 2012 to 2016.  You can see 30 million.  30 million.

18   2014, a little bright year.  You only lost seven or eight

19   million that year.  2015, 2016, 30 million, 30 million.  But

20   here's what's worse.  The DOJ slide, you probably saw number

21   12.  It's green, I guess, for money, that is going to be

22   made in these D and D projects.  But the real money doesn't

23   start, the best I could tell from my notes, until 2034.

24   Well, WCS can't make it that long.  In 2017, their they're

25   projected to lose upwards of 25, $28 million.  2018, 2019,

1    40.   2020, 35.   2021, $55 million.   That's $200 million in

2    losses that are still to come.   They can't make it to 2034.

3    They can't make it to 2024.   They can't make it through that

4    2021.

5              And WCS is supported by its parent, Valhi.   Cash

6    has got to come from somewhere.   They can't print it.   And

7    this funding from the parent, 50 million in cash, 30

8    million, it's to pay those salaries, to keep this facility

9    open, to try new ideas, to try to find new markets, to see

10   if there may be some way you could turn a profit.   They

11   never, ever have turned a profit.   And they are going to

12   have cash deficits in the future that approach $150 million.

13             You will hear from Rob Graham, they have

14   liquidity issues that prohibit them from continuing to

15   shovel cash into this landfill.   And Rob Graham, when he

16   took over in early 2017, he did commission a study by

17   Berkeley Research Group, a leading group who looked at the

18   projections and said, well, maybe the projections are wrong.

19   Let's see if your projections are wrong.   Maybe the sales

20   are wrong.   And, unfortunately, Berkeley Research Group, to

21   the directors at Valhi, reported that the is prospects were

22   poor.   You're in a highly speculative business.   One thing

23   true about the nuclear business, by the way, is it always

24   takes too long, and it doesn't -- it can never be planned

25   on.

1          The projections demonstrate that the company

2     will continue to fail to generate positive cash flows.

3     Indeed, that is true in the past.  And WCS will almost

4     certainly require additional and substantial future funding

5     to continue operations.  Those are the facts that are going

6     to be presented in evidence about the failing firm.  Not a

7     summary slide, your Honor.  Those are the facts.

8          And so you will hear from Mr. Graham and Ms.

9     Samford about their conclusions about whether we can

10    survive.  And the conclusion will be that we are a failing

11    firm.  We're a classic one.  It's unfortunate.  It's

12    unfortunate for the 160 women and men out in Andrews, Texas,

13    and it's also unfortunate in this way.  The United States

14    needs a place to put low level radioactive waste.  We have

15    one.  It cost $700 million to build.  And to now go out

16    there with concrete trucks and entomb it and close it

17    because that's the right thing to do for Valhi, that's the

18    right thing to do for Valhi shareholders, to do that would

19    be an unjust and unfair result in this case.

20         Your Honor, we look forward to presenting

21    evidence and I appreciate your time.

22         THE COURT:  All right.  Thank you very much.

23    Ready for our first witness?

24         MR. COMENETZ:  Good morning, your Honor.  I'm

25    Aaron Comenetz for the United States.  And, your Honor,

Dickinson - direct

1      plaintiff calls Terrance Dickinson to the stand.

2                  THE COURT:  All right.  Thank you.

3                  MR. COMENETZ:  And Mr. Dickinson is a radiation

4      protection superintendent at the Palo Verde Nuclear

5      Generating Station in Arizona.

6                  He will testify about the purchase of disposal

7      services for low level radioactive waste, which relates

8      primarily to the product market and competitive effects

9      aspects of this case.

10                 And, your Honor, those topics are discussed

11     in Section 3 and 6 of plaintiff's proposed findings of

12     fact.

13                 THE COURT:  Thank you.

14                     PLAINTIFF'S TESTIMONY

15                 ... TERRANCE DICKINSON, having been duly

16         sworn as a witness, was examined and testified as

17         follows...

18                 MR. COMENETZ:  May I proceed, your Honor?

19                 THE COURT:  Yes, you may.

20                     DIRECT EXAMINATION

21     BY MR. COMENETZ:

22     Q.    Good morning, sir.

23     A.    Good morning.

24     Q.    Would you please state your name.

25     A.    Terrance Dickinson.

Dickinson - direct

1  Q.    Are you currently employed?

2  A.    Yes.

3  Q.    And where do you work?

4  A.    I work at the Palo Verde Nuclear Generating Station.

5  Q.    All right.  And is that also known simply as Palo

6  Verde?

7  A.    Yes, it is.

8  Q.    Can you tell us what is Palo Verde?

9  A.    Palo Verde is a three-unit reactor facility located in

10 Arizona.  It's approximately 1400 megawatts per reactor.

11 We're one of the largest -- we are the largest generating

12 station in the country.  We're also the largest nuclear

13 facility in the country, power plant.

14 Q.    Is Palo Verde currently operational?

15 A.    Yes.

16 Q.    And what geographic area does Palo Verde provide power

17 to?

18 A.    It provides power to the Western grid, so it would be

19 everything west of the Mississippi.

20 Q.    And where is Palo Verde located?

21 A.    Palo Verde is located approximately 50 miles west of

22 Phoenix, Arizona.

23 Q.    About how many people does Palo Verde provide power

24 to?

25 A.    We have a generating capacity to provide to

Dickinson - direct

1   approximately four million people.

2   Q.   Is Palo Verde your employer?

3   A.   No.  Actually, APS, Arizona Public Service, is my

4   employer.

5   Q.   And could you tell us what is the relationship between

6   Palo Verde and Arizona Public Service?

7   A.   Well, the Palo Verde Nuclear Generating Station is

8   owned by seven different owners.  APS, owning the largest

9   percentage, they manage the facility.

10  Q.   Have you told your superiors at Arizona Public Service

11  that you are testifying here today?

12  A.   Yes.

13  Q.   When did you start working at Palo Verde?

14  A.   I started on January 6th of 1986.

15  Q.   And what is your current title there?

16  A.   Currently, I'm a radio protection superintendent.

17  Q.   As a radiation protection superintendent, what are

18  your responsibilities?

19  A.   My current responsibilities include oversight of the

20  ALARA planning organization and the outer support facility.

21  In addition to that, my primary focus is on radioactive

22  material control, which includes processing, transportation

23  and disposal of radioactive waste.

24  Q.   You mentioned ALARA.  Would you mind spelling that for

25  us?

Dickinson - direct

1   A.    ALARA.  It stands, it's an acronym that we use in the

2   industry for as low as reasonably achievable.

3   Q.    And what does that mean?

4   A.    We try to maintain our doses, the radiation dose that

5   the employees receive as low as reasonably achievable.

6   Q.    Do your responsibilities at Palo Verde include

7   managing the disposal of Palo Verde's low level radioactive

8   waste?

9   A.    Yes.

10  Q.    And is it okay if we refer to low level radioactive

11  waste as LLRW?

12  A.    Yes.

13  Q.    Are you responsible for the disposal of Class A, B and

14  C LLRW?

15  A.    Yes.

16  Q.    About how much LLRW does Palo Verde generate annually

17  altogether?

18  A.    On average, it's 30 to 35,000 cubic feet.

19  Q.    And about how much of that is Class A?

20  A.    Class A is the majority of it.  99 percent at 30 to

21  35,000 cubic feet.

22  Q.    And about how much is Class B or C?

23  A.    Class B and C is about one percent or less.  It's a

24  smaller amount than the Class A.

25  Q.    Does Palo Verde also generate greater than Class C

Dickinson - direct

1   **LLRW?**

2   A.    **There's a potential to generate Class C.**

3   Q.    **So for purposes of this examination, let's just focus**

4   **on Classes A, B and C.**

5   A.    **I understand.**

6   Q.    **Does Palo Verde have a waste minimization program?**

7   A.    **Yes.**

8   Q.    **Could you briefly describe that for us.**

9   A.    **In the early to mid-nineties, with the disposal rates,**

10  **we had become efficient and tried to reduce the amount of**

11  **waste that we would generate, so we implemented processes to**

12  **reduce the amount of material that is actually taken into**

13  **the areas that could become potentially radioactive waste,**

14  **and throughout the nineties, early 2000s and up to current**

15  **day, we're still trying to minimize as much radioactive**

16  **waste that we can.**

17  Q.    **Is there anything you could do to reduce the amount of**

18  **LLRW that you currently generate?**

19  A.    **At this point in time, no.**

20  Q.    **Why not?**

21  A.    **Because we pretty much exhausted all of our**

22  **possibilities up to this point.  We implemented those**

23  **procedures and processes I previously spoke of and we're**

24  **facing an endpoint where we have not found any new avenues**

25  **to reduce that generation.**

Dickinson - direct

1    Q.    As part of managing the disposal of Palo Verde's LLRW,

2    are you responsible for negotiating the companies that

3    provide LLRW disposal services?

4    A.    Yes.

5    Q.    And as part of your ordinary responsibilities at Palo

6    Verde, do you discuss LLRW with your peers at commercial

7    nuclear generating stations throughout the country?

8    A.    Yes.

9    Q.    How many years of experience do you have with LLRW

10   disposal?

11   A.    In my current position at APS, I've got 31 years of

12   experience.  Prior to that, I had three-and-a-half years

13   with the U.S. military, stationed at Pearl Harbor, where I

14   also was involved in waste disposal transportation.

15   Q.    Is your testimony here today based on the knowledge

16   and experience that you have acquired over that time?

17   A.    Yes.

18   Q.    I would like to ask you some questions about disposal

19   of Class A LLRW.

20   A.    Okay.

21   Q.    First of all, can you tell us, what does it mean to

22   dispose of LLRW?

23   A.    Disposal of LLRW is when we would place the material

24   in its final resting point at a disposal facility, basically

25   placing it in a permanent resting point, and it's isolated

Dickinson - direct

1    from humans for the sake of final disposition.

2    Q.    Does Palo Verde have what's known as a license plant

3    agreement with EnergySolutions?

4    A.    Yes.

5    Q.    Can you tell us generally what is a life of plant

6    agreement?

7    A.    A life of plant agreement was placed in service that

8    guaranteed us a million cubic feet of disposal when we would

9    decommission our facility.  It also gave us a price lock and

10   it provides exclusivity that we have to dispose of all of

11   our Class A with EnergySolutions.

12   Q.    Is it okay if we refer to the life of plant agreement

13   as the LOP?

14   A.    Yes.

15   Q.    Does the LOP affect how you dispose of Class A LLRW?

16   A.    Currently, yes.  We're under the contract to provide

17   it to EnergySolutions.

18   Q.    Can you tell us why did Palo Verde sign the LOP with

19   EnergySolutions?

20   A.    Like I mentioned, it did guarantee a million cubic

21   feet at the point of decommissioning.  It also guaranteed a

22   price lock on our disposal rates, and when we signed into

23   the LOP, there was no other disposal options available at

24   that time.

25   Q.    Was that in 2007?

Dickinson - direct

1    A.    Yes.   Actually, I believe it's 2008 time frame.

2    Q.    Is the interpretation of some of the LOP's terms

3    currently the subject of disagreement with EnergySolutions?

4    A.    Yes.

5    Q.    How would you characterize the relationship with

6    EnergySolutions in light of that disagreement?

7    A.    I have a very good working relationship with

8    EnergySolutions.  We need EnergySolutions.  It provides

9    services to us for containers, transportation disposal.  We

10   need EnergySolutions.

11   Q.    Do you intend to continue doing business with

12   EnergySolutions despite this disagreement?

13   A.    Yes.

14   Q.    Does that disagreement have any effect at all on your

15   testimony here today?

16   A.    No, it does not.

17   Q.    Do the fees for disposal of Class A LLRW in the LOP

18   come up for renegotiation at some point?

19   A.    Yes.

20   Q.    When is that?

21   A.    It's currently in the year 2017.  It expires 12/31 of

22   17.

23   Q.    Have the negotiations begun?

24   A.    Yes.

25   Q.    And what is the current status of those negotiations?

Dickinson - direct

1    A.     We are currently engaging EnergySolutions.  At their

2    request we've discontinued negotiations until after this

3    acquisition is worked out, and then we will actively engage

4    them again and continue negotiating.

5    Q.     What leverage do you have in those negotiations with

6    EnergySolutions?

7    A.     Well, currently with the Texas WCS exempt cell in

8    operation, we have that as leverage.

9    Q.     And can you just briefly tell us, what is the exempt

10   cell?

11   A.     At the WCS Andrews facility, adjacent to their compact

12   waste disposal cell, there's another exempt cell and it's on

13   the same property.  Basically, it's a disposal facility for

14   Class A waste.

15   Q.     Have you and WCS discussed terms for the disposal of

16   Class A LLRW in the exempt cell if the LOP is not renewed

17   with EnergySolutions?

18   A.     Yes.

19   Q.     And have you agreed on a price?

20   A.     Yes.

21   Q.     How does WCS's price compare to what you are paying

22   EnergySolutions?

23   A.     Well, currently, my contract rates with

24   EnergySolutions is in the two-plus dollar range.  My rates

25   at the WCS facility are a dollar something.  You know, just

Dickinson - direct

1    as an estimate.  With the WCS rates, it would be about a 40

2    to 50 percent reduction in my current disposal cost, which

3    correlates out to approximately $800,000 a year in savings

4    for my company.

5    Q.    I would like to ask you some more questions about

6    WCS's exempt cell.  Does the exempt cell have requirements

7    for what Class A waste it will accept?

8    A.    Yes.

9    Q.    And do you know how much of your Class A waste meets

10   those requirements?

11   A.    It would be greater than 80 percent of my Class A

12   waste.

13   Q.    And how do you know that?

14   A.    Because I have applied the exempt cell criteria to my

15   current waste streams.  In 2012 through 2016 inclusive, we

16   have the shipping records for that material that we have

17   sent to the Valhi facility under the LOP agreement.  When we

18   used that material and performed an analysis against the

19   activity per gram criteria and determined that the bulk of

20   that waste would be able to be acceptable at the exempt

21   cell.  In addition to that, there's two other criteria that

22   you have to meet.  One of them is 75 millirem per hour on a

23   project.

24         We have a source process to recover tools,

25   things that may be introduced into the waste stream during

Dickinson - direct

1      the packaging and processing process that we want to

2      recover.  So during that store process, we actually ran

3      examples where we removed the 75 millirem per hour or

4      greater objects, and it comes out to well over 80 percent of

5      my waste stream would be acceptable for the exempt cell of

6      Texas, the WCS facility.

7   Q.     And just to get a little clarity here, if you have a

8      container of LLRW that exceeds the exempt cells

9      requirements, is it possible to process it in such a way

10     that it could be eligible for disposal in the exempt cell?

11  A.     Yes.

12  Q.     And can you give us an example of that?

13  A.     Well, like I just mentioned, if I had a had a

14     container with an object in it that was greater than 75

15     millirem per hour, I could remove that offending piece of

16     material, or if I had a container that, say, is a resin

17     liner and it is basically a cylinder, I had one small

18     portion that was greater than the 75 millirem per hour, I

19     could remove the lower activity material into a separate

20     container and disposal of that.

21             And as another methodology, if I had a liquid

22     waste stream or sludges, I could mix that with grout,

23     thereby increasing the intensity, which would lower the dose

24     rate, and it also affects the activity per gram, and the new

25     concentration limits that are associated with that WCS

Dickinson - direct

1    exempt cell.  So there's a multitude of ways.

2    Q.    Have you told WCS that you believe that at least

3    80 percent of your Class A LLRW could go in an exempt

4    cell?

5    A.    Yes.

6    Q.    And did you tell them before it was announced that

7    they would be acquired by EnergySolutions?

8    A.    Yes.

9    Q.    And at that time did WCS agree with your 80 percent or

10   more calculation?

11   A.    Yes, they did.

12   Q.    Does WCS agree with your calculation now?

13   A.    No.

14   Q.    Who told you that their position had changed?

15   A.    Rod Baltzer.

16   Q.    And he is WCS's president and CEO?

17   A.    As I understand it.

18   Q.    And when did Mr. Baltzer tell you that WCS's position

19   had changed?

20   A.    It was following the acquisition, Rod Baltzer, myself

21   and Mike McLaughlin, we had a meeting in Phoenix, Arizona,

22   where Rod Baltzer described as the volume was much less

23   now.

24   Q.    All right.  Are you confident in the accuracy of your

25   calculation?

Dickinson - direct

1    A.    Yes.   I'm a hundred percent confident in my, my

2    analysis that we performed, the calculations, and the

3    testing that we've gone done.   In this business, there's no

4    room for errors.

5    Q.    What information would WCS need to calculate how much

6    of your Class A waste is eligible for the exempt cell?

7    A.    They would need the activity per gram criteria to

8    satisfy that.   They would also have to have an in-depth

9    knowledge of my internal processes and my capabilities for

10   handling the material as well as the dose rate distribution

11   of the objection coming through my waste streams.

12   Q.    Have you provided that information to WCS?

13   A.    No, I have not.

14   Q.    I would like to ask you some questions about Palo

15   Verde's decision to begin storing Class B/C LLRW in 2007.

16   A.    Okay.

17   Q.    First of all, can you tell us, what does it mean to

18   store LLRW?

19   A.    To store would be to -- it's an interim function.

20   Right.   We would place the container into a shielded area

21   and with the eventual plan to dispose of that material.

22   Q.    And just so we're clear, what is the difference

23   between disposal and storage?

24   A.    Disposal is when it's introduced to the endpoint,

25   the disposal facility, and we no longer have responsibility

Dickinson - direct

1    for it.  At the storage facility, I would still incur the

2    cost associated with the material's eventual disposal, so I

3    have to accrue those costs.  There's also the cost of

4    operating the storage facility.  And then in addition to

5    that, there's the unknown that when you are in a period of

6    storage, you don't know what your future costs or

7    liabilities are going to be exactly, so there's that risk

8    involved as well.

9    Q.    In 2007, did Palo Verde begin storing B/C LLRW?

10   A.    Yes.

11   Q.    And why?

12   A.    We had no option at that time.  When the Barnwell

13   facility closed, we had to institute a storage program, so

14   the Class B/C material was stored on our site awaiting a

15   future disposal facility to become operational.

16   Q.    Why couldn't you have sent it to Energy Solutions?

17   A.    At that time, Energy Solutions only handled Class A

18   waste.

19   Q.    Was Energy Solutions not offering down blending

20   services then?

21   A.    Not at that time.

22   Q.    Can you briefly tell us, what is downblending?

23   A.    Downblending is when you take a higher concentration

24   material, the Class B/C that we're speaking of, and blending

25   it with a lower concentration material, typically Class A.

1    Both constituents are radioactive materials, and you can

2    downblend your B/C waste into the Class A category.

3    Q.    And does EnergySolutions offer downblending now?

4    A.    Yes, they do.

5    Q.    All right.  And does Palo Verde have any objections to

6    working with a disposal vendor who would engage in

7    downblending?

8    A.    No, we would not.

9    Q.    And why couldn't you have sent your waste to WCS in

10   2007?

11   A.    Because their facility didn't become operational until

12   around 2012 time frame.

13   Q.    And do you have any options now for disposal of B/C

14   LLRW?

15   A.    Yes.  The B/C low level radioactive waste in the resin

16   category can go direct disposal to Texas, or it can be

17   processed through that downblending process that we just

18   talked about and turned into Class A waste to be disposed of

19   at the Clive facility in Utah.

20   Q.    Now I would like to ask you some questions about

21   competition between EnergySolutions and WCS for disposal of

22   Class B/C LLRW.

23   A.    Okay.

24   Q.    Does Palo Verde use competition between Energy

25   Solutions and WCS in negotiating B/C disposal pricing?

Dickinson - direct

1    A.    Yes.

2    Q.    And was it for disposal of the B/C waste that you

3    started storing in 2007?

4    A.    Yes.

5    Q.    At what point did you decide to dispose of that waste

6    instead of continuing to store it?

7    A.    Well, following the opening of the WCS facility in

8    Texas in the year 2012 time frame, we entered into

9    negotiations in the year 2013.  And following that, we had

10   done a competitive bid process with both EnergySolutions and

11   WCS.

12            We went back and forth several times achieving a

13   lower cost every time, and subsequently to those

14   negotiations, over the course of a year-and-a-half,

15   approximately December of 2014 time frame, we entertained

16   both companies.  They requested a -- ES requested a request

17   for a formal proposal.

18            My procurement department said there's only two

19   holes in the ground, two endpoints, so at that time we just

20   went with the unsolicited proposals.

21            We had a meeting in January of 2015, where both

22   ES and WCS representatives came to our site and gave their

23   best and final offers, and then a determination was made at

24   that point in time.

25   Q.    And how many times did you go back and ask for various

1    offers from EnergySolutions and WCS?

2    A.    Throughout that course, the period of time that we

3    just spoke to, it was at least four to five times where we

4    received written offers from them.  In addition to that, I

5    had numerous e-mails and correspondences, phone

6    conversations with representatives of both companies,

7    discussing various options.  At that point in time, we had

8    not accrued the quantity of money required to dispose of it,

9    so we were trying to determine different methodologies, and

10   it occurred over that 18-month, three-year period.

11   Q.    What price did you start at in the negotiations?

12   A.    When we entered the negotiations, we had contracted

13   pricing with WCS in the 34 to $4,300 range.  For the

14   quantity of waste that we were looking to dispose of, it

15   would have been 16 to $19 million.

16   Q.    So 3400 to 4300?

17   A.    Cubic foot.

18   Q.    Cubic foot.

19         And then what was the final price that you

20   agreed to with WCS?

21   A.    In the end, it came down to around $1,500 a cubic

22   foot.  However, there's a 31.1 -- 31.25 percent tax on that.

23   It was just around the $2,000 range.  The overall, as

24   comparison of the 16 to $19 million project that we were

25   talking about, we got the pricing down to $6.5 million.

Dickinson - direct

1    Q.    All right.

2    A.    $10 million savings.

3    Q.    And can you put an approximate percentage on that?

4    A.    Greater than 50 percent.

5    Q.    Did EnergySolutions and WCS know they were competing

6    against each other?

7    A.    Yes, they did.

8    Q.    How do you know that?

9    A.    One, I told them.  Two, correspondences back and forth

10   between both companies, and we were requesting unsolicited

11   proposals from them at the same exact times, and there's

12   several e-mails that I have that transpired between both

13   companies where we talked about setting that meeting up in

14   January.

15            So in the December time frame of 2014, both

16   companies were providing bids to me, proposals, and then

17   with the intent of making their presentations in January to

18   my procurement officer.  They definitely knew they were

19   competing against each other through that process.

20   Q.    Is EnergySolutions licensed to dispose of Class B/C

21   LLRW?

22   A.    No.

23   Q.    How are they proposing to dispose of your B/C LLRW?

24   A.    Like we spoke of earlier with the downblending

25   process, we would have transported that material to their

Dickinson - direct

1    facility in Tennessee.  They would have mixed it with other

2    resins, downblended it, and then with the eventual disposal

3    taking place at their Clive, Utah facility, as I understand

4    it.

5    Q.    How much unused space did you have to store B/C's

6    ALARA at the time of these negotiations?

7    A.    When we entered into the negotiations, it was around

8    three to five vaults in our storage facility, so I could

9    have stored an additional three to five containers.

10   Q.    Three to five out of how many?

11   A.    Out of 60 storage vaults.

12   Q.    So out of 60 storage vaults, three to five had not

13   been sold?

14   A.    That is correct.  And that's at the 2013 time, when we

15   entered into the negotiations.  When we actually he got

16   through the negotiating process, it was a smaller number,

17   obviously, because we generate waste every year.

18   Q.    At the time the negotiations concluded, do you recall

19   how much space was available for storage then?

20   A.    I believe at that point in time, we had one to two

21   spaces available.

22   Q.    All right, sir.  Now I have some questions about

23   storage of LLRW.

24   A.    Okay.

25   Q.    Is Palo Verde currently storing LLRW?

Dickinson - direct

1    A.    We have -- the answer is yes.

2    Q.    And what LLRW are you currently storing?

3    A.    We currently store a small quantity of Class B/C.

4    Q.    Why are you storing it?

5    A.    We're storing that material -- it's sort of like a

6    surge volume.  You know, to prepare these containers for

7    shipment for disposal, you have to perform analysis,

8    radiation surveys, calculations to determine that it meets

9    the disposal facility's waste acceptance criteria, and in

10   the process of performing those calculations and preparing

11   that material for shipment, it will decay a little bit, but

12   we have this surge volume just so that we can prepare the

13   material for its eventual disposal.

14   Q.    And can you tell us about how long do you intend to

15   store that LLRW?

16   A.    Again, it varies, but it's typically less than six

17   months that material, that surge volume that we're talking

18   about would be in the storage facility.

19   Q.    And if we set aside the temporary storage that you

20   just described, is it Palo Verde's practice to store Class A

21   B or C LLRW?

22   A.    No, it is not.

23   Q.    Why not?

24   A.    Well, there's regulatory requirements.  If we go back

25   to generic letter A138, there was a second letter in 84, and

Dickinson - direct

1    again the NRC established their position in 2011 when the

2    downblending was being discussed.  The NRC's position is if

3    you have the ability to dispose of waste, you should dispose

4    it if it's economically feasible, and that is Palo Verde's

5    practice as well.

6            In addition to that, we spoke earlier about the

7    cost associated with disposal.  Right.  You have the --

8    you've got to accrue it.  You've got to pay for the storage

9    facilities.  And then you've got to pay for the eventual

10   disposal and the uncertainties involving that.

11           Also, the more waste that we keep out of our

12   disposal facility, the greater effect it will have at the

13   storage facility if we were denied access.  We would have

14   greater capacity at that point in time.  So it's Palo

15   Verde's opinion that we would minimize storage.

16           For the Class A waste, because you combine it

17   into three categories, that was for B/C.  For the Class A

18   waste, it's not practical based on the volume of the

19   material.

20   Q.    Okay.  All right.  I want to go -- and so in addition

21   to the guidance from the NRC, are there additional factors

22   that you consider when assessing whether to store or dispose

23   of LLRW?

24   A.    Yes, there are.

25   Q.    Can you tell us what those are?

Dickinson - direct

1    A.    Well, obviously, the storage facility, we've got to

2    look at the environmental conditions.  There's security

3    requirements.  There's exposure to the individuals at the

4    facility.  There's a potential for exposure to the public as

5    a result of accidents in that facility.  There's maintenance

6    upgrades to the equipment.  There's also obsolescence issues

7    that come up from time to time where we've got to upgrade

8    stuff.  Things in the facility.  There's insurance

9    requirements.  There's a whole list of reasons why storage

10   is not the preferred option.

11   Q.    Okay.  So I would like to go back through those

12   factors.

13          You first said the environment.  Could you

14   expand on that?

15   A.    Sure.  The environment in Arizona, obviously being a

16   desert climate, is very warm, so there's temperature

17   limitations.  There's also the potential UV exposure to

18   containers which would degrade the container itself.  So for

19   those environmental reasons, the impact on storage, it has

20   an effect on it.

21   Q.    And when you talked about container degradation, what

22   does that mean?

23   A.    Well, when you place a container in interim storage,

24   the waste can interact with the container material itself.

25   Container in this environment could degrade.  Say in the

Dickinson - direct

1    case of like a poly container, the adverse effects of the

2    radiation can impact the poly material.

3                If a container degrades, it develops a breach of

4    the container.  Then there is, where our facility is, we

5    cannot perform those repackaging activities there, so we

6    have a degraded container, we have to take it back into our,

7    where our RCRA facilities are and perform the repackaging,

8    reprocessing at that location.

9    Q.    You also mentioned security.  Could you elaborate on

10   that?

11   A.    Yes.  I can't get into the specifics of the security

12   plan, but on our facility, we have 10C573, which requires us

13   to have security patrols around the protected area.  Where

14   our storage facility is located is inside our security

15   control area.

16                And following 9/11, the NRC placed additional

17   security measures on these types of storage that have been

18   codified into the Federal Regulations of 10 C.F.R. 37 for

19   Category 1 and Category 2 materials.

20                So with this storage facility in the location

21   that we have it in, there's additional security

22   requirements.  We developed a security plan for 10 C.F.R.

23   37.  There's additional things that our security patrols

24   have to perform, such as tours and stuff like that, without

25   getting into the specifics.  There's also systems that had

Dickinson - direct

1    to be installed to monitor the material.  And obviously the

2    more material you have in the facility, it's a larger

3    aggregate quantity, and it sets you into the levels of that

4    security plan.

5    Q.    You also mentioned exposure, but to the public and

6    also your employees.  Could you elaborate on that?

7    A.    Sure.  From the employee perspective, obviously

8    handling this material, introducing it into the storage

9    facility or removing it, the monthly inventories that we

10   perform on the facility, facility inspections.  Like I

11   mentioned, maintenance and other activities that go on in

12   the building, any time that we're interfacing with the

13   facility, there's a potential for employee exposure.

14             In the case of public exposure, if we had a

15   handling accident internal to that facility and there was a

16   radiological release, it could impact the public.  So there

17   is a public piece of it as well.

18   Q.    You also mentioned that there are maintenance-related

19   reasons not to store.  Could you elaborate on that?

20   A.    Well, obviously, with the storage facility, there's

21   upgrades that we have to perform.  You know, air handling

22   units.  There's air-conditioning units.  There's exhaust

23   ventilation units.  They all have filtration systems that

24   need to be maintained.

25             Lighting in the building has to be replaced.

Dickinson - direct

1    When you go into this storage facility to replace the

2    lighting, an exposure to the workers that I just talked

3    about.  So there is maintenance costs with maintaining that

4    facility.

5    Q.    Can you give us some other examples of what sorts of

6    facility upgrades are required if you're intending to store

7    LLRW.

8    A.    Well, I also mentioned the obsolescence.  We had, with

9    the security piece, we had to install a security system,

10   which I mentioned.  We also have a crane that does the

11   material handling in the facility.  It required extensive

12   upgrades.  In the last probably six years, I think we

13   upgraded the crane.  The video systems in there that allow

14   us to perform some remote handling operations.  Designed

15   obsolescence into those systems required us to upgrade our

16   entire video systems, things of that nature.

17          We had a fire protection system that we had to

18   replace all the CL200 with ductile piping recently.  We had

19   the roof, the roof needed complete replacement at a cost of

20   $200,000.  So these maintenance and upgrades to the facility

21   can become expensive.

22   Q.    And you also mentioned insurance as a factor that you

23   consider when assessing whether to store instead of

24   disposal, instead of disposing.  Can you elaborate rate on

25   that?

Dickinson - direct

1   A.    Well, with the increasing quantities of material in a

2   storage facility, with the increasing liabilities, so your

3   insurance rates would be adjusted accordingly.  And another

4   follow-on item.

5        When we place that material in storage, we're

6   packaging it to today's standards.  We may not know what --

7   you know, we don't know what the standard is going to be

8   five to seven years from now, so whether we actually intend

9   to dispose of the material, there may be repackaging

10  activities that have to be performed, and they would be much

11  like when I talked about the degradation of the container,

12  where the materials would have to be reintroduced back into

13  the power block per se and handled the second time, thereby

14  increasing exposures as well.  It is our intent to dispose

15  if we have access.

16  Q.    Does the volume of LLRW that you might store have any

17  impact on how you would assess all of those factors you just

18  discussed?

19  A.    Yes, it would.

20  Q.    Could you explain that.

21  A.    Well, in the case of the maintenance, you're going to

22  perform those maintenance activities whether you have a

23  small volume or not, but in the case of security, there's

24  additional requirements.  When you aggregate more quantity

25  of material with the exposures to the individuals working in

Dickinson - direct

1    the facility and the potential for an accident affecting the

2    public, those escalate as you obtain more material in these

3    areas.  Pretty much across the board, your costs are going

4    to increase if you store more material, as you add to that

5    storage.

6    Q.    I believe you testified previously that you would not

7    store Class A LLRW because the volume is so great?

8    A.    That is correct.

9    Q.    All right.  Well, let's talk about storage of Class

10   B/C LLRW.  Do you have capacity for storage of Class B/C

11   LLRW?

12   A.    Yes.

13   Q.    How long would it take to fill your B/C storage space

14   based on the amount of B/C waste that you currently

15   generate?

16   A.    Our current generation would fill that facility in

17   approximately 15 years.

18   Q.    If EnergySolutions and WCS merge and the cost of

19   increasing B/C waste increases by five percent, would you

20   then store your B/C waste?

21   A.    No.

22   Q.    Why not?

23   A.    You know, we factor into our budgets small increases,

24   you know, CPI basically.  From CPI to five percent, we would

25   not entertain storage.  It would be offset by the risk and

Dickinson - direct

1    the costs associated with storage.  We would prefer to

2    continue disposing at a CPI to five percent increase.

3    Q.    So help us understand.  You have 15 years of B/C

4    storage capacity.  So if comprises went up five percent,

5    why not just store instead of paying that higher disposal

6    cost?

7    A.    It's our intent, and it's also the NRC's guidance,

8    that you will dispose of the material if you have the

9    capability of doing that.  With a five percent cost

10   increase, we could -- we could continue to dispose of that

11   material.

12   Q.    Does it cost less to dispose of Class A waste than B/C

13   waste?

14   A.    Yes.

15   Q.    Is it theoretically possible for B/C waste to

16   eventually decay down to Class A waste if you store it for

17   long enough?

18   A.    Possible, yes.

19   Q.    Would it make sense for Palo Verde to store B/C waste

20   until it decays to Class A waste as a way to try to lower

21   your disposal costs?

22   A.    No.

23   Q.    Why not?

24   A.    In my 31 years of experience in the waste handling

25   management business at Palo Verde, I've seen one container

Dickinson - direct

1      in that entire time, we're talking hundreds of containers,

2      that has actually transitioned from Class B to Class A.  And

3      the reason for that is, the radionuclide classification it's

4      based on are very long lived.  In some cases, these

5      radionuclide lives are 100 half-lives to 5,000 in the case

6      of carbon.  So it's not practical for these containers.  Is

7      it possible? Yes.  Practical?  No.  And like I said, one

8      container in 31 years that I recall transition from Class B

9      to Class A, and the only reason it did was because it was

10     right at that threshold, and it shifted into Class A.

11     Q.     All right.  I would like to ask you about a couple of

12     disposal sites.  Are you familiar with something called bulk

13     survey for release?

14     A.     Yes.

15     Q.     And is that also known as BSFR?

16     A.     We can call it that?

17     Q.     Do you send LLRW to BSFR now?

18     A.     Not currently.

19     Q.     Why not?

20     A.     There's a couple of factors.  One, the BSFR program is

21     located in the State of Tennessee.  There's additional

22     transportation costs associated with getting that material

23     to Tennessee.  Our evaluation is that it's a very small

24     volume of material, five percent or less.

25              In addition to that, once it goes through the

Dickinson - direct

1  process, BSFR, there is a potential to have non-conforming

2  waste returned to you at an additional cost.  And then once

3  it is processed through the BSFR route and it's placed

4  into the industrial landfills in the State of Tennessee,

5  there's the liabilities associated with that material.

6  It's commingled with other people's waste and then it's

7  placed into a non-licensed disposal facility as the BSFR

8  program.

9  Q.    You mentioned something about it being a small volume.

10  Could you explain that?

11  A.    Yes.  We had pretty extensive green is clean release

12  program on our site throughout the nineties.  Part of that

13  waste minimization program that we spoke of earlier, a side

14  avenue was this green is clean program.  So we had to survey

15  the material, do an aggregate on it and then a composite,

16  and then we would be able to release things that did not

17  come in contact with, you know, contaminated systems, stuff

18  like that.

19       During that process, it was very similar to what

20  you would describe as a BSFR program.  Basically, the same

21  levels of radioactivity could remain on the level.  And

22  through that process, we determined that it would be less

23  than five percent of our Class A waste stream would be a

24  candidate for the BSFR program.  It is a very small volume.

25  Q.    If EnergySolutions acquires WCS, do you think that

Dickinson - direct

1    telling EnergySolutions that you are going to send your LLRW

2    to BSFR instead of EnergySolutions would be an effective

3    negotiating strategy?

4    A.    I don't believe it would be very effective based on

5    the small volumes that we just spoke of.  I don't think it's

6    a very big bargaining chip at all.

7    Q.    Are you familiar with a company called U.S. Ecology?

8    A.    Yes, I am.

9    Q.    Do you understand what U.S. Ecology has a facility in

10    Idaho?

11    A.    Yes.

12    Q.    And does that facility offer LLRW disposal services?

13    A.    I believe they do.

14    Q.    Do you send LLRW to U.S. Ecology in Idaho now?

15    A.    No.

16    Q.    Why not?

17    A.    My understanding is that their waste acceptance

18    criteria is so limited that my material would not fit into

19    their disposal environment.  Also, there's additional

20    transportation costs as the facility is located further

21    away.

22         But going back to the first point, I've had

23    interaction with the disposal facility operator, U.S.

24    Ecology, with the attempt to dispose of some small mining

25    sources.  These were like check sources, and they would only

Dickinson - direct

1    take them if they were accelerator produced.  They would not

2    accept my byproduct material at my levels.

3    Q.    You mentioned something called the waste acceptance

4    criteria.  Could you just very briefly explain to us what

5    that is?

6    A.    Yes.  The waste acceptance criteria, when a disposal

7    facility is licensed, they will get their operating license,

8    but the disposal company, say Waste Control Specialist,

9    EnergySolutions, U.S. Ecology, they will have their own

10   subset of -- they are not regulations, but they're rules

11   that they prefer to see the material, you know, handling

12   things, stuff like that.  Maybe concentrations.  It's their

13   own derive criteria.  You have to comply with the waste

14   acceptance criteria to dispose of your material into that

15   disposal facility.

16   Q.    If EnergySolutions acquires WCS, do you think that

17   telling EnergySolutions that you're going to send your LLRW

18   to U.S. Ecology in Idaho instead of EnergySolutions would be

19   an effective negotiating strategy?

20   A.    No.  I can't send my material there, so why would that

21   be a negotiating strategy?  The answer is no.

22   Q.    If EnergySolutions acquires WCS, what leverage will

23   you have in negotiating disposal prices for LLRW?

24   A.    Basically, I will have little, little to none.  You

25   know, when one company would own both holes in the ground,

1   they would control the entire marketplace.  And like I

2   talked about earlier, when we went through that competitive

3   bid process from 2012 or 2013 through 2015, we saw suggest

4   reductions in our cost for the potential disposal of B/C

5   waste, actual disposals.  And we've seen a significant

6   reduction in cost associated with the exempt material.  I

7   have contracted rates in my WCS agreement an is opposed to

8   my life of plant with EnergySolutions that are 40 to

9   50 percent less.

10          So the bottom line is, when we have two

11  companies competing against each other in this marketplace,

12  we saw significant reductions in rate and the rate for waste

13  disposal.  If you combine both companies together, the

14  competitive marketplace would be gone, and I will have

15  virtually no leverage in working future agreements.

16          MR. COMENENTZ:  Thank you sir.  Nothing further,

17  your Honor.

18          THE COURT:  All right.  We've been at it for two

19  hours.  Let's take our 15-minute break.

20          (Short recess taken.)

21                   -   -   -

22          (Proceedings resumed after the short recess.)

23          MR. LARKIN:  Your Honor, good morning.  May I

24  approach the witness with a binder?

25          THE COURT:  Yes, you may.  And you may proceed

Dickinson - cross

1    with cross-examination.

2              MR. LARKIN:   Thank you.

3                    CROSS-EXAMINATION

4    BY MR. LARKIN:

5    Q.    Mr. Dickinson, good morning, sir.   We met at your

6    deposition.

7    A.    Yes.

8    Q.    And we meet again.

9              Sir, there are 100 operating nuclear power

10   reactors in the United States; right?

11   A.    Approximately.

12   Q.    Okay.  And you're not testifying on behalf of any of

13   them; right?

14   A.    Not at this time.

15   Q.    Okay.  And you're not testifying on behalf of any

16   other nuclear waste generator; right?

17   A.    No.

18   Q.    Okay.  Or processor; right?

19   A.    No.

20   Q.    Okay.  You testified on direct about the dispute that

21   arose between EnergySolutions and APS in 2015; is that

22   correct?

23   A.    Okay.  Yes.

24   Q.    You did; right?   Okay.

25              And that dispute centered around the scope of

Dickinson - cross

1    the, one of the terms of the life of plant agreement you

2    have with EnergySolutions; is that right?

3    A.    It was involving the life of plant agreement.

4    However, there was a couple of issues, not just one.

5    Q.    Okay.  And the parties went to mediation in the fall

6    of 2015; is that right?

7    A.    That's correct.

8    Q.    And that was just a couple months before the merger

9    was announced, right, in the fall of 2015?

10   A.    Yes.

11   Q.    And you went to mediation with EnergySolutions to try

12   to resolve the dispute; is that right?

13   A.    Yes.  That was our intent.

14   Q.    Right.  Okay.  But the dispute was not resolved;

15   right?

16   A.    Not at mediation.

17   Q.    Okay.  Well, it remains unresolved; is that right?

18   A.    One attribute does remain unresolved.

19   Q.    Okay.  In fact, you told me at your deposition, sir,

20   that APS walked away from the table; is that correct?

21   A.    That's possible.

22   Q.    Okay.  Let's take a look at your deposition, sir.

23   It's right in front of you if you open that binder there.

24   Would you go to page 35 of your deposition?

25   A.    Okay.

Dickinson - cross

1   Q.    Okay.  And this was at your deposition that I took

2   about a month ago in Washington; right?

3   A.    Yes.  If you are telling me that.  I believe you.

4   Q.    Okay.  I asked you:  "So in your view, was the dispute

5   resolved or not?  I don't believe the dispute was resolved,

6   but neither side had major issues with it at that point in

7   time."

8           Did I ask you that question, did you give me

9   that answer, sir?

10  A.    Are you on line 4?

11  Q.    Yes.  What I just read you, sir?

12  A.    Give me a second to look at it.

13  Q.    Sure.

14          (Pause.)

15  BY MR. LARKIN:

16  Q.    35, sir.  2 through 6.  Do you see that?

17  A.    Say it again.

18  Q.    Page 35, lines 2 through 6.

19          "So in your view, was the dispute resolved or

20  not?"  I asked you that question.

21          You said, "I don't believe the dispute was

22  resolved, but neither side had major issues with it at that

23  point in time."

24  A.    That is correct.

25  Q.    Okay.  Thank you.  You can put that aside.

1          And it's also true, sir, that during that

2  mediation, you personally reached out to 15 to 20 other

3  utilities who also had life of plant agreements with

4  EnergySolutions; right?

5  A.     That is correct.

6  Q.     All right.  And the reason you reached out to those

7  utilities is you wanted to determine what the term of their

8  life of plant agreements with EnergySolutions said; is that

9  correct?

10 A.     I wouldn't characterize it as wanting to know all of

11 their terms.

12 Q.     All right.

13 A.     I was trying to gain their position on what they

14 believed the life of plant agreement applied to.

15 Q.     Okay.  And you knew the terms of those agreements

16 between EnergySolutions and other customers were

17 confidential; is that right?

18 A.     It's possible.  I don't know that.

19 Q.     Well, if they were publicly available, you wouldn't

20 have had to call your friends in the utility business and

21 ask them about it; right?

22 A.     There's a lot of documents that I have that are not

23 publicly available.  I don't know that their agreements are

24 confidential or not.

25 Q.     Okay.  And so when you called -- you don't know

Dickinson - cross

1  whether the life of plant agreements that EnergySolutions

2  has with its other customers are confidential documents,

3  sir?

4  A.    I know that the life of plant agreement that

5  EnergySolutions has with my company is treated as

6  confidential.

7  Q.    Okay.

8  A.    I do not know if the life of plant agreements with

9  whoever they may have them with is confidential.

10  Q.    Okay.  And despite those efforts to reach out to the

11  other utilities during that mediation, EnergySolutions has

12  continued to honor its LOP agreement with APS; is that

13  correct?

14  A.    State that again.

15  Q.    Sure.

16  A.    I don't think they're connected.

17  Q.    Okay.  It's true that EnergySolutions has continued to

18  honor its obligations under the LOP agreement.  Is that

19  correct, sir?

20  A.    Yes, they have.

21  Q.    Okay.  And, in fact, sir, since the merger was

22  announced in November of 2015, other executives aside from

23  yourself at APS have continued to have regular

24  communications with folks from EnergySolutions; is that

25  right?

Dickinson - cross

1    A.    I do not know what other executives do.

2    Q.    Okay.  In fact, sir, isn't it true that some of your

3    colleagues at APS have actually expressed their support for

4    the merger to the folks at EnergySolutions; right?

5    A.    I don't know that.

6    Q.    Okay.  Admiral Mike McLaughlin, sir?  Do you know

7    whether he has expressed support for the merger to the folks

8    at ES?

9    A.    I don't know.

10   Q.    I'm sorry.  I didn't mean to step on you.

11   A.    That's okay.  We'll get through this.

12         I have no knowledge that Mike McLaughlin

13   supports this.

14   Q.    What about Chuck Carl, sir?

15   A.    If I could finish?

16   Q.    Sure?

17   A.    As recently as last Thursday, I had spoken to Mike

18   McLaughlin and he does not support the acquisition.

19   Q.    Okay.

20   A.    Now, are you asking me about Chuck Carl?

21   Q.    Yes.

22   A.    He's my plant manager.

23   Q.    Right?

24   A.    It's my understanding he does not support the

25   transaction.

Dickinson - cross

1    Q.    And we'll hear more about that today, sir.

2              On January 6th of this year, sir, APS formally

3    notified EnergySolutions that it was exercising its right

4    under the LOP agreement to open the LOP agreement for

5    renegotiation; right?

6    A.    That is correct.

7    Q.    Okay.  And under the terms of the LOP agreement,

8    right, APS has agreed to negotiate in good faith with

9    EnergySolutions; is that right?

10   A.    As stated in the contract, we intend to negotiate in

11   good faith with EnergySolutions.

12   Q.    Right.

13   A.    And I believe we have, you know, currently.

14   Q.    Okay.  And APS will continue to negotiate in good

15   faith with EnergySolutions regardless of whether the

16   proposed merger closes; is that right?

17   A.    Yes, we will.

18   Q.    Okay.  So regardless of whether or not EnergySolutions

19   acquires WCS, APS is perfectly happy to renew its LOP

20   agreement with EnergySolutions if the terms are right?

21   A.    I don't think you characterized that right.  Perfectly

22   happy?

23   Q.    Sure.

24   A.    We would if the terms are correct.

25   Q.    Sure.

Dickinson - cross

1    A.    If our dollar values were more in alignment with what

2    the current competitive marketplace is, most certainly.

3    Q.    Sure.   Regardless of whether the merger closes or not;

4    is that right?

5    A.    I don't see how the merger closing has anything to do

6    with that.

7    Q.    Okay.   Thank you.

8            Sir, the merger was announced on November 15th,

9    2015; is that right?

10   A.    Around about that date.

11   Q.    Okay.

12   A.    I thought it was the 16th.

13   Q.    So it was a couple months after EnergySolutions and

14   APS went to mediation and did not resolve their dispute; is

15   that right?

16   A.    Correct.

17   Q.    Okay.   And it's also true, sir, that almost

18   immediately after the merger was announced, you started

19   lobbying the Department of Justice to block it; is that

20   right?

21   A.    I wouldn't characterize it as lobbying.

22   Q.    Okay.   It's true, sir, that APS, you and others at APS

23   reached out to the Department of Justice, correct, shortly

24   after the merger was announced; is that right?

25   A.    We contacted them.

Dickinson - cross

```
 1    Q.    Okay.  And as part of that lobbying effort, you and

 2    others at APS tried to enlist the support of other utilities

 3    against the merger; is that right?

 4    A.    Again, you're using the word "lobbying."  That has a

 5    different connotation or meaning for me.

 6    Q.    All right.

 7    A.    We did contact other utilities to seek what their

 8    position was at the time.

 9    Q.    Okay.  You were actually contacting other utilities to

10    see if they would join forces with you in opposing the

11    merger; is that correct?

12    A.    Again, are I don't believe it was joining forces.

13    Q.    Okay.

14    A.    That spins it a different way.

15    Q.    Okay?

16    A.    It was more like I mentioned in my deposition.

17    Q.    Yes?

18    A.    We were fact-finding.  We were trying to find out what

19    their positions were and to see if we were an outlier, and

20    it was just that.  It was not lobbying or attempting to

21    persuade somebody, as you're kind of leading me to believe.

22    Q.    All right.  Sir, go to the document in your binder,

23    DTX-133 there.  It's at the back of the binder.

24    A.    DTX?

25    Q.    DX.  DX-133?
```

Dickinson - cross

1    A.    I understand.

2    Q.    Thank you.

3              Sir, I will represent to you this was an e-mail

4    chain that was produced to you in this litigation by Exelon.

5    A.    Okay.

6    Q.    If you go to the third page of the document, it's the

7    e-mail and it's also on your screen there.

8              THE COURT:  And I know I don't have a jury, but

9    in my courtroom you don't put a document up until it is

10   admitted.  This has not been admitted.  If it's going to be

11   used for impeachment, it doesn't go up here.

12             MR. LARKIN:  I'm not moving to admit it, your

13   Honor.

14             THE COURT:  All right.

15   BY MR. LARKIN:

16   Q.    Mr. Dickinson, if you take a look at the e-mail, at

17   the bottom of page 3, this is from Carl Moller to

18   Mr. Thompson, Mr. Cole and Mr. Harris.  They're with Duke

19   Energy, Entergy and Exelon; is that correct?

20   A.    Can I get a moment to look at it?

21   Q.    Sure.

22   A.    I've not seen this document before, I believe.

23   Q.    All right.

24             (Pause.)

25   BY MR. LARKIN:

Dickinson - cross

1   Q.    Mr. Dickinson, if I could just draw your attention to

2   the e-mail at 11:07 a.m.

3   A.    Can I finish?  I'd like to review the entire e-mail

4   because I'm not listed on this document anywhere.

5   Q.    I just wanted to ask you about the statement made by

6   Mr. Moller to those individuals.  All right?

7   A.    Could I review the document?

8   Q.    It's just a straightforward question, sir.  Right

9   here.

10        You see on page 3, Mr. Moller writes to those

11   individuals:  "We are going to Washington, D.C. next week to

12   meet with individual reviewing this application and DOJ.

13   Our legal reached out and the individual reviewing this

14   asked for the meeting.  Our R waste shipper -- that's you,

15   right -- and senior legal counsel plan on attending.  This

16   may be an opportunity to join forces.

17        Do you see that?  That's what Mr. Moller wrote

18   on December 11th, 2015?

19   A.    I see that statement.

20   Q.    Okay.  And it's also true, sir, that Duke Energy,

21   Entergy and Exelon, they did not agree to join forces

22   with APS in their efforts to block the merger; is that

23   right?

24   A.    Again, if I could review the entire document, I could

25   speak to that.

Dickinson - cross

1   Q.    I'm just asking you, sir.  Are you aware of whether

2   Entergy, Duke Energy or Exelon agreed to join forces with

3   APS to block the merger, sir?

4   A.    I have no knowledge of that.

5   Q.    All right.  Thank you.

6   A.    But, again, join forces?  I wouldn't use that

7   terminology.

8   Q.    Okay.  But Mr. Moller used it in this e-mail; is that

9   right?

10  A.    I -- I cannot speak to what Mr. Moller was referring

11  in this e-mail.

12  Q.    Okay.  So let's talk about Exelon, sir.  Exelon is the

13  largest provider of energy services in the country; is that

14  right?

15  A.    I do not know that.

16  Q.    All right.  You're aware that when Mr. Moller sent

17  your presentation to Exelon in December of 2015, Exelon told

18  Mr. Moller to take their name off it; right?

19  A.    Again, I do not know what presentation Mr. Moller

20  distributed to Exelon.

21  Q.    Mr. Dickinson, is it your testimony that you are not

22  aware that Exelon asked Mr. Moller to take their name off of

23  your presentation to the Department of Justice?

24  A.    I do know that Carl Moller corresponded with me

25  following this time period about Exelon not wanting their

Dickinson - cross

1    name on a talking points presentation that was distributed

2    internally to APS.  I have no knowledge about, if that's

3    the -- it's not the same presentation that was delivered to

4    the Department of Justice.

5    Q.    Okay.  Mr. Dickinson, it's also true that when you

6    reached out to Lee Hamel at Duke Energy personally about the

7    merger, he told you that Duke Energy was choosing to remain

8    neutral with respect to the merger; is that correct?

9    A.    I believe that was their official position at the

10   time.

11   Q.    It's true, sir, that Mr. Hamel told you that Duke

12   Energy didn't have the same vested interests and issues with

13   the merger; is that correct?

14   A.    We spoke about that during the deposition.

15   Q.    Yes.

16   A.    And there is a document on that.

17   Q.    Okay.

18            MR. LARKIN:  Your Honor, this is a document that

19   I would like to admit into the record.

20   BY MR. LARKIN:

21   Q.    Could you turn to DX-230, please, in your binder.

22   A.    I'm with you.

23   Q.    Okay.  Mr. Dickinson, this is an e-mail from you to

24   Mike Green.  He is the APS general counsel; is that correct?

25   A.    Could I get a moment to review it?

Dickinson - cross

1    Q.    Sure.  Absolutely.

2    A.    Thank you.

3              (Pause.)

4              THE COURT:  At the moment, just need to say

5    whether it's an e-mail.  I mean, you are just identifying

6    the document, not the content.

7              THE WITNESS:  Okay.  I understand, your Honor.

8    Yes, it is an e-mail.

9    BY MR. LARKIN:

10   Q.    Okay.  Thank you, sir.

11             If you go to the first embedded e-mail, this is

12   an e-mail from Mr. Hamel to you the same day as the e-mail

13   we just looked at?

14             THE COURT:  And have you admitted it?  You've

15   authenticated it?  Are you done the authentication?

16             MR. LARKIN:  I am not, your Honor.

17             THE COURT:  Okay.

18   BY MR. LARKIN:

19   Q.    Mr. Dickinson, do you have any doubt you wrote this

20   e-mail to Mr. Green on December 11, 2015?

21   A.    No.

22   Q.    Okay.  Thank you.

23             MR. LARKIN:  Your Honor, we would move to admit

24   DX-230 into the record.

25             THE COURT:  Thank you.  It's admitted.

Dickinson - cross

1            MR. LARKIN:  Thank you.

2            (Defendants' Exhibit No. 230 was admitted into

3    evidence.)

4    BY MR. LARKIN:

5    Q.    You'll see that Mr. Hamel writes to you in the second

6    paragraph:  "That said, our talking point summary is a

7    little different from yours, as I do understand you all have

8    more vested interests and issues with the purchase for a

9    variety of reasons."

10            Do you see that, sir?

11   A.    Yes, sir.

12   Q.    Okay.  So far as you know, sir, as of December 11th,

13   2015, Duke Energy was in an ongoing dispute with

14   EnergySolutions over the scope of their life of plant

15   agreement; right?

16   A.    I have no knowledge of that.

17   Q.    Okay.  You can put that down.  Thank you.

18            Mr. Dickinson, you made a presentation to the

19   Department of Justice on December 18th, 2015; is that

20   correct?

21   A.    Yes.

22   Q.    Okay.  And when you made your presentation to the

23   Department of Justice, it was a PowerPoint presentation; is

24   that right?

25   A.    Yes.

Dickinson - cross

1   Q.    Okay.

2   A.    Actually --

3   Q.    I'm sorry.

4   A.    It was a raged as a PowerPoint presentation, but it

5   was delivered in paper format.

6   Q.    Understood.   Okay.

7              When you made that presentation to the

8   Department of Justice, you didn't actually provide the

9   Department of Justice with any backup analysis or

10  spreadsheets or data to support the statements that were

11  made in that analysis; is that right?

12  A.    Not at that time.

13  Q.    Okay.  So, and you recall at your deposition, we

14  talked about the fact that you told the Department of

15  Justice that it was your understanding that 80 percent of

16  APS's Class A waste could be disposed of at the exempt cell;

17  is that correct?

18  A.    That is correct.  And we still believe greater than

19  80 percent of our Class A waste is an acceptable candidate

20  to go into the WCS exempt cell in Texas.

21  Q.    Okay.  And when you told the Department of Justice

22  that in December of 2015, you didn't provide them with your

23  backup analysis or data to support that; is that right?

24  A.    I did not.

25  Q.    All right.  And, in fact, sir, it's also true that

Dickinson - cross

1    when you made that presentation, you were not able to

2    tell the Department of Justice that any of the other

3    utilities that you had contacted opposed the merger; is

4    that correct?

5    A.    I believe we didn't.

6    Q.    Or any other processors; right?

7    A.    I don't believe so.

8    Q.    Okay.  Sir, you met with the Department of Justice for

9    an entire day to prepare for your deposition last month; is

10   that correct?

11   A.    I wouldn't characterize it as an entire day.

12   Q.    Okay.  You met with the Department of Justice lawyers

13   to prepare for your deposition on the day before your

14   deposition; is that correct?

15   A.    That's correct.

16   Q.    All right.  And when you met with the Department of

17   Justice lawyers, they did not inform you that any other

18   utility had opposed the merger; is that right?

19   A.    I don't believe so.

20   Q.    Okay.  And you have testified on direct that someone

21   from WCS told you in 2014 or 2015 that WCS could accept

22   80 percent of the Class A waste generated by APS at its

23   exempt cell; is that correct?

24   A.    If you're talking about 2014/2015, there's multiple

25   people.

Dickinson - cross

1    Q.    Okay.

2    A.    But we did speak of an individual in the deposition.

3    Q.    Right.  The individual we spoke about in the

4    deposition was Mr. Blithe; is that correct?

5    A.    Yes.

6    Q.    Okay.  And he was in business development at WCS; is

7    that right?

8    A.    He was my accounts representative.  He also handled

9    some of my waste characterization.  There's a profiling

10   process.  There's pieces and parts to the program.

11   Q.    All right.

12   A.    So he was more than just the account guy.

13   Q.    Okay.  And you recall at your deposition, you told me

14   that when Mr. Blithe made that statement to you about the

15   exempt cells capabilities, he did not actually provide you

16   with any backup data or analysis to support that statement

17   that 80 percent of APS's Class A waste could go to the

18   exempt cell; is that right?

19   A.    Well, he wouldn't have specific knowledge of my waste

20   streams, so, no, he did not provide me with anything, and I

21   did not need it as I had my own analysis, my own data.

22   Q.    Okay.  But he didn't provide it to you; right?

23   A.    He did not provide it.

24   Q.    Thank you.

25              And he's no longer with WCS; is that right?

Dickinson - cross

1    A.    He's no longer with WCS.

2    Q.    All right.  He moved on to WMG; right?

3    A.    That's correct.

4    Q.    And he has actually moved on since to ICE Services

5    Group, right, as of March of this year?

6    A.    I know he does work for ICE Services, but he is still

7    my account rep for WMG.

8    Q.    All right.  And you testified on direct that you had

9    subsequent conversations with Mr. Baltzer, WCS's president

10   and CEO, concerning the exempt cells capabilities; is that

11   right?

12   A.    That's correct.

13   Q.    Okay.  And Mr. Baltzer is present with us today; is

14   that correct?

15   A.    Yes, he is.

16   Q.    Okay.  And Mr. Baltzer told you in early 2016 at a

17   meeting between you and Mr. Baltzer and Mr. McLaughlin, that

18   based on further analysis that WCS had done, it believed

19   that it could take significantly less than 80 percent of the

20   Class A waste generated by APS at the exempt cell; is that

21   correct?

22   A.    He did not state it was based on further analysis.  He

23   just stated that he believed it was a different number than

24   what we had previously spoke of.

25   Q.    Okay.

Dickinson - cross

1    A.    There was no analysis in the equation.

2    Q.    You told me at your deposition that Mr. Baltzer told

3    you that the range was between 13 and 19 percent; is that

4    correct?

5    A.    That is correct.

6    Q.    Okay.  Right.  And Tim Blithe was not at that meeting;

7    right?

8    A.    No, Mr. Blithe was not there.

9    Q.    And we talked about this at your deposition, but you

10   don't believe when Mr. Baltzer told you the range was

11   between 13 to 19 percent rather than the 18 percent you had

12   heard from Mr. Blithe, that Mr. Baltzer was lying to you

13   about that; right?

14   A.    Again, during the deposition, as I stated it, I don't

15   know what Mr. Baltzer's intent is.  I do not know if he's

16   lying.  Maybe just misinformed about the fact.  I don't know

17   if he's lying.  Does that answer your question?

18   Q.    Well --

19   A.    You keep throwing the lying word in there.  I'm not

20   comfortable with that.

21   Q.    Okay.

22   A.    He may be misinformed.

23   Q.    We'll look at your deposition testimony, sir.

24   A.    Okay.

25   Q.    All right.  Could you go to your deposition, page 100,

Dickinson - cross

1    sir.

2    A.    I'm with you.

3    Q.    Thank you.

4          This is starting at line 12.

5    A.    I understand.

6    Q.    I asked you:  "Do you think they were lying to you,

7    sir?"  And that was referencing Mr. Baltzer in my question.

8    There was an objection from Mr. Comenetz.

9          You answered:  I would not call Rob Baltzer a

10   liar because I do not know where he was getting his

11   information from."

12         Did I ask you that question, did you give me

13   that answer, sir?

14   A.    Yes.

15   Q.    Thank you.

16   A.    And the information we're referring to is his

17   statement of 13 to 19 percent.  It was not information

18   pertaining to some analysis at some point during that

19   discussion.

20   Q.    Okay.  You also told me that the percentage of waste

21   that could be disposed of at the exempt cell based on these

22   calculations is variable; right?

23   A.    It's a two-part process as I described previously.

24   Q.    All right.

25   A.    There's the calculations that go into the activity per

Dickinson - cross

1    gram piece, and then there's the threshold value, so

2    millirem.  Contact with the object, two millirem at one

3    meter.  Those are not analyses.  Those are just performance

4    based objectives that we did within our sort program.

5    Q.    Right.

6    A.    So analysis, no.

7    Q.    Right.  You told me at your deposition, sir, that it's

8    impossible to get a precise number of the percentage of

9    waste that could go to the exempt cell based on these

10   analysis and calculations; is that right?

11   A.    That's why I describe it as greater than 80 percent.

12   Q.    All right.

13   A.    My specific analysis for the waste, from 2012 until

14   2016 inclusive, is in the high nineties.

15   Q.    All right.

16   A.    But it is greater than 80 percent based on my own

17   internal analysis at our facility and the results of our

18   sort process.

19   Q.    Right.

20   A.    Greater than 80 percent for the Class A waste stream.

21   Q.    Sorry about that.  It's possible, isn't it, that the

22   smart folks at WCS analyzed the capabilities of its own

23   exempt cell; right?  Its own site and came to a different

24   conclusion about what it can take in terms of Class A waste;

25   right?

1    A.    WCS does not have the characteristics and the

2    information pertaining to my individual waste streams to

3    perform that analysis.  They don't know what I have.  They

4    don't have the information that I have.

5    Q.    All right, sir.  It's true that as of today, right,

6    APS has never sent any waste to the WCS exempt cell for

7    disposal; is that right?

8    A.    That is correct, and that's a result of having the

9    life of plant agreement in place.

10   Q.    Right.

11   A.    It prevents us from using that facility at this time.

12   Q.    I understand that.  But my question is:  Your analysis

13   of what could go there is not based on anything you've

14   actually sent there; right?

15   A.    My analysis is based on what I have the potential to

16   send there through those measurements we discussed.  I have

17   not sent any objects to that facility at this time.

18   Q.    Right.  Okay.  So it's just a, just so I understand

19   it, it's a theoretical conclusion based on an analysis that

20   you did of the waste; right?  But it's not based on anything

21   that has actually been sent to the exempt cell by APS; is

22   that correct?

23   A.    We have not sent anything to the exempt cell, but it's

24   more than just a theory.  It's actual performance data on

25   the characteristics of shipments from 2012 to 2016 inclusive

Dickinson - cross

1    in addition to the performance-based analysis that we did on

2    our sort process to remove those objects.

3    Q.    Right.

4    A.    We are very confident -- I mean, I'm in a business

5    where nuclear safety, industrial safety, safety culture are

6    our top priorities.  We don't haphazardly go off and perform

7    an analysis that we cannot back up.  I am a hundred percent

8    guaranteed that my 80 percent calculation or better is a

9    good number for the amount of material that can go into the

10   exempt cell.

11   Q.    Okay.  But, again, that's not based on any actual

12   shipments that have gone there from APS or any other

13   generator; is that right?

14   A.    Again, I can't speak for other generators.

15   Q.    Right.

16   A.    You know, let's keep the topic to a PSI.  I've not

17   sent any material to the exempt cell, so it's not based on

18   any actual shipment to that facility.

19   Q.    Okay.  You understand that there are other processors

20   and generators who have attempted to use the exempt cell; is

21   that correct?

22   A.    I know other facilities speaking with Mr. Blithe that

23   have used the exempt cell.  One that comes to mind is

24   Humboldt Bay Decommissioning Project.

25   Q.    All right.

Dickinson - cross

1   A.      As far as other generators, I can't speak for them.

2   Q.      Right.  So if a generator testified in this case that

3   it took ten times as long to disclose of waste at the exempt

4   than at the Clive facility, you would have no basis to

5   dispute that?

6   A.      Well, actually, I hear those similar arguments from my

7   peers in the industry concerning the compact waste facility,

8   and my experience at the compact waste facility that it's

9   not as difficult as they make it out to be, and based on

10  that experience, I would think that going into the exempt

11  cell is just as easy.

12  Q.      So you hear comments from others in the industry that

13  it's also difficult to make shipments at a compact waste

14  facility that accepts B/C waste?

15  A.      From people that have never shipped their waste to the

16  compact facility.

17  Q.      I'm talking about people who have actually attempted

18  to ship waste to the exempt cell, sir.  If someone testified

19  that it took ten times as long to dispose of waste at the

20  exempt cell than at the Clive facility in Utah, you would

21  have no basis to dispute that; right?

22  A.      I have no knowledge of that.

23  Q.      Right.  Or someone describing the process of disposing

24  waste at the exempt cell is untenable, you wouldn't have any

25  basis to dispute that?

Dickinson - cross

1    A.    It's not my understanding based on the knowledge that

2    I do have.

3    Q.    For example, a processor that waited more than eight

4    months just to have a shipping profile approved by WCS

5    before it could make a shipment to the exempt cell, you have

6    no basis to dispute that either; is that right?

7    A.    I have no knowledge of that.

8    Q.    All right.

9    A.    I don't know what the specific examples are.

10   Q.    Okay.

11   A.    It's probably something that they didn't do on their

12   then.

13   Q.    Okay.  So let's talk about the analysis that you did

14   with respect to the waste that could go to the exempt cell.

15   We talked about this at your deposition; right?

16   A.    Okay.

17   Q.    Your 80 percent or more figure of Class A waste that

18   could go to the exempt cell is based on the total volume of

19   Class A waste shipped by APS from 2012 through 2016

20   inclusive; is that right?

21   A.    That's correct.

22   Q.    Okay.  But you actually have no idea what percentage

23   of shipments that APS made of Class A waste during that

24   period could have gone to the exempt cell; is that correct?

25   A.    Knowledge of it, yes.  Specific, no.

Dickinson - cross

1    Q.    Okay.  Well, let's go to your deposition, sir.  I

2    asked you about this.

3    A.    All right.

4    Q.    Page 80.

5    A.    Page which?

6    Q.    80, sir.

7    A.    I understand.

8    Q.    I asked you starting at line 22, sir.

9    A.    Okay.

10   Q.    "What percentage of shipments, what percentage of

11   shipments that went to Clive during the period that you

12   looked at could go to the exempt cell?

13             "Answer:  I have no idea."

14             Did I ask you that question and did you give me

15   that answer, sir?

16   A.    Yes.

17   Q.    Okay.  Thank you.  Put that aside.

18   A.    But that was just that time.  Since our conversation,

19   I went back and looked at it.

20   Q.    Okay.  So a month ago, you had no idea what percentage

21   of shipments could actually go -- that you made to Clive

22   during that period could go to the exempt cell; right?

23   A.    And if we look through this deposition, at that point

24   in time, we were discussing shipments, and you were focused

25   in on shipments, and it was a volume based determination.

Dickinson - cross

1    It wasn't a per shipment criteria that we were discussing.

2    Q.    All right.

3    A.    Does that make sense?

4    Q.    Sir, did I ask you that question and did you give me

5    that answer?

6    A.    I'm trying to put this into context where this was

7    pulled out of.

8    Q.    All right.

9    A.    I'm sorry if I did something inappropriate.

10   Q.    Okay.  Your analysis of the total volume that you

11   claim could be disposed aft the exempt cell, that presumes

12   that all of the waste that was shipped by APS over that

13   four-year period inclusive through 2016 that was already

14   sorted, already processed by APS on site; right, that it

15   would be repackaged or resorted, resegregated, reprocessed

16   and repackaged going forward into shipments that would

17   satisfy the waste acceptance criteria at the exempt cell; is

18   that right?

19   A.    State that again.

20   Q.    Sure.  So you look at all of the waste that was

21   shipped, the total volume of waste that was shipped during

22   that period of time; is that correct?

23   A.    That is correct.

24   Q.    All right.  And you don't know what percentage of

25   shipments that were made during that time would have

Dickinson - cross

1    actually satisfied the waste acceptance criteria at the

2    exempt cell as shipped, right, during that period of time?

3    A.    I have knowledge of it, but not a specific number.

4    Q.    Right.  So your analysis looking forward as to what

5    could go to the exempt cell, right, looks at that volume of

6    waste.  And if it was resorted, resegged, reprocessed,

7    repackaged, then shipped to the exempt cell, right,

8    80 percent of it could qualify for the exempt cell; is that

9    correct?

10   A.    I don't think that accurately characterizes it.  There

11   was a number of these shipments that could go direct to the

12   exempt.  If we go back to the analysis that I performed,

13   there's soil shipments, there's dry active waste shipments.

14   There's some resin shipments.  There's a number of shipments

15   that would not require the repackaging, reprocessing that

16   you speak of.  They could have went direct disposal to WCS

17   exempt.

18            There is a few shipments, DAW, maybe resin, that

19   we would have to sort out 75 millirem per hour components.

20   They met the exempt activity criteria, but we didn't sort

21   them at that time to the 75 millirem.  If we were using the

22   exempt cell, that would automatically be a part of the

23   process.  There would be no repackaging required going

24   forward.

25   Q.    Okay.  Sir, just to be clear, you looked -- again, you

Dickinson - cross

1    looked at the total volume that was generated over that

2    entire time and shipped?

3    A.    2012 through 2016 inclusive.  That is correct.

4    Q.    And you don't have any idea what percentage of those

5    shipments that were made could have qualified for the exempt

6    cell; is that correct?

7    A.    Again, a specific number of shipments, no, but I do

8    have information that tells me that some of those shipments

9    would have went direct there with no repackaging.

10    Q.    All right.  Some of them; right?

11    A.    A number.

12    Q.    But some of them, some of them would have had to have

13    been resorted, reprocessed, resegged, repackaged; is that

14    right?

15    A.    If we were going to apply it to what has already

16    happened, this material is already in Clive, Utah.  We

17    wouldn't repack it because it's already in the ground.

18    Going forward, we would institute that sort piece, and that

19    would be applying or applicable to any shipment going

20    forward.

21    Q.    All right.  And that sort of piece that you spoke

22    about in your direct, that's something that APS does

23    in-house; is that correct?

24    A.    That is correct.

25    Q.    Okay.  You're not aware of any other utility that has

Dickinson - cross

1      that in-house capability to sort, seg, process their waste

2      before it would be disposed of at Clive or the exempt cell;

3      is that correct?

4      A.     As we talked in the deposition, I have no knowledge of

5      what the other facility's capabilities are in regard to that

6      sort site piece.

7      Q.     Okay.  Right.

8             So, and it's also true, sir, that the analysis

9      that you did, it didn't actually factor in the additional

10     cost to APS in doing this additional sorting and segging of

11     Class A waste before it's shipped to the exempt cell; is

12     that correct?

13     A.     My analysis does include that.  The sort/seg process,

14     as I described it earlier, is already established.  It is

15     basically large containers placed in their processing

16     facility.  The waste is removed from that and it's ran

17     through an X-ray machine to remove those consumables or

18     those tools and equipment or non-conforming items, and when

19     it comes out the other side, it goes into one of two

20     containers.

21            In this case, we would put a division there.

22     The waste would go into the 75 millirem per hour or larger

23     or it would go into the less than 75 millirem.  There's no

24     additional cost because there's still a person handling go

25     that waste to place it into the disposal.

Dickinson - cross

1    Q.    You don't know whether any other utility has those

2    capabilities at this time; is that correct?

3    A.    As I stated, no, I do not know what their specific

4    capabilities are as related to the, that 75 millirem sort

5    process.

6    Q.    Whether they have any capabilities with respect to

7    sorting go, segging and pro processing on site; right?

8    A.    I do know other utilities do have sort/seg processes,

9    but not necessarily for the 75 millirem criteria.

10   Q.    Okay.  It's also true, sir, that if a shipment is made

11   that does not satisfy the waste acceptance criteria for the

12   exempt cell, right, that shipment of waste is sent back to

13   the customer at the customer's cost; is that right?

14   A.    That is correct.

15   Q.    Okay.  So to the extent that a customer, like APS or

16   another customer that wanted to use the exempt cell, made a

17   shipment that didn't satisfy the strict criteria that you

18   talked about on your direct with respect to dose rates, that

19   waste would be shipped back at a customer's cost; is that

20   right?

21   A.    Again, I wouldn't characterize it as strict criteria.

22   If it exceeded the 75 millirem per hour, you're correct, it

23   would come back to me.  However, in my 31 years of

24   experience of shipping radioactive waste to multiple

25   disposal facilities and processors across the country, I've

Dickinson - cross

1    never had a waste acceptance criteria violation.

2    Q.    Okay.  But that 31 years of experience, that actually

3    doesn't include any experience with the WCS exempt cell;

4    right?

5    A.    Currently, because of a life of plant agreement, I'm

6    not allowed to ship to the WCS.

7    Q.    I understand that.  The waste acceptance criteria at

8    life is not as strict as the WCS exempt cell criteria with

9    respect to dose rates?

10   A.    They have a dose rate limitation.

11   Q.    Right.

12   A.    But, yes.  That's the same thing.  If it's 75 millirem

13   at WCS or 200 to 500 at Clive or 80 or more, it's still a

14   threshold limit that I must meet and make my material go

15   there.  So in my 31 years of experience, I've never had any

16   waste acceptance criteria violation.

17   Q.    Okay.

18   A.    So I'm able to meet one facility's threshold criteria.

19   I would be able to meet the threshold criteria of another

20   facility.

21   Q.    That's your experience; right?  You are not speaking

22   behalf of any other utility and their experience with having

23   waste rejected; is that correct?

24   A.    That is correct.

25   Q.    Right.  And one of the reasons that other utilities

Dickinson - cross

1    aside from APS may choose to use a processor is to make sure

2    that their waste is processed in a way that it can be

3    accepted at Clive; right?  Or, I'm sorry, or another Class A

4    landfill; is that correct?

5    A.    I do know those services exist out there.  The

6    specifics of why a utility chooses it, I do not know.

7    Q.    Well, you told me at your deposition that you are

8    aware just based on your industry knowledge that there are

9    other utilities who use the Bear Creek processing facility;

10   is that correct?

11   A.    That is correct.

12   Q.    And there are other utilities who may use Toxco, for

13   example, to process their waste; right?

14   A.    Possible.

15   Q.    Or Omega; right?

16   A.    They may.

17   Q.    Right.  And there's other processors, right, who

18   process Class A waste, right, to make sure that it satisfies

19   the waste acceptance criteria before it's disposed of;

20   right?

21   A.    I think we pretty much exhausted them at that point.

22   Q.    All right.

23          MR. LARKIN:  Can I have demo 1, please.

24   BY MR. LARKIN:

25   Q.    Mr. Dickinson --

Dickinson - cross

1          MR. LARKIN:  Your Honor, this is a

2   demonstrative.  I'm not going to admit it into evidence, but

3   could I please publish it?

4          THE COURT:  Sure.

5          MR. LARKIN:  Thank you.

6   BY MR. LARKIN:

7   Q.    Mr. Dickinson, this is a map from the NRC's website of

8   the current U.S. operating commercial nuclear power reactors

9   in the United States.  All right?  I will represent that to

10  you.

11  A.    I believe you.

12  Q.    All right.  So this is -- I will just mark, this is

13  APS right here, right, in Arizona?

14  A.    I believe so, yes.

15  Q.    Okay.  And we have, there's two reactors in

16  California, there's a reactor in Washington; right?  Would

17  you agree with that?

18  A.    Actually, I believe there's four reactors in

19  California.

20  Q.    I think this is active, so I think two have been

21  removed for decommissioning.

22  A.    If they turn to a decommissioning status, then you may

23  be right.

24  Q.    Okay.  So would you agree with me, sir, that other

25  than those four that are represented on the map, right, that

Dickinson - cross

1    the overwhelming majority of the nuclear power reactors are

2    in the eastern half of the United States, starting basically

3    east of Kansas; right?

4    A.    Well, you stated four.  I count six.  Right.  There's

5    three in Arizona, two in California, one in Washington.

6    Q.    You're right.  I apologize.  You're right.  Okay.

7          And you understand that many of the utilities on

8    the eastern half of this map, they utilize the processing

9    services in Tennessee; is that correct?

10   A.    Yes.  I think another key point though is the reactor

11   in Washington State, the Columbia facility, has a U.S.

12   Ecology facility right next-door a few miles down the road,

13   so they would not be in a position to utilize the services

14   of the California plants or myself.

15   Q.    Right.

16   A.    To answer your question, it does appear based on the

17   map that the majority of the plants are in the eastern

18   portion of the country.

19   Q.    And you understand, as you told me at your deposition,

20   right, that the vast majority of the nuclear power reactors

21   in the United States, they use Bear Creek processing

22   facility and other processors to process their waste, right,

23   before it's sent for disposal; is that correct?

24   A.    That is correct, based on their regional location.

25   Q.    Yes.

Dickinson - cross

1    A.      They would utilize that facility.

2    Q.      All right.  In fact, one of the additional costs to

3    APS if they were to use a processor in Tennessee would be to

4    ship that waste all the way across the United States and

5    then ship it back to Clive or use one of the BSFR landfills,

6    is that correct, or another facility to dispose of it;

7    right?

8    A.      In the case of most waste streams, yes.

9    Q.      All right.

10   A.      In my life of plant agreement, I have a criteria that

11   is the bulk of my EAW called Easy Ship and transportation is

12   included into that rate structure, so it's up to

13   EnergySolutions, where they actually transport that waste

14   to, whether they go direct to Clive or whether they go to

15   Tennessee.

16   Q.      Okay.

17   A.      So for that category of material, there would be no

18   difference in transportation cost.

19   Q.      Okay.  But at least for the generators that are on the

20   eastern half of the United States, to the extent they are

21   using a processor, right, they've made the calculation that

22   it's more cost-effective for them to incur the

23   transportation costs, process it, and then ship it to Clive

24   or BSFR or another site; is that correct?

25   A.      They may have.  I can't speak for them.  It may be an

Dickinson - cross

1  EnergySolutions decision-making process.

2  Q.    And one of the reasons that APS does the in-house

3  processing that we talked about, that you talked about on

4  your direct, is because it does not want to incur the

5  transportation costs of having to ship that waste all the

6  way across the country and then back; is that right?

7  A.    Partly.  We thought previously there are some items in

8  that waste stream that I want to recover, so I'm going to

9  perform that seg/sort process to recover tools and other

10 valuable items.

11 Q.    Okay.

12 A.    Occasionally during the generation of this waste,

13 items may be placed into the waste stream that were not

14 intended for that.  Say a valve part, a motor, some high

15 dollar piece of equipment.  Our sort/seg process allows us

16 to remove that material.  It also allows us to comply with

17 the requirements for search of inanimate objects.  New reg

18 1608, activity levels.  Again, there are threshold levels

19 for service contamination that the material can be placed

20 into a general design package, so that analysis is being

21 performed at that same time in that sort process.

22 Q.    All right.

23 A.    The sort process isn't exactly for what you described.

24 It's for a multitude of reasons.

25 Q.    Okay.  Sir, would you agree with me that to the extent

Dickinson - cross

1    a generator was using a processor to process its Class A

2    waste currently, that to develop the type of in-house sort

3    and seg capabilities that APS has, it would cost money;

4    right?

5    A.    It may.  It would be a small amount of money.  I mean,

6    you are placing one disposal container.  You've got a

7    generation container on one end, a disposal container on the

8    other and an X-ray machine between them.

9    Q.    Well, you would have to sort and seg the waste; is

10   that right?

11   A.    That's not a very difficult process.  We don't remove

12   it from the bag.  It's basically bags of material going

13   through an X-ray machine like you would see at any airport

14   and coming off a conveyor belt at the other side.  It's not

15   a difficult process.

16   Q.    Okay.  But you don't know whether any other generators

17   have done that same calculus and decided that it's in the

18   best interests of their utility to use a processor and not

19   incur those additional costs; is that right?

20   A.    Again, the cost is minimal, and I cannot tell you what

21   other generators have done or whether they've evaluated that

22   or determined that it is acceptable to them.

23   Q.    Okay.  Mr. Dickinson, you stated to the Department of

24   Justice in your presentation that at least as of

25   December 2015, EnergySolutions had life of plant agreements

Dickinson - cross

1    with 84 of the 104 nuclear power reactors in the United

2    States.  Does that sound right?

3    A.    That is correct.

4    Q.    Okay.  And you understand that a number of those life

5    of plant agreements have come up for renewal or off ramp

6    periods since that time; right?

7    A.    I do not know that.

8    Q.    All right.  Let me ask you this:  Are you aware of any

9    utility that has decided not to renew its life of plant

10   agreement during an off ramp period with EnergySolutions

11   since the exempt cell came into place in 2014 and instead is

12   using the exempt cell to dispose of their Class A waste?

13   A.    Like I said, I have no knowledge that they've renewed

14   them or they've not renewed them.  My understanding is many

15   of the LOPs are coming up for discussion in the year of

16   2017.

17   Q.    All right.

18   A.    As we have not completed that process; right?  We're

19   still in negotiation.

20   Q.    You have not completed that process with

21   EnergySolutions; is that right?

22   A.    That is correct.

23   Q.    All right.  But you don't know whether there have been

24   other utilities who have had the opportunity to off ramp to

25   another option and, in fact, found it cost-effective to

Dickinson - cross

1    stick with Energy Solutions because of all the services

2    that Energy Solutions provides for its customers; is that

3    right?

4    A.    Again, I don't think all the services that

5    EnergySolutions provide is really specific to the question.

6    If the question is do I know of anybody that has renewed

7    their LOPs or not renewed their LOPs during this negotiation

8    time period, I don't know that.

9    Q.    Okay.  You're also not aware of any utility that's

10   currently shipping anywhere close to 80 percent of its Class

11   A waste to the exempt cell; right?

12   A.    Again, the one piece I do know is Amulte (phonetic) is

13   shipping a large quantity of decommissioning materials to

14   the exempt cell.

15   Q.    Right.

16   A.    Other than that, I have no knowledge of how much waste

17   other utilities are placing into the exempt cell.

18   Q.    Right.  That's decommissioning waste; right?  I'm

19   talking about operational waste?

20   A.    Amulte is a decommissioning situation.

21   Q.    Are you aware of any other utility that is shipping

22   80 percent of its Class A operational waste to the exempt

23   cell, sir?

24   A.    I just answered no.

25   Q.    Okay.  Thank you.

Dickinson - cross

1             And you talked to people in your industry;

2    right?  You talked to 15 to 20 utilities during your

3    mediation with EnergySolutions; right?

4    A.     I talked to a number of utilities during the --

5    leading up to the negotiations with the LOP contract.

6    Q.     Right.  Okay.  And you have conversations on a regular

7    basis with people in the industry; right?

8    A.     Occasionally.  I wouldn't say it's daily.

9    Q.     Okay.  Right.  And in those occasional conversations,

10   you've never heard from one of your fellow nuclear power

11   reactors that they're shipping 80 percent of their Class A

12   waste to the exempt cell; right?

13   A.     I don't have that information.

14   Q.     You don't have the information.  No one has ever told

15   you that; right?

16   A.     I did not seek it out because I know my numbers are

17   80 percent and I'm confident of it.

18   Q.     That's your spreadsheet analysis; right?  No one has

19   ever told you that they've actually done it; right?

20   A.     It's more than just a spreadsheet analysis.  It was

21   actual trial runs using the sort process I have determined

22   that 80 percent of my waste can go in the WCS exempt cell

23   and I'm a hundred percent confident of that.  Eighty percent

24   or greater, actually.

25   Q.     Okay.  Let's switch topics.  You were asked some

Dickinson - cross

1   questions about APS's self-storage capabilities on direct.

2   A.   Yes.

3   Q.   It's true that APS currently has the ability to store

4   the -- the capacity to store 15 years worth of B/C waste on

5   site; is that correct?

6   A.   That's correct.

7   Q.   Okay.

8   A.   Thereabouts.  I mean, we have campaigns where we may

9   generate more or less, but on average, it's about a 15-year

10  period for storage.

11  Q.   Right.  So you have the capacity to store until at

12  least 2032?

13  A.   Say it again.

14  Q.   Until about 2032?

15  A.   15 years.

16  Q.   And given your current storage capabilities for B/C

17  waste, you could just choose to store that waste depending

18  on the cost of disposal; correct?

19  A.   Again, for the same reasons we've spoke of earlier,

20  there's additional cost.  I have to accrue the money.  I

21  have to pay for the storage process, and I have to take the

22  risk on potential disposal fees, because they're unknown at

23  this point in time.

24  Q.   Okay.

25  A.   So it is our position, as I stated previously, that we

Dickinson - cross

1    would not store this type of material.  If direct disposal

2    is available, that is the method that Calvert uses.

3    Q.    You were asked about the NRC's guidance on storage.

4    There's no NRC requirement that generators ship their waste;

5    is that correct?

6    A.    There is not a regulation.

7    Q.    All right.

8    A.    However, the NRC routinely performs inspections at our

9    station.  There's a transportation module.  There's an

10   inspection manual.  71, something, something, something.

11   Anyway, when they come in and review your reg waste

12   transportation and packaging programs, the inspection manual

13   specifically states, refer to generic letter 138.

14         There has been a letter in '94 that I spoke to.

15   There's also the 2011 time frame where the downblending

16   argument was being discussed.  In every one of those

17   situations, the NRC has made it very clear that in their

18   position, and it has stayed true to the facts, that they

19   prefer direct disposal over storage.

20   Q.    Okay.

21   A.    If economically feasible.

22   Q.    All right.  But it's not required; is that correct?

23   A.    It is not a regulation.

24   Q.    All right.

25   A.    It's --

Dickinson - cross

1    Q.    It's not a requirement that you ship.  You are not

2    required by the NRC to ship that waste to a disposal site;

3    right?

4    A.    It's not a regulation.  However, it's a very strong

5    recommendation.  Sort of like the Branch deposition.  It's

6    not a regulation, but the NRC will hold us accountable to

7    that guidance.

8    Q.    Okay.  Mr. Dickinson, isn't it true that APS has

9    actually used its self-storage capabilities as negotiating

10   leverage with WCS in the disposal of B/C resins?

11   A.    I don't believe so.

12   Q.    Okay.  Do you recall that during your negotiations

13   with WCS in the 2014/2015 time period for the disposal of

14   the legacy B/C resins that you talked about on direct, that

15   you took Mr. Baltzer on a tour of APS's storage facilities

16   that APS has on site?

17   A.    It's possible.

18   Q.    Okay.  And do you recall that you showed Mr. Baltzer

19   where the casks were located and how many empty slots APS

20   had to continue to store B/C resins if WCS didn't meet APS's

21   price expectations and accrual rates, sir?

22   A.    Well, actually, if that, in fact, happened, our

23   disposal, our storage slots would have been practically

24   full, so he would have saw that we had very little storage

25   capability at that point in time if he, in fact, went on a

Dickinson - cross

1    tour.

2    Q.    This is what Mr. Baltzer said in his deposition.

3    "They also took me on a tour of their storage facilities

4    that they had already built where those casks were located

5    and how many empty slots they had to continue to store B/C

6    resins if we didn't meet their price expectations and their

7    accrual rates."

8            Do you think Mr. Baltzer was lying about that,

9    sir?

10    A.    Again, I'm not calling Mr. Baltzer a liar, but I don't

11    know that that information accurately reflects the situation

12    at the time.  Because we were into a storage configuration

13    where we had very little space available, why would I tell

14    him that storage is our -- is in competition with disposal?

15    If we had no space available, that doesn't make sense.

16    Q.    Why would you tell him that?  I don't know.  But

17    according to Mr. Baltzer, right, he was shown the storage

18    capability and told that APS would continue to store the B/C

19    resins if WCS didn't meet APS's price expectations and

20    accrual rates, sir?

21    A.    I don't think that's an accurate statement, and the

22    other piece of the statement that doesn't ring true is we

23    don't store casks in that facility.  We store containers.

24    Q.    Okay.  It's also true, sir, that APS also currently,

25    is currently storing a significant amount of Class A waste

Dickinson - cross

1    on site; right?

2    A.    That is not correct.

3    Q.    You currently have four steam generators stored in

4    your facility; is that correct?

5    A.    No, that's not correct.

6    Q.    We talked about this at your deposition; right?

7    A.    Yes, we did.

8    Q.    You have four steam generators that are stored in a

9    mausoleum at Palo Verde?

10   A.    That's not correct.  We have six.

11   Q.    You have six.  All right.  You have six steam

12   generators?

13   A.    Six steam generators and three old vessel reactors

14   closer guides.

15   Q.    Okay.

16   A.    And they are stored in a robust concrete structure.

17   The -- it is not currently characterized as waste.  It would

18   meet the Class A waste requirements, but it's a material at

19   this point in time.

20   Q.    Okay.  And it would be classified as Class A waste if

21   it was classified as waste; right?

22   A.    If we classified it as waste, it would be Class A.

23   That is correct.

24   Q.    Right.  Okay.  I understand.

25   A.    But it's not.  There as clear distinction between

Dickinson - cross

1   waste and material.  Right?  There's radioactive material

2   and then the subcategory of that is Class A and Class B and

3   C.  So you may have a large quantity of material, but then

4   the waste has got different requirements on it for storage

5   requirements.

6   Q.   Okay.  We talked about this, sir, at your deposition.

7   The reason APS choses, is choosing to store those steam

8   generators on site is because it was cheaper to store them

9   in the, call it the mausoleum, than transport them to Clive;

10  is that correct?

11  A.   I wouldn't use the term -- it's cost-effective.

12  Q.   Okay.

13  A.   At the time, and it wasn't Clive -- at the time that

14  we removed those steam generators, Clive was not accepting

15  that material, we would have had to transport it to the

16  Barnwell facility in South Carolina.  And the cost for the

17  transportation, that part of our facility traveled to the

18  Gulf, around South America, all the way over to Barnwell,

19  that cost was prohibitive at that point in time for the

20  disposal of that material.

21  Q.   Right.  And you've told me that you've actually had

22  subsequent discussions with EnergySolutions about

23  potentially disposing of those generators at Clive; is that

24  right?

25  A.   Yes, we have.

Dickinson - cross

1    Q.    Okay.  But you have not reached an agreement with

2    EnergySolutions on that; right?

3    A.    There's, there's some difficulties in our -- in our

4    situation, because EnergySolutions came to us offering this

5    disposal pack that would include getting into our

6    decommissioning funds as a revenue source to pay for that

7    disposal.

8          With the seven owners and the corporation

9    commission, it's my understanding that we would be -- it

10   would be highly unlikely that we could obtain those

11   decommissioning funds for the disposal of this material, but

12   we're always entertaining offers.  If EnergySolutions comes

13   back today with an offer -- I mean, we want to do business

14   with these people.  They come back with an offer that's

15   acceptable, we would dispose of that material.

16   Q.    Right.  Okay.  But to the extent they don't come back

17   with an offer that's acceptable, you'll just continue to

18   store them; right?

19   A.    Because we've already incurred the costs of

20   constructing the facility that they are stored in.

21   Q.    I understand.  Okay.

22         Do you recall, sir, you told me at your

23   deposition that Mr. Baltzer informed you in early 2016 that

24   WCS's financial condition was not good; is that correct?

25   A.    It's possible.

Dickinson - cross

1    Q.    Do you recall we talked about that at your deposition,

2    sir?

3    A.    Not in detail.  I think pretty much at that point in

4    time said that I'm not their financial analyst.  I don't

5    know what their financial situation is.

6    Q.    Right.  Mr. Baltzer told you that WCS was losing

7    money; right?

8    A.    I have heard that.

9    Q.    All right.  You heard it from Mr. Baltzer; is that

10   correct?

11   A.    That's correct.

12   Q.    All right.  And to the best of your knowledge, sir,

13   WCS's financial condition has not improved since that time;

14   right?

15   A.    I have no knowledge of that.

16   Q.    Okay.  Sir, are you aware that last week WCS asked the

17   NRC to suspend its review of WCS's license application for

18   interim spent fuel storage at the compact waste facility,

19   sir?

20   A.    I'm aware of that.

21   Q.    And that's not a positive development, is it, sir?

22   A.    I have no idea what WCS's intent is with the dry cask

23   storage.  That's -- it's completely different than the low

24   level waste that we're speaking of.  It may not meet their

25   business model.  I have no idea.

Dickinson - cross

1    Q.    One of the reasons cited by WCS was the cost of the

2    application process; right?

3    A.    They may have said that.

4    Q.    Okay.  Right.  Which was estimated to be about

5    seven-and-a-half million dollars.  Did you know that?

6    A.    I don't know that.

7    Q.    Okay.  Right.

8          Do you recall that we talked at your deposition

9    and it was your understanding that if WCS were to close, the

10   State of Texas would continue to operate the compact waste

11   facility, sir.  Do you recall that?  You told me that was

12   your understanding of the NRC reg?

13   A.    I made it clear that somebody would be operating the

14   facility.  The State of Texas has a compact with the State

15   of Vermont, and that compact configuration is such that

16   somebody that will be operating that facility.

17   Q.    All right.  And you don't actually know that; is that

18   right?

19   A.    It's my understanding that that is the way the compact

20   legislation is written, to have a facility available for

21   both the State of Texas and the State of Vermont.  So it's

22   my understanding that the facility would stay operational.

23   It may not be WCS that owns it.

24   Q.    Okay.  You understand that the TCQ, Texas Commission

25   on Environmental Quality, has testified in this matter

Dickinson - cross

1    they're not going to operate the WCS facility if it's closed

2    by WCS?

3    A.    I have no knowledge of that.

4    Q.    Okay.  And if the compact waste facility were to

5    close, sir, and the exempt cell were to close because WCS

6    can no longer afford to operate it, APS will -- you know,

7    that will no longer be an option for APS to dispose of their

8    Class B/C waste; right?

9    A.    Possible.

10   Q.    Okay.

11   A.    If it's closed, yes, but it's my belief that somebody

12   else will take over.

13   Q.    Somebody else will walk out of the corn fields at the

14   field of dreams and operate the exempt cell, sir?

15   A.    I don't think that's an accurate assessment of the

16   situation.

17   Q.    Okay.  And, of course, if it was closed, you would

18   just store your B/C waste on site; right?  With your

19   15 years of storage; is that correct?

20   A.    I would have no other options unless I sent it for

21   downblending with EnergySolutions, to their facilities and

22   potential disposal at the Clive facility.  You know, that is

23   an option.

24   Q.    All right.

25   A.    When these two companies are in direct competition

Dickinson - cross

1    with each other, that's the beauty of it.  Right?

2    Q.    Is it your testimony, sir, that all B/C waste can be

3    downblended?

4    A.    The vast majority of it, B/C waste can be downblended.

5    Q.    That's your position, the vast majority?

6    A.    A majority of it can be downblended.

7    Q.    A majority of it?

8    A.    Yes.

9    Q.    Okay.  Sir, you understand that there are B/C resins

10   that could be downblended; right?

11   A.    B/C resins can be downblended.

12   Q.    Right.

13   A.    B/C filters can be shredded, mixed with a grout

14   material, slipped by and obtain the same classification as

15   Class A and disposed at the Clive facility.

16   Q.    That's just a subclass of all B/C waste that's

17   generated, right, by utilities; is that correct?  B/C resins

18   and filters; right?  That's just a subclass of all of the

19   categories, all of the types of B/C waste that could be

20   generated by a nuclear power reactor; is that right?

21   A.    There is a small amount of hardware that would not be

22   subject to the downblending or the encapsulation or

23   concentration process with filters, but when I spoke earlier

24   of the 300 to 450 volume that we generate a year, when I

25   spoke to those numbers, all of that material is Class B/C

Dickinson - cross

1    resins or filters.  It would be greater than 90 percent of

2    my waste.

3    Q.    Of your waste; right?

4    A.    Of my waste.

5    Q.    Of APS's Class B/C waste would be resins and filters?

6    A.    That's correct.

7    Q.    Aside from APS, you don't know in terms of the total

8    volume of B/C waste that's generated, what percentage of

9    that that's generated by reactors could actually be

10   downblended; right?

11   A.    I do know historically, looking at the disposal

12   volumes, that a typical PWR is not different -- PWR is an

13   pressurized water reactor -- is not too different than other

14   PWRs.

15   Q.    Okay.  Sir --

16   A.    So I would envision those volumes are similar.

17   Q.    All right.  Would you agree with me, sir, that not all

18   B/C resins can be downblended?

19   A.    There's a small fraction that cannot be downblended

20   based on EnergySolutions' determination.

21             MR. LARKIN:  Your Honor, I have no further

22   questions.

23             THE COURT:  All right.  Any redirect?

24             MR. COMENETZ:  Yes.  Just a few, your Honor.

25   May I proceed?

Dickinson - redirect

1            THE COURT:  Yes, you may proceed.

2

3                    REDIRECT EXAMINATION

4    BY MR. COMENETZ:

5    Q.    Mr. Dickinson, you were asked a number of questions

6    about the LOP and negotiating in good faith.  What impact

7    could Energy Solutions' acquisition of WCS have on your LOP

8    negotiations with EnergySolutions?

9    A.    Well, the impact would be that two disposal cells,

10   right, we've got basically two holes in the ground where

11   this material ultimately resides.  If they -- if they have

12   both of the holes in the ground, I will have very little

13   negotiating power when I'm reassessing my LOP rates.

14   Q.    And you were also asked some questions about exempt

15   cell.  In order for you to know what you can send to the

16   exempt cell, is it necessary for you to have actually sent

17   LLRW to the exempt cell?

18   A.    No.

19   Q.    Why not?

20   A.    Again, like we spoke of earlier, we've done the

21   analysis.  The activity per gram component of it, the

22   purities per gram, that analysis, information is pulled

23   straight from our manifest.  From 2012 to 2016 inclusive, we

24   have that knowledge.  We've analyzed it.  It's well greater

25   than 80 percent.  High nineties, actually.  The component

Dickinson - redirect

1   that actually impacts the amount of material that can go

2   there is the 75 millirem per hour on an object per our

3   analysis.

4            So we have ran scaled testing on the waste

5   stream, actually a large number of containers, and we've

6   looked at the previous shipping histories and determined

7   that the volume is definitely greater than 80 percent.

8            I don't need to actually have performed the

9   shipment to know that my material meets the requirements,

10  because we have these measurements.  Right.  We have this,

11  the calculations that support the activity.  We have the

12  actual physical field measurements for the 75 millirem per

13  hour, and then we also have the mathematical modeling and

14  computer modeling that goes in to determine the 15 millirem

15  of one liter would be satisfied.

16           I also have, you know, 31 years of

17  experience of placing waste into disposal containers.  And

18  based on my experience and my knowledge of the waste

19  process, I believe, and actually I know 80 percent or

20  greater of my material would make that exempt cell without

21  actually physically performing it.

22  Q.   Okay.

23  A.   Through the negotiations that we've had ongoing with

24  EnergySolutions, I do know that they stated that the process

25  is difficult.  I've asked them to give me an opportunity to

Dickinson - redirect

1   explore that process, write something into my contract that

2   allows me to do a campaign of some volume of material, some

3   quantity to test their theory that it's difficult, and they

4   have refused to do that.

5   Q.    Okay.  Could I ask you to turn to your deposition from

6   March 16th, 2017.  Mr. Larkin pointed you to line 22 on page

7   80.

8   A.    Page 80.

9   Q.    That's right.  Could you take a look at that, please?

10  A.    Yes.

11  Q.    You testified here that you were trying to put that

12  deposition testimony in context.  Would you go ahead and do

13  that for us now?

14  A.    In relationship to the volume versus shipment?

15  Q.    Yes.

16  A.    Yes.  Following this deposition, when I went back to

17  Arizona, I actually reviewed all of the shipping history

18  from 2012 to 2016 again, and looked at the number of

19  shipments, not just the volume.  And when I reviewed that

20  information, it was a large quantity of the shipments would

21  require no repackaging, no handling, and it would have

22  satisfied the criteria, because we had discussed this

23  shipment thing.  It was kind of a -- a contentious point

24  here in the deposition when we were talking.  In one term,

25  we were talking volume.  Right.  And then we kept trying to

Dickinson - redirect

1  shift the shipments.  At this point in time, I had no idea,

2  but since then, I've gone back and looked at it, and it's a

3  large quantity of those shipments, a large percentage that

4  would have been acceptable to go straight to WCS without any

5  further repackaging, resorting, segregation.

6  Q.    Mr. Larkin also asked you some questions about the

7  steam generators that you're storing and you referred to the

8  steam generator storage facility.  Can anything else be

9  stored in that facility?

10 A.    No, it cannot.

11 Q.    Why not?

12 A.    The steam generator storage facility, it was

13 originally designed as a single building for the storage of

14 two steam generators.  Our fuel cycle is on an 18-month

15 period, so we replace these generators 18 months apart.

16       We establish this one concrete bunker, put two

17 steam generators in it, and these are massive objects.

18 They're 700-plus ton.  When they were introduced into the

19 facility, the doors were closed.  They're approximately

20 two-foot thick concrete doors held by fasteners around the

21 perimeter of the door.  Those fasteners were all welded

22 shut.  There's no access to that single cell unit.  And then

23 in the subsequent outages, we added on each side of that,

24 and it's the same exact controls and parameters on the door.

25 There's no access to the facility.  And then when we

Dickinson - redirect

1    replaced our three temporary or our three racket closure

2    heads, they went into a building that was attached.

3              It's all one big monolith.  We call it the

4    mausoleum, where these three reactors heads are, and it has

5    the same physical controls.  The doors are a couple feet

6    thick concrete.  They're welded shut.

7              In addition to that, the storage guidance in

8    8138 that the NRC holds us to, when they come in and do

9    their inspection audits, they'll pull 8138 and look and see

10   if you are meeting it.

11             This facility we have these generators and

12   reactor heads in is not considered a waste storage facility.

13   It doesn't meet the reg guide 134 criteria.  It doesn't meet

14   8138.  There's no way to do periodic inspections.  There's

15   no lighting in the facility.  There's no electrical in the

16   facility.  These are dry components that contain no liquids

17   in their form, so therefore there's no sumps or other

18   facilities that you would need for the typical storage of

19   low level radioactive waste.

20   Q.   Finally, sir, Mr. Larkin asked you some questions

21   about downblending, and I just want to be clear on this.

22   Was it your testimony that the vast majority of your waste

23   is eligible for downblending?

24   A.   That is correct.

25             MR. COMENETZ:  Nothing further, your Honor.

```
 1                  THE COURT:  All right.  Thank you.  And you may

 2   step down.

 3                  THE WITNESS:  Thank you, your Honor.

 4                  (Witness excused.)

 5                  THE COURT:  I don't allow recross in case anyone

 6   was wondering.

 7                  MR. LARKIN:  I'm sorry, your Honor?

 8                  THE COURT:  I said I don't generally allow

 9   recross in case anyone was wondering.

10                  All right.  I generally stop for lunch around

11   1:00, so if we have the next witness teed up, we should get

12   him or her on the stand.

13                  MS. ELMER:  Your Honor, the United States calls

14   Assef Azadeh as an adverse party witness.

15                  MR. LARKIN:  Your Honor, you don't want these

16   binders.  Right.

17                  THE COURT:  We only want an original and a copy

18   of the one admitted into evidence.

19                  MR. LARKIN:  We'll do that.  Thank you.

20                  THE COURT:  All right.

21                  MR. LARKIN:  Your Honor, I can hand that up now

22   if that's all right.

23                  THE COURT:  All right.  Thank you.

24                  MR. LARKIN:  Thank you.

25                      ... ASSEF AZADEH, having been
```

Azadeh - direct

1              duly sworn as a witness, was examined and

2              testified as follows ...

3              MS. ELMER:  Your Honor, may I approach?

4              THE COURT:  All right.

5              (Ms. Elmer handed notebooks to the witness.)

6                       DIRECT EXAMINATION

7              MS. ELMER:  May I proceed?

8              THE COURT:  Yes, you may.

9    BY MS. ELMER:

10   Q.    Mr. Azadeh, I've handed you two binders and we may

11   refer to them during your examination.  I will let you know

12   at that time.

13              You're the Senior Vice President of Commercial

14   Integration at EnergySolutions; is that correct?

15   A.    Yes.

16   Q.    And you've worked at Energy Solutions or its

17   predecessors for over 20 years; is that correct?

18   A.    Yes.

19   Q.    And you're responsible for business development for

20   Energy Solutions' low level radioactive waste processing

21   facilities?

22   A.    Yes.

23   Q.    You report to Ken Robuck, President of Decommissioning

24   and Disposal, sir?

25   A.    Yes.

Azadeh - direct

1   Q.    I would like to talk a little bit about Energy

2   Solutions' commercial low level radioactive waste disposal

3   customers.

4           So those customers include nuclear power plants,

5   hospitals, research facilities; is that correct?

6   A.    Yes, among others.

7   Q.    They also include processors; true?

8   A.    Yes.

9   Q.    Mr. Azadeh, let's talk about how Energy Solutions is

10  able to disposition higher activity waste.

11          Now, downblending is the taking of waste of

12  higher radioactivity and blending it to a lower

13  radioactivity; true?

14  A.    Yes.

15  Q.    Downblending is often used for resins; is that

16  correct?

17  A.    Yes.  It has to be in compliance with the NRC approved

18  branch technical position for downblending, yes.

19  Q.    Resins are materials that are used to filters water

20  used in nuclear reactors; is that correct?

21  A.    Yes.

22  Q.    And EnergySolutions performs resin downblending at

23  its Erwin Resins Solutions processing facility; is that

24  correct?

25  A.    Yes.

Azadeh - direct

1    Q.    And Erwin Resins Solutions is sometimes referred to as

2    Erwin or ERS?

3    A.    Yes.

4    Q.    Is that right?

5    A.    Yes.

6    Q.    At Erwin, Class B and C resins are downblended so they

7    can be disposed of as Class A waste; is that right?

8    A.    Both downblended and volume reduced for disposal at

9    WCS.

10   Q.    All right.  But the downblended resins are disposed of

11   at Clive; is that correct?

12   A.    Correct.

13   Q.    And the volume reduced resins are residual and those

14   are disposed of at WCS; is that correct?

15   A.    Correct.

16   Q.    And WCS and Clive are the only two disposal facilities

17   where resins processed at Erwin can go; right?

18   A.    Correct.

19   Q.    Now, there's no reason to downblend waste that is

20   already Class A waste, is there?

21   A.    Not in my opinion, no.

22   Q.    Generally speaking, sir, the sum of fractions refers

23   to a measure of concentrations of radio nucleides in waste;

24   is that correct?

25   A.    Yes.

Azadeh - direct

1    Q.    And as a general rule of thumb, a higher sum of

2    fractions number corresponds with a higher concentration of

3    radio nucleides in waste; true?

4    A.    Generally, yes.

5    Q.    And the abbreviation SOF is sometimes used to refer to

6    the sum of fractions?

7    A.    Yes.

8    Q.    Waste with a sum of fraction of less than one is Class

9    A waste?

10   A.    Less than or equal to one.

11   Q.    Is that right?

12   A.    Yes.

13   Q.    And waste with a sum of fraction between one and six

14   is Class B or C waste?

15   A.    Greater than one, yes.

16   Q.    And some waste with a sum of fraction of greater

17   than six may also still be Class B or C waste; is that

18   correct?

19   A.    Anything over a sum of fraction of one is Class B/C

20   waste.

21   Q.    And waste up to a certain sum of fractions is

22   economical for EnergySolutions to downblend at Erwin; is

23   that right?

24   A.    Yes.

25   Q.    And waste that has been downblended at Erwin is then

Azadeh - direct

1   disposed of at the Clive facility as Class A waste?

2   A.    Yes.

3   Q.    Waste that cannot be economically downblended at Erwin

4   is instead volume reduced; is that right?

5   A.    Yes.

6   Q.    And that waste is disposed of at WCS's facility as

7   Class B/C waste; is that correct?

8   A.    Yes.

9   Q.    And we've talked about downblending, but there are

10  other ways to process Class B and C waste to make them A

11  waste for disposal; is that correct?

12  A.    I'm not sure what you are talking about.

13  Q.    Well, for example, filter shredding is a method by

14  which Class B and C filters could be processed so they can

15  be disposed of at a Class A facility; is that correct?

16  A.    Generally, yes.

17  Q.    And Energy Solutions does filter shredding for

18  customers at its Bear Creek processing facility; is that

19  right?

20  A.    Correct.

21  Q.    Segmentation of waste is another method that can

22  sometimes be used to move waste from the B/C category to the

23  A category; is that correct?

24  A.    I would lump that with shred, yes.

25  Q.    Concentration averaging is an NRC method of moving

Azadeh - direct

1    higher class waste to a lower class waste?

2    A.    Correct.

3    Q.    And the NRC issued a branch technical position in 2015

4    reaffirming that downblending and concentration averaging

5    are allowed; is that correct?

6    A.    Yes.

7    Q.    But this 2015 branch technical position did not really

8    expand the ability to downblend, did it?

9    A.    I'm not sure what you mean by that.

10   Q.    Well, let's look at your deposition testimony in your

11   binder.

12   A.    Okay.

13   Q.    Your litigation deposition testimony.  And I want you

14   to look at page 28, line 4 through line 16.

15   A.    The white one or the black one?

16   Q.    The black one, sir.  It should be the second tab.

17   A.    What page was that?

18   Q.    It's page 28 and we're beginning at line 4.

19   A.    Okay.

20   Q.    "Question:  Did the 2015 branch technical position

21   expand the options available to Energy Solutions for

22   managing low level radioactive waste for its customers?

23          "Answer:  I've got to get the dates correct

24   because I believe the 2015 position went final, but there

25   was a version of it that allowed the concentration averaging

Azadeh - direct

```
 1   or the downblending we spoke of earlier that permitted the

 2   activity, but I believe 2015 solidified it in its final

 3   form.  But the answer is no, because we were still doing

 4   that work based on the earlier revisions of the branch

 5   technical positions.

 6               "Question:  I see.  So the Nuclear Regulatory

 7   Commission had already issued some guidance that permitted

 8   these types of methods for managing waste?

 9               "Answer:  Yes."

10               Did I ask you those questions and did you give

11   me those answers at your deposition?

12   A.    Yes.

13   Q.    Mr. Azadeh, I would like to shift gears and talk for a

14   moment about the Tennessee bulk survey for release program

15   for lower activity waste.  You're generally familiar with

16   that program; is that correct?

17   A.    Yes.

18   Q.    And the abbreviation BSFR means bulk survey for

19   release?

20   A.    Yes.

21   Q.    And the BSFR program allows for the certification and

22   disposal of waste in certain subtitled D landfills; is that

23   correct?

24   A.    Yes.

25   Q.    And a subtitle D landfill is a municipal solid waste
```

Azadeh - direct

1    landfill; is that correct?

2    A.    Yes.

3    Q.    In the BSFR program, customers cannot shift waste

4    directly to the participating landfills, can they?

5    A.    No.

6    Q.    Instead they must first ship their waste to a

7    processor with a BSFR license; is that correct?

8    A.    Yes.

9    Q.    And then that processor certifies that the waste meets

10   the strict criteria for the program; is that correct?

11   A.    Yes.

12   Q.    And then the processor prepares the waste for disposal

13   in one of the participating municipal landfills; true?

14   A.    In the authorized, licensed authorized landfill, yes.

15   Q.    And some of EnergySolutions' processing facilities

16   have a BSFR license; is that right?

17   A.    Yes.

18   Q.    Only waste on the lowest end of the Class A scale is

19   eligible for the BSFR program; right?

20   A.    Very low end, yes.

21   Q.    And we've been discussing the waste that nuclear power

22   plants generate when they operate, but let's talk about the

23   waste they produce when they are shut down.

24         Now, waste generated from a nuclear power

25   plant's ordinary operations differs from waste generated by

Azadeh - direct

1    the decommissioning of a plant; is that correct?

2    A.    Some of them do, yes.

3    Q.    And waste generated as a result of the decommissioning

4    of a nuclear power plant generates more large components

5    like steam generators; is that correct?

6    A.    Yes.

7    Q.    And the decommissioning of a nuclear power plant also

8    generates a large volume of construction debris and soil;

9    true?

10   A.    Yes.

11   Q.    And construction debris and soil tend to be a lower

12   radioactivity than resins and filters and other types of

13   operational waste; correct?

14   A.    Yes.

15   Q.    I would like to shift gears and talk a bit about

16   storage of radioactive waste.

17           Now, waste storage and waste disposal are two

18   different things, aren't they?

19   A.    Yes.

20   Q.    And from an environmental liability point of view,

21   customers have ultimate responsibility for the waste that

22   they generate from cradle to grave, don't they?

23   A.    Yes.

24   Q.    And for that reason, customers are happier once their

25   waste is finally disposed of in the ground, aren't they?

Azadeh - direct

1  A.    You have to ask the customers, but in my opinion, yes.

2  Q.    And ultimately, a customer's storage of waste poses a

3  higher risk than if the waste is disposed, doesn't it?

4  A.    Again, in my opinion, yes, but you have to ask the

5  customers, because a lot of them do lots of storage.

6  Q.    And one of the higher risks that is associated with

7  storage versus disposal is that regulations may change;

8  right?

9  A.    Again, in my opinion, yes.

10 Q.    And one of the higher risks associated with storage

11 versus disposal is the possibility of an accident or a

12 natural disaster; right?

13 A.    Again, in my opinion, yes.

14 Q.    One of the higher risks associated with storage versus

15 disposal is that disposal prices might go up?

16 A.    That's a possibility, yes.

17 Q.    And one of the higher risks associated with storage

18 versus disposal is the increased exposure of a plant's

19 workers to radiation; is that correct?

20 A.    That could be, yes.

21 Q.    Let's shift gears and talk about the contracts that

22 Energy Solutions has with many of its utility customers.  So

23 Energy Solutions has long-term contracts with many of its

24 utility customers; true?

25 A.    Yes.

Azadeh - direct

1   Q.     And these are often referred to as life of plant

2   contracts?

3   A.     Yes.

4   Q.     Or LOPs?

5   A.     Yes.

6   Q.     And you've been involved with negotiating these

7   types of long-term contracts since about 2009; is that

8   correct?

9   A.     Yes.

10  Q.     And all of EnergySolutions' life of plant contracts

11  were originally negotiated with customers before 2012; is

12  that correct?

13  A.     Yes.

14  Q.     And life of plant contracts typically are of a term of

15  20 years or so?

16  A.     Yes.  It could be more.

17  Q.     And life of plant contracts typically provide an

18  opportunity periodically to renegotiate pricing or other

19  terms; is that true?

20  A.     That is correct.

21  Q.     Exclusivity is generally a feature of life of plant

22  contracts; is that correct?

23  A.     Yes.

24  Q.     And exclusivity under a life of plant contract

25  requires a utility to ship all of its Class A low level

Azadeh - direct

1    radioactive waste to EnergySolutions; is that correct?

2    A.    Yes.

3    Q.    And most of EnergySolutions' life of plant contracts

4    also include a right of first refusal provision; is that

5    right?

6    A.    Yes.

7    Q.    And the right of first refusal applies to waste, but

8    does not fall under the exclusivity requirement; is that

9    correct?

10   A.    Yes.

11   Q.    And so under a right of first refusal provision in a

12   typical life of plant agreement, a customer could go get bid

13   for ways that falls outside the scope of an exclusivity

14   provision; is that correct?

15   A.    Yes.

16   Q.    And then EnergySolutions would have the opportunity to

17   match or beat a competitor's price for that particular

18   waste; is that right?

19   A.    EnergySolutions will have the right of first refusal

20   from the customer, yes.

21   Q.    So waste that falls outside the scope of exclusivity

22   would be bid out on a case by case basis subject to

23   EnergySolutions' right of first refusal; is that correct?

24   A.    Yes.

25   Q.    Mr. Azadeh, because your counsel has designated as

Azadeh - direct

1    confidential any further questions about the terms of life

2    of plant agreements, I'm going to save my remaining

3    questions on that topic for the end of your examination and

4    we'll move on to a different topic.  So instead, let's talk

5    a little bit about EnergySolutions' response to the presence

6    of WCS in the marketplace.

7                    Mr. Azadeh, if you would, please turn to your

8    binder to tab PTX-006.  So this is the other binder, exhibit

9    binder.  And Plaintiff's Exhibit 6 is an e-mail with

10   attachments, and it is dated August 29, 2014.

11                   Mr. Azadeh, do you recognize Plaintiff's Exhibit

12   6 as an e-mail and attachments dated August 29, 2014; is

13   that correct?

14   A.    Yes.

15   Q.    And this is an e-mail from J. Williams at

16   EnergySolutions.com to you and others at EnergySolutions;

17   right?

18   A.    I think it's to Ken Robuck with a copy to me and

19   others.

20   Q.    Thank you for that clarification.  You're right.

21                   And J. Williams is Jason Williams?

22   A.    Correct.

23   Q.    Mr. Williams is a Senior Vice President at Energy

24   Solutions as well?

25   A.    Yes.

Azadeh - direct

1    Q.     And K.W. Robuck at EnergySolutions.com is your boss,

2    Ken Robuck; is that correct?

3    A.     Yes.

4              MS. ELMER:  Your Honor, plaintiff moves to admit

5    Plaintiff's Exhibit 6 into evidence.

6              THE COURT:  All right.  Any objection?

7              MR. LOCKWOOD:  No objection, your Honor.

8              THE COURT:  Thank you.

9              (Plaintiff's Exhibit No. 6 was admitted into

10   evidence.)

11             MS. ELMER:  Mr. Beaton, if we could put a

12   redacted copy of Plaintiff's Exhibit 6 on the screen, and

13   the redactions were made by Energy Solutions.

14   BY MS. ELMER:

15   Q.     I want to look at the first page of Plaintiff's

16   Exhibit 6 and the -- maybe we could blow up that e-mail,

17   Mr. Beaton.

18             So Mr. Williams writes in the first sentence of

19   the e-mail:  "Ken, the team met this week in SLC to review

20   our strategy and options in competing with WCS."

21             Did I read that correctly, sir?

22   A.     Yes.

23   Q.     And you attended this meeting in SLC, which I assume

24   refers to Salt Lake City; is that correct?

25   A.     I participated in the meeting.  I'm not sure if I

Azadeh - direct

1   attended in person.  It might have been a conference call.

2   I don't recall exactly.

3   Q.    The second sentence of Mr. Williams' e-mail says:

4   "The purpose of the meeting was to spell out our options to

5   level the playing field with WCS from the sales team

6   perspective and the behind-the-scenes approach with the NRC,

7   TCEQ, Texas regulators, et cetera."

8            Did I read that correctly, sir?

9   A.    Yes.

10  Q.    And I take it that NRC refers to the Nuclear

11  Regulatory Commission in this context?

12  A.    It does.

13  Q.    And the TCEQ refers to the Texas Commission on

14  Environmental Quality?

15  A.    Correct.

16  Q.    The second-to-last line of Mr. Williams' e-mail

17  contains a sense which reads:  "Assef and Bret led the

18  discussion with Weston and myself."

19            Did I read that correctly, sir?

20  A.    Yes.

21  Q.    And Assef refers to you?

22  A.    Yes.

23  Q.    And Bret refers to Bret Rogers?

24  A.    Yes.

25  Q.    And he's another senior vice president at

Azadeh - direct

1    EnergySolutions; is that correct?

2    A.    Yes.

3    Q.    And he's the Clive counterpart to you; is that right?

4    A.    Yes.

5    Q.    And this e-mail indicates that you and Mr. Rogers led

6    a discussion at the meeting in Salt Lake City along with

7    Weston and Jason; is that right?

8    A.    Yes.

9    Q.    Let's turn to the attachment to this e-mail.  And I

10   want to look at or highlight the first part of the document,

11   item number one.

12             So item number one reads:  "WCS issues."

13             And, sir, you had input into the preparation of

14   the attachment to Mr. Williams' e-mail; is that correct?

15   This document?

16   A.    Yes.

17   Q.    The first WCS issue is:  "A, long term fair pricing

18   for Erwin disposal."

19             Did I read that correctly?

20   A.    Yes.

21   Q.    The second WCS issue is:  "B, drop in B/C market

22   price."

23             Did I read that correctly?

24   A.    Yes.

25   Q.    The third WCS issue is:  "C, drop in large component

Azadeh - direct

1  prices and penetration."

2           Did I read that correctly?

3  A.    You read that correctly, but as I mentioned in my

4  deposition, that was not a WCS issue.  It was a WMG issue.

5  Q.    But on this document, the word "WCS issues" is

6  written; is that correct?

7  A.    On this document, it is, but as I mentioned, it was a

8  WMG issue with IMC.

9  Q.    But, sir, this is not entitled WMG issues, is it?

10  A.    It is not, but it was a WMG issue.

11  Q.    And WMG disposed of that large component at WCS, did

12  it not?

13  A.    WMG had the contract with the customer for the

14  turnkey, logistics, transportation and disposal, and the

15  final disposal was at WCS, but it was a WMG issue.

16  Q.    And the resting place for that large component was

17  WCS; is that correct?

18  A.    The final disposal was WCS, but the job was not lost

19  to disposal.  It was lost to logistics to WMG.

20  Q.    All right.  And the fourth issue, the fourth WCS, WCS

21  issue is:  "D, drop in Class A resin price and no

22  dewatering."

23           Difficult read that correctly?

24  A.    You did.

25  Q.    And the fifth -- I'm sorry.

Azadeh - direct

1    A.    Again, as I discussed in the deposition, that was a

2    one time issue with TVA, and it was because we added a

3    transportation and it had nothing to do with disposal

4    pricing.  It was a logistics issue.

5    Q.    The fifth WCS issue listed here is:  "E, threat in

6    Class A pricing for out of compact."

7          Did I read that correctly?

8    A.    You did.  Again, it was tied to TVA and

9    transportation.

10   Q.    The sixth WCS issue listed here is:  "F, large impact

11   of exempt waste disposal."

12          Did I read that correctly?

13   A.    Yes, you did, but, again, at that time, this was based

14   on data which was not correct.

15   Q.    And you did not learn -- well, we'll move on.

16          Mr. Azadeh, you can set Plaintiff's Exhibit 6

17   aside.

18   A.    Okay.

19   Q.    Let's look at another document from that same

20   August 2014 time frame.  So if you will turn to tab PTX-5 in

21   your binder, it might say PTX-005.

22   A.    Got it.

23   Q.    Plaintiff's Exhibit 5, which is a multi-page slide

24   deck, appears there.

25          And you prepared Plaintiff's Exhibit 5; is that

Azadeh - direct

1    correct?

2    A.    Yes, I had input into this.

3            MS. ELMER:  Your Honor, plaintiff moves to admit

4    Plaintiff's Exhibit 5 into evidence.

5            THE COURT:  Any objection?

6            MR. LOCKWOOD:  No objection, your Honor.

7            THE COURT:  Thank you.

8            (Plaintiff's Exhibit No. 5 was admitted into

9    evidence.)

10            MS. ELMER:  Mr. Beaton, can we put Plaintiff's

11   Exhibit 5 up.

12   BY MS. ELMER:

13   Q.    And Plaintiff's Exhibit 5 is a slide desk entitled

14   "Risk evaluation for exempt waste disposal drafted on

15   August 27, 2014."  Is that correct?

16   A.    Yes.

17   Q.    Let's look at the fourth slide.

18            And the first bullet on this slide says, "Exempt

19   waste disposal is authorized in Tennessee and tension as on

20   an isotope specific basis."

21            That's what you wrote; is that correct?

22   A.    Yes.

23   Q.    And the reference to exempt waste disposal in

24   Tennessee is to the BSFR program, I take it?

25   A.    Correct.

Azadeh - direct

1   Q.      And the reference to exempt waste disposal in Texas is

2   to the WCF exempt cell?

3   A.      Yes.

4   Q.      The second bullet reads:  "Texas limits for exempt

5   waste are astronomically beyond any approved exemption by

6   the NRC, or any other agreement state."

7                Did I read that correctly?  Is that what you

8   wrote?

9   A.      I wrote that, and my focus on this was safety.  That

10  until this point, all exempt waste disposal in the country,

11  including BSFR and U.S. Ecology, were stuff like you were

12  mentioning that could get disposed of with household trash.

13  And in this case, the State of Texas authorized exempt --

14  exempt waste disposal, that as it was approved and later on

15  proven not to be implementable.  They put the public, the

16  worker and transportation issues at risk.  Yes, I wrote

17  that.

18  Q.      Mr. Azadeh, you didn't go to the NRC to complain about

19  the safety standards, did you?

20  A.      I personally did not, no.

21  Q.      And you're not aware of anyone from EnergySolutions

22  who did, are you?

23  A.      I can't answer that specifically.  We might.  I don't

24  know.

25  Q.      But as we sit here today, you can't testify that

Azadeh - direct

1    anyone did?

2    A.    We did not go to the NRC, but there are other

3    documents that we went to the Texas, I think the Compact

4    Commission, we went on the record saying that we did not

5    agree with the limits of the exempt waste because it was

6    unsafe and much higher than anything else that was

7    previously approved in the country.

8              And, again, household trash is completely

9    different than the stuff -- as I mentioned here, 64,000

10   times higher, okay.  To transport this stuff, you have to

11   put it in lead shielded containers, okay.  And then once you

12   take it off the lead shielded container, it becomes exempt.

13   So that was my entire point here, that it was unsafe.

14   Q.    Mr. Azadeh, you can set Plaintiff's Exhibit 5 aside.

15   A.    Okay.

16   Q.    So let's fast forward a couple of months to December

17   of 2014.  And if you could please turn to tab PTX-10 in your

18   binder.  That's Plaintiff's Exhibit 10.  And that's a

19   multi-page slide deck.

20             And do you recognize Plaintiff's Exhibit 10,

21   sir?

22   A.    Yes.

23   Q.    And you helped prepare this draft modified LOP

24   approach dated December 15, 2014; is that right?

25   A.    Yes, I had input to this.

Azadeh - direct

1          MS. ELMER:  Your Honor, plaintiff moves to admit

2    Plaintiff's Exhibit 10 into evidence.

3          THE COURT:  Any objection?

4          MR. LOCKWOOD:  No objection, your Honor.

5          THE COURT:  Thank you.

6          (Plaintiff's Exhibit No. 10 was admitted into

7    evidence.)

8          MS. ELMER:  Mr. Beaton, let's put a copy of

9    Plaintiff's Exhibit 10 that has been redacted by

10   EnergySolutions on the screen.

11   BY MS. ELMER:

12   Q.   So let's go to the second slide.  And the first bullet

13   on this slide reads, "Our LOP coming up for their," redacted

14   term, "renewal starting in," redacted term, "where both

15   customers and ES can exit the agreements."

16          With the redactions, sir, did I read that

17   correctly?

18   A.   Yes.

19   Q.   It may be easier for you as we go through these

20   redacted documents to follow along with a copy in your

21   notebook from time to time?

22   A.   Thank you.

23   Q.   The second bullet reads, "WCS exempt cell option

24   provides high levels of rad acceptance and extremely low

25   prices that threaten LOP renewal process."

Azadeh - direct

1              **Did I read that correctly?**

2    A.    **At the time, as you mentioned, the 15th of December**

3    **2014, based on data which was not correct, yes, you read**

4    **that correctly.**

5    Q.    **And you didn't learn that the data that you were**

6    **relying on was, quote, not correct until after the DOJ's**

7    **merger investigation began; right?**

8    A.    **Based on a DOJ request from EnergySolutions to**

9    **evaluate what portion of low level waste could go to the**

10   **exempt facility, we were given additional data that was not**

11   **publicly available, and our assessments showed that the data**

12   **that we based our evaluation on, which was ten percent of**

13   **Class A, which was based on the WCS marketing literature,**

14   **was wrong.**

15   Q.    **And you didn't learn that this so-called marketing**

16   **literature was wrong until 2016; is that correct?**

17   A.    **That is correct.**

18   Q.    **And that was after the DOJ began its merger**

19   **investigation; is that correct?**

20   A.    **Yes, I believe so.**

21   Q.    **All right.  Let's go to the first sub-bullet under**

22   **that second bullet.  And the first sub-bullet under that**

23   **reads:  "A large portion of LOP waste can be accepted as**

24   **exempt waste."**

25              **Did I read that correctly?**

Azadeh - direct

1    A.    Again, on the same document or one of the ones we

2    looked at.  If you look at the WCS marketing literature

3    that was put out, they stated that ten percent of Class A

4    limits -- I'm not talking about the volume of Class A

5    available in the country for disposal, but I'm talking about

6    the Nuclear Regulatory Commission has Class A limits, and

7    the WCS marketing literature said that ten percent of the

8    Class A limit can be accepted, again, quote unquote, as

9    exempt waste.  And based on that information that was

10   incorrect, I put that statement in.  So, yes.

11   Q.    And the third sub-bullet under that reads, "Longer

12   term.  We must sign up remaining LOP customers/renewals

13   before WCS can introduce their own LOP approach."

14             And did I read that correctly?

15   A.    Yes, you did.

16   Q.    Let's go to the fourth slide, proposed LOP strategy.

17   And I with a want to look at the first sentence there.

18             The first bullet says:  "Exempt cell disposal

19   drives future approach."

20             And that's what you wrote there; is that right?

21   A.    Again, based on information that was not correct, yes,

22   I wrote that.

23   Q.    And this is the information that you did not learn was

24   incorrect until after the DOJ began its investigation; is

25   that true?

Azadeh - direct

1    A.    That is correct.

2    Q.    The second sub-bullet under that says, {Until the

3    renewals are put in place, we must defend current LOP

4    exclusivity."

5          Did I read that correctly?

6    A.    Yes, you did.

7    Q.    And the last bullet on this slide says, "Most LOP

8    renewals start in," redacted date, "but we want to renew

9    much sooner before WCS can develop their own LOP approach."

10         Did I read that correctly?

11   A.    You did.

12   Q.    All right.  Let's move to slide number 5.

13         And the fifth slide says, "Disposal options and

14   overlaps by disposal site operator."

15         And I want to focus on the graphic at the top of

16   the page.  Do you see that graphic there, Mr. Azadeh?

17   A.    Yes.

18   Q.    And the left-hand side of the graphic is lower

19   activity; right?

20   A.    Yes.

21   Q.    And on the right-hand side of the graphic is higher

22   activity; is that right?

23   A.    Yes.

24   Q.    And the ES on the left-hand column of that graphic

25   refers to EnergySolutions?

Azadeh - direct

1    A.    Correct.

2    Q.    WCS refers to Waste Control Specialists?

3    A.    Correct.

4    Q.    And U.S.E. stands for U.S. Ecology; right?

5    A.    Correct.

6    Q.    Let's look at the ES row.  In looking at the left side

7    of the ES row, BSFR stands for bulk survey for release; is

8    that correct?

9    A.    That is correct.

10   Q.    And that appears on the ES row because BSFR is one of

11   the services that EnergySolutions offers; is that right?

12   A.    That is correct.  And it's also, if you notice, it's

13   under the lower activity portion.  Yes.

14   Q.    And then to the right of BSFR, as we start moving

15   toward the higher activity, we have BWF; is that correct?

16   A.    That is correct.

17   Q.    And BWF stands for bulk waste facility?

18   A.    Yes.

19   Q.    And that is EnergySolutions' bulk waste facility at

20   Clive, Utah?

21   A.    Yes.

22   Q.    And continuing to move to the right, we have

23   containerized waste facility, which is CWF; is that right?

24   A.    Yes.

25   Q.    And that facility is also located at Clive; is that

Azadeh - direct

1    right?

2    A.    Yes.

3    Q.    And continuing to move to the right, to the higher

4    activity side of the graphic, we have ERS and filters; is

5    that correct?

6    A.    Yes.

7    Q.    And ERS refers to Erwin?

8    A.    Yes.

9    Q.    And ERS and filters are some of the higher activity

10   dispositioning that ES is capable of doing; is that correct?

11   A.    Yes.

12   Q.    Now let's look at the WCS row.  Exempt is on the lower

13   activity end of the WCS row; is that correct?

14   A.    Based on the information that we had, if you remember

15   I said ten percent of Class A was in our marketing

16   literature, and I said that's a large portion of the Class A

17   waste, which has proven not to be the case.  And not just

18   because of the DOJ and the data that was provided that we

19   found out that it could not be accepted, but also the

20   customer experience.  Okay.  That is not correct anymore,

21   but back then, yes, it was correct.

22   Q.    But, sir, my question was simply whether exempt was on

23   the lower activity side of this graphic.

24   A.    Based on the information we had at the time, yes.

25   Q.    And exempt remains the lowest activity option that WCS

Azadeh - direct

1   offers; is that correct?

2   A.    Not at these levels.  They ended up being closer to

3   the BSFR and the U.S. Ecology lines.  This was done in

4   December 2014.  If you fast-forward the experience of not

5   just the DOJ, but the customer practices and what they were

6   actually able to do and the extra work that was required to

7   do the sorting, right now today, exempt waste is more in

8   line with BSFR and U.S. Ecology lines.

9   Q.    But the question I was asking, sir, is whether the

10  exempt is the lower activity option that WCS offers?

11  A.    Yes.

12  Q.    And exempt is also the lowest priced option in the WCS

13  row; is that correct?

14  A.    Yes.

15  Q.    And just to the right of exempt on the WCS row is A

16  routine; is that right?

17  A.    Yes.

18  Q.    And A routine has a higher price than exempt; right?

19  A.    Yes.

20  Q.    And underneath A routine is LC; is that right?

21  A.    Yes.

22  Q.    And LC has a higher price than A routine?

23  A.    Yes.

24  Q.    And I take it that LC stands for large component?

25  A.    Yes.

Azadeh - direct

1   Q.    And moving to the right of A routine and LC, you see A

2   shielded on the continuum there; is that right?

3   A.    I do.  Do you mind if I make a point on the LC one?

4   Q.    I think we've moved on to another question.

5   A.    Okay.

6   Q.    A shielded is higher priced than A routine; is that

7   right?

8   A.    Yes.

9   Q.    And continuing to move to the right on the WCS row,

10  B/C is on the higher activity side; is that correct?

11  A.    Yes.

12  Q.    And it's also higher priced; is that right?

13  A.    Yes.

14  Q.    And on this graphic, all of the choices on the

15  left-hand side of the graphic are lower activity than the

16  choices on the right side; is that correct?

17  A.    Yes.  And you keep going on the hardware, correct.

18  Q.    And the lower activity options are also lower priced

19  than the higher activity options; is that correct?

20  A.    Yes.

21  Q.    All right.  Mr. Azadeh, you can set Plaintiff's

22  Exhibit 10 aside.

23  A.    Okay.

24            THE COURT:  And it's after 1:00, so we'll take

25  our lunch break.  Half-an-hour.

Azadeh - direct

```
 1              (Luncheon recess taken.)

 2                      -  -  -

 3              Afternoon Session, 1:36 p.m.

 4              MS. ELMER:  Your Honor, may I proceed?

 5              THE COURT:  Yes, you may resume.

 6    BY MS. ELMER:

 7    Q.    Mr. Azadeh, you testified before lunch that you became

 8    aware of data in 2016 that caused you to view WCS's

 9    marketing material regarding its exempt cell as exaggerated;

10    is that right?

11    A.    Correct.

12    Q.    And this is the information that Bret Rogers provided

13    to the DOJ in the summer of 2016; is that correct?

14    A.    Yes.

15    Q.    Let's talk about the restrictions that apply to WCS's

16    exempt cell.  One of those restrictions would be WCS's

17    license from the TCEQ; is that correct?

18    A.    Yes.

19    Q.    And the TCEQ has not imposed any additional

20    restrictions on WCS's exempt cell since January 2014, have

21    they?

22    A.    The TCEQ Texas regulator has not, but WCS has had to

23    be in compliance with other regulations that include worker

24    protection, public safety, things of that nature, so, but

25    TCEQ has not.
```

Azadeh - direct

1    Q.    A second limitation on WCS's exempt cell would be

2    WCS's own waste acceptance criteria for the exempt cell; is

3    that correct?

4    A.    Yes.

5    Q.    And WCS's waste acceptance criteria for its exempt

6    cell has been publicly available on WCS's website since

7    February of 2014; is that correct?

8    A.    Yes.

9    Q.    A third restriction on WCS's exempt cell is some data

10   that you received from WCS during the due diligence project,

11   process for this deal that was used to support Mr. Rogers'

12   analysis; is that correct?

13   A.    That's the big difference.  That's the difference

14   between the low dose rate that they gave us for the DOJ work

15   and the fact that there's no way they could have done ten

16   percent of Class A because of safety reasons.

17   Q.    But you don't know what document this data was

18   contained in, do you?

19   A.    I do not.  I received the information from Mr. Rogers.

20   Q.    And you don't know the name of the WCS person who

21   provided that data to Mr. Rogers, do you?

22   A.    I do not.  It came from Bret.

23   Q.    And you don't -- do you know the dose that you

24   provided, the number that you were provided?

25   A.    The number that was given to me by Bret Rogers?

Azadeh - direct

1    Q.    Correct.

2    A.    Yes, I do.

3    Q.    What was that?

4    A.    10 millirems per hour.

5    Q.    And so it's your sworn testimony that someone from WCS

6    provided Mr. Rogers a 10 millirem per number hour and that

7    that is what makes the difference between your perception of

8    WCS's exempt cell in February 2014 and your perception of it

9    today?

10   A.    Could you repeat that question for me, please?  The

11   information came from Bret Rogers.  That's the answer.

12   Q.    Is it your sworn testimony, sir, that the difference

13   between your perception of WCS's exempt cell in late 2014

14   and your perception of it today is the 10 millirem per hour

15   number that Mr. Rogers gave you?

16   A.    That was one factor.  Since 2014, other factors, like

17   the actual customers using the exempt waste facility, the

18   extra sorting that's required, all of that has gone into my

19   perception from 2014, which was the publicly available data

20   to the additional information that we got because of the DOJ

21   question plus the fact that the customers have not used them

22   since 2014, and it's just extra work for them.

23          The customers have to do all sorts of different

24   sorting in order to go to the exempt waste facility, so all

25   of those together is what has changed my perception.

Azadeh - direct

1   Q.    Let's keep our focus on actual technical limitations

2   on WCS's exempt cell for the time being for purposes of my

3   question.  Okay?

4   A.    I will try.

5   Q.    All right.  So the first limitation, WCS's license

6   from the TCEQ has not changed since February 2014; is that

7   correct?

8   A.    I think it has changed, but not materially changed.

9   Q.    And WCS's waste acceptance criteria has been available

10  to you since February of 2014; is that correct?

11  A.    Yes.

12  Q.    So the only other number or technical restriction that

13  has changed since then, at least from your perspective, is

14  the 10 millirem per hour number that Bret Rogers got during

15  the due diligence process for this deal; is that correct?

16  A.    From a technical perspective, yes.

17  Q.    And you don't know where Mr. Rogers got that number,

18  do you?

19  A.    I was told, he told me he got it from WCS, but I don't

20  know specifically who.

21  Q.    And you're not aware of any other technical limitation

22  on WCS's exempt cell other than the three items that we've

23  discussed today; is that correct?

24  A.    Other than the fact that WCS has to also comply with

25  regulations that require worker protection, okay, and public

Azadeh - direct

1    safety.  So I knew something was going to come, because they

2    must comply with protecting their workers.  So I wasn't

3    surprised when I saw the 10 millirem per hour.  But

4    something definitively, it was the 10 millirem.  Knowing

5    that something else was going to happen, absolutely.

6    Q.    But as we sit here today, you cannot identify a single

7    other technical factor that limits WCS's exempt cell other

8    than their license, their waste acceptance criteria and this

9    alleged 10 millirem per hour figure that you got from an

10   unknown source at WCS; is that correct?

11   A.    Yes, and the fact that they must comply with all sorts

12   of other regulations.  That was not specified.  Just the

13   fact that they didn't specify it does not mean that they

14   have to -- they don't have to comply.

15   Q.    Thank you, sir.

16   A.    You're welcome.

17   Q.    Let's shift gears and focus on a specific instance

18   of competition for lower activity operational waste

19   disposal.

20         Mr. Azadeh, if you could please turn to tab

21   PTX-14 in your binder, and Plaintiff's Exhibit 14 is an

22   e-mail chain.  And you recognize Plaintiff's Exhibit 14; is

23   that correct?

24   A.    Yes.

25   Q.    And Plaintiff's Exhibit 14 is an e-mail exchange among

Azadeh - direct

1    you and some of your colleagues in February of 2015; is that

2    correct?

3    A.    Yes.

4              MS. ELMER:  Your Honor, plaintiff moves to admit

5    Plaintiff's Exhibit 14 into evidence.

6              THE COURT:  Any objection?

7              MR. LOCKWOOD:  No objection, your Honor.

8              THE COURT:  Thank you.

9              (Plaintiff's Exhibit No. 14 was admitted into

10   evidence.)

11             MS. ELMER:  Mr. Beaton, if we could put the

12   redacted version of Exhibit 14 on the screen.

13   BY MS. ELMER:

14   Q.    Now, James Miller at this time was in charge of

15   operations at EnergySolutions' Clive disposal facility; is

16   that right?

17   A.    Yes.

18   Q.    And I want to look at the last three sentences on the

19   second page of this document, and this is an e-mail from

20   you, February 10, 2015, to Mike Lahr.

21             And in your February 10, 2015 e-mail, copying

22   James Miller, and this is underneath the second chart, you

23   wrote:  "As you can see from above, all Class A resins

24   previously sent to Clive are being sent to WCS.  Clive has

25   over," amount redacted, "worth of disposal."

Azadeh - direct

1          We "are trying to pin the business back.  James

2    Miller has agreed to incentivize disposal prices."

3          That's what you wrote; is that correct?

4    A.    This tied back to the discussion we had earlier

5    regarding TVA and their Class A resins.  This is tied to

6    that project.

7    Q.    Okay.

8    A.    So for TVA, since we added the extra transportation, I

9    lost the resin work, has nothing to do with disposal.  It

10   was the extra transportation --

11   Q.    I appreciate that.  My question was actually a little

12   bit simpler than that.

13   A.    Okay.

14   Q.    And that is, this is the sentence that you wrote;

15   correct?

16   A.    As a part of this larger e-mail, yes.

17   Q.    Mr. Azadeh, you can set Plaintiff's Exhibit 14 aside.

18   A.    Okay.

19   Q.    Switching topics now, let's talk about pricing for the

20   dispositioning of higher activity resins at Erwin.

21          And, sir, if you would please turn to page

22   tabbed tab PTX-16 in your binder.  Plaintiff's Exhibit 16 is

23   an e-mail chain.  And you recognize this chain; is that

24   correct?

25   A.    Yes.

Azadeh - direct

1   Q.    And this is an e-mail chain among you and your

2   colleagues, Mark Ping and Ed Kulski, in late April of 2015;

3   is that right?

4   A.    Yes.

5   Q.    Mr. Ping is vice president of business development at

6   EnergySolutions?

7   A.    He's a sales guy with EnergySolutions.  I'm not sure

8   about his exact title.

9           MS. ELMER:  Your Honor, plaintiff moves to admit

10  Plaintiff's Exhibit 16 into evidence.

11          THE COURT:  Any objection?

12          MR. LOCKWOOD:  No objection, your Honor.

13          THE COURT:  Thank you.

14          (Plaintiff's Exhibit No. 16 was admitted into

15  evidence.)

16          MS. ELMER:  Mr. Beaton, if we could put a

17  redacted version up on the screen.

18  BY MS. ELMER:

19  Q.    And I want to focus on Mr. Ping's e-mail to you about

20  a third of the way down the page.

21          Mr. Ping wrote to you on April 29th:  "You

22  okay with not increased tier 17 rate CPI wise this year

23  for," customer name redacted, "being WCS is hunting them

24  hard."

25          Did I read that correctly?

Azadeh - direct

1    A.    You read that correctly, yes.

2    Q.    And the term tier 17 refers to a rate that

3    EnergySolutions was charging for B/C resin dispositioning at

4    that time; is that correct?

5    A.    Yes, that is correct.

6    Q.    And I take it that CPI stands for Consumer Price

7    Index?

8    A.    Yes.  I believe in that year, it was like one or

9    two percent, yes.

10   Q.    All right.  And then let's look at your response to

11   Mr. Ping, which is the top e-mail in the chain.

12         And you responded yes to Mr. Ping's e-mail; is

13   that correct?

14   A.    I responded yes to the part of CPI not being increased

15   because it was so low.  Sometimes it takes us more effort to

16   implement the change to the contract world.  So the first

17   part is yes, I said to no CPI increase.

18   Q.    And you approved the waiver of the CPI increase for

19   B/C resin dispositioning for a customer that was being

20   pursued by WCS; is that correct?

21   A.    I approved no CPI increase for that year.

22   Q.    And the reason you approved it is because this

23   customer was being actively solicited by WCS, weren't they?

24   A.    Approved it because I agreed not to raise the CPI.

25   Q.    Mr. Azadeh, you can set Plaintiff's Exhibit 16 aside.

Azadeh - direct

1    A.    Okay.

2    Q.    Let's look at a document from a month or so later.

3    A.    Okay.

4    Q.    So turn to page or tab PTX-18 in your binder.  And

5    that is Plaintiff's Exhibit 18, which is an e-mail chain.

6              And you recognize Plaintiff's Exhibit 18; is

7    that right?

8    A.    Yes.

9    Q.    Plaintiff's Exhibit 18 is an e-mail chain dated

10   June 9th, 2015, among you and a number of other

11   EnergySolutions employees; is that correct?

12   A.    Yes.

13             MS. ELMER:  Your Honor, plaintiff moves to admit

14   Plaintiff's Exhibit 18 into evidence.

15             THE COURT:  Any objection?

16             MR. LOCKWOOD:  No objection, your Honor.

17             THE COURT:  Thank you.

18             (Plaintiff's Exhibit No. 18 was admitted into

19   evidence.)

20             MS. ELMER:  And if we could put that up on the

21   screen.

22   BY MS. ELMER:

23   Q.    So Weston White is in the finance group at

24   EnergySolutions?

25   A.    Yes.

Azadeh - direct

1   Q.    And let's look at his e-mail from the bottom of the

2   chain on page 2.

3           Mr.  White writes, "It looks like we have

4   given," customer name redacted, "quite a big discount on

5   price with your latest version of pricing."

6           Did I read that correctly?

7   A.    Yes.

8   Q.    And let's go to your response to Mr.  White, which is

9   on the first page of this document.

10           And you responded to Mr.  White:  "Below is a

11   comparison... we had to do it.  Also is attached XLS.  WCS

12   price with tax is $2,489 per cubic foot.  We had to do it,

13   one, to be competitive.  Also increases in," term redacted,

14   "with added transportation and dewatering."

15           And that's what you wrote back to him; is that

16   correct?

17   A.    I did.

18   Q.    Mr. Azadeh, you can set Plaintiff's 18 aside.

19           Let's look at a document from a couple of weeks

20   later, so if you will turn to tab PTX-19 in your binder.

21   Plaintiff's Exhibit 19 is a cover e-mail and attached

22   document.  And you recognize Plaintiff's Exhibit 19; is that

23   correct?

24   A.    Yes.

25           MS. ELMER:  Your Honor, plaintiff moves to admit

Azadeh - direct

1    Plaintiff's Exhibit 19 into evidence.

2                    THE COURT:  Any objection?

3                    MR. LOCKWOOD:  No objection, your Honor.

4                    THE COURT:  Thank you.

5                    (Plaintiff's Exhibit No. 19 was admitted into

6    evidence.)

7    BY MS. ELMER:

8    Q.    And, Mr. Azadeh, you sent this e-mail dated June 24,

9    2015, to your colleagues, Mr. Williams and Mr. Ping; is that

10   correct?

11   A.    Yes.

12   Q.    And let's look at the attachment to the e-mail.  And

13   you prepared the attachment; is that correct?

14   A.    Yes.

15   Q.    And the attachment contains your recommendation for a

16   new pricing approach at Erwin; right?  And it may be easier

17   for you to follow along with the unredacted copy in your

18   binder.

19   A.    Both a pricing approach and operational practices,

20   yes.

21   Q.    And your boss, Ken Robuck, ultimately agreed with your

22   recommendation; is that correct?

23   A.    Yes.

24   Q.    And your recommendation was implemented; is that

25   correct?

Azadeh - direct

1    A.    Yes.

2    Q.    Let's look at Paragraph 1E at the top.  One of the

3    motivations for your recommendation to change the pricing

4    strategy was to maintain market share and competitiveness;

5    is that correct?

6    A.    Yes, in response to what was happening with the

7    various pieces and parts of the market, yes.

8    Q.    And let's look at item number four.

9    A.    Okay.

10   Q.    And the last sentence of item number four states:  "We

11   needed to change pricing approach in order to compete with

12   WCS continued price spiral downward."

13         That's what you wrote; is that correct?

14   A.    Yes, but that's an oversimplification of what was

15   happening.  There was a lot of factors that went into

16   this.

17   Q.    Mr. Azadeh, you can set Plaintiff's Exhibit 19 aside.

18         Let's shift gears and talk about

19   EnergySolutions' earlier interest in buying WCS.

20         Now, back in early 2014, EnergySolutions was

21   contemplating the acquisition of WCS; is that correct?

22   A.    Yes.

23   Q.    And if you would, sir, turn to tab PTX-002 in your

24   binder to what has been marked as Plaintiff's Exhibit 2.

25   A.    Okay.

Azadeh - direct

1   Q.      And you recognize Plaintiff's Exhibit 2; is that

2   correct?  Two-page e-mail?

3   A.      Yes.

4           MS. ELMER:  Your Honor, plaintiff moves to admit

5   into evidence Plaintiff's Exhibit 2.

6           THE COURT:  Any objection?

7           MR. LOCKWOOD:  No objection, your Honor.

8           THE COURT:  Thank you.

9           (Plaintiff's Exhibit No. 2 was admitted into

10  evidence.)

11          THE COURT:  I told you all you would be getting

12  exercise and not eating.

13          MS. ELMER:  Thank you.

14  BY MS. ELMER:

15  Q.      And, Mr. Azadeh, this is a February 7, 2014 e-mail

16  exchange between you and your boss, Mr. Robuck; is that

17  correct?

18  A.      Yes.

19  Q.      And Mr. Rogers and Mr. Tony Didgeon in are also copied

20  on this exchange; is that right?

21  A.      Yes.

22  Q.      Let's look at your e-mail on the bottom half of the

23  first page on the document.

24          And your e-mail to your boss begins:  "Hi,

25  please see below two examples.  As expected, escalation

Azadeh - direct

1    rates make a large difference."

2              That's what you wrote; is that correct?

3    A.    Yes.

4    Q.    And you wrote this e-mail to your boss with

5    EnergySolutions' possible acquisition of WCS in mind; is

6    that correct?

7    A.    I wrote this e-mail as a part of a model that I was

8    preparing for the acquisition.  One of the elements of which

9    was a price increase element.  There were other things in

10   that model, but, yes, it was done as part of the acquisition

11   for modeling purposes.

12   Q.    And in this e-mail to your boss, you used the term

13   escalation to mean price increase; is that correct?

14   A.    Yes.  As you can see in the two examples below, some

15   assumptions were made under Example 1 and 2.  Zero percent,

16   five percent, seen percent, seen percent, five percent, and

17   a different set of numbers elsewhere and other presentations

18   that follow a different set of numbers.  These were just

19   assumptions used to see what it would look like for the WCS

20   acquisition.

21   Q.    Let's look at example number one.

22   A.    Okay.

23   Q.    And at the time that you drafted this e-mail to

24   Mr. Robuck, you believed that the price increases set forth

25   in this example number one was something that

Azadeh - direct

1    EnergySolutions might be able to sell to its customers if it

2    could successfully acquire WCS; is that correct?

3    A.    No, not necessarily.

4    Q.    Sir, let's turn to your CID deposition.

5    A.    Okay.

6    Q.    And let's go to page 149.

7    A.    What page?

8    Q.    149?

9    A.    Okay.

10   Q.    And I want to start at line number two.

11   A.    Okay.

12           "Question:  Did you think that the projections

13   set forth in your example that you e-mailed to Mr. Robuck on

14   February 7, 2014, were realistic?

15           "Answer:  At the time I did not think the second

16   example was at all realistic.  Perhaps Example 1 was

17   something we might have been able to sell to the customer,

18   saying, hey, look, you need a long term viable option for

19   Class B/C disposal.  You've seen this company with money

20   year after year in order for us to make a profit.  Okay.  We

21   need you to agree with us to increase pricing so we can

22   actually run a profitable operation.  So I think we might

23   have had a shot at selling Example 1.  And we actually

24   would have shown them the book, say, here's the publicly

25   available data.  Here's what Valhi has reported, and you

Azadeh - direct

1    want us to keep WCS open and we might have had a shot with

2    Example 1."

3              So I asked you that question and you gave me

4    that answer in your deposition; right?

5    A.    As a part of the answer, my focus was profitability of

6    WCS, and one way to make WCS more profitable, because they

7    have lost money, I recall this discussion.  Since 2003, the

8    data that I showed you, to 2015, WCS has lost money year

9    after year.  One way to make a profit and make a business

10   viable is to raise prices.  There are other ways.  So the

11   focus was getting it to making money and one way is to raise

12   prices.

13   Q.    But the escalations that are set forth in PTX-02, they

14   apply to LPD, EnergySolutions, as well as WCS, is that

15   correct, as set forth in Plaintiff's Exhibit 2?

16   A.    I'm not sure I'm following your question.

17   Q.    LPD on Plaintiff's Exhibit 2 refers to

18   EnergySolutions; is that correct?

19   A.    It refers to logistics, processing and disposal for

20   EnergySolutions, yes.

21   Q.    So LPD is a business unit of EnergySolutions that

22   includes its Clive disposal facility; is that correct?

23   A.    It does.

24   Q.    And it also includes the Erwin processing facility; is

25   that correct?

Azadeh - direct

1   A.    Correct.

2   Q.    And so the LPD on Plaintiff's Exhibit 2 refers to

3   EnergySolutions and the WCS refers to WCS; is that correct?

4   A.    Correct.

5   Q.    And the price escalations used do not distinguish

6   between those two, do they, on that example?

7   A.    You are just reading way too much into this.  They did

8   not apply to the LPD price escalation.  All the discussions,

9   all the presentation that we discussed had to do

10  specifically with WCS, the publicly available data.  The

11  fact that they did not make any money, and how could we make

12  the B/C disposal site viable.  So, no, it does not include a

13  price escalation for logistics processing disposal.

14  Q.    And you would not have recommended the price increases

15  if you did not think they would be profitable, would you?

16  A.    In the model that I performed, okay, one of the

17  elements was price increases.  Other elements included being

18  more cost-effective, reducing costs.  Other elements would

19  have been being more productive.  Okay.  So this was just

20  one element in a very draft model that evolved to something

21  completely different.

22  Q.    Mr. Azadeh, my question was a little simpler than

23  that.  You would not have recommended the price increases

24  set forth in Plaintiff's Exhibit 2 to your boss if you did

25  not think that they would be profitable for the merged

Azadeh - direct

1    company, would you?

2    A.    The numbers showed that if you assumed those sets of

3    numbers, the WCS portion of it, the line will come above

4    here.  Yes, it will be profitable.  But that's not what

5    happened.

6    Q.    Now, Mr. Azadeh, you took Plaintiff's Exhibit 2 and

7    you expanded it into a slide deck; is that correct?

8    A.    Correct.

9    Q.    All right.  So let's set Plaintiff's Exhibit 2 aside

10   and let's look at an example of a slide deck that you

11   created.

12   A.    Okay.

13   Q.    And, sir, if you could turn to tab PTX-003 in your

14   binder.

15   A.    Yes.

16   Q.    And there you will find Plaintiff's Exhibit 3.  Do you

17   recognize this document, sir?

18   A.    Yes.

19            MS. ELMER:  Your Honor, plaintiff moves to admit

20   Plaintiff's Exhibit 3 into evidence.

21            MR. LOCKWOOD:  No objection, your Honor.

22            THE COURT:  Thank you.

23            (Plaintiff's Exhibit No. 3 was admitted into

24   evidence.)

25   BY MS. ELMER:

Azadeh - direct

1   Q.    Now, you and your colleague, Bret Rogers, were

2   involves in the preparation of Plaintiff's Exhibit 3; is

3   that correct?

4   A.    Yes.

5   Q.    And when you prepared Plaintiff's Exhibit 3, you had

6   in mind the possible acquisition of WCS by EnergySolutions;

7   is that correct?

8   A.    The purpose was to convince our boss, Ken Robuck, to

9   look into the acquisition of WCS.

10  Q.    And you shared this deck, this Plaintiff's Exhibit 3,

11  with your boss; is that correct?

12  A.    Yes.

13  Q.    And you tried to be as accurate as possible in

14  preparing that deck for him; right?

15  A.    Based on the information that I had at that time,

16  absolutely, yes.

17  Q.    Let's look at the second slide in the deck, current

18  LPD five-year forecast?

19  A.    Okay.

20  Q.    And as we mentioned before, LPD is EnergySolutions

21  Logistics Processing and Disposal Unit; is that correct?

22  A.    Correct.

23  Q.    And Grouse on this slide stands for Erwin resins

24  solutions, doesn't it?

25  A.    Yes.

1  Q.    And let's look at the bullet of page 2.  And that

2  bullet point states, "WCS is threatening current status quo

3  through price degradation/loss of B/C market affecting

4  Grouse.

5            "Price degradation/loss of future LOP rates and

6  large components.

7            "Disposal of higher Class A waste as 'BSFR' at

8  WCS RCRA landfill."

9            Did I read that correctly?

10 A.    You did.

11 Q.    Let's look at slide number 6, positive impact for

12 Grouse and WCS.  And I want to look at the second bullet

13 point below the chart.

14           And that second bullet says, no increase in

15 2014, thereafter resin processing and WCS disposal rates

16 were increased 15 percent, 15 percent, 5 percent and 5

17 percent for 2015, 2018."

18           Did I read that correctly?

19 A.    As we discussed earlier, one of the model elements was

20 a price increase assumption, and already we've seen three

21 different sets.  So, yes, that was a model element to get --

22 if you go back to the same set of data, the same thing you

23 have in front of you, if you look at slide 5 in the same

24 presentation -- can we do that?

25 Q.    I'd really like to just continue forward.  I think

Azadeh - direct

1    your counsel will have an opportunity to cross-examine you.

2    A.    Okay.  Fair enough.

3    Q.    A friendly cross.

4          In any event, on the slide that we are on, slide

5    number 6, this bullet point refers to resin processing,

6    a/k/a Erwin, as well as WCS disposal, does it not?

7    A.    Yes, I believe it does, for this set of assumptions,

8    for this model, yes, I believe it included both, both Erwin

9    and WCS.

10   Q.    And so the prices would be increased both at Erwin and

11   WCS in this particular model that's on slide 6; is that

12   right?

13   A.    Under this hypothetical assumed set of models as a

14   draft discussion, yes.

15   Q.    The first sub-bullet below that says, "Increase brings

16   resin's WCS disposal back up to approximately $5,000 per

17   cubic foot as was the case in early 2013."

18          Did I read that correctly?

19   A.    Yes, you did.

20   Q.    And this sub-bullet adequately reflects that the

21   pricing for high activity resin dispositioning in early 2013

22   was indeed around $5,000 per cubic foot, wasn't it?

23   A.    Yes, it was.

24   Q.    And just for reference, those prices eventually got

25   down to about $2,000 per cubic foot by May of 2015, didn't

Azadeh - direct

1   they?

2   A.    For the sum of fraction, 1 through 6, for

3   EnergySolutions, that's a correct state.

4   Q.    And in this slide deck that you shared with your boss,

5   you would not have recommended the increase of resin

6   processing and WCS disposal rates by 15 percent, 15 percent,

7   5 percent and 5 percent if you did not think that those

8   increases would be profitable, would you?

9   A.    Again, this was an assumed set of conditions.  I was

10  not making any recommendations to increase pricing.  It was

11  a model parameter that brought us back to break even in a

12  little profit above zero.  So, no, it was not a

13  recommendation to raise prices.

14  Q.    But you would not have modeled something for your boss

15  that you thought would be unprofitable, would you?

16  A.    That's why I did it.  There's also other elements in

17  here, like the SGNA pickup.  Okay.  That was modeled as

18  well, which ended up being significantly higher than the

19  numbers I plugged in here.  This was a draft.  This was --

20  this is not an end all, be all document.  This evolved into

21  due diligence.

22  Q.    The 15 percent that is in year three of your model

23  here on here on slide number six would be a 15 percent

24  increase on top of the 15 percent increase in year two; is

25  that right?

Azadeh - direct

1   A.    For this particular model, yes.

2   Q.    And the five percent increase in year four would be on

3   top of the 15 percent increase in year three; is that

4   correct?

5   A.    Again, for this particular model, yes.

6   Q.    And the five percent increase in year five would be on

7   top of the five percent increase in year four; is that

8   correct?

9   A.    For this model, yes.

10  Q.    And you believed that these price increases were

11  conservative, didn't you?

12  A.    No.

13  Q.    Well, let's look at slide number seven.

14  A.    Okay.

15  Q.    Entitled "LPD and WCS if combined."

16  A.    Okay.

17  Q.    And I want to start with the first bullet below the

18  chart, and the first bullet below the chart says, "Reverses

19  price degradation."

20        Did I read that correctly?

21  A.    You did.

22  Q.    So you expected a combination of the two companies to

23  not only stop price degradation, but also reverse it; is

24  that right?

25  A.    For this particular model, yes.

1   Q.     The second bullet below the chart says, "Protects

2   against RCRA exempt waste."

3              Did I read that correctly?

4   A.     Yes.  Based on the information, that was not correct

5   at that time.  Yes.

6   Q.     And this is referring to WCS's exempt cell, isn't it?

7   A.     Yes, it is.

8   Q.     So a combination of EnergySolutions and WCS would

9   protect against intrusion by WCS's exempt cell; is that

10  right?

11  A.     Based on the information we had at the time which

12  proved not to be true, yes.

13  Q.     And the third bullet below the chart says, "Increases

14  revenue and EBITDA."

15             Did I read that correctly?

16  A.     You did.

17  Q.     You were contemplating that EBITDA for EnergySolutions

18  and WCS would be higher if the firms were combined than not

19  combined; is that correct?

20  A.     Under this model, yes.

21  Q.     And the fifth bullet below the chart says,

22  "Conservative price increases."

23             Did I read that correctly?

24  A.     You did.

25  Q.     So you considered the price increases of 15 percent,

Azadeh - direct

1    15 percent, 5 percent and 5 percent as set forth in

2    Plaintiff's Exhibit 3 conservative; is that right?

3    A.    For this model, yes.

4    Q.    And --

5    A.    Which proved not to be the case.

6    Q.    Mr. Azadeh, you can set Plaintiff's Exhibit 3 aside.

7    A.    Okay.

8    Q.    And, Mr. Azadeh, I have a few questions for you, but

9    they relate to areas that EnergySolutions' counsel has

10   designated confidential.

11            MS. ELMER:  Counsel, may I proceed?

12            MR. LOCKWOOD:  No.  We'd prefer that the

13   courtroom be closed.

14            THE COURT:  All right.  For some period of time,

15   hopefully not long, anyone in the courtroom not on the

16   protective order in this case needs to leave.

17            *** (The following portion of the transcript is

18   under seal.)

19

20

21

22

23

24

25

Azadeh - direct

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Azadeh - direct

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Azadeh - cross

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19            *** (End of portion under seal.)

20            MS. ELMER:  Good afternoon.  It's Paul Lockwood

21    on behalf of EnergySolutions.

22                    CROSS-EXAMINATION

23    BY MR. LOCKWOOD:

24    Q.    Mr. Azadeh, so the business that you are responsible

25    for, Energy Solutions, is the processing business; is that

Azadeh - cross

1    correct?

2    A.    Yes.

3    Q.    And you have oversight of marketing and business

4    development for processing?

5    A.    Yes.

6    Q.    And does that give you insight into the market for B/C

7    waste?

8    A.    Yes.

9    Q.    And just for a moment focus on the market for the

10   Class A waste.  And with respect to Class A waste, you don't

11   have direct responsibility; is that correct?

12   A.    For class disposal, no.

13   Q.    But you have been asked questions today about, several

14   questions about the exempt cell of WCS.

15         Do you recall those questions?

16   A.    Yes.

17   Q.    And what is your understanding of what -- the

18   historical understanding of what exempt waste is?

19   A.    Historically, the term exempt waste is for material

20   that is very low in radioactivity, very low in dose that

21   could get disposed of, as we discussed earlier, in a

22   municipal landfill, which is household trash.  That's a

23   historical reference to exempt waste, things that are very,

24   very low in dose, very safe to dispose of.

25   Q.    So are there generally public safety concerns with

Azadeh - cross

1   exempt waste?

2   A.    No.

3   Q.    And with respect to the WCS exempt cell facility in

4   Texas, what is the regulator that sets the parameters for

5   that facility?

6   A.    It is the Texas commission environment called the TCQ.

7   Q.    And as an interested participant, did you have views

8   about the radiation levels that Texas considered exempt

9   waste under the exempt cell program at WCS?

10  A.    It was extremely high.  To call something exempt waste

11  at ten percent of Class A would -- something I had never

12  seen before.

13  Q.    And can you give some examples of why that caused you

14  concern?

15  A.    I will give you an example.  You could -- we wrote

16  this down and communicated with certain individuals, but if

17  you take, for example, from their license their limit for a

18  cobalt 60 and put it in a container, the dose rate on it

19  would be such that you actually need to shield it to protect

20  people during the transportation to the exempt cell

21  facility.  And then once it arrived there, you actually had

22  to do stuff regulatory required to protect your workers and

23  the general members of the public that might be at the site

24  boundary.  I've never heard the term exempt waste applied to

25  anything like that.

Azadeh - cross

1   Q.    So even if the Texas license allowed for materials

2   with those dose levels to be treated as exempt waste, in

3   your view, would there be other practical or legal

4   restrictions to their ability to accept materials to the

5   full extent of the Texas license?

6   A.    Absolutely.

7   Q.    And what are some of those concerns?

8   A.    Nuclear Regulatory Commission has regulations for the

9   protection of workers, for the protection of the public.

10  There's all sorts of requirements out there.

11  Q.    And could you take out -- we had -- you had been asked

12  previously about Plaintiff's Exhibit 1, which is the slide

13  deck that you prepared on February 7th, 2014.  Could you

14  take that out again?

15  A.    Which tab do I go to?

16  Q.    It's towards the back.  The second-to-last document.

17  A.    Okay.

18  Q.    So when you prepared this document in February of

19  2014, had WCS at that time begun receiving waste at its

20  exempt cell facility?

21  A.    Not to the best of my knowledge.

22  Q.    So when you were making assessments about the

23  potential of the WCS exempt cell and the forecast for it, at

24  that time did you have any historical performance data to

25  evaluate?

Azadeh - cross

1   A.    No.

2   Q.    And let's talk about the data that you did have

3   available.    What is the information that you used to prepare

4   the forecasts in Plaintiff's Exhibit 1?

5   A.    We used the Texas license, the TCQ issued license of

6   WCS.   We used the WCS waste acceptance guidelines.   And we

7   also used the WCS marketing literature.

8   Q.    And based on the WCS marketing literature, what did

9   they say that they could accept at the exempt cell facility?

10  A.    They said they could accept up to ten percent of the

11  Class A limit.

12  Q.    And did you use that ten percent number when you were

13  preparing these slides in Exhibit 1?

14  A.    I did.

15  Q.    And in light of the safety concerns that you just

16  testified about, did you apply any skepticism or make any

17  adjustments to the marketing materials from WCS to reflect

18  any future restrictions you thought might apply beyond the

19  Texas license?

20  A.    I applied the ten percent flat out as much as it could

21  go.

22  Q.    And as you're sitting here today, do you believe that

23  they can receive at the exempt cell materials to the full

24  extent of the Texas license?

25  A.    Not at all.

Azadeh - cross

1   Q.    And why is that?

2   A.    There was the operational constraint that was part of

3   the work we did for the DOG.  The actual WCS told us the

4   contacted dose limit is very low, so we applied that limit.

5          The other fact is, back here in 2014, we had no

6   operational history.  Fast-forward several years.  The

7   facility is just not used as much.  In fact, when you do all

8   life cycle value analysis, there's a lot of extra work

9   involved with sending stuff to the facility.

10  Q.    And you were asked questions by Ms. Elmer about the

11  dose rate number that you received from Bret Rogers and how

12  that affected your analysis.  Let me ask you about that.

13         Regardless of what that number actually was, did

14  you have an expectation that there would be some limit

15  imposed by WCS below the Texas license requirements?

16  A.    Absolutely.

17  Q.    And what was the reason why you expected that there

18  would be restrictions like that?

19  A.    Because there are regulations in place to protect your

20  workers and to protect the public against it, that the

21  full class, the full ten percent Class A limit like you

22  mentioned -- the Department of Transportation has a limit of

23  200 millirem per hour.  The example I gave you is like 300

24  million recommend per hour.  There's absolutely no way they

25  could have done the full ten percent of Class A.

Azadeh - cross

1    Q.    And with respect to the sorting issue that you

2    mentioned, aren't there other exempt cell operators that

3    require sorting for customers?

4    A.    Would you --

5    Q.    So BSFR and U.S. Ecology, we heard about those today.

6    Do those also require sorting?

7    A.    Not the same as the WCS, no.

8    Q.    Why is it different?

9    A.    For the bulk survey of release BSFR program, the

10   person who sends the waste over actually knows without doing

11   any measuring or any sorting if the material is clean or

12   not.  For example, I will go into a radiation area and I

13   wear personal protective equipment and I know if I didn't

14   touch anything radioactive and I stay clean, I will come out

15   and put my things in a green bag.  So I know it's low dose.

16   I know it's going to pass the bulk survey release.  There's

17   no surveys required.

18          The U.S. Ecology ones, they get approvals on a

19   project specific basis, so they know specifically for that

20   project what they are, but for the WCS ones, and it's the

21   ten percent Class A, it's not that I know the stuff was

22   clean and goes in a green bag.

23          I pile it all up together as Class A, but then

24   have to go spend time sorting out the portion that would go

25   to the WCS, the portion that requires proper Class A

Azadeh - cross

1    disposal.

2    Q.    If you could again look at Exhibit 1.  There are

3    forecasts that you made, for example, on page 3 and on page

4    4 that show LPD without WCS and LPD with WCS.  And if you

5    were preparing those forecasts over again with the

6    information you have now, would you have done them

7    differently?

8    A.    Yes.

9    Q.    And why is that?

10   A.    Because the exempt cell just didn't end up being

11   reality.  It ended up being more like a ES4 or U.S. Ecology

12   option.

13   Q.    So let's talk for a moment about the pricing of the

14   B/C waste.  And if we stick with this exhibit, PTX-1, and if

15   we look at page 2, there's a current LVP five-year forecast

16   on page 2.

17   A.    Yes.

18   Q.    And there's a chart on that page, and there's a -- in

19   the chart, there's something called Grouse.  There's a row

20   called Grouse.  So what is Grouse on this chart?

21   A.    That's the Erwin resin processing facility.

22   Q.    And if you look at the projections that you had at

23   this time and the historical result, about what percentage

24   of the overall business was the Erwin facility in your

25   analysis?

Azadeh - cross

1    A.    I would say the Erwin facility --

2    Q.    The Grouse business?

3    A.    Yes.   The Grouse business, the B/C business.

4    Q.    Yes.

5    A.    The Class B/C business was about five to six percent

6    of our revenue.

7    Q.    And with respect to future growth of the processing

8    business of Erwin, what are the prospects for that business?

9    A.    This is a very small part of business.   It's going to

10   remain around five to six percent.

11   Q.    And is there any expectation of potential growth in

12   the overall industry for B/C waste?

13   A.    The market for B/C waste is actually shrinking, so,

14   no.

15   Q.    And why is it shrinking?

16   A.    Because various reasons.   One, they are not building

17   any new power plants.

18         Two, when they shut down, there's no more

19   operational waste.

20         And, three, people are getting really smart and

21   not actually generating the B/C material in the first place.

22   And some are getting really, really smart and actually

23   blending their own material onsite, so it never goes to a

24   processor.

25   Q.    So when Ms. Elmer showed you some e-mails where you

Azadeh - cross

1    were involved in making pricing approvals, it was

2    Plaintiff's 16 and 18 were two of the examples.  Did that

3    relate to the B/C processing business?

4    A.    Yes.

5    Q.    And that is the part of the business that represents

6    about five to six percent of ES?

7    A.    Yes.

8    Q.    Now, with respect to the decline in B/C prices between

9    2013 and 2015 that you talked about, were there any actions

10   by market participants that in your view had significant

11   effect on that decline?

12   A.    Yes, very much.

13   Q.    And what is it in your view, what actions by a market

14   participant, how did they have an effect on pricing?

15   A.    I would say two of the biggest effects on the market

16   participants was, one, although the Nuclear Regulatory

17   Commission branch technical position concentration

18   averaging, that blending was available and went final in

19   2015.  By it going final in 2015, so market participants

20   started implementing more.  And the absolute biggest impact

21   was Exelon entered the Class B/C disposal market.

22   Q.    Well, how is it that Exelon could have just entered

23   the market at that time?  How were they not in the market

24   previously?

25   A.    So Exelon is the largest utility in the country, and

Azadeh - cross

1    when the previous B/C disposal site, in 2008 they licensed

2    and built a very large central Class B/C, B/C source

3    facility, and they stored all their material.  And once WCS

4    opened up, they used that very large quantity, that very

5    large warehouse to negotiate a very, very good deal with

6    WCS.  So they managed the lowest price possible from WCS and

7    they got it.

8    Q.    And in terms of the negotiations did they use the

9    availability of storage as a means of negotiating prices?

10   A.    Very much.  One, they used the availability of

11   storage.  And, two, they wanted to go direct to disposal, so

12   they never -- they never used any large services either.

13   Q.    And how in your view did that affect the entire B/C

14   market?

15   A.    It established in one shot the lowest price that was

16   available out there for the market through the Exelon

17   negotiation with WCS.

18   Q.    Could you go back to Exhibit 1, the slide deck.  And I

19   would like to bring you to page 5 of that slide deck.

20         So when Ms. Elmer was asking you about the price

21   increases that were reflected on page 6, you wanted to take

22   her to page 5.

23   A.    Yes.

24   Q.    I'm just going to allow you to provide that answer.

25   A.    Thank you.

Azadeh - cross

1    Q.    Go ahead.

2    A.    So, again, the price increases we're talking about in

3    this particular one, 15 percent, 15 percent, 5 percent,

4    5 percent, okay.  If you look at the chart on slide 5, this

5    is from Valhi, prepared for WCS, that publishes information

6    and has a particular section about WCS.  So if you plot out

7    from 2005 through 2013 the WCS for an actual performance,

8    there's a bunch of lines.  But if you just look at the one

9    that had the little X's in it, that's the operating income.

10   That's the money you make.  If you find a zero million

11   dollar line, year after year, starting in 2005 through 2013,

12   they lost money.  Okay.  So in order to -- here we go.

13   Q.    Yes.

14   A.    So that's the lowest line on the chart.  So one of the

15   ways you could take this up to break even or above zero is

16   to raise prices, and that's one of the assumptions that was

17   made in this presentation.

18          And there was another assumption, which was

19   increasing productivity and lowering costs.  All of those

20   things considered.

21   Q.    So when you say assumption, did you do any study or

22   analysis to determine whether the combined company would be

23   able to achieve particular price increases?

24   A.    No.

25          MS. ELMER:  Objection.  Plaintiff's Exhibit 1

Azadeh - cross

1    has not been admitted into evidence.

2              MR. LOCKWOOD:  Wasn't 1 that you used?

3              MS. ELMER:  Plaintiff's Exhibit 3.

4              MR. LOCKWOOD:  Well, your Honor, since I've

5    asked him several questions about it, I think we'll ask that

6    it be admitted.

7              THE COURT:  Is there any objection to it being

8    admitted?

9              MS. ELMER:  No objection, your Honor.

10             THE COURT:  All right.  Thank you.

11             (Plaintiff's Exhibit No. 1 was admitted into

12   evidence.)

13   BY MR. LOCKWOOD:

14   Q.   And why don't we switch to 3, the one that I asked you

15   about, very similar.  Look at page 5.  It has the exact same

16   chart.

17             And on page 6 of Plaintiff's Exhibit 3, you were

18   asked about these 15, 15, 5 and 5 percent increases.  Did

19   you do any study or analysis to support those?

20   A.   No.

21   Q.   And so why would you include numbers in this chart if

22   you didn't have any analysis or data to back them up?

23   A.   It's just the model to show that we could get the

24   break-even using price.

25   Q.   So were you recommending these price increases in

Azadeh - cross

1    preparing this slide?

2    A.    No.  My recommendation was to look at acquiring WCS

3    and all of these things would come out with real numbers

4    during due diligence.  The entire purpose of this document,

5    2014 document, was not pricing strategy or the future at

6    WCS.  I was to get the company interested in looking at WCS

7    and doing due diligence.

8    Q.    Are there other paths to get the profitability above

9    the zero line for the combined --

10   A.    There's three things to do to go above zero.  One is

11   without losing sales, raise your price.  Okay.  The other is

12   reduce your costs.  Okay.  And the other one is increase

13   your productivity.  Those three will get you to break even

14   or above.

15   Q.    Did you do any cost study or analysis when you

16   prepared this?

17   A.    None.  We had a placeholder.  We had a plug-in number

18   for this model.

19   Q.    During the due diligence, have there been studies of

20   potential cost savings?

21   A.    That's my understanding, yes.

22   Q.    And have you been involved in the due diligence?

23   A.    No, I've not.

24   Q.    Okay.  Do you have a general understanding of what the

25   due diligence analysis has shown with respect to cost

Azadeh - cross

1    savings?

2    A.    A lot of cost savings.

3    Q.    And would, in your view, price increases be necessary

4    to make this transaction profitable?

5    A.    In my view, no.

6    Q.    Can you take a look at Plaintiff's Exhibit 10.  And

7    I'm going to ask you about page 5 of that document.

8    A.    Okay.

9    Q.    So this is another document that you were asked about

10   by Ms. Elmer.  And when she was asking you about a chart on

11   this page, she was pointing to the box in the WCS row that

12   says 110 LC.  And you were about to make a comment and got

13   cut off.  I just want to give you a chance to provide the

14   answer you were prepared to give at that time?

15   A.    This was our discussion for the WMG wanting the

16   project for disposal of steam generators at WCS.  It was not

17   the disposal that we lost.  You could see the range that

18   they are in is -- it was not the disposal.  It was the

19   entire package.  WMG just was very clever in how they

20   approached logistics for it.

21   Q.    So when you look at large component analysis for

22   internal presentations and you write WCS, do you also

23   include WMG in them?

24   A.    Going forward, I will.

25   Q.    No, no.

Azadeh - cross

1    A.    At times I just lumped them all together.

2    Q.    So you generally, when you were writing, you would

3    lump WCS and WMG together?

4    A.    I did.

5    Q.    And did you expect to be testifying in court,

6    explaining that some day?

7    A.    No.

8    Q.    With respect to slide 4 on this page, if we go back to

9    the previous page.

10            So you were asked about the bullet that says,

11   exempt cell disposal drives future approach.  Below that it

12   says, must continue technical challenge, i.e., 100 mR per

13   hour on contact wastes are not exempt.  They are Class A.

14   So what does that refer to?

15   A.    That goes back to the vernacular exempt waste in the

16   past referred to disposal of household trash, and saying

17   that they could accept and dispose of ten percent of Class A

18   based on their license and their waste acceptance guidelines

19   and marketing literature was not going to hold up.  And

20   that's referencing that they've got to comply with other

21   bits and parts of their regulations which ended up, we find

22   that you are in due diligence, that they had to.  The limit

23   was 10 millirem, not a hundred.

24   Q.    So if you go back then to slide 2 in this same deck,

25   the page that says, current situation.

Azadeh - cross

1   A.    Yes.

2   Q.    So the second bullet says, WCS exempt cell option

3   provides high levels of rad acceptance and extremely low

4   prices that threaten LOP renewal process.

5            Is it still your view today as opposed to

6   December 2014 that the WCS exempt cell threatens the LOP

7   renewal process?

8   A.    Not at all.

9   Q.    Okay.  And that's for the same reasons we discussed

10  about the safety issues and the limit?

11  A.    It's the safety.  It's the fact that nobody has used

12  them.  It's the fact that we renewed LOP contracts that were

13  coming due, customers were very smart.  As the extra costs

14  associated, it just didn't end up being real.  In fact, what

15  it ended up doing, being more like a BSFR option.

16            MR. LOCKWOOD:  Your Honor, I have no more

17  questions.

18            THE COURT:  All right.  Anything further?

19                  REDIRECT EXAMINATION

20  BY MS. ELMER:

21  Q.    Mr. Azadeh, you made reference to Exelon entering the

22  B/C market, but Exelon did not open a Class B and C

23  radioactive waste disposal facility, did it?

24  A.    They did not.

25  Q.    And Exelon cannot store the waste of other utilities,

Azadeh - redirect

1    can it?

2    A.    Just their own.

3    Q.    Now, your counsel asked you some questions about

4    Plaintiff's Exhibit 3, and you sent Plaintiff's Exhibit 3 to

5    your boss, Mr. Robuck, didn't you?

6    A.    I'm sorry.  Which tab was that?

7    Q.    PTX-003.

8    A.    I will find it.

9              THE COURT:  It was the last exhibit discussed.

10             THE WITNESS:  Okay.  Sorry.  I've got it.

11             Yes, I did.

12   BY MS. ELMER:

13   Q.    And, Mr. Azadeh, if you knew that the WCS exempt cell

14   would have to tie in as waste acceptance criteria, as you

15   testified, or tighten some other criteria, as you testified,

16   why were you worried about WCS's exempt cell as a competitor

17   at all?

18   A.    Because at the time I had assumed the worst case.

19   Q.    And sitting here today, you still cannot tell us where

20   the ten millirem per hour figure that you keep referring to

21   came from, can you?

22   A.    It came from Bret Rogers.

23   Q.    But you can't tell me where Bret Rogers got that

24   figure, can you?

25   A.    My understanding is that it came from WCS.

Didgeon - direct

1    Q.    But you can't tell me what document it came from; is

2    that correct?

3    A.    I cannot tell you what document.

4    Q.    And you cannot tell me the name of the person it came

5    from; is that correct?

6    A.    I do not know the name of the person, no.

7                    MS. ELMER:  Thank you.

8                    THE COURT:  All right.  You may step down, sir.

9    Thank you.

10                   THE WITNESS:  Thank you.

11                   (Witness excused.)

12                   THE COURT:  I will let the attorneys clean up.

13                   MR. CHAPMAN:  Thank you.

14                   We call William Didgeon, Vice President of

15   EnergySolutions.

16                   THE COURT:  All right.  Thank you.

17                       ... TONY DIDEGON, having been duly

18                   sworn as a witness, was examined and testified

19                   as follows ...

20                   THE COURT:  And are these old binders still from

21   the last witness?

22                   THE WITNESS:  They are.

23                   THE COURT:  All right.  Someone needs to clear

24   those off, whoever's binders they are.

25                   MR. CHAPMAN:  May I approach?

Didgeon - direct

1           THE COURT:  Yes.  You may exchange.

2           MR. CHAPMAN:  Thank you.

3           THE COURT:  Thank you.

4                      DIRECT EXAMINATION.

5    BY MR. CHAPMAN:

6    Q.    Good afternoon, Mr. Didgeon.  I've handed you two

7    binders that we may refer to during your examination today.

8    I will let you know if and when we need to look at them.

9           Today I'm going to avoid missing particular

10   customer names, particular dollar amounts and percentages

11   that your counsel stated were confidential.  Those will be

12   redacted from any documents that are on the screen, but

13   those will be in your binder unredacted, so please refer to

14   those during the questioning.

15          You are currently the senior vice president for

16   business development decommissioning and projects?

17   A.    Correct.

18   Q.    And you started that position in January of 2016?

19   A.    2016.

20   Q.    And prior to that, you were a vice president of

21   business development?

22   A.    That is correct.

23   Q.    So I would like to talk to you today about work that

24   you did in your prior position as the vice president of

25   business development.

Didgeon - direct

 1          You were responsible for certain customer

 2  relationships?

 3  A.      Yes, I was.

 4  Q.      Those included some of EnergySolutions' largest

 5  commercial and nuclear utility customers?

 6  A.      Yes.

 7  Q.      If you could turn to the tab marked Didgeon

 8  Demonstrative 1 in your binder, in the white binder.  This

 9  is a simple demonstrative that will help our conversation

10  today so that I can refer to the customer as Customer A, but

11  you can see the customer's name in the demonstrative.

12              MR. CHAPMAN:  Your Honor, may I approach with a

13  copy for you?

14              THE COURT:  Yes, please.  That would be helpful.

15  BY MR. CHAPMAN:

16  Q.      And, sir, you see that I refer to a certain customer

17  as Customer A throughout our examination today?

18  A.      Yes.

19  Q.      Customer sends all of its Class A waste to Energy

20  Solutions for disposal?

21  A.      Yes.

22  Q.      Sir, are you familiar with EnergySolutions' life of

23  plant, or LOP contract?

24  A.      Yes, I am.

25  Q.      And while the contract has a unique name, Customer A

Didgeon - direct

1   has a contract that is substantially similar TO to an LOP

2   contract with EnergySolutions?

3   A.    Yes, IT IS similar.  It's called a disposal agreement.

4   Q.    In 2014, Customer A initiated discussions to

5   renegotiate that contract?

6   A.    Yes.

7   Q.    Customer A was seeking a discount?

8   A.    Yes.  They were checking the market for prices at the

9   time.

10  Q.    Sir, if you can please turn to the tab marked PTX-230

11  in the white binder.  It's a document that has been marked

12  for identification purposes as Plaintiff's Trial

13  Exhibit 230.

14            This is an e-mail chain.  The top e-mail, you're

15  not on that.  The e-mails below that are e-mails in which

16  you and a number of other folks at EnergySolutions are

17  e-mailing; is that correct?

18  A.    Yes.

19            MR. CHAPMAN:  Your Honor, plaintiff moves to

20  admit PTX-230 into evidence.

21            MS. REINHART:  No objection, your Honor.

22            THE COURT:  Thank you.

23            (Plaintiff's Exhibit No. 230 was admitted into

24  evidence.)

25  BY MR. CHAPMAN:

Didgeon - direct

1    Q.    Sir, if you can turn to the second page of the

2    document.  Looking at the e-mail at the bottom that you

3    sent --

4              THE COURT:  And I think we've gotten in the

5    habit of, if you could give me, now that it's admitted, the

6    two copies.  Despite what I said and how I've done this in

7    the past, I think it will be helpful in this certain case.

8              MR. CHAPMAN:  I apologize, your Honor.

9              THE COURT:  That's all right.  Thanks.  We'll

10   get in the habit here.

11   BY MR. CHAPMAN:

12   Q.    Sir, so looking at the e-mail at the bottom that says

13   12:42 on page 2, it looks like you circulated a proposed

14   contract renewal to a group at EnergySolutions including

15   Mr. Robuck, Mr. Azadeh, Mr. Rogers and Mr. Williams.

16   A.    Yes.

17   Q.    The proposed contract renewal was Customer A's

18   contract renewal that we've been discussing?

19   A.    Yes.

20   Q.    And Mr. Robuck responds to your e-mail by asking,

21   quote, "What is the predicted annual savings," quote, to

22   this customer; is that right?

23   A.    Yes.

24   Q.    And, sir, if you could turn to the first page, to the

25   top, you respond to this e-mail chain in the second

Didgeon - direct

1    paragraph by writing that, "The proposal would be an annual

2    savings to Customer A," quote, "over not providing them with

3    a rollback competitive offer."

4              Did I read that correctly?

5    A.    Yes.

6    Q.    And while I can't discuss the specific number in

7    court, you noted a specific dollar amount in annual savings

8    to Customer A?

9    A.    Yes.  There was a dollar amount savings.

10   Q.    You then wrote, quote, "If we decided to play the

11   let's bid against WCS exempt cell card and go the distance,

12   we know WCS can easily lower the exempt cell price."

13   A.    Yes.

14   Q.    And you can set PTX-230 aside.

15             If you can turn to the tab in your binder marked

16   230.  I'm sorry.  229.

17   A.    Oh, could I just explain this a little bit?

18   Q.    Sir, we're going to move on to PTX-229, please.

19   A.    Okay.

20             THE COURT:  And let me just explain for all the

21   fact witnesses, it's a timed trial, and so your attorney

22   gets to use their time to let you explain.

23             THE WITNESS:  Understood.

24             THE COURT:  All right.

25   BY MR. CHAPMAN:

Didgeon - direct

1   Q.    Sir, looking at PTX-229, this is another e-mail chain

2   in which you and a number of folks at EnergySolutions are

3   e-mailing; is that right?

4   A.    Yes.

5           MR. CHAPMAN:  Your Honor, plaintiff moves to

6   admit PTX-229 into evidence.

7           MS. REINHART:  No objection, your Honor.

8           THE COURT:  Thank you.

9           (Plaintiff's Exhibit No. 229 was admitted into

10  evidence.)

11  BY MR. CHAPMAN:

12  Q.    If you can turn to the middle of the second page.  You

13  sent an e-mail at 2:50 p.m. to a number of folks at

14  EnergySolutions attaching the renewal contract that we've

15  been discussing for, quote, "review and approval"; is that

16  right?

17  A.    Yes.

18  Q.    And if you could turn to page 1.

19          THE COURT:  And, once again, I apologize.  I

20  don't have my copy.

21          MR. CHAPMAN:  Your Honor, I promise, I will get

22  the hang of it.

23          THE COURT:  Yes, that's fine.  You weren't

24  expecting this until today probably.  Thank you.

25  BY MR. CHAPMAN:

Didgeon - direct

1   Q.    And, sir, turning to the bottom of the first page,

2   Mr. Miller responded by writing, "I'm assuming ask you this

3   management supports the reduction in disposal pricing.   If

4   so, I concur.   If not, we should discuss."

5         Did I read that correctly?

6   A.    You did.

7   Q.    And, sir, you responded in the next e-mail by writing,

8   "Yes, they do -- the alternative is WCS."

9         Is that correct?

10  A.    Yes, that's correct.

11  Q.    And you can put that aside, sir.

12        If you can turn to tab PTX-545 in your binder.

13  A.    Mm-hmm.

14  Q.    A document that has been marked for identification

15  purposes as 545.   This is an e-mail attachment from

16  employees at EnergySolutions to yourself and others at

17  EnergySolutions?

18  A.    Yes.

19        MR. CHAPMAN:   Your Honor, plaintiff moves to

20  admit PTX-545 into evidence.

21        MS. REINHART:   No objection, your Honor.

22        THE COURT:   Thank you.

23        (Plaintiff's Exhibit No. 545 was admitted into

24  evidence.)

25  BY MR. CHAPMAN:

Didgeon - direct

1    Q.    All right.  Sir, if you can turn to the second page of

2    the exhibit, which is the first page of the attachment to

3    the e-mail.  This is the executed renewal contract between

4    EnergySolutions and Customer A?

5    A.    Yes.

6    Q.    And you signed this contract on behalf of

7    EnergySolutions?

8    A.    Yes, I did.

9    Q.    You can go back to the first page of the contract.

10         The first numbered bullet on the contract notes

11   that EnergySolutions, in fact, agreed to, quote, "reduce the

12   current applicable rates for disposal of," quote, "Company

13   A's LLRW, by a certain percentage"; right?

14   A.    Yes.  The same as we do normally for Exelon all the

15   time.

16   Q.    And if you could turn to page 3 of the contract.  If

17   you can look at the section titled, "Add the following

18   language to article one term and commitment."

19         The first bullet says that Customer A agrees to

20   not pursue bidding this contract for a certain number of

21   years.

22   A.    Yes.

23   Q.    Is that right?

24   A.    Yes.

25   Q.    And the second bullet says that all Class A LLRW would

Didgeon - direct

1    remain exclusive to EnergySolutions?

2    A.    Yes, for this renewal period.  Correct, yes.

3    Q.    So Customer A cannot pursue bidding this contract for

4    the a least a few years?

5    A.    Yes.

6    Q.    And you can set that aside, sir.  If you can turn to

7    tab PTX-489 in your binder, marked for identification

8    purposes Plaintiff's Trial Exhibit 489.

9          This is an e-mail chain between yourself and

10   others at EnergySolutions including Mr. Williams?

11   A.    Yes.  From me to Jason Williams, correct.

12         MR. CHAPMAN:  Your Honor, plaintiff moves to

13   admit PTX-489 into evidence.

14         THE COURT:  Any objection?

15         MS. REINHART:  No objection, your Honor.

16         THE COURT:  Thank you.

17         (Plaintiff's Exhibit No. 489 was admitted into

18   evidence.)

19   BY MR. CHAPMAN:

20   Q.    If we can turn to the e-mail that you wrote at the

21   bottom of page 3 at 7:05, you wrote that you were just

22   notified by Customer A that, quote, "ES has a first right of

23   refusal price to beat from WCS."

24         Is that right?

25   A.    Yes.

Didgeon - direct

1   Q.    And the first right of refusal that you referred to

2   hear, that's a term in this customer's LOP light contract?

3   A.    Yes.  In their disposal agreement.

4   Q.    The right of first refusal means that if Customer A

5   wants to dispose of something that is not included in their

6   disposal agreement and they get a better price elsewhere,

7   they have to give EnergySolutions the opportunity to meet

8   this price?

9   A.    Yes, essentially.

10  Q.    And if you can turn to page 2 of this document.  You

11  went and you confirmed that this customer had gotten an

12  alternative price from WCS?

13  A.    I did, yes, through their supply contact.

14  Q.    And turn to the first page.  Did Customer A ultimately

15  get the discount they requested?

16  A.    Yes, they did.

17  Q.    And this customer had previously used WCS to get a

18  lower price from EnergySolutions; is that correct?

19  A.    One time before there was an event, yes.

20  Q.    Sir, you can set that aside.

21        If you can please turn to the tab marked

22  PTX-184.  Sir, this is a series of e-mails between yourself

23  and a number of other folks at EnergySolutions; is that

24  correct?

25  A.    Yes.

Didgeon - direct

1                MR. CHAPMAN:  Your Honor, plaintiffs move to

2     admit PTX-184 into evidence.

3                MS. REINHART:  No objection, your Honor.

4                THE COURT:  Thank you.

5                (Plaintiff's Exhibit No. 184 was admitted into

6     evidence.)

7     BY MR. CHAPMAN:

8     Q.    Mr. Didgeon, looking at the subject of these e-mails,

9     they appear to relate to SEMPRASAFE pricing for these

10    customers?

11    A.    I believe this is related to Duke Energy.

12    Q.    I was trying to avoid using the customer name, sir.

13    A.    Okay.  Sorry.

14    Q.    But they relate to SEMPRASAFE pricing?

15    A.    Yes.

16    Q.    And SEMPRASAFE refers to the EnergySolutions' Erwin

17    facility?

18    A.    Yes.

19    Q.    Turning your attention to the bottom of page 2, I want

20    to draw your attention to Mr. Robuck's e-mail.

21                He asks in an e-mail to you, Mr. Ping and

22    Mr. Williams, quote, "Why are we lowering a certain

23    customer's pricing?"

24                Do you see that?

25    A.    Yes.

Didgeon - direct

1   Q.   And above that, Mr. Ping responds.  Looking at the

2   second bullet of his response, he wrote, "We had to lower

3   the price due to WCS competition."

4            He goes on to state that, quote, "The customer

5   is not exclusive.  WCS dropped the pricing trying to get

6   resin.  They are doing this everywhere."

7            And then he mentions another set of customers,

8   which he notes, quote, "is also not exclusive.  We will be

9   doing this same approach to those contracts as well."

10           Do you see that?

11  A.   Yes.

12  Q.   That is -- the customers that Mr. Ping mentioned in

13  the second sentence, you were responsible for those customer

14  contracts at the time?

15  A.   No.

16  Q.   Were you responsible for those customer relationships

17  at the time?

18  A.   No.

19  Q.   Sir, if you can turn to the binder, deposition binder.

20  A.   Okay.

21  Q.   If you can turn to page 183, sir.

22  A.   I'm there.

23  Q.   And look at lines 19 through 21.

24  A.   Yes.

25  Q.   I asked you the question:  "Did you at this time have

Didgeon - direct

1   responsibility for," and I'm going to omit the names of the

2   customers.

3              Do you see those names, sir?

4   A.    Yes, I do.

5   Q.    And your answer:  "I did."

6   A.    Correct.  But the one company I was telling you about

7   that I named was what I'm referring to that I didn't.

8   Q.    I'm sorry.  I was referring to the second set of

9   customers that Mr. Ping wrote about in his e-mail.

10  A.    Oh, okay.  I didn't see that.  But, yes.  These are

11  true and correct, just like my deposition.

12  Q.    Thank you, sir.

13             If you can turn to the top of the first page of

14  the e-mail.

15             You wrote in response to this e-mail discussion

16  that, quote, "In general, we are selectively revising ERS

17  prices to meet changing market conditions in order to retain

18  market share.  Otherwise, we would not.  WCS is now bouncing

19  at the bottom market rate in their contracts."

20             Is that what you wrote?

21  A.    Yes.

22  Q.    And here ERS refers to the Erwin Resin Solutions

23  facility?

24  A.    Yes.

25             MR. CHAPMAN:  Your Honor, no further questions

Didgeon - cross

1    at this time.

2                    THE COURT:  All right.

3                        CROSS-EXAMINATION.

4    BY MS. REINHART:

5    Q.    Mr. Didgeon, I'm going to stand right here so that you

6    can see me.  We're going to talk about Customer A.  Okay?

7    Was it Customer A or Customer 1?  Customer A.

8    A.    A.

9    Q.    Okay.  You testified in response to counsel's

10   questions about an LLP contract that Customer A had; is that

11   correct?

12   A.    Yes.  I called it the disposal agreements.

13   Q.    Do you know when that LLP was entered into?

14   A.    Well, it's one of the very first ones and we called it

15   and still do a disposal agreement, that we -- that we made,

16   but, no, it has been a long, long time ago.  Very old.

17   Q.    Can you give me a sense in terms of how long ago?

18   A.    Eight years.

19   Q.    Was it before Energy Solutions knew that WCS was

20   entering the market?

21   A.    Yes, well before.

22   Q.    And why did Energy Solutions enter that disposal

23   contract?

24   A.    We entered into that disposal contract because it just

25   made good sense for Exelon to continue it and provide

Didgeon - cross

1    long-term pricing for the future.  They wanted price

2    certainty, and with all the services and costs and price

3    predictability, it seemed like a win-win for both the

4    customer and us.

5    Q.    Did the contract also provide for a guarantee of

6    capacity for disposal?

7    A.    It did.  It guaranteed a certain amount of capacity

8    for the reactors through the life of the operating plant.

9    Also when they shut down, when they go for decommissioning.

10   Q.    And do you have a sense of how many plants that

11   affected?

12   A.    Well, the agreement went across all of that customer's

13   site, so it was, at the time, you know, probably 22 reactor

14   sites.

15   Q.    Does the contract provide for services besides

16   disposal?

17   A.    It does.  That particular contract provides for

18   off-site processing services as well through our Bear Creek

19   facility.  It also, I believe, might have a little

20   transportation in there as well.

21   Q.    What kind of processing services does EnergySolutions

22   provide the customer at Bear Creek?

23   A.    Well, at Bear Creek, we provide a spectrum of services

24   for customers to send their low level waste to being solid

25   waste processing or liquid waste processing, liquids, bulk

Didgeon - cross

1    survey for release.  Any kind of specialty-type projects

2    that they have a tough time with onsite, we can normally

3    typically handle it at that facility.

4    Q.    Does the Bear Creek facility handle any of the resins

5    or filters that have to be downblended or shredded from

6    Class B/C to Class A?

7    A.    No.  Those typically go to Erwin, but we can take at

8    the Bear Creek facility high activity filters and do a

9    little bit of mixing with those to be able to get them to

10   Class A status.

11   Q.    All right.  So counsel showed you PTX-230.  Could you

12   turn back to that, please.

13   A.    Yes.  I'm here.

14   Q.    Okay.  Without describing the details of the

15   negotiation, can you tell me, what was happening with this

16   customer negotiation at this time of this e-mail?

17   A.    Back at that time, we were right in the beginning of

18   an off-ramp in the disposal agreement where Exelon could go

19   to market and check pricing.  And if they wanted to look at

20   an alternative approach, they could, or they could continue

21   with this contract and extend it ongoing forward.

22          So at the time, we were talking to Exelon about

23   extending it.  We normally would do that anyway.  They were

24   checking the market.  And the bottom line is in this

25   particular case, we gave them a discount of, oh, about nine

Didgeon - cross

1    percent just to go ahead and close it up and move on.  And

2    it's real typical to what we normally do day in and day out

3    with Exelon.  In fact, we had recently done it, and there's

4    probably three or four examples I could provide of it.

5    Q.    Well, I was asking to ask:  Have you ever given the

6    company a discount of that magnitude before?

7    A.    Yes.  In fact, just recently we're finishing that up

8    with this customer.  They challenged us to help them find

9    cost savings across the fleet, because as most people know,

10   utilities are pretty challenged today for cost control, the

11   low price of natural gas.

12            So bottom line, we put together a package that

13   included all of our services, including disposal and

14   off-site processing, and we gave them some discounts that

15   were in this range, maybe a little bit higher, in exchange

16   for extending our contracts longer, which was a win-win.  So

17   that is one.

18            We did a couple of what we call special quotes

19   for different, I don't know if I should name the utilities,

20   but it's within their fleet that was for special projects

21   onsite that included all of our services in the onsite, the

22   package and transport, specialty waste, to our processing

23   facility, and then repackage it, and then disposition it.

24   So we did that for one, two, three different sites of

25   Exelon's within the last couple years, and that's all

Didgeon - cross

1    documented.

2    Q.    So those examples that you just gave me, did they have

3    anything to do with the possibility of competition from WCS?

4    A.    Not whatsoever.

5    Q.    Well, then, why did you give them those discounts?

6    A.    Because it's what we normally do for Exelon and large

7    customers like that all the time.  I mean, the customers

8    really are our biggest competitor, and we want to keep our

9    customers happy and those contracts in place long term.

10   Q.    Now, counsel also showed you a document PTX-489.

11   Could you please turn back to that.

12             THE COURT:  And it is after our closing time.

13   If there's some reason to try to get this witness done and

14   you're not going to be much longer, I have a few minutes,

15   but otherwise, we'll have to recess until tomorrow morning.

16             MS. REINHART:  Your Honor, I could finish in

17   five minutes, my part.  Whatever the Court prefers.

18             THE COURT:  Well, it's really the convenience of

19   the witness, not me and it's not you, lawyers.  I have to

20   leave at 3:15.

21             MR. CHAPMAN:  Your Honor, I think that works for

22   us.

23             THE COURT:  All right.

24   BY MS. REINHART:

25   Q.    Okay.  Mr. Didgeon, were you looking at PTX-489?

Didgeon - cross

1    A.    Yes, ma'am.

2    Q.    And I see halfway down the page that this e-mail

3    string relates to something called OSD.

4          Do you see that?

5    A.    Yes.

6    Q.    What does that mean?

7    A.    Old steam dryer.  It's an acronym for a large

8    radioactive component.  It's essentially dry steam that this

9    Customer A wanted to remove, package, transports and dispose

10   of.

11   Q.    So what was going on in this e-mail string?

12   A.    Back at the time, we were under contract by this

13   Customer A to perform a service where we go in and we

14   design, package, fabricate and then help the customer move

15   this old steam dryer inside the reactor to the package and

16   then actually take it and transport it and disposition.  And

17   so at that time we weren't doing very well on schedule for

18   the fabrication of that package, and we were behind, and it

19   was potentially going to cost money, and the customer was a

20   little bit upset about that, a little strained.

21          They got upset enough that they went to the

22   actual disposal agreement and pulled out the right of first

23   refusal clause and went out and asked and got, I guess, a

24   third-party price for us to meet or beat, and so we did it,

25   but we did it mainly just to appease this customer, because

Didgeon - cross

1    we had kind of a strained, strained project situation at the

2    time at the time.

3    Q.     This e-mail mentioned WCS.  Based on the work in this

4    project, could WCS have even done the work?

5    A.     No, they couldn't.

6    Q.     Why not?

7    A.     They just weren't set up to have all of the elements,

8    the components in order to perform the work.  There's a lot

9    of detailed engineering, project management, fabrication.

10   The transportation was very difficult.  It's a large

11   radioactive component, so, no.

12   Q.     Let me ask you to turn briefly to PTX-184, which

13   counsel showed you.

14           Mr. Didgeon, he asked you about the line that

15   says WCS is now bouncing at the bottom of market rate in

16   their contract.

17           Do you see that?

18   A.     I do.

19   Q.     What did you mean when you wrote that?

20   A.     Just take a minute to refresh.  I think what I meant

21   at the time was that this is a situation where another

22   customer was -- had a few containers they were trying to

23   disposition.  It was resins.  And during that process, you

24   know, customers typically, like I say, they pretty much are

25   our number one competitor, so they didn't want to ship them.

Didgeon - cross

1          We wanted to do what we could to help motivate

2    them to ship, and in so doing here, it just looks like they

3    were -- WCS in this case was in the mix, and it looks like

4    when I mentioned balancing at the bottom, they were putting

5    out some really low desperate type rates that we've seen in

6    the past.

7    Q.    What do you mean by desperate?

8    A.    Well, it's unusually low, lower than you ever see

9    normally, so it's not something you would normally see very

10   often.

11   Q.    Did you have an opinion at the time whether WCS was a

12   competitor for this waste?

13   A.    I was a little bit on the periphery of this, so I

14   think they were involved in the end, but I think it was more

15   just ES trying to work to get those containers to move, and

16   they probably had a price from WCS that was a little bit too

17   low.

18   Q.    When you said you were trying to get the customer to

19   move the waste, had they been refusing to ship?

20   A.    Yes.  They were sitting on the waste and just not

21   moving it, from what I can recall.

22   Q.    Do you have an understanding why they did that?

23   A.    Yes, because typically, you know, they'll hold waste

24   until it's economically more beneficial for them, or their

25   budget is in line with when they can better make the expense

Didgeon - cross

1    and ship material.

2                    MS. REINHART:  Thank you.

3                    THE WITNESS:  You're welcome.

4                    THE COURT:  Redirect.

5                    MR. CHAPMAN:  No further questions, your Honor.

6                    THE COURT:  All right.  You may step down,

7    sir.

8                    We will recess for the evening and start

9    tomorrow morning at 9:00.  Thank you.

10                    (Witness excused.)

11                    (Court recessed at 3:09 p.m.)

12                         -  -  -

13

14

15

16

17

18

19

20

21

22

23

24

25