1              - PORTIONS UNDER SEAL -

2                  - VOLUME 2 -

3          IN THE UNITED STATES DISTRICT COURT

4          IN AND FOR THE DISTRICT OF DELAWARE

5                     - - -

6
     UNITED STATES OF AMERICA,      :   CIVIL ACTION
7                                    :
                    Plaintiff,       :
8                                    :
          vs.                        :
9                                    :
     ENERGY SOLUTIONS, INC.,         :
10    ROCKWELL HOLDCO, INC.,          :
     ANDREWS COUNTY HOLDINGS,        :
11    INC., and WASTE CONTROL         :
     SPECIALISTS LLC,                 :
12                                    :
                    Defendants.  :   NO. 16-01056-SLR
13

14                     - - -

15                          Wilmington, Delaware
                         Tuesday, April 25, 2017
16                       9:00 o'clock, a.m.

17                     - - -

18   BEFORE:  HONORABLE SUE L. ROBINSON, U.S.D.C.J.

19                     - - -

20   APPEARANCES:

21           JENNIFER LYNNE HALL, ESQ.,
             Assistant United States Attorney
22

23                  -and-

24
                             Valerie J. Gunning
25                           Official Court Reporter

```
 1    APPEARANCES (Continued):

 2
                    UNITED STATES DEPARTMENT OF JUSTICE
 3                  BY: PATRICIA SINDEL, ESQ.,
                        JULIE S. ELMER, ESQ.,
 4                      AARON COMENETZ, ESQ.,
                        TRAVIS R. CHAPMAN, ESQ. and
 5                      JOHN D. LINDERMUTH, ESQ.
                        (Washington, D.C.)
 6

 7                      Counsel for Plaintiff
                        United States of America
 8

 9
                    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
10                  BY:  PAUL J. LOCKWOOD, ESQ.

11
                            -and-
12

13                  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                    BY: JOSEPH O. LARKIN, ESQ.,
14                      TARA L. REINHART, ESQ.,
                        KENNETH B. SCHWARTZ, ESQ.,
15                      STEVEN C. SUNSHINE, ESQ.
                        PAUL ECKLES, ESQ.,
16                      JOHN THORNBURGH, ESQ. and.
                        CHARLES CHURCHILL, ESQ.
17                      (Washington, D.C.)

18
                        Counsel for Defendants
19                      EnergySolutions Inc. and Rockwell Holdco,
                        Inc.
20

21
                    MORRIS, NICHOLS, ARSHT & TUNNELL LLP
22                  BY:  DONALD E. REID, ESQ.

23
                            -and-
24

25
```

1    APPEARANCES (Continued):

2

3              BAKER BOTTS LLP
               BY:   JOSEPH OSTOYICH, ESQ. and
4                    HUGH M. HOLLMAN, ESQ.
                     (Washington, D.C.)
5

6                    -and-

7              BAKER BOTTS LLP
               BY:   VAN H. BECKWITH, ESQ.
8                    (Dallas, Texas)

9

10             Counsel for Defendants
               Andrews County Holdings, Inc.,
               and Waste Control Specialists LLC
11

12                   -   -   -

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2

 3              (Proceedings commenced in the courtroom,

 4    beginning at 9:00 a.m.)

 5

 6              *** (REPORTER'S NOTE:  The transcript contains

 7    portions under seal.)

 8

 9              THE COURT:  All right.  Are we ready for our

10    next witness or are there preliminary matters we need to

11    discuss?

12              MS. ELMER:  Your Honor, there are just a couple

13    of preliminary matters.

14              THE COURT:  All right.

15              MS. ELMER:  Really, one is just a housekeeping

16    matter.  We're going to be playing our first video today

17    and we worked with the defendants to create, have one video

18    with the exhibits that both parties or both sides want to

19    use.

20              Our question for the Court is how your Honor

21    would like for us to handle those exhibits.  The videos have

22    been prepared so that the exhibits actually show on the

23    screen because neither side has any objections to the

24    others, so if your Honor would like for us to provide the

25    manilla folders before the videos, we can do that and then
```

1    move after the videos or over, or if you have a different

2    suggestion, let us know.

3              THE COURT:  No.  I think it makes sense for you

4    to identify them and basically move to admit them because of

5    the circumstances.  And are the numbers in the deposition

6    consistent with the trial exhibit numbers?

7              MS. ELMER:  I have to say I have not watched the

8    video, so I am not sure.

9              MR. CHAPMAN:  They're not, your Honor, but we

10   have a key which shows you how they match up.

11             THE COURT:  Okay.  Well, I think it would be

12   helpful to have the exhibits beforehand, so perhaps you all

13   can identify those for us and hand up our copy.

14             MS. ELMER:  Thank you, your Honor.

15             THE COURT:  All right.

16             MS. ELMER:  One other issue, and it's really

17   just to flag it, is that we have an outstanding hearsay

18   objection to one of the exhibits that the defendants intend

19   to use with Mr. Rogers, who may be called later today, and,

20   you know, that we will just address it at that time if that

21   is fine.

22             THE COURT:  All right.

23             MS. ELMER:  Thank you, your Honor.

24             THE COURT:  All right.

25             MS. ELMER:  The United States calls Jason

Williams - direct

```
 1    Williams, an adverse witness.

 2              THE COURT:  All right.

 3                    Plaintiff's Testimony, Continued.

 4                    ... JASON WILLIAMS, having been duly

 5              sworn as a witness, was examined and testified

 6              as follows ...

 7              MS. ELMER:  And Mr. Williams is a Senior Vice

 8    President at EnergySolutions, and his testimony is expected

 9    to relate to the competitive effects aspects of this case.

10              THE COURT:  Thank you.

11              MS. ELMER:  Your Honor, may I approach?

12              THE COURT:  Yes, you may.

13              (Ms. Elmer handed binders to the witness.)

14                    DIRECT EXAMINATION

15    BY MS. ELMER:

16    Q.    Mr. Williams, I've given you two binders that we may

17    refer to during your examination and I will let you know at

18    the time.

19    A.    Thank you.  Good morning.

20    Q.    Good morning.

21              Sir, you are the Senior Vice President of

22    Business Development at EnergySolutions; is that correct?

23    A.    Yes, ma'am.

24    Q.    And you have worked at EnergySolutions since April of

25    2014?
```

Williams - direct

1    A.    Yes, ma'am.

2    Q.    And you report to Ken Robuck?

3    A.    Yes.

4    Q.    And the salespeople that are responsible for

5    commercial utility customers report to you; is that right?

6    A.    Yes, ma'am.

7    Q.    Let's look at some specific instances of competition

8    for your utility customer's business.  And the first one is

9    about lower activity waste.

10            Mr. Williams, if you could turn to tab PTX-190

11   in your binder.  PTX, or Plaintiff's Exhibit 190 is an

12   e-mail chain.  And, sir, you recognize Plaintiff's Exhibit

13   190; is that correct?

14   A.    Correct.

15   Q.    And this is an e-mail chain among you and others at

16   EnergySolutions on September 11, 2014?

17   A.    Yes.

18            MS. ELMER:  Your Honor, plaintiff moves to admit

19   Plaintiff's Exhibit 190 into evidence.

20            THE COURT:  Any objection?

21            MR. LARKIN:  No objection, your Honor.

22            THE COURT:  Thank you.

23            (Plaintiff's Exhibit No. 190 was admitted into

24   evidence.)

25   BY MS. ELMER:

Williams - direct

1   Q.     And, Mr. Williams, on the screen is a version of

2   Plaintiff's Exhibit 190 that has been redacted by your

3   counsel, but it may be easier for you in answering my

4   question to look at the unredacted copy in your binder.

5           And the subject line of this e-mail chain is

6   regarding, redacted customer name, legacy disposal; is that

7   correct?

8   A.     That's right.

9   Q.     And let's look at what you wrote about this customer's

10  legacy components disposal.  K.W. Robuck at

11  EnergySolutions.com is your boss, Ken Robuck?

12  A.     Yes.

13  Q.     And W.A. Didgeon is Tony Didgeon?

14  A.     Correct.

15  Q.     And Mr. Didgeon reported to you at that time?

16  A.     At the time, he did.

17  Q.     And then Mr. Miller ran the Clive operations at that

18  time; is that right?

19  A.     That's correct.

20  Q.     And you wrote to your boss, Mr. Didgeon and

21  Mr. Miller, about this customer's legacy components

22  disposal.  "Agreed, given all the uncertainty in the mark

23  with WCS.  Let's get this one the books."

24          That's what you wrote; is that correct?

25  A.     That is what I wrote.

243
Williams - direct

1    Q.    Mr. Williams, you can set Plaintiff's Exhibit 190

2    aside.

3    A.    Could I add one comment?

4    Q.    Your counsel will have an opportunity to do a friendly

5    cross.

6    A.    All right.  Thank you.

7    Q.    Let's look at another example of competition for

8    utility business, and this one relates higher activity

9    waste.

10          If you could turn to tab PTX-192 in your binder

11   and take a look at Plaintiff's Exhibit 192.  And this is

12   also an e-mail chain.

13   A.    I have a 194.  I don't see a 192.

14   Q.    We will come back to that.

15   A.    Okay.

16   Q.    So let's look at Plaintiff's Exhibit 194.

17          And, sir, you recognize Plaintiff's Exhibit 194

18   as an e-mail exchange that you had with Mr. Miller in

19   January of 2015?

20   A.    Yes, ma'am.

21          MS. ELMER:  And, your Honor, plaintiff moves to

22   admit Plaintiff's Exhibit 194 into evidence.

23          MR. LARKIN:  No objection, your Honor.

24          THE COURT:  Thank you.

25          (Plaintiff's Exhibit No. 194 was admitted into

Williams - direct

1    evidence.)

2    BY MS. ELMER:

3    Q.    And, Mr. Williams, on the screen is a version of

4    Plaintiff's Exhibit 194 that has been redacted by your

5    counsel, but, again, it may be easier in answering my

6    questions to refer to unredacted version in your binder.

7            And the first e-mail in the chain at the bottom

8    of the first page, Mr. Miller is asking you how a customer

9    meeting went; is that right?

10   A.    That is correct.

11   Q.    And let's look at your response back to him.  That's

12   the second e-mail from the bottom.

13           And you wrote back:  "For some reason, they are

14   enamored with WCS.  There is one person internally that is

15   calling the shots and he feels that direct disposal is the

16   best option for B/C waste.  We are trying every trick in the

17   book including putting them on notice with the LOP contract

18   and dropping the price once again."

19           That's what you wrote; is that correct?

20   A.    Looking at this, I did write this, I agree, but the

21   issue I think that, in hindsight, as I look at it, the issue

22   was direct disposal with this customer.  And we didn't

23   provide direct disposal.  We provided processing.  So the

24   requirement to go all the way to Erwin, Tennessee versus

25   going to Andrews, Texas -- I mean, it was further to go to

Williams - direct

1    Erwin.  So we didn't -- we weren't really working with --

2    this was not an apples-to-apples comparison as far as the

3    customer is concerned.

4            I figured this out much later to my -- I mean,

5    I'm a little embarrassed it took as long as it did for us to

6    actually figure out what they were looking for.  But they

7    were going to -- they were going to go direct to Andrews,

8    Texas, much shorter.  There were other concerns here.  And

9    price was not really the deciding factor.  I mean, we didn't

10   provide what they wanted.  They wanted direct disposal.

11   They had mentioned this, but, you know, we were, you know,

12   going through the process, trying to -- and then we had a

13   contract as well.  So we had a contractual understanding

14   you, you know, of how we under understand it.  It was

15   different than they thought.  But it wasn't a -- this was

16   not -- price was not really the issue here.  It was, they

17   wanted something else.

18           MS. ELMER:  Move to strike as nonresponsive.

19           THE COURT:  Denied.

20   BY MS. ELMER:

21   Q.    I have another line of questions about competition for

22   this customer's business, but your counsel has designated

23   confidential.  Therefore, I will save it for the end of your

24   examination and I will move on to another topic.  So, sir,

25   you can set that exhibit aside for now.

Williams - direct

1   A.      Okay.

2   Q.      Sticking with higher activity waste, I want to talk a

3   bit about EnergySolutions' Erwin processing facility.  And,

4   Mr. Williams, if you could turn to tab PTX-187 in your

5   binder and take a look at Plaintiff's Exhibit 187.  That's

6   an e-mail chain with an attached slide deck.  And you

7   recognize this document, sir?

8               MR. LARKIN:  Your Honor, I apologize.  187 is

9   not in our witness binder.  We can pull it out of our

10  binders.

11              THE COURT:  Is it in the witness' binder?  Do

12  you have it?

13              THE WITNESS:  Yes, your Honor.

14              MR. LARKIN:  We have it.  I'm sorry.

15              THE COURT:  All right.

16              MR. LARKIN:  I found it.

17  BY MS. ELMER:

18  Q.      And, sir, you recognize Plaintiff's Exhibit 187 as an

19  e-mail chain and slide deck you received and forwarded in

20  November of 2015; is that correct?

21  A.      Yes, ma'am.

22              MS. ELMER:  Plaintiff moves to admit Plaintiff's

23  Exhibit 187 into evidence.

24              MR. LARKIN:  No objection.

25              THE COURT:  Thank you.

1              (Plaintiff's Exhibit No. 187 was admitted into

2     evidence.)

3     BY MS. ELMER:

4     Q.     And, Mr. Williams, on the screen is a version of

5     Plaintiff's Exhibit 187 that has been redacted by your

6     counsel, but it may be easier in answering my questions to

7     refer to the unredacted version in your binder.

8              So looking at the first e-mail in the chain at

9     the bottom of the page, Mr. Ping is the sender of that

10    e-mail.  And you may need to turn to the second page, but he

11    is the Vice President of Business Development at

12    EnergySolutions; is that right?

13    A.     That is correct.

14    Q.     And Mr. Robuck is your boss?

15    A.     Correct.

16    Q.     He's also in the chain?

17    A.     Correct.

18    Q.     And Mr. Christian is also your superior at

19    EnergySolutions; is that correct?

20    A.     Yes, ma'am.

21    Q.     And look at the e-mail to you and others at the very

22    bottom of the first page, Mr. Ping writes, "Jason, Tony,

23    Weston, Assef, Bret, attached is my action item from the SLC

24    meeting, a/k/a Erwin.  Please review and suggest edits.

25    Comments appreciated.  Also, sanity check, please."

Williams - direct

1      Did I read that correctly?

2   A.    Yes, you did.

3   Q.    And then Mr. Ping sends another e-mail to the group on

4   November 9th; is that right?

5   A.    He did send an e-mail, yes.

6   Q.    And he writes:  "I only got feedback from Tony -- the

7   rest you've were silent on comments/suggests.

8            "New version is attached (added an executive

9   summary slide number 1, along with some minor edits.)

10            "If I receive no comments or feedback, I will

11   consider my task completed."

12            Did I read that correctly?

13   A.    You did.

14   Q.    And then on November 30th you forwarded the slide deck

15   you received from Mr. Ping to your superiors; is that

16   correct?

17   A.    Correct.

18   Q.    And you did not correct Mr. Ping's work before you

19   forwarded it to superiors, did you?

20   A.    I wouldn't normally -- with regard to Erwin, I

21   wouldn't normally correct Mark's work, and if there's

22   anything technically inaccurate and, really, others would

23   have done that.

24   Q.    So let's look at the deck that you forwarded to

25   Mr. Robuck and Mr. Christian, the Erwin market update.  And

1       let's go to the slide entitled "Executive Summary."

2               And the second bullet on this slide says,

3       "Inability to capture new targeted resin customers due to

4       pricing wars."

5               Did I read that correctly?

6       A.    Yes, you did.

7       Q.    I would like to look at slide number 5, Erwin summary.

8               And the first bullet says, "Mid-2015 the

9       competitor dropped greater than 1.0 SOF resin market pricing

10      to the U.S. market forcing attention by both customer and

11      ES."

12              Did I read that correctly?

13      A.    So at this time it's not as easy as -- as that.  Let

14      me -- the issues with Erwin in --

15      Q.    Sir, first, could you answer my question?

16      A.    Did you --

17      Q.    You'll have an opportunity to explain when your

18      counsel does the friendly cross.

19      A.    Did you read this?

20      Q.    That was my question, sir:  Did I read that bullet

21      correctly?

22      A.    You read it as it's written, yes.

23      Q.    All right.  That is what I was asking, sir.

24      A.    Yes.

25      Q.    Thank you.

Williams - direct

1   A.    Yes.

2   Q.    And this bullet refers to the competitor in the

3   singular, doesn't it?

4   A.    It is in the singular, yes.

5   Q.    And the second bullet says, "To maintain the greater

6   than 1.0 SOF market share, EnergySolutions, or ES, had to

7   make pricing approach adjustments."

8         Did I read that correctly.

9   A.    You did.

10  Q.    And EnergySolutions did, in fact, make pricing

11  adjustments for its Erwin line of business in 2015; is that

12  right?

13  A.    Our -- we had to -- we had a number of contracts from

14  Studsvik when we acquired them, so we had to make changes to

15  those, those contracts.  There was -- Studsvik was a

16  standalone company.  We had to on -- there were process

17  changes related to that, so and there were also alignment

18  with other contracts.  And then some customers, like Duke

19  and Progress, had merged as customers.  So there were

20  changes.  So it wasn't just, we were making adjustments

21  because we acquired business.

22  Q.    And you also made pricing adjustments; is that

23  correct?

24  A.    There were a number of categories in pricing, so we,

25  yes, categories in pricing adjustments.

Williams - direct

1   Q.    Sir, you may want to look at the unredacted copy of

2   the exhibit in your binder for my next couple of questions

3   because of the heavy redactions that your counsel has made

4   to this document.

5           The third bullet discusses the pricing

6   adjustments energy made at Erwin in 2015; is that correct?

7   A.    I --

8   Q.    You are probably going to want to look at the one in

9   your binder for this question.  And my question was that the

10  third bullet actually outlines some of the pricing

11  adjustments that EnergySolutions made at Erwin in 2015; is

12  that correct?

13  A.    So, yes.  At this time, there was -- there were

14  changes -- I think this was late 2015; right?  So at this

15  time, all of the large shipments of -- there were no longer

16  any more large stored resins in the market, so this was more

17  operational reference.

18          And the market at this point was -- I mean, the

19  market was shrinking.  There was reduced resins in the

20  market, so there were changes, and then, again, as I had

21  mentioned, we had modified contracts.  We were also

22  blending, bringing, you know, company contracts together as

23  the utility market had changed.

24  Q.    And the fourth bullet says, "This adjustment," which

25  is the adjustment that was described in the third bullet,

1    "resulted in the following revenue dilution."

2             Did I read that correctly?

3    A.   So --

4    Q.   Sir, my question is very simple:  Does the fourth

5    bullet read, this adjustment resulted in the following

6    revenue dilution?  Yes or no?

7    A.   Yes, but it appears that the -- that there should

8    be -- there should be a -- an indention after the bullets if

9    you go down probably apply to this one.  So I mean Mr. Ping

10   probably had some errors in the way he described it, but,

11   yes.

12   Q.   So the two bullets following that bullet describe the

13   revenue dilution that EnergySolutions experienced because of

14   the pricing adjustments at Erwin; is that correct?

15   A.   Yes.  At the time I think that we also had issues,

16   because we were bringing in additional low level waste for

17   diluting the two -- there were some process changes as well

18   in here.

19   Q.   And the last bullet on this slide says, "Market

20   intelligence recently obtained -- competitor again lowered

21   pricing by removing the curie surcharges to customers."

22             Did I read that correctly?

23   A.   I think in context -- it reads this way, but in

24   context -- the market was -- there was no large volume.  The

25   market had essentially -- there was just -- the market

Williams - direct

1    shrunk.

2    Q.    And the competitor here again, sir, is referred to in

3    the singular; correct?

4    A.    Yes, ma'am, it is.

5    Q.    All right.  Let's look at page 6 of the deck, Erwin

6    Summary.  And I want to look at the third bullet here.

7              And the third bullet on this page says, "Resin

8    leakage to competitor due to extreme blue light specials."

9              Did I read that correctly?

10   A.    Yes, but I'm not -- I don't understand what Mr. Ping

11   is -- is referring to, if this was a late 2015 document.

12   Q.    But, sir, you were the Senior Vice President of

13   Business Development and Mr. Ping's boss at that time; is

14   that correct?

15   A.    Yes, and the last blue light special I think in this

16   case, this was 2015.  Obviously, this -- the large shipment

17   was APS of this year.

18   Q.    All right.

19   A.    So, I'm sorry.  I shouldn't have said that.  But, yes.

20   It's -- you read it correctly.

21   Q.    All right.  And here, the competitor is once again

22   referred to in the singular; correct?

23   A.    Yes, ma'am.

24   Q.    And leakage means EnergySolutions is losing market

25   share to the competitor; is that right?

Williams - direct

1    A.    I don't -- the context of leakage is assuming

2    something is dripping out.  There was one, and as I

3    understand it, there was one, maybe two large opportunities,

4    and when he refers to blue light special, typically, it's a

5    one off deal that he mentioned.  So in context, I don't -- I

6    don't really understand what he's referring to.

7    Q.    And the competitor referred to in the singular

8    multiple times in this Erwin market update is WCS; is that

9    correct?

10   A.    For the B/C resin, yes, or in this case -- I mean, the

11   reality is, these customers can store this almost

12   indefinitely, so the reality for us, a competitor, is it

13   WCS?  Yes.  But the reality with the customer we referred to

14   here was they had stored this for years, they could continue

15   to store it, and I mean, we would change -- we oftentimes

16   provide lower pricing so that they could then, you know, so

17   that we encourage them to ship it, because they have

18   limitations and budgets.  So, I mean, the competitor is in

19   reality storage and it's also, it was also WCS.

20   Q.    All right.  But this particular document does not

21   refer to storage, does it?

22   A.    We understand that as a company.  We understand

23   storage is our biggest customer.

24   Q.    And a customer who is storing doesn't offer blue light

25   specials to itself, does it?

Williams - direct

1    A.    We -- I don't understand the question.  We provide --

2    we try to work with customers so that they can ship waste to

3    us.

4    Q.    A customer does not charge itself prices for storing

5    its own waste, does it?

6    A.    Well, there's a large -- they build a large mausoleum

7    and they have to store it.  I mean, they have a place to

8    store it.

9    Q.    And a customer does not offer itself a blue light

10   special on storage, does it?

11   A.    Again, I don't understand the question, but, no.

12   Q.    Okay.  Sir, you can set that document aside.

13   A.    Okay.

14   Q.    So let's return to Plaintiff's Exhibit 192.

15         MS. ELMER:  May I approach, your Honor?

16         THE COURT:  Yes, you may.

17   BY MS. ELMER:

18   Q.    I'm sorry.  I don't think this was included in your

19   binder.  I think there may be two copies in there (handing

20   documents to the witness).

21   A.    Okay.

22   Q.    Sir, if you could take a look at Plaintiff's

23   Exhibit 192 and let me know if you recognize that document,

24   that e-mail exchange between you and Mark Ping.

25   A.    Yes, ma'am.

Williams - direct

1    Q.    And this e-mail exchange is dated December 25th and

2    26, 2014; is that right?

3    A.    Yes, ma'am.

4              MS. ELMER:  Your Honor, plaintiff moves to admit

5    Plaintiff's Exhibit 192 into evidence.

6              THE COURT:  Any objection?

7              MR. LARKIN:  No objection, your Honor.

8              THE COURT:  Thank you.

9              (Plaintiff's Exhibit No. 192 was admitted into

10   evidence.)

11   BY MS. ELMER:

12   Q.    So, Mr. Williams, on the screen is a version of

13   Plaintiff's Exhibit 192 that has been redacted by your

14   counsel, but it may be easier in answering my questions to

15   refer to the unredacted version that I've just handed you in

16   the folder.

17             So let's look at Mr. Ping's e-mail from

18   December 25th at 9:01 p.m.  And, again, Mr. Ping reports to

19   you; is that right?

20   A.    Yes, ma'am.

21   Q.    And he wrote to you on December 25th:  "Redacted is

22   telling me that the CNO asked him to develop a spreadsheet

23   to compare both ES and WCS, then to compare what the

24   published lowest rate Texas/WCS can charge.  I think that's

25   what the CNO is going to fight for during our meeting

Williams - direct

1    (a/k/a, that's the CNO's target price.)"

2            Did I read that correctly with the redaction?

3    A.    I think that it seems a little confusing as to what he

4    wrote.

5    Q.    Well, CNO stands for Chief Nuclear Officer; is that

6    right?

7    A.    Yes, ma'am.

8    Q.    And that's typically a high-ranking executive at a

9    utility?

10   A.    Yes.  He's typically the one in charge of the plant.

11   Q.    All right.  Well, let's look at your response to Mr.

12   Ping on December 26th.

13           And your response that you wrote back is:

14   "Why is WCS coming back and lowering the price after they

15   submit?  That's not how a proposal process works.  How did

16   they know to do that?  Does Sackett have our price?  We will

17   have to do whatever it takes to win this."

18           And that's what you wrote; is that correct?

19   A.    Yeah, but it's not what -- I think as far as the

20   situation when we were looking at this particular deal,

21   there were so many unknowns.  Initially, this customer

22   had -- had -- had a budget that was far lower than the --

23   what the -- what the actual price was.

24           So we were working with them to develop pricing,

25   and during that process, we -- we again were working against

Williams - direct

1    storage -- long term storage was the option.

2    Q.    But?

3    A.    And then --

4    Q.    But this e-mail does not mention storage, does it,

5    sir?

6    A.    Again, but in our business, I mean, this waste had

7    been stored for years.  That was the -- that was the

8    context.

9    Q.    But in your e-mail, back to Mr. Ping, you do not

10    mention storage, do you?

11    A.    No, because at this time they were talking about

12    shipping the waste and we were providing pricing for that.

13    Q.    Mr. Williams, you can set Plaintiff's Exhibit 192

14    aside.

15              And, sir, if you will turn to tab PTX-181 in

16    your binder and take a look at Plaintiff's Exhibit 181.

17              And Plaintiff's Exhibit 181 is an e-mail chain

18    among you and others at EnergySolutions dated December 1,

19    2016; is that correct?

20    A.    Yes, ma'am.

21              MS. ELMER:  Your Honor, plaintiff moves to admit

22    Plaintiff's Exhibit 181 into evidence.

23              MR. LARKIN:  No objection.

24              THE COURT:  Thank you.

25              (Plaintiff's Exhibit No. 181 was admitted into

Williams - direct

1    evidence.)

2    BY MS. ELMER:

3    Q.     And, Mr. Williams, on the screen is a version of

4    Plaintiff's Exhibit 181 that has been redacted by your

5    counsel, but it may be easier in answering my questions to

6    refer to the unredacted version in your binder.

7              So looking at the to line at the top e-mail,

8    Jeff Hays is the Senior Vice President of decommissioning at

9    EnergySolutions.

10   A.     That is correct.

11   Q.     Your boss, Mr. Robuck, is also in the "to" line of

12   your top e-mail?

13   A.     Yes.

14   Q.     And it appears that you all are discussing how to

15   respond to a customer's request for information; is that

16   right?

17   A.     I don't know that they're asking for -- I think we

18   were responding to how to -- well, we were responding to you

19   who to work with the customer, I think.  You can say it that

20   way.

21   Q.     And you wrote to Mr. Robuck and Mr. Hays:  "What about

22   WCS?  In the meeting, please address the DOJ and the WCS

23   issue, how will it impact, redacted, if we are unsuccessful

24   in purchasing WCS?

25              "The answer is that it will not, and we have a

Williams - direct

1   contract with WCS that will cover both, redacted."

2            That's what you wrote; right?

3   A.    I think that I wrote that, but in context, this

4   particular issue, the ruling had just come under the, out on

5   the wire, and I think that the customer -- the engineers

6   and, you know, the individuals that are in the nuclear waste

7   business are not attorneys, so they get confused.  So in

8   this particular instance, I think it was important for us to

9   address the issue because a lot of information had come out

10  of the wire and it warranted some additional comments.  So

11  that's really what I'm discussing here.

12            In addition to that --

13  Q.    Sir --

14  A.    Yes?

15  Q.    -- if you are going to go into a lengthy

16  explanation --

17  A.    Yes?

18  Q.    -- I would like to give you the opportunity to do so

19  during your counsel's examination.

20  A.    All right.

21  Q.    I think you've answered my question.

22  A.    Yes, ma'am.

23  Q.    So your e-mail relates to EnergySolutions' ability to

24  manage a potential decommissioning customer's B and C waste;

25  is that correct?  That was their concern?

Williams - direct

1    A.    I think that was part of the concern.  Yes, ma'am.

2    Q.    And you believe that this information was important to

3    convey to the customer in the context of a potential

4    decommissioning project; is that correct?

5    A.    I think it was -- it was -- yes, to address that.

6    Yes.

7    Q.    Okay.  You can set Plaintiff's Exhibit 181 aside.  But

8    staying in the same December 2016 time frame, let's look at

9    another document about EnergySolutions' higher activity

10   disposal capabilities.

11            So, Mr. Williams, if you could turn to tab

12   PTX-180 in your binder and take a look at Plaintiff's

13   Exhibit 180.

14            Plaintiff's Exhibit 180 is an e-mail from you to

15   Mr. Hays, dated December 16, 2016; is that correct?

16   A.    That is correct.

17            MS. ELMER:  Your Honor, plaintiff moves to admit

18   Plaintiff's Exhibit 180 into evidence.

19            MR. LARKIN:  No objection, your Honor.

20            THE COURT:  Thank you.

21            (Plaintiff's Exhibit No. 180 was admitted into

22   evidence.)

23   BY MS. ELMER:

24   Q.    And, Mr. Williams, on the screen is a version of

25   Plaintiff's Exhibit 180 that has been redacted by your

Williams - direct

1    counsel, but it may be easier in answering my question to

2    look at the unredacted version in your binder.

3               Your e-mail to Mr. Hays begins, "I agree that we

4    should send our D&D brochure to, name redacted.  With the

5    attachment, we should provide an e-mail summary of some of

6    the critical components highlighting the following:

7               "LP and D capabilities.

8               "Waste disposal facilities -- Class A, B and C

9    disposal (note, here we have the ability to downblend the B

10   and C through analysis and processing.)"

11              And that's what you wrote?

12   A.    That's correct.

13   Q.    And D&D stands for decontamination and

14   decommissioning?

15   A.    Yes.

16   Q.    And you thought it was important to convey these

17   downblending capabilities to EnergySolutions' vice president

18   of decommissioning, Mr. Hays?

19   A.    I think I was just providing talking points.

20   Q.    And it was also important for him to convey those

21   capabilities to the customer who had the decommissioning

22   project; correct?

23   A.    This was a higher level discussion with their -- the

24   person mentioned is at a higher level.  I don't even think

25   he was really directly involved with the decision, but this

Williams - direct

1    was more of an informational-type transfer.

2    Q.    And this customer had a potential decommissioning

3    project that your company was interested in?

4    A.    Correct.

5    Q.    Okay.  Sir, you can set that exhibit aside.

6          And, Mr. Williams, I have a detailed line of

7    questions about another exhibit, Plaintiff's Exhibit 185,

8    large portions of which your counsel has designated

9    confidential.

10              MS. ELMER:  May I proceed?

11              MR. LARKIN:  Yes.

12              MS. ELMER:  You ail have designated large

13    portions of this confidential and it will be difficult to

14    talk about it unless you --

15              THE COURT:  Closing the courtroom.

16              MS. ELMER:  Unless you make whatever motion you

17    find necessary.

18              MR. LARKIN:  Your Honor, we have designated it,

19    and I think it probably is important for the Court to close

20    the Court for this issue.

21              THE COURT:  We're going to close the courtroom

22    again.  If you are not on the protective order in the case,

23    nude to exit the courtroom for a moment.

24              ***(The following portion of the transcript is

25    under seal.)

Williams - direct

Williams - direct

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Williams - direct

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Williams - cross

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Williams - cross

1

2

3

4

5

6                    **(End of portion under seal.)**

7                    MR. LARKIN:  Thank you.

8    BY MR. LARKIN:

9    Q.    Mr. Williams, could you turn back to the document

10   PTX-180 that Ms. Elmer showed you?  This is the

11   December 16th, 2016 e-mail from you to Mr. Hays.

12   A.    Yes, sir.

13   Q.    Okay.  Ms. Elmer directed you to the first sentence

14   under LP&D capabilities.  It states, "Here we have the

15   ability to downblend the B and C through analysis and

16   processing."

17                    Is that an area that you would also defer to

18   your technical staff, EnergySolutions?

19   A.    Yes, I would, and I would also say that Entergy is

20   our, one of our largest customers as well.

21   Q.    Okay.

22   A.    I guess I'm not supposed to say that name, but, yes.

23   Q.    Understood.

24   A.    And we provide operational -- we work with them on a

25   daily and weekly basis throughout the year.

Williams - cross

1    Q.    All right.  Mr. Williams, in your current position

2    with EnergySolutions, how many people do you oversee on the

3    business development side?

4    A.    Over 20.

5    Q.    Over 20?

6    A.    Yes.

7    Q.    All right.  And do you work with your team on a daily

8    basis to grow the EnergySolutions business?

9    A.    I do.

10   Q.    Okay.  And you joined EnergySolutions in early 2014;

11   is that right?

12   A.    Yes, sir.

13   Q.    Okay.  And since that time, about how much of your

14   time, Mr. Williams, is spent out on the road with customers

15   and your team?

16   A.    About 70 percent.

17   Q.    Okay.  Do you have an understanding from your sales

18   team about whether EnergySolutions is losing business to WCS

19   on a monthly or quarterly basis since you've been with the

20   company?

21   A.    I do.

22   Q.    Okay.  And what is that understanding?

23   A.    We typically don't see -- well, the business we lose

24   is really to processors.

25   Q.    Okay.  What do you mean by that, sir?

Williams - cross

1    A.    Well, companies will go in and they basically take the

2    material.  They will recycle it.  They basically clean it

3    and recycle it.  And this is stuff that would typically --

4    it could go to, you know, some of these other -- I mean,

5    lower activity cells, but this is -- typically, it's

6    processors that deal with it.

7                 MR. LARKIN:  James, can I have demo 1, the map?

8                 Your Honor, may I publish the map of the nuclear

9    reactors?

10                THE COURT:  Sure.

11                MR. LARKIN:  Thank you.

12   BY MR. LARKIN:

13   Q.    All right.  Mr. Williams, this is a map of the

14   U.S. operating commercial nuclear power reactors.  We

15   looked at this yesterday.  I understand you weren't in

16   court.

17                You said that you lose business, EnergySolutions

18   loses business to other processors.  Sir, where are those

19   processors located?

20   A.    Well, they're typically located in Tennessee.  So it's

21   really the surrounding area to Tennessee where a lot of the

22   reactors are, and I mean those are the ones that will go to,

23   where it makes sense to send them.

24   Q.    And just for the Court's benefit, who are some of the

25   other -- EnergySolutions has processing capabilities; is

Williams - cross

1  that correct?

2  A.    We do.

3  Q.    Okay.

4  A.    We do.

5  Q.    And who are the other processors that you compete

6  with?

7  A.    Well, Alaron is probably a big one.  Omega is another

8  one.  And then I think New Green is another one.  You know,

9  they all do some recycling.  And then Toxco is another

10 processor.

11 Q.    Okay.  If the merger were to close, are those

12 processors going anywhere?

13 A.    They're not going anywhere.  They are going to

14 continue with their business.

15 Q.    Okay.  Since the exempt cell came on line in 2014,

16 EnergySolutions has had a number of LOP agreements come up

17 for renewal; is that correct?

18 A.    Correct.

19 Q.    Okay.  Has EnergySolutions lost any renewals with

20 customers?

21 A.    No.

22 Q.    Since the exempt cell came on line?

23 A.    No, sir.

24          MR. LARKIN:  No further questions, your Honor.

25          THE COURT:  All right.  Any redirect?

Williams - redirect

1                    REDIRECT EXAMINATION

2    BY MS. ELMER:

3    Q.    Mr. Williams, the processors that you identified do

4    not have low level radioactive disposal landfills, do they?

5    A.    They do not.

6              MS. ELMER:  No further questions.

7              THE COURT:  All right.  You may step down, sir.

8    Thank you.

9              THE WITNESS:  Thank you.

10             (Witness excused.)

11             MS. ELMER:  Your Honor, we next wish to show

12   the video, video deposition of Mr. Lewis Centofanti of

13   PermaFix.

14             MR. CHAPMAN:  Your Honor, may I approach?

15             THE COURT:  Yes.

16             MR. LARKIN:  Your Honor, one housekeeping

17   matter.  Mr. Williams, as he just testified, is on the

18   road quite a bit.  Could he be excused now that he has

19   testified?

20             MS. ELMER:  No objection, your Honor.

21             MR. LARKIN:  Thank you very much.

22             THE COURT:  All right.

23             (The videotaped deposition of Louis Centofanti

24   was played as follows.)

25             "Question:  Will you please state and spell your

Centofanti - deposition designations

1    name for the record?

2              "Answer:  Louis Centofanti, Centofanti.

3              "Question:  Okay.  Where do you work?

4              "Answer:  Work at PermaFix Environmental

5    Services.

6              "Question:  And what's your job title?

7              "Answer:  CEO.

8              "Question:  Are you president as well?

9              "Answer:  Yes.

10             "Question:  And how long have you held your

11   position?

12             "Answer:  I founded the company in '91.

13             "Question:  And can you describe your

14   responsibilities as president and CEO?

15             "Answer:  Oversee all the operations involved in

16   waste treatment, nuclear services, and also on the board of

17   the company.  And, so, very involved in the technical

18   development side and the direction of the company from a

19   strategic point of view.

20             "Question:  Are there classes of LLRW?

21             "Answer:  There are three classes of LLRW.  It's

22   A, B and C; and in a way, greater than Class C also.

23             "Question:  And do those go in order of

24   radioactivity starting with the least at A?

25             "Answer:  Correct.  Yes.

Centofanti - deposition designations

1          "Question:  There's B?

2          "Answer:  Correct, uh-huh.

3          "Question:  Is lower activity LLRW another name

4    for Class A LLRW?

5          "Answer:  A general name.  I mean, there's --

6    yes.

7          "Question:  Okay.  Is the term higher activity

8    LLRW another name that could be used for Class B and C LLRW?

9          "Answer:  Correct, for B and C, yes.

10         "Question:  So in general terms, can you

11   describe the services that PermaFix offers?

12         "Answer:  Our primary service is we bring waste

13   in that has either, it's low-level waste, one of the three

14   categories.  And it's either contaminated with RCRA waste,

15   TSCA waste, or it has some special issue where it needs

16   treatment.

17         "Question:  Is processing a fair term used to

18   describe what PermaFix does?

19         "Answer:  Yes.

20         "Question:  There are four licensed LLRW

21   disposal sites in the United States?

22         "Answer:  Correct.

23         "Question:  And those four are in Richland,

24   Washington, Clive, Utah, Barnwell, South Carolina, and

25   Andrews, Texas?

Centofanti - deposition designations

1              "Answer:  Yes.

2              "Question:  Has PermaFix sent LLRW to each of

3      these disposal sites?

4              "Answer:  Yes.

5              "Question:  The Richland disposal site accepts

6      waste only from waste generators located in the Northwest

7      and Rocky Mountain compacts?

8              "Answer:  Correct.

9              "Question:  (By Mr. Gower):

10             "And the Barnwell disposal site accepts waste

11     only from waste generators in the Atlantic compact, right?

12             "Answer:  Correct.

13             "Question:  I'd like to ask you about waste

14     generators not located in the Northwest, Rocky Mountain or

15     Atlantic compacts, okay.

16             "Answer:  Uh-huh.

17             "Question:  Those waste generators have only two

18     licensed disposal sites to choose from; is that correct?

19             "Answer:  Correct.

20             "Question:  And those two are the Clive disposal

21     site and the Andrews disposal site?

22             "Answer:  Correct.

23             "Question:  Are you familiar with US Ecology's

24     disposal site in Idaho?

25             "Answer:  Yes.

Centofanti - deposition designations

1    "Question:  Has PermaFix sent radioactive waste

2    to U.S. Ecology?

3    "Answer:  Yes.

4    "Question:  What kinds of LLRW does US Ecology

5    Idaho accept?

6    "Answer:  I believe only Class A, yeah.  Is that

7    what you mean?  Yeah.

8    "Question:  Is it true that to accept

9    radioactive waste at the US Ecology Idaho site, US Ecology

10   must receive an NRC exemption?

11   "Answer:  I don't know, yeah.

12   "Question:  How often do you dispose of

13   commercial waste at US Ecology Idaho?

14   "Answer:  Quite a bit.  We're -- about the only

15   utility we deal with is Northwest utilities, and we process

16   most of their waste, and it goes to that cell.

17   "Question:  Is this LLRW?

18   "Answer:  Yes.

19   "Question:  What processes or steps has PermaFix

20   had to go through to dispose of waste at US Ecology Idaho?

21   "Answer:  The processes, again, it depends on

22   the waste.  Either we -- we treat it if it needs -- if it

23   has some issue of concern or we will volume reduction, burn

24   it to reduce the organics, do volume reduction on it, and

25   then we send the waste there.

Centofanti - deposition designations

1          "Question:  Can US Ecology Idaho accept all

2    types of Class A radioactive waste?

3          "Answer:  I don't -- I'm not that familiar with

4    their waste acceptance.  I don't know.

5          "Question:  Okay.  Have you heard of Tennessee's

6    BSFR program?

7          "Answer:  Yes.

8          "Question:  And what is that?

9          "Answer:  It's a program where the State of

10   Tennessee has allowed very low-level radioactive waste to go

11   into industrial landfills in Tennessee that meet certain

12   criteria.

13         "Question:  Has LLRW processed at PermaFix ever

14   been disposed of at a BSFR facility?

15         "Answer:  Yes.

16         "Question:  Do you still send waste to any BSFR

17   facilities?

18         "Answer:  I don't believe we have.  We have

19   stopped doing that, but we may -- we may have in the last

20   year or two, but I don't know.  In general, we've tried --

21   we've tried not to.

22         "Question:  Why?

23         "Answer:  Two reasons:  We're a little nervous

24   about the program itself from a regulatory point of view.

25   And the second is with the opening of the exempt cell at

Centofanti - deposition designations

1    WCS, it economically did not make a lot of sense to do the

2    program.

3                "Question:  Let's talk about the first reason

4    that you mentioned.  Can you describe what you meant when

5    you said that you were a little nervous about the program

6    itself?

7                "Answer:  We were very concerned that there was

8    material going into the BSFR program and would escape the

9    detection systems and end up in an improper disposal

10   facility the way the program's operated and the standards.

11   We have looked at -- we have a technology we developed in

12   how we were going to do it, which would have been total sort

13   segregation so that there is no chance of anything slipping

14   through.  We were very uneasy that the present program will

15   allow stuff to slip through.

16               "Question:  What would be the consequence if it

17   slipped through?

18               "Answer:  From a regulatory point of view, you'd

19   be violating the rules.  From an actual impact point of

20   view, it would be hard to ever find out that you have.

21               "Question:  Did I understand from your answer

22   that BSFR is a program, not necessarily a particular

23   facility ?

24               "Answer:  Well, it's a program; and facilities

25   can be licensed under that program.  We -- we could get a

Centofanti - deposition designations

1    BSFR license to do it, and we've looked at doing -- how to

2    do it and what to do, and the economics to us never made

3    sense, especially once the WCS exempt cell opened.

4           "Question:  And that was the second reason

5    you mentioned, the exempt cell -- that's the second reason

6    that you mentioned that you don't send waste to BSFR

7    anymore?

8           "Answer:  Correct, yeah.

9           "Question:  Can you flush that out for me a

10   little?

11          "Answer:  The economics of the WCS cell was a

12   little more expensive than BSFR, but not enough to take a

13   risk at creating a violation of the rules.

14          "Question:  Are you aware of any state that has

15   a BSFR program similar to Tennessee's?

16          "Answer:  No, I believe it's the only one in the

17   nation.

18          "Question:  Can waste generators ship LLRW

19   directly to a BSFR landfill?

20          "Answer:  I don't know.  I don't think so.  I

21   think they have to go through a program, one of the BSFR

22   facilities.

23          "Question:  Can you describe that for me?

24          "Answer:  They could ship directly to one of the

25   several companies that have a BSFR program and then they

Centofanti - deposition designations

1    would do the -- they would do their -- their program on the

2    waste to make sure it meets the requirements and then send

3    it onto the Tennessee landfill.  I believe that's how it

4    works.

5                "Question:  And you mentioned one of the several

6    companies that has a BSFR program.  Are those companies

7    processors?

8                "Answer:  Yes.

9                "Question:  So waste generators taking advantage

10   of the BSFR program first send their waste to a process or;

11   is that true?

12               "Answer:  Correct.  I believe.  I believe so,

13   yeah.

14               "Question:  And then the processor certifies

15   that the waste is BSFR eligible?

16               "Answer:  Correct.

17               "Question:  And then the waste can go to a BSFR

18   landfill for disposal?

19               "Answer:  Correct, yes.

20               "Question:  How do the BSFR radioactivity limits

21   compare to the Class A LLRW limit?

22               "Answer:  I don't remember.  Yeah, I don't have

23   that knowledge at the moment.

24               "Question:  Do you know how the BSFR

25   radioactivity limits compare to the limits at WCS's exempt

281

Centofanti - deposition designations

1    cell?

2            "Answer:  The exempt cell is a much more

3    vigorous limits and standards, and most of the BSFR would

4    fall under those limits, fall way below them.  So it's --

5    it's a much better facility for accepting waste than -- than

6    what's in Tennessee.  I don't know if that answers your

7    question, yeah.

8            "Question:  So the limitations at a BSFR

9    facility are way below the limitations of the WCS exempt

10   cell?

11           "Answer:  Correct, yes.

12           "Question:  And PermaFix does not own or operate

13   a BSFR landfill?

14           "Answer:  Correct.

15           "Question:  Outside the BSFR program, back to

16   LLRW in general, does PermaFix operate a site for disposing

17   of LLRW?

18           "Answer:  No.

19           "Question:  Has PermaFix ever operated a site

20   for disposing of LLRW?

21           "Answer:  No.

22           "Question:  Has PermaFix ever considered a --

23   considered operating a site for operating LLRW -- excuse me,

24   for disposing of LLRW?

25           "Answer:  Only in our minds, yeah, no.

Centofanti - deposition designations

282

1              "Question:  So it sounds like you've taken no

2        formal consideration of opening a BSFR -- or excuse me, an

3        LLRW landfill?

4              "Answer:  Correct.

5              "Question:  Why not?

6              "Answer:  We're very focused on treatment and

7        services.  And the opportunities for opening a facility are

8        so onerous, did not see a path forward that made sense over

9        any period of time.

10             "Question:  So did you consider the costs?

11             "Answer:  We considered the costs, the hassles,

12       and what our -- what our really focus was, which was more

13       treatment processing and service, the service side of the

14       business.

15             "Question:  Outside of the BSFR program, back to

16       LLRW in general, does PermaFix operate a site for disposing

17       of LLRW?

18             "Answer:  No.

19             "Question:  Has PermaFix ever operated a site

20       for disposing of LLRW?

21             "Answer:  No.

22             "Question:  Has PermaFix ever considered a --

23       considered operating a site for operating LLRW -- excuse me,

24       for disposing of LLRW?"

25             MR. BECKWITH:  Your Honor, I think we already

Centofanti - deposition designations

1    heard this testimony.

2                THE COURT:  This looks awfully familiar.

3                "Question:  Where does PermaFix send commercial

4    waste that was generated outside the Northwest, Rocky

5    Mountain, or Atlantic compacts?  Where does PermaFix send

6    that waste for disposal?

7                "Answer:  Commercial waste?

8                "Question:  Yes.

9                "Answer:  We've had two options is either into

10   EnergySolutions or into -- and this is non-governmental, so

11   it would either go to WCS or EnergySolutions.

12               "Question:  By WCS, you mean WCS Andrews?

13               "Answer:  Correct.

14               "Question:  And EnergySolutions, you mean

15   EnergySolutions -- you mean Energy/Clive, Utah?

16               "Answer:  Clive, Utah facility.

17               "Question:  What percentage of the waste goes to

18   WCS's exempt cell?

19               "Answer:  I'm sure it varies, but today the vast

20   majority goes to the WCS exempt cell.

21               "Question:  Did that -- did you begin shipping

22   commercial waste from the relevant states that we spoke of

23   to WCS in around 2014?

24               "Answer:  Correct.

25               "Question:  Before that most of the waste went

Centofanti - deposition designations

1    to BSFR, a BSFR landfill or Clive?

2                "Answer:  A very small amount would have gone to

3    BSFR.  The majority would have gone to Clive.

4                "Question:  So when WCS's exempt cell opened,

5    you diverted most of the waste that you were sending to

6    Clive to WCS's exempt cell?

7                "Answer:  Correct.

8                "Question:  Why did you do that?

9                "Answer:  And out of BSFR also, that's -- yeah.

10               "Question:  And why did you do that?

11               "Answer:  The cost and the service.

12               "Question:  Can you explain that in more detail?

13               "Answer:  I don't remember the exact numbers,

14   but the -- the cost of the exempt cell was far below the

15   cost of EnergySolutions.  And the cost of BSFR was -- BSFR

16   was a little cheaper, but it wasn't worth the risk.

17               "Question:  So is it fair to say that when the

18   WCS exempt cell opened, your costs went down dramatically?

19               "Answer:  Yes.

20               "Question:  Does PermaFix have disposal

21   contracts with WCS and ES?

22               "Answer:  Yes.

23               "Question:  How long ordinarily is the duration

24   of those contracts?

25               "Answer:  Yearly.  With EnergySolutions, it's a

Centofanti - deposition designations

1  yearly contract as -- today we have a -- for the exempt

2  cell, we have a seven-year contract with WCS.

3          "Question:  Did your contracts -- before this

4  current contract, were your contracts yearly as well?

5          "Answer:  Yes.

6          "Question:  How burdensome was it for PermaFix

7  to begin shipping waste to the WCS exempt cell?

8          "Answer:  The initial shipments are always

9  burdensome because you need to go through a variety of

10  approvals for waste into any facility.  And so to initially

11  switch a waste stream from one disposal facility to another

12  always takes time and effort; but after you ship one, then

13  any other waste streams that are equivalent to that are very

14  simple.  So initially -- there's always a barrier to do it

15  initially; but once you do it, then it's a fairly simple

16  process to continue to duplicate those types of waste

17  streams.

18          "Question:  It was worth diverting waste to the

19  WCS exempt cell despite those initial burdens because of the

20  costs you were saving?

21          "Answer:  The cost was, yes, very significant so

22  that it was -- we have made an attempt to divert all our

23  material to WCS.

24          "Question:  Did opening of the exempt cell allow

25  you to process or revenue forms of waste?

Centofanti - deposition designations

1           "Answer:  Yes.  It allowed us to go after some

2   utility waste we could never compete with.

3           "Question:  Can you explain that?

4           "Answer:  The price offered by EnergySolutions

5   to the processors were never equivalent to what they offered

6   the customer.  And so that for us to take waste in and

7   then -- and even after processing, knowing that we could do

8   volume reduction and have a dramatic savings in volume, they

9   would price -- they carefully priced it so that wouldn't --

10  that volume reduction would not help on pricing.

11          "So what we found is that we could then never

12  compete; and even without the life plant contracts, we could

13  never compete in the utility market on -- on radioactive

14  waste.  Because even though we do volume reduction, get a

15  ten-to-one volume reduction, the pricing was set up so that

16  it would -- wouldn't allow us to do -- make -- make any

17  money on processing.  So once the exempt cell opened, it

18  allowed us to compete more directly in the utility market

19  with WCS as a partner.

20          "Question:  So waste generators that were free

21  to choose which disposal sites they wanted, because they

22  weren't bound by a life of plant contract, they were able to

23  lower their costs by using PermaFix and WCS's exempt cell

24  when before they only had Clive, Utah, to choose from?

25          "Answer:  Correct.

Centofanti - deposition designations

1      "Question:  When the exempt cell opened, did the

2  prices for disposal at Clive change?

3      "Answer:  Sort of.

4      "Question:  Can you explain that?

5      "Answer:  They became more receptive when we

6  offered them that if we could send you certain amounts of

7  material, would you give us this price.  So we had cases

8  where we had volumes of waste that could have gone either

9  facility, and EnergySolutions then did negotiate a better

10 price with us when we laid it out that you take it for this

11 price, we will -- we'll send it to you, yes.

12     "Question:  So you were able to use the exempt

13 cell to bargain for a lower rate with EnergySolutions in

14 Clive?

15     "Answer:  Correct.

16     "Question:  Have you ever been able to do it the

17 other way -- and let me say by that I mean, have you ever

18 been able to use ES's landfill to negotiate a better price

19 for disposal with WCS?

20     "Answer:  Almost all our waste goes to the

21 exempt cell.  So they had given us a very good price at the

22 beginning, so there was really no need to really renegotiate

23 the price.

24     "Question:  You mentioned a moment ago the life

25 of plant contracts that restricted options of some of

Centofanti - deposition designations

1    PermaFix's otherwise potential customers?

2                "Answer:  Yes.

3                "Question:  Is there -- do you know if those

4    contracts will relapse at any point?

5                "Answer:  Yes, they do lapse at some point and

6    an re -- open a renegotiation.  I don't know the details of

7    all that, but I know they do lapse at some point.  They're

8    not really life of plant, yeah.

9                "Question:  Does PermaFix compete for business

10   from those utilities at the lapse point in the contract that

11   they have with ES?

12               "Answer:  Prior to WCS, we never had.  In fact,

13   never paid a lot of attention to them, cause we really

14   didn't see any option there from a competitive point of

15   view, but once they started -- once WCS opened, then we

16   started paying more attention to life of plant contracts,

17   yes.

18               "Question:  Can you describe any circumstances

19   where that -- where you saw that --

20               "Answer:  I know our sales group is focused on

21   that and with WCS; but, no, I don't have any -- personally,

22   I don't know the details.

23               "Question:  The sales group's employees will be

24   able to talk about particular examples?

25               "Answer:  If we have any.  I'm not sure that

Centofanti - deposition designations

1    they're looking at and what they're doing, but they -- I

2    know we're more sensitive to the life of plant expirations

3    now than we used to be.

4                "Question:  Because you have the exempt cell?

5                "Answer:  Because we have the exempt cell that

6    we can -- and the pricing that we can compete with.

7                "Question:  Do you send any waste to -- does

8    PermaFix send any commercial waste to WCS's CWF cell?

9                "Answer:  We may have.  I don't know at this

10   point.

11               "Question:  Do you know --

12               "Answer:  We have plans to do it, but I don't

13   know if we have or not at this point.

14               "Question:  Can you describe the plans that you

15   have now for sending waste to the CWF cell?

16               "Answer:  No details.  I don't know.  I just

17   know we've talked about it, but --

18               "Question:  Can you describe the circumstances

19   that prompted you to consider sending waste to the CWF

20   cell?

21               "Answer:  Again, it would be just price, price

22   and service, yeah, and the customer's desire.  Those are the

23   three deciding factors.

24               "Question:  Mr. Cenofanti, I'm handing the court

25   reporter what will be marked as PFLIT 2, which I will refer

1    to as Exhibit 2.

2                "And the document has no Bates stamp, but it's

3    an August 24th, 2016 letter sent to the Department of

4    Justice by John Elrod on behalf of PermaFix.  Do you

5    recognize this?

6                "Answer:  Yes, correct.

7                "Question:  Did I describe it accurately?

8                "Answer:  Yes.

9                "Question:  And who is John Elrod?

10               "Answer:  He's our attorney.

11               "Question:  Did you approve of the letter's

12   content before it was sent?

13               "Answer:  Yes.

14               "Question:  Now, I'd like to direct you to the

15   first paragraph.  On the third line, the letter states,

16   'PermaFix has previously expressed concerns about the

17   proposed acquisition and its potential impact on PermaFix's

18   access to as well as the cost and amount of so-called exempt

19   waste disposal capacity.'

20               "Do you see that?

21               "Answer:  Yes.

22               "Question:  So if I'm reading this correctly,

23   before this letter was sent, PermaFix had expressed concerns

24   to the Department of Justice about the proposed merger

25   between ES and WCS?

Centofanti - deposition designations

1              "Answer:  Right, yes.

2              "Question:  What were the concerns that you

3      expressed?

4              "Answer:  The concerns were that if the

5      acquisition went through that the -- that there would be

6      changes in our main disposal facility which was the exempt

7      cell at that time, and that it would -- it would exclude

8      us from a wide part of the market.  If EnergySolutions

9      owned it, they would raise the prices and create a problem

10     for us.

11             "Question:  So when you said that your concerns

12     would be that there -- when you were concerned that there

13     would be changes, you were concerned that EnergySolutions

14     would raise prices for disposal at WCS?

15             "Answer:  Correct.  Yes.

16             "Question:  Did you have any other concerns?

17             "Answer:  That was the major concern from the

18     company's point of view, yes.

19             "Question:  Were you concerned about being able

20     to access the WCS exempt cell?

21             "Answer:  No.  It would be more question of

22     price.

23             "Question:  In the second paragraph of this

24     letter, PermaFix states, 'PermaFix has now resolved its

25     concerns about the potential impact on the low-level

Centofanti - deposition designations

1    radioactive waste disposal including exempt waste disposal

2    costs and availability under the proposed transaction and

3    now supports its closure.

4                "Do you see that?

5                "Answer:  Correct.  Yes.

6                "Question:  So by August 24th, 2016, PermaFix

7    had resolved the concerns that it had raised in early

8    January 2016?

9                "Answer:  Correct, yes.

10                "Question:  What resolved those concerns for

11    you?

12                "Answer:  We negotiated with WCS a new contract

13    that gave us a seven-year fixed price for the exempt cell.

14                "Question:  Did WCS ask you to convey support

15    for the merger to the Department of Justice?

16                "Answer:  Yes.

17                "Question:  Who at WCS asked you to do that?

18                "Answer:  The CEO, Ron Baltzer, said if we

19    resolve your issues, will you -- will you support the

20    merger.  If we can give you a long-term contract, would you

21    be satisfied, and I said yes.

22                "Question:  So you agreed that if you got a

23    long-term contract, you would express your support for the

24    merger to be the Department of Justice?

25                "Answer:  Correct.

Centofanti - deposition designations

1          "Question:  You can set aside Exhibit 2.  I'm

2     going to hand the court reporter what will be marked PFLIT

3     three, which I'll refer to as Exhibit 3.

4          "Exhibit 3 also has no Bates number, but it's

5     documents signed by John Lash on behalf of PermaFix and by

6     Rodney Baltzer on behalf of WCS.  Have you had a moment to

7     review the document?

8          "Answer:  Yes.

9          "Question:  This is the seven-year extension

10     that resolved PermaFix's concerns with the proposed merger?

11          "Answer:  Correct.

12          "Question:  So if you look down to the bottom,

13     next to John Lash's signature, is it true that this

14     document -- that you entered this agreement with WCS on

15     August 24th, 2016?

16          "Answer:  Correct.

17          "Question:  That's the same day that you mailed

18     Exhibit 2, the letter supporting the merger, to the

19     Department of Justice.

20          "Answer:  Correct.

21          "Question:  Is it true that those happened on

22     the same day because they were part of an agreement that you

23     had with WCS?

24          "Answer:  Correct.

25          "Question:  So PermaFix wouldn't have sent the

Centofanti - deposition designations

1    letter supporting the merger, it wouldn't have sent that

2    letter to the Department of Justice had WCS not entered the

3    agreement memorialized here in Exhibit 3?

4              "Answer:  Correct.

5              "Question:  Because the concerns that you had

6    would have remained?

7              "Answer:  Yes.

8              "Question:  But -- so you're saying that you

9    understood that even if the merger went through, ES would be

10    bound by the agreement that you signed with WCS?

11              "Answer:  Yes, yes.

12              "Question:  You've reviewed WCS's parent,

13    Valhi's, public filings, haven't you:

14              "Answer:  Correct.

15              "Question:  And you've seen year over year

16    PermaFix, your company, processor of waste, has outperformed

17    WCS year over year over year, right?

18              "Answer:  Correct.

19              "Question:  And have you had any net income at

20    PermaFix over the last, say, five years?

21              "Answer:  It's been a rough couple of years;

22    but, in general, we have positive cash and we generate

23    revenue income -- income, yes.

24              "Question:  And looking at the 10K's for Valhi,

25    the parent of WCS, you've seen, haven't you, that WCS has

Centofanti - deposition designations

1    not had net income ever?

2             "Answer:  Reviewing their public filings, yes, I

3    could see that, yes.

4             "Question:  You said it's been a rough couple

5    years.  Why has it been a rough couple years for PermaFix?

6             "Answer:  There's been a -- issues in the

7    industry in terms of -- especially on the Government side,

8    and on the utility side, in terms of the waste business.

9    There's been a lot of focus on the DOE -- the Government

10   side on other products -- may have a lot of waste -- and

11   commercial utilities have been under pressure from various

12   reasons where they had issues where they've cut back on --

13   in the waste side and service side.

14            "Question:  One of the things that you've seen

15   in this industry is a decline in the volume of waste,

16   right?

17            "Answer:  Correct.  Yes, we've seen that.

18            "Question:  And you've seen a decline in the

19   volume of A waste?

20            "Answer:  Yes.

21            "Question:  Earlier you said -- and before there

22   was interruption by the counsel -- you said that there was

23   a -- that the utilities have faced street strains.  What are

24   the utility strains?

25            "Answer:  What we've seen on the utility side

Centofanti - deposition designations

1    is -- of course, is the whole effect of natural gas on the

2    utility market and the competition.  It has driven the

3    utilities more to gas systems and less -- less desire for

4    nuclear.

5              "Question:  Likewise, if we look back at Number

6    4, Exhibit Number 4, this is your annual earnings call.

7    This is the same Sam Roboski, right?

8              "Answer:  It's the same Sam Roboski, yes.

9              "Question:  I'm on page 10, about halfway down.

10             'Sam Roboski:  So you can gain more business

11   going forward if this deal goes through?

12             Do you know what deal he's talking about?  Is it

13   Hanford?

14             "Answer:  I believe -- I believe it's the high

15   level waste.

16             "Question.  Okay.

17             "Answer:  Yeah.

18             "Question:  'Answer, Lou Cenotfanti:

19   Competition between us and EnergySolutions is not that

20   great.  They like large volumes of waste.  We compete once

21   in a while and we're partners once in a while.'

22             "Was that -- is that right?

23             "Answer:  Correct.

24             "Question:  So PermaFix at times is a partner of

25   EnergySolutions?

297

Centofanti - deposition designations

1        "Answer:  Sometimes, yeah.

2        "Question:  And PermaFix at times is a

3    competitor of EnergySolutions?

4        "Answer:  Correct.

5        "Question:  Now, you were asked about this

6    letter, this Exhibit Number 2 letter from Mr. Elrod at

7    Conner & Winters law firm to John Lindermuth at the United

8    States Department of Justice, August 24, 2016.  Do you have

9    that letter in front of you?

10        "Answer:  Yes.

11        "Question:  Exhibit Number 2.

12        "Answer:  Mm-hmm.

13        "Question:  Did you intend for Mr. Elrod to send

14    this letter?

15        "Answer:  Yes.

16        "Question:  It says, 'Dear Mr. Lindermuth:  I

17    write on behalf of PermaFix.'

18        "Was Mr. Elrod authorized to send this?

19        "Answer:  Yes.

20        "Question:  It says, 'PermaFix has now resolved

21    its concerns about the potential impact on low-level

22    radioactive waste disposal, including exempt waste disposal

23    costs and availability under the proposed transaction and

24    now supports its closure.'

25        "Is it fair that as of August 24, 2016, PermaFix

Centofanti – deposition designations

1    supported the merger of EnergySolutions and WCS?

2                    "Answer:  That's correct.

3                    "Question:  And as of today -- we're here in

4    Atlanta at a hotel, March 10, 2017 -- does PermaFix support

5    a merger of EnergySolutions and WCS?

6                    "Answer:  Yes.

7                    "Question:  Then it says, 'In addition, we

8    believe that the transaction has the potential to lead to

9    greater service as a result of the enhanced efficiency of a

10   one-stop disposal option for all waste disposal services.'

11                   "What does that mean?

12                   "Answer:  That dealing with one company would

13   improve the efficiency.

14                   "Question:  How does it improve the efficiency,

15   sir?

16                   "Answer:  In terms of having options to send to

17   multiple facilities with one company.

18                   "Question:  Can you think of other ways that the

19   merger could potentially increase efficiencies in this

20   industry?  Is this an industry in need of efficiency

21   increase?

22                   "Answer:  It's an industry under costing

23   pressures.  So any way you could reduce the cost would be an

24   improvement for this industry.

25                   "Question:  What are those costing pressures?

Centofanti - deposition designations

1    Tell us about that.

2              "Answer:  The costing pressures are the clients

3    are continuing to look for less expensive ways to provide --

4    to dispose of their waste.

5              "Question:  Does PermaFix feel costing pressures

6    in this industry?

7              "Answer:  Constantly, yes.

8              "Question:  Does PermaFix feel pressure from

9    waste generators to drive prices down?

10             "Answer:  Yes.

11             "Question:  You also talked about PermaFix is

12   trying to drive efficiency.  Is that cutting costs?  Is

13   that -- tell me what driving efficiency means.

14             "Answer:  Better processors, cutting costs, and

15   then we're, ourselves, are consolidating our facilities from

16   four down to three.

17             "Question:  PermaFix didn't think it was doing

18   something wrong by entering into a long-term contract, did

19   they?

20             "Answer:  No.

21             "Question:  Was --

22             "Answer:  WCS, in fact, told us that this is

23   their standard contract with their utility clients.

24             "Question:  And had -- has PermaFix been

25   satisfied with the contract?

Centofanti - deposition designations

1          "Answer:  Yes.

2          "Question:  Did WCS -- has WCS continued to

3    accept waste under the contract?

4          "Answer:  Yes.

5          "Question:  Have you done any analysis on the

6    question about whether WCS as a facility out in West Texas

7    can survive on exempt cell alone, an analysis?  Have you

8    done that?

9          "Answer:  No.

10         "Question:  And as a result of entering into

11   this long-term contract and then sending this letter to the

12   Department of Justice, I just want to make sure I'm clear.

13   You haven't changed any of your testimony as a result of

14   that, have you?

15         "Answer:  No.

16         "Question:  Your testimony is what it is?

17         "Answer:  Right.

18         "Question:  You've told the truth in giving your

19   answers today to the Department of Justice?

20         "Answer:  Uh-huh, yes.

21         "Question:  And so we're clear, as of March 10,

22   2017, even after listening to the Department of Justice's

23   questions, you still support this merger being approved,

24   correct?

25         "Answer:  Correct.

Centofanti - deposition designations

1        "Question:  Would PermaFix have the goal to

2    reduce the volume of waste appropriately?

3        "Answer:  Yes.

4        "Question:  Why would you even reduce the volume

5    of waste appropriately on behalf of generators?

6        "Answer:  In general, it's a less risky in the

7    long run solution for the generator.

8        "Question:  Would it also save the generator

9    money?

10        "Answer:  Yes.

11        "Question:  I'm just trying to think about, when

12    you go out and sell to a customer, please higher PermaFix.

13        "Answer:  Right.

14        "Question:  You've got a customer who has got

15    LLRW, and that customer could either ship direct to

16    EnergySolutions or WCS or US Ecology or they can hire a

17    processor.

18        "Answer:  Right.

19        "Question:  What do you tell them?

20        "Answer:  My processing, you'll reduce your

21    risk.  You reduce the volume.  And it's environmentally more

22    acceptable than throwing the material in a landfill as it

23    is.

24        "Question:  Would you also offer that by

25    reducing the volume you would potentially at least save them

Centofanti - deposition designations

1  money?

2          "Answer:  In the long run, you would save them

3  money and reduce liability.

4          "Question:  Now, PermaFix, we talked about some

5  of the services.  I'm not sure if I've got them all, but let

6  me -- let me see if I've got them.  I see sorting and

7  segregation services.  What are those?

8          "Answer:  We take material in that is -- where

9  people have just thrown everything they've got in a box.  We

10  will then go through and sort out the box or drum or

11  whatever it's in and send the segregated waste to the

12  appropriate disposal facility.

13          "Question:  Would supporting and segregation

14  service that you offer, does that have the effect of

15  potentially at least saving generators money?

16          "Answer:  Yes, significantly, yeah.

17          "Question:  And can also this sorting and

18  segregating process affect where the waste might ultimately

19  be buried, disposed of?

20          "Answer:  Yes.

21          "Question:  For example, when you sort and

22  segregate, can you choose from different places for disposal

23  for the segregated -- ultimately segregated waste?

24          "Answer:  In certain segregation, you also do it

25  -- yes, that you'll always end up with different disposal

Centofanti - deposition designations

1    options for the different segments.

2            "Question:  I saw on your website that PermaFix

3    offers waste minimization plans.  I've heard a little bit

4    about those.  What are those?

5            "Answer:  We'll go in and do an audit of a

6    facility and provide the client with ways to minimize their

7    waste.

8            "Question:  Do clients like -- when you talk

9    about client, you're talking about a generator of LLRW?

10            "Answer:  Yes.

11            "Question:  Do generators of LLRW try to have

12    waste minimization plans even if they're not in writing,

13    even if they don't higher an expert like you?

14            "Answer:  They -- they try, but they -- without

15    someone coming in to -- that understands the rules and

16    regulations and what the waste is, it's -- without someone

17    like us, they'd have hard time with a plan.

18            "Question:  So when you finish a waste

19    minimization plan, is the goal to minimize the waste at the

20    generator?

21            "Answer:  It's to minimize the waste.

22            "Question:  And what effect does that have on

23    volume?

24            "Answer:  It reduces the volume.

25            "Question:  And what does that do to price or

304

Centofanti - deposition designations

1    total cost, excuse me, of disposal?

2            "Answer:  Waste minimization plans usually

3    reduce their cost of their waste disposal.

4            "Question:  Have waste minimization plans in

5    this LLRW industry had the effect of reducing volume of

6    waste disposed of across the United States?

7            "Answer:  Yes.

8            "Question:  And I see in your website you also

9    do something called thermal destruction.

10           "Answer:  Right.

11           "Question:  Tell me about the thermal

12   destruction.  What is thermal destruction of Class A, B and

13   C resins?  What is that?

14           "Answer:  We take in radioactive waste, mostly

15   organic, and burn it and that reduces the volume.

16           "Question:  Has that thermal destruction been a

17   product offering you've been able to sell to customers,

18   generators of LLRW?

19           "Answer:  In general, yes.  We have three

20   incinerators.

21           "Question:  Has it been a successful method of

22   reducing the footprint of LLRW in the United States?

23           "Answer:  Yes.

24           "Question:  Tell me about -- I see on your

25   website decay and storage is another product offering you

Centofanti - deposition designations

1    have.  What is decay and storage?

2                    "Answer:  A lot of radioactive waste has very

3    short half lifes.  So that if you let it sit in a warehouse

4    for a year, it actually -- the radioactivity disappears.

5                    "Question:  Have you -- as part of your waste

6    minimization plans, would a waste minimization plan also at

7    least try to understand whether a generator is storing in

8    place?

9                    "Answer:  Yes.  You wouldn't see it with the

10   utilities in general, yeah.

11                   "Question:  So what -- I didn't mean to cut you

12   off.  Were you finished?

13                   "Answer:  They just don't have waste -- you

14   know, decay and storage is usually for some very specific

15   isotopes that are more found like in the medical field, and

16   that so --

17                   "Question:  Is decay and storage used for any

18   LLRW?

19                   "Answer:  If it's the proper isotope where it

20   has an effect, yes.

21                   "Question:  You at PermaFix have offered to

22   customers decay and storage assistance with respect to some

23   LLRW, haven't you?

24                   "Answer:  Yes.

25                   "Question:  And the effect of that is to

1    ultimately volume reduce or to class reduce the waste?

2              "Answer:  Yes.

3              "Question:  Now, there was a -- well, actually,

4    I see on your website there's some reference to storage

5    services.  Does PermaFix offer storage services?

6              "Answer:  Yes.

7              "Question:  What storage services do you offer

8    at PermaFix?

9              "Answer:  Just decay and storage.  We have

10   limited storage licenses.

11             "Question:  So this is to create the sort of

12   buffer between the generator and then ultimate disposal,

13   this store-in-place or this decay and storage concept?

14             "Answer:  Yeah, as a treatment facility, we have

15   very limited storage times.  We have limits on our licenses

16   that we can only store material for a very short period.  So

17   that decay and storage or any other storage would be for

18   things that you could store for, say, years, less than a

19   year.

20             "Question:  Do they try to put their waste in a

21   form that drives down the total cost of disposal?

22             "Answer:  Yes.

23             "Question:  Where does PermaFix rank in terms of

24   volume shipment for ultimate disposal in United States LLRW

25   facilities?

307

Centofanti - deposition designations

1                    "Answer:  If you include our Government work,

2          we'd be a fairly significant shipper.

3                    "Question:  What if you exclude your Government

4          work?

5                    "Answer:  If we exclude the Government work,

6          we -- we probably would be near what a utility would

7          generate and ship.

8                    "Question:  How much waste did PermaFix ship in

9          2016 to US Ecology?

10                   "Answer:  Don't know.

11                   "Question:  Would you --

12                   "Answer:  It would have -- it would have all --

13         most of it would have come from Northwest Utilities.  I know

14         about revenue what we do with Northwest Utilities, but I

15         don't know the volume.

16                   "Question:  If you can turn back to PFLIT 4.

17                   "Answer:  4.

18                   "Question:  And direct you to page 10.  And in

19         the middle there, there's a question by Sam Roboski and your

20         response.  Yes?

21                   "Answer:  Yes, several, yeah.

22                   "Question:  And then Mr. Roboski says, 'So you

23         can gain more business going forward if this deal goes

24         through.'  And your answer was, 'The competition between us

25         and EnergySolutions is not that great.  They like large

Centofanti - deposition designations

1   volume of waste, we compete once in a while, and we're

2   partners once in a while.  So, again, it's not -- it's hard

3   to say what the effects of the merger would be now that

4   Department of Justice has now brought a lawsuit to stop it

5   and we'll see how it all ends up.'

6           "Now, my question is about the competition

7   comment you had here.  When you said the competition between

8   us and EnergySolutions is not that great, the competition

9   that does exist between the two of you, is that for

10  processing?

11          "Answer:  Yes, for processing, yes.

12          "Question:  Not for disposal?

13          "Answer:  Not for disposal.

14          "Well, no, let me rephrase that.  The

15  competition is for the material.  It could go through us

16  with volume reduction or it could have gone to

17  EnergySolutions directly.  So there was no treatment.  We

18  compete a very little bit on treatment, and we compete for

19  waste that doesn't need treatment a little bit where we

20  would do volume reduction, then send it to them or to WCS.

21  And so in that area, we did compete a little bit for the dry

22  waste that comes out of utilities.  It includes where we

23  would -- now, we never had much luck in that area, so we did

24  compete there, yes.

25          "Question:  Even to the extent that you compete

Centofanti - deposition designations

1    with EnergySolutions to receive waste, you still have to

2    dispose of it somewhere, correct?

3                "Answer:  It still has to be disposed of.  So

4    after we treat it, after we burned it, it would then go to

5    them, but with a much lower volume, yeah.

6                "Question:  Okay.  You can set PFLIT 4 aside:

7                It's always been a goal in the LLRW industry to

8    reduce the volume of waste; is that true?

9                "Answer:  The industry as a whole.  Of course,

10   it was very much a negative for the landfills.

11               "Question:  But a waste generator, it's always

12   been a goal to reduce --

13               "Answer:  Absolutely, yeah.

14               "Question:  And even if waste is reduced, it's

15   not extinguished; correct?

16               "Answer:  Correct.

17               "Question:  It still has to go for disposal?

18               "Answer:  It has to go for disposal.

19               "Question:  You were asked questions about WCS's

20   financial viability.  Do you remember those?

21               "Answer:  Yes.

22               "Question:  I just want to be clear.  Your

23   opinions on that are based on public information, correct?

24               "Answer:  Correct.

25               Question:  And you're not a financial analyst,

Centofanti - deposition designations

1     right?

2                    "Answer:  Correct, no.

3                    "Question:  Is it economical to store all forms

4     of waste?  All forms of LLRW?

5                    "Answer:  It's -- in general, we do not like to

6     store waste because it's -- it's a liability that's sitting

7     there that you want to move as fast as you can and not allow

8     it to build up, and our licenses don't allow us to store it

9     for, you know, more than a year anyway."

10                   (End of videotaped deposition.)

11                   MS. ELMER:  Your Honor, plaintiff moves for the

12    admission of Plaintiff's Exhibits PTX-372.  That would have

13    been Deposition Exhibit 2, and PTX-373, which would have

14    been the Deposition Exhibit 3.

15                   MR. BECKWITH:  No objection, your Honor.

16                   And, your Honor, the defendants move for, I'm

17    sorry.  I didn't let you --

18                   THE COURT:  That's fine.  I was wondering what

19    happened to the third.  I didn't realize it --

20                   MR. BECKWITH:  Defendants move and offer

21    PTX-374.

22                   THE COURT:  All right.

23                   MS. ELMER:  No objection.

24                   THE COURT:  Thank you very much.

25                   (Plaintiff's Trial Exhibits 372, 373 and 374

Wood - direct

1    were admitted into evidence.)

2              MS. ELMER:  Your Honor, at this time the United

3    States calls Greg Wood as an adverse party witness.

4              Mr. Wood is the Chief Financial Officer of

5    EnergySolutions and of Rockwell Holdco, and his testimony

6    will relate to competition between EnergySolutions and

7    WCS.

8              MR. LARKIN:  Your Honor, my colleague, Ken

9    Schwartz, will be handling any redirect on Mr. Wood.  I want

10   to introduce him to your Honor.

11             THE COURT:  All right.  Fine.

12             MR. SCHWARTZ:  Good morning, your Honor.

13             THE COURT:  Good morning.

14             ... GREG WOOD, having been duly sworn

15             as a witness, was examined and testified as

16             follows ...

17                     DIRECT EXAMINATION

18   BY MS. ELMER:

19   Q.    Good morning, Mr. Wood.

20   A.    Good morning.

21             MS. ELMER:  Your Honor, may I approach?

22             THE COURT:  Yes.

23             (Ms. Elmer handed binders to the witness.)

24   BY MS. ELMER:

25   Q.    Mr. Wood, I've handed you two binders that we may

Wood - direct

1    refer to from time to time during your examination and I

2    will let you know.

3                    Good morning.  You're the Chief Financial

4    Officer at EnergySolutions; is that correct?

5    A.    Yes, I am.

6    Q.    And you are also an officer at Rockwell Holdco; is

7    that correct?

8    A.    Yes, I am.

9    Q.    And you've been the CFO of EnergySolutions since June

10   of 2012?

11   A.    That's correct.

12   Q.    And EnergySolutions is owned by Energy Capital

13   Partners; is that right?

14   A.    That's right.

15   Q.    And Energy Capital Partners bought EnergySolutions in

16   a take private transaction in May of 2013?

17   A.    Correct.

18   Q.    Mr. Wood, if you would take a look at Tab PTX-56 in

19   your pink binder and look at Plaintiff's Exhibit 6, an

20   e-mail chain.

21   A.    Can you repeat that?

22   Q.    Yes, sir.  If you could turn to the -- I believe it

23   is the first or second tab, PTX-056, and Plaintiff's

24   Exhibit 6.

25   A.    Yes.

Wood - direct

1    Q.    56 should be there.

2    A.    I have it.

3    Q.    And, sir, do you recognize Plaintiff's Exhibit 56?

4    A.    Yes, I do.

5              MS. ELMER:  Your Honor, plaintiff moves to admit

6    Plaintiff's Exhibit 56 into evidence.

7              MR. SCHWARTZ:  No objection, your Honor.

8              THE COURT:  Thank you.

9              (Plaintiff's Exhibit No. 56 was admitted into

10   evidence.)

11   BY MS. ELMER:

12   Q.    And, Mr. Wood, on the screen in front of you is

13   Plaintiff's Exhibit 56, an e-mail chain dated March 4, 2014.

14   And you drafted the e-mail at the top of this chain; is that

15   correct, sir?

16   A.    Yes, I did.

17   Q.    And the Rahul and Ravi that are referenced in your

18   e-mail work at Energy Capital Partners?

19   A.    Yes.  They do.

20   Q.    In your e-mail -- maybe we can blow that up.  You

21   informed your colleagues at EnergySolutions about Rahul and

22   Ravi's expectations for a board meeting the following week;

23   is that correct?

24   A.    That's right.

25   Q.    And you write here that their primary desire is a deep

Wood - direct

1    dive on LP&D and get a slightly less detailed update on

2    Government, Asia, Zion, et cetera.  I think what's driving

3    the LP&D request is that their original buyout model assumed

4    significant price increases as LOP contracts expired due to

5    limited competition, some modest volume increases, et

6    cetera, and now they are hearing about increased

7    competition, much lower Clive volumes than forecast, et

8    cetera.  So they want to dig into this more, understand

9    what's happening in the market competition from WCS, ECOL,

10   et cetera), how we are positioned for renewal of LOP, status

11   of DU, Government waste, et cetera."

12                Did I read that correctly, sir?

13   A.    Yes, you did.

14   Q.    All right.  And the LP&D in this e-mail stands for the

15   logistics, processing and disposal business unit at energy

16   collusions?

17   A.    That's correct.

18   Q.    And that business unit at the time included the Clive

19   waste disposal facility; correct?

20   A.    Yes, it does.

21   Q.    And the original buyout model that you are referring

22   to in your e-mail is Energy Partner Capital's original

23   buyout model for EnergySolutions; is that right?

24   A.    Yes.  That was their model for when they acquired

25   EnergySolutions.

Wood - direct

1  Q.    All right, Mr. Wood.  You can set Plaintiff's

2  Exhibit 56 aside, sir.

3            Now let's look at the materials that were

4  prepared for the board meeting referenced in the e-mail that

5  we just discussed.

6            If you would turn to tab PTX-091 in your binder

7  and take a look at Plaintiff's Exhibit 91.  It is an e-mail

8  with multiple attachments.

9            Sir, do you recognize Plaintiff's Exhibit 91?

10 A.    Yes.

11            MS. ELMER:  Your Honor, plaintiff moves to admit

12 Plaintiff's Exhibit 91 into evidence.

13            MR. SCHWARTZ:  No objection, your Honor.

14            THE COURT:  Thank you.

15            (Plaintiff's Exhibit No. 91 was admitted into

16 evidence.)

17 BY MS. ELMER:

18 Q.    Mr. Wood, on the screen is a version of Plaintiff's

19 Exhibit 91 that has been redacted for confidentiality by

20 your counsel, and I'm just showing the first page of the

21 document right now.  It may be easier for many of my

22 questions, for you to refer to the unredacted copy in your

23 binder.

24 A.    Okay.

25 Q.    And you recognize this document as an e-mail with

Wood - direct

1     attachments that you sent to a group of people on March 8th,

2     2018?

3     A.    Yes, I do.

4     Q.    And the recipients of this e-mail are members of the

5     board?

6     A.    Most of those are members of the board, but they're

7     all Energy Capital Partners, employees.

8     Q.    And part of your duties as CFO of EnergySolutions

9     is supplying information for board meetings; is that

10    correct?

11    A.    That's right.

12    Q.    And do you gather the most accurate information that

13    you can for the board meeting; is that correct?

14    A.    Yes, I try to.  I'm not responsible for all the

15    sections of the presentation, but my job is to pull together

16    the presentations from other people and send those to the

17    board.

18    Q.    For example, you would trust the information that your

19    colleagues, Ken Robuck and John Christian, supplied; is that

20    correct?

21    A.    Well, I trust my colleagues, but I'm not responsible

22    for preparing or reviewing their sections of this document.

23    Q.    And you would not have forwarded information you know

24    to be incorrect to the board, would you?

25    A.    I would not.

Wood - direct

1    Q.    And let's look at the cover page of the LP&D summary,

2    March 20th, draft six, March 2012.  The Bates number at the

3    bottom of that page -- actually, it's the fifth page of

4    PTX-91 if that helps, the fifth page of that document.

5              Let's go to Slide 11 of that deck, developments

6    and competition, WCS impact to date.  And I've also placed

7    that on the screen in redacted form.

8              The first bullet on slide 11 says, "Resin Class

9    B/C market price erosion of $25 million per year; price was

10   initially over $5,500 per cubic foot.

11             "WCS offered Exelon approximately $2,200 per

12   cubic foot bundled with irradiated hardware.

13             "Lost SONGs at less than $3 per cubic foot.  WCS

14   offer.

15             "Had to drop redacted customer's contract price

16   from redacted to redacted in order to keep the work."

17             With the redactions, did I read that correctly,

18   sir.

19   A.    Yes, you did.

20   Q.    And the second bullet point on slide 11 says,

21   "Previously believed WCS could not compete with disposal

22   prices of large components, but they are charging less

23   than their in compact rates for out of compact large

24   components."

25             Did I read that correctly, sir?

Wood - direct

1    A.    Yes, you did.

2    Q.    And now let's turn to the next slide, slide 12, and

3    that is entitled "Developments in competition.  WCS future

4    potential impact."

5              And I'd like to look at the first bullet on that

6    slide.  And the first bullet on slide 12 -- and we may want

7    to also pull out the sub-bullets there.

8              "Exempt waste -- friendly regulatory environment

9    in Texas has allowed WCS to dispose of much higher levels of

10   radioactive wastes as exempt in their RCRA site that does

11   not have a radioactive materials license.

12             "Can affect approximately 90 percent by volume

13   of Clive bulk waste disposal up to $50 million per year.

14             "Can affect federal work eroding prices from,

15   amounts redacted.

16             "Future turnkey decommissioning projects with

17   waste in range of, price redacted, pricing can erode to,

18   price redacted."

19             With the redactions, did I read that correctly,

20   sir?

21   A.    Yes, you did.

22   Q.    I'd like to look at the second bullet on slide number

23   12, this board deck.

24             That second bullet says, "WCS imagine campaign

25   launched in 2014 is offer generators one-stop shopping for

Wood - direct

1    RCRA, exempt, Class A, B and C waste under single contract

2    at same site."

3                Did I read that correctly, sir?

4    A.    Yes.

5    Q.    In looking at the unredacted version in your binder,

6    the sub-bullet underneath that provides an estimate of the

7    size of the LOP market; is that right?

8    A.    Yes, it does.

9    Q.    And I won't say that number.

10                Mr. Wood, you can set Plaintiff's Exhibit 91

11    aside.

12                Let's look at set of board materials, and this

13    one is going to be from May 27, 2014.  If you could turn,

14    sir, to tab PTX-92 in your binder and take a look at

15    Plaintiff's Exhibit 92.  It is also an e-mail with a fairly

16    large attachment.

17                Sir, do you recognize Plaintiff's Exhibit 92?

18    A.    Yes, I do.

19                MS. ELMER:  Is the your Honor, plaintiff moves

20    to admitted Plaintiff's Exhibit 92 into evidence.

21                THE COURT:  Any objection?

22                MR. SCHWARTZ:  No objection, your Honor.

23                THE COURT:  Thank you.

24                (Plaintiff's Exhibit No. 92 was admitted into

25    evidence.)

Wood - direct

1    BY MS. ELMER:

2    Q.    And, Mr. Wood, on the screen is a version of

3    Plaintiff's Exhibit 92 that has been redacted by your

4    counsel.  Right now I'm showing only the first page.

5            Again, it may be easier to follow along with the

6    unredacted version in your binder for many of my questions.

7            Plaintiff's Exhibit 92 is a board book that you

8    forwarded to Matt Yu in October of 2014; is that right?

9    A.    Yes.

10   Q.    And the board book is from the May 27, 2014 board

11   meeting; is that correct?

12   A.    That's correct.

13   Q.    And Matt Yu is the head of corporate development at

14   EnergySolutions?

15   A.    Yes, he is.

16   Q.    And he reports to you?

17   A.    He does.

18   Q.    I would like to look at one of the decks that's

19   included in the board book.  This deck is entitled,

20   "Board of Directors meeting, May 27, 2014.  LP&D Q1 2014

21   summary."

22           And let's look at slide 18 of that deck

23   entitled, "Pricing and competitive landscape -- WCS."

24           THE COURT:  And you'll have to give at least me

25   a minute to find it.

321

Wood - direct

1              MS. ELMER:  Yes, ma'am.  Yes, your Honor.

2              THE COURT:  What was the --

3              MS. ELMER:  Let's see.  I think it is page 47 of

4    Plaintiff's Exhibit 42, your Honor.

5    BY MS. ELMER:

6    Q.    And, Mr. Wood, are you also there on that page?

7    A.    Yes, I am.

8              THE COURT:  What is the caption?

9              MS. ELMER:  And the name of this is "Pricing and

10   competitive landscape -- WCS."

11             THE COURT:  I meant of the slide deck

12   altogether.

13             MS. ELMER:  Oh, let's put that back up, Brian,

14   Mr. Beaton.

15             THE COURT:  I don't --

16             MS. ELMER:  It was LP&D Q1 2014 summary.  And

17   then the Bates page number is -- is ESI-0668284, and it's

18   the 18th page of this particular deck.  I will give everyone

19   a few moments to get there.

20             THE COURT:  Page -- go ahead.  I haven't found

21   it, but I will catch up.

22             MS. ELMER:  Thank you, your Honor.

23   BY MS. ELMER:

24   Q.    The first bullet on this slide says, "WCS received a

25   license amendment to dispose of exempt waste in their

Wood - direct

1    Subtitle C landfill (hazardous waste landfill)."

2                Did I read that correctly, sir?

3    A.    Yes, you did.

4    Q.    And the second bullet said, "Exemption would allow WCS

5    to take 90 percent of the BWF at Clive."

6                Did I read that correctly?

7    A.    Yes.

8    Q.    And BWF is the bulk waste facility?

9    A.    That's right.

10   Q.    And the third bullet says, "Majority of exempted waste

11   would not require TCEQ approval before disposal."

12               Did I read that correctly?

13   A.    Yes.

14   Q.    And the TCEQ is the Texas regulator; is that right?

15   A.    That's correct.

16   Q.    The fourth bullet says, "WCS exempt rates -- $8 per

17   cubic foot soil, $17 per cubic foot debris."

18               Did I read that correctly?

19   A.    Yes, you did.

20   Q.    The fifth bullet says, "WCS is offering a

21   volume-tiered pricing approach to processors to compete for

22   utility waste."

23               Did I read that correctly?

24   A.    Yes.

25   Q.    And the sixth bullet says, "WCS will push to open up

Wood - direct

1    LOP agreements for competition."

2              Did I read that correctly?

3    A.    Yes.

4    Q.    And EnergySolutions has life of plant or LOP

5    agreements with a high percentage of the nuclear power

6    plants in the United States; is that correct?

7    A.    That's correct.

8    Q.    And those life of plant agreements have been in place

9    for a number of years?

10   A.    Yes, they have.

11   Q.    And those life of plant agreements have various

12   renewal dates; is that correct?

13   A.    Correct.

14   Q.    And, Mr. Wood, you can set Plaintiff's Exhibit 92

15   aside.

16              Let's look at one more set of materials prepared

17   for an EnergySolutions board meeting.  If you would, sir,

18   please turn to Tab PTX-441 in your binder and take a look at

19   Plaintiff's Exhibit 441, an e-mail with -- again, I

20   apologize, a rather large attachment.

21              Sir, do you recognize this document?

22   A.    Yes, I do.

23              MS. ELMER:  Your Honor, plaintiff moves to admit

24   Plaintiff's Exhibit 441 into evidence.

25              MR. SCHWARTZ:  No objection, your Honor.

Wood - direct

1          THE COURT:  Thank you.

2              (Plaintiff's Exhibit No. 441 was admitted into

3     evidence.)

4     BY MS. ELMER:

5     Q.    And, Mr. Wood, Plaintiff's Exhibit 441 is a March

6     23rd, 2015 cover e-mail and attachment you sent in

7     preparation for the March 25th, 2015 EnergySolutions board

8     meeting.

9     A.    Yes.

10    Q.    And let's look at the presentation that was assembled

11    for this particular board meeting.  And I would like to go

12    to slide number 23.  The Bates number of that slide is

13    ESI-0027142, and it is the 26th page of the exhibit.

14              The title of this slide is entitled,

15    "Competitive landscape."  Is that right, sir?

16    A.    That's right.

17    Q.    And if you could, let's look at bullet number one.

18    You may want to follow along in your binder.  I will

19    highlight the redacted copy on the screen.

20              So the first bullet on this slide says, "LOP

21    contracts continue to protect ES market position, and

22    redacted extension to redacted customer contract provides

23    stable basis for future work."

24              With the redactions, did I read that correctly,

25    sir?

Wood - direct

1    A.    Yes.

2    Q.    And the second bullet on the slide says, "WCS

3    continues to devalue the market with high activity resins

4    and with their exempt waste."

5          Did I read that correctly?

6    A.    Yes.

7    Q.    And you may want to go to the unredacted copy of this

8    exhibit in your binder for my next question.

9          Listed underneath this second bullet that we

10   just discussed are two examples of specific projects that

11   EnergySolutions lost; is that right?

12   A.    Yes.

13   Q.    And I would like to look at the third sub-bullet under

14   bullet number two, and that bullet says, "Customers are

15   telling ES that they like Texas taking title to waste better

16   than ES taking title to waste as a significant

17   discriminator."

18         Did I read that correctly?

19   A.    Yes.

20   Q.    And this refers to the State of Texas taking title to

21   a customer's waste when it is disposed of at WCS's compact

22   waste facility; is that correct?

23   A.    I believe so.

24   Q.    And the third bullet on this slide says, "ES has

25   negotiated exclusive contracts with two other processors,

Wood - direct

1    redacted and redacted, in an effort to keep WCS from

2    promoting the exempted waste process through their

3    facilities."

4              Did I read that correctly?

5    A.    Yes, you did.

6    Q.    And, Mr. Wood, you can set Plaintiff's Exhibit 441

7    aside.

8              So we've talked about competitive landscape

9    information that you've shared with the Board of Directors,

10   but I would like to talk about some of the information on

11   that topic that you've shared with some of EnergySolutions'

12   lenders.

13             So, Mr. Wood, if you could turn to tab number

14   PTX-102 in your binder, and take a look at Plaintiff's

15   Exhibit 102, an e-mail with attachment.

16             And you recognize Plaintiff's Exhibit 102?

17   A.    Yes, I do.

18             MS. ELMER:  Your Honor, plaintiff moves to admit

19   Plaintiff's Exhibit 102 into evidence.

20             MR. SCHWARTZ:  No objection, your Honor.

21             THE COURT:  Thank you.

22             (Plaintiff's Exhibit No. 102 was admitted into

23   evidence.)

24   BY MS. ELMER:

25   Q.    And, Mr. Wood, on the screen is the first page of a

Wood - direct

1    version of Plaintiff's Exhibit 102 that has been redacted by

2    your counsel.  Again, it may be easier to look at the

3    unredacted version in your binder for many of my questions.

4              And, sir, do you recognize Plaintiff's

5    Exhibit 102 as a cover e-mail and EnergySolutions' company

6    overview presentation that you made to the Morgan Stanley

7    leverage finance conference on June 4, 2015?

8    A.    Are we in PTX-104?

9    Q.    102?

10   A.    That's all right.

11   Q.    I apologize if I misspoke.

12   A.    102.  Yes, I did.

13   Q.    And the audience for this presentation was

14   EnergySolutions lenders?

15   A.    EnergySolutions lenders or other potential lenders

16   that might be interested.

17   Q.    And you endeavored to provide that audience with the

18   most accurate information you could; is that correct?

19   A.    I did.

20   Q.    Let's look at slide number 3 entitled company

21   overview, so it's the fourth page of Plaintiff's

22   Exhibit 102.

23   A.    Yes.

24   Q.    And I would like to look at the second bullet point,

25   or right underneath it, the third sub-bullet.

Wood - direct

1              And that reads, "Life of plant contracts with 84

2      reactors in the U.S."

3              Did I read that correctly?

4      A.    Yes, you did.

5      Q.    And is that your understanding of approximately how

6      many life of plan's EnergySolutions has with utilities?

7      A.    I believe that's correct.

8      Q.    And let's look at slide No. 6.  And the title of this

9      slide is "Nonreplicable assets."  The left side of the page

10     relates to Clive; is that right?

11     A.    Yes, that's right.

12     Q.    And the first bullet on the Clive side of the slide

13     says, "Largest and most comprehensively licensed commercial

14     radioactive waste disposal facility in the U.S."

15             Did I read that correctly?

16     A.    Yes, you did.

17     Q.    And the second bullet on the Clive side of the page

18     says, "Largest commercial Class A LLRW disposal site in the

19     U.S. creates significant barriers to entry."

20             Did I read that correctly?

21     A.    Yes.

22     Q.    And the third bullet on the Clive side of the page

23     says, "Handles over 95 percent of the Class A LLRW disposed

24     of by U.S. commercial entities."

25             Did I read that correctly, sir?

Wood - direct

1    A.    Yes.

2    Q.    Mr. Wood, you can set Plaintiff's Exhibit 102 aside.

3              So let's fast-forward a few months to September

4    of 2015.  Sir, if you would turn to tab PTX-104 in your

5    binder, and take a look at Plaintiff's Exhibit 104, an

6    e-mail with attached quarterly lender update.

7              Sir, do you recognize Plaintiff's Exhibit 104?

8    A.    Yes, I do.

9              MS. ELMER:  Your Honor, plaintiff moves to admit

10   Plaintiff's Exhibit 104 into evidence.

11             MR. SCHWARTZ:  No objection, your Honor.

12             THE COURT:  Thank you.

13             (Plaintiff's Exhibit No. 104 was admitted into

14   evidence.)

15   BY MS. ELMER:

16   Q.    Mr. Wood, on the screen is the first page of a version

17   of plaintiff's Exhibit 104 that has been redacted by your

18   counsel.  Again, it may be easier to follow along with the

19   unredacted version in your binder.

20             And so Plaintiff's Exhibit 4 is a cover e-mail

21   attaching a presentation entitled "Quarterly lender update,"

22   which is dated September 2, 2015; is that right?

23   A.    Yes.

24   Q.    And you received this e-mail and attachment from David

25   Nilsson?

Wood - direct

1    A.    Yes, that's right.

2    Q.    And Nilsson is the treasurer at EnergySolutions?

3    A.    Yes.

4    Q.    And he reports to you?

5    A.    Yes.

6    Q.    And Chief Financial Officer of EnergySolutions, are

7    you ultimately responsible for the work of your direct

8    report?

9    A.    Yes, I am.

10   Q.    And the intended audience of this quarterly lender

11   update is EnergySolutions lenders; is that right?

12   A.    Correct.

13   Q.    And you and your team strive to be as accurate as

14   possible in providing updates to that audience; is that

15   correct?

16   A.    Yes, we did.

17   Q.    Let's look at slide number 8.  This would be the ninth

18   page of the exhibit.  And slide 8 of the presentation is

19   entitled, "LP&D results lower than planned."  Is that right,

20   sir?

21   A.    Yes.

22   Q.    And the large header on the bottom right side of the

23   page reads, "EBITDA down year over year due to lower

24   processing margins and increased costs."

25         Did I read that correctly?

Wood - direct

1    A.    Yes, you did.

2    Q.    And the third bullet under that header says, "Margins

3    also negatively impacted by lower pricing."

4            Did I read that correctly?

5    A.    Yes.

6    Q.    And you and your team would not have included

7    inaccurate information in an update to EnergySolutions'

8    lenders, would you?

9    A.    No.

10   Q.    You can set Plaintiff's Exhibit 104 four aside,

11   Mr. Wood.

12           I would like to now look at an internal document

13   from that same early September 20, 2015 time frame as the

14   quarterly lender update that we just discussed.  So if you

15   could turn to tab PTX-105 in your binder and take a look at

16   Plaintiff's Exhibit 105.  This is an e-mail with eight pages

17   attached.

18           Sir, do you recognize Plaintiff's Exhibit 105.

19   A.    Yes, I do.

20           MS. ELMER:  Your Honor, plaintiff moves to admit

21   Exhibit 105 into evidence.

22           MR. SCHWARTZ:  No objection, your Honor.

23           THE COURT:  Thank you.

24           (Plaintiff's Exhibit No. 105 was admitted into

25   evidence.)

Wood - direct

1    BY MS. ELMER:

2    Q.    Again, on the screen is a version of the exhibit that

3    has been redacted by your counsel, and, again, you may want

4    to follow along with your binder instead for many of my

5    questions.

6              So, Mr. Wood, you received this e-mail and

7    attachments from Mr. Weston White; is that correct?

8    A.    Yes, it is.

9    Q.    And the date of this would be September 1, 2015; is

10   that right?

11   A.    Yes.

12   Q.    And then you forwarded his e-mail and attachments to

13   your assistant for printing; is that right?

14   A.    Correct.

15   Q.    And Mr.  White reports to you?

16   A.    Yes, he does.

17   Q.    And as Chief Financial Officer of EnergySolutions,

18   you're ultimately responsible for the work of your direct

19   report; is that correct?

20   A.    Yes, I am.

21   Q.    The preparation of the various explanations attached

22   to this e-mail would be something that Mr. White would do in

23   the ordinary course of his job duties; is that correct?

24   A.    Correct.

25   Q.    And these various explanations help decision-makers

Wood - direct

1    within EnergySolutions understand what is going on with the

2    business.    True?

3    A.    That's right.

4    Q.    And you expected Mr. White to supply accurate variance

5    explanations; is that correct?

6    A.    I do.

7    Q.    I would like you to look at the fourth page of the

8    document, bridge 2014 versus 2015 Q3 forecast, and focus

9    your attention on the left column.

10             Do you see Erwin, the Erwin row right here?

11    We'll highlight that.

12    A.    Yes, I see it.

13    Q.    And I won't say the dollar figure out loud because it

14    has been redacted, but if you look at the unredacted version

15    in your binder, this figure reflects a loss at Erwin; is

16    that correct?

17    A.    That reflects a variance against our forecast.

18    Q.    Understood.    Thank you for the clarification.

19             And the note beside Erwin says, lower pricing

20    with pricing pressure from WCS, excess blendstock processing

21    and storage cost at RMS.

22             Did I read that correctly?

23    A.    Yes.

24    Q.    And let's look at the sixth page of Plaintiffs'

25    Exhibit 105.    And let's look at the first sentence of the

Wood - direct

1    first paragraph.  And that reads, "Clive revenues are

2    deteriorating with added pricing pressure from WCS and their

3    exempt cell."

4            Did I read that correctly?

5    A.    Yes.

6    Q.    And let's look at the third paragraph.  The first

7    sentence of the third paragraph says, "Erwin pricing has

8    decreased by, amount redacted, since purchase due to WCS

9    pricing strategy."

10            Did I read that correctly?

11   A.    Yes.

12   Q.    Let's look at the sixth paragraph.  The first sentence

13   of the sixth paragraph says, "Filter shredding is currently

14   stable but could be vulnerable to WCS pricing pressure."

15            Did I read that correctly?

16   A.    Yes.

17   Q.    Now let's turn to the seventh page of Plaintiff's

18   Exhibit 105.  LP&D Q3 forecast."

19            The bottom paragraph on that page says, "Erwin.

20   Revenues are down, redacted amount, due to pricing pressure

21   for resins from WCS and the timing of receipts toward the

22   end of the year?"

23            And that's what Mr. White reports; is that

24   correct?

25   A.    Yes, that's right.

Wood - direct

1    Q.    Let's look at the ninth page of Plaintiff's

2    Exhibit 105.    This one is entitled "LP&D Q3 forecast

3    variances with 2014 actuals."   The third paragraph is Erwin.

4              Do you see that?

5    A.    Yes.

6    Q.    And the last sentence of that paragraph states,

7    "EBITDA is down due to lower pricing with pricing pressure

8    from WCS, excess blendstock processing and storage costs at

9    RMS."

10              Did I read that correctly?

11   A.    Yes, you do.

12   Q.    You can set Plaintiff's Exhibit 105 aside, Mr. Wood.

13              So approximately two months after Mr. White

14   e-mailed Plaintiff's Exhibit 105 to you, EnergySolutions and

15   WCS entered into an agreement to combine the two firms; is

16   that right?

17   A.    That's right.

18   Q.    And the purchase agreement was executed November 18,

19   2015?

20   A.    Correct.

21              MS. ELMER:   Your Honor, I have no further

22   questions for Mr. Wood at this time.

23              THE COURT:   All right.   I would like to take our

24   15-minute morning break and then we'll continue with the

25   friendly cross.

Wood - cross

1                    (Short recess taken.)

2                         -   -   -

3                    (Proceedings resumed after the short recess.)

4                    MR. SCHWARTZ:  Thank you, your Honor.  Ken

5    Schwartz for EnergySolutions.

6                         CROSS-EXAMINATION.

7    BY MR. SCHWARTZ:

8    Q.    Mr. Wood, I would like to go through some of the

9    material that Ms. Elmer went through with you.  If we could

10   start with the first tab.

11                   At the time ECP acquired EnergySolutions, you

12   were employed by EnergySolutions; is that correct?

13   A.    That's correct.

14   Q.    You were not employed by WCS at that point?

15   A.    That's correct.

16   Q.    The document references a buyout model.  Did you work

17   on that buyout model?

18   A.    No.

19   Q.    Did you ever see the buyout model?

20   A.    No.

21   Q.    To the best of your understanding, had ECP owned or

22   invested in a low level radioactive waste disposal facility

23   prior to its investment in EnergySolutions?

24   A.    Not to my knowledge.

25   Q.    How about in a low level radioactive waste processing

Wood - cross

1    facility?

2    A.    Not to my knowledge.

3    Q.    How about a nuclear power plant?

4    A.    Not to my knowledge.

5    Q.    So the investment in EnergySolutions by ECP was an

6    investment in a new industry for them, to the best of your

7    knowledge?

8    A.    That's correct.

9    Q.    Thank you.  You can set aside that exhibit, sir.

10            Turning to the next exhibit --

11            THE COURT:  It would be helpful if you identify

12    it for me.

13            MR. SCHWARTZ:  I'm sorry.  I apologize, your

14    Honor.  PTX-091.

15    BY MR. SCHWARTZ:

16    Q.    Ms. Elmer asked you some questions about this slide,

17    Bates Number 0668257.

18    A.    What slight is it?

19    Q.    I'm sorry.  It is slide 11 and the Bates number ends

20    in 257.

21    A.    Okay.

22    Q.    Did you prepare this slide, sir?

23    A.    No, I didn't.

24    Q.    Do you know who would have prepared the slide?

25    A.    It would have been, I believe, someone in Ken Robuck's

338

Wood – cross

1    organization.

2    Q.    Okay.  And Mr. Robuck would be better positioned to

3    discuss competition industry issues in the low level

4    radioactive waste disposal industry?

5    A.    Yes, he would.

6    Q.    All right.  Would you turn the page.  Ms. Elmer also

7    had some questions about this slide, page 12.

8              Did you prepare this slide, sir?

9    A.    No, I didn't.

10   Q.    Do you know who did?

11   A.    No, I don't.

12   Q.    We can turn to the next tab, PTX-092.  And I want to

13   focus again on the slide that Ms. Elmer asked about.  I

14   believe it's slide 18.  The Bates range ends in 284.

15   A.    Okay.

16   Q.    Mr. Wood, did you prepare this slide?

17   A.    No, I didn't.

18   Q.    Do you know who would have?

19   A.    No, I don't.

20   Q.    All right.  I'm going to turn to the next tab,

21   PTX-441.

22              Ms. Elmer asked you about slide 23 that ends in

23   the Bates numbers 142.

24   A.    Yes.

25   Q.    Did you prepare this slide, Mr. Wood?

Wood - cross

1   A.    No, I didn't.

2   Q.    Do you know who did?

3   A.    No, I don't.

4   Q.    I will ask you to turn to the next tab, PTX-102.

5   Actually, I apologize.  We can skip that one.  PTX-104.

6   A.    Yes.

7   Q.    Mr. Wood, did you prepare this document?

8   A.    Yes, I did.

9   Q.    You did?

10  A.    Or one of my staff did.

11  Q.    All right.  In your role as CFO, are you responsible

12  for customer pricing for EnergySolutions waste disposal?

13  A.    No, I'm not.

14  Q.    And the same question on the next tab, sir, PTX-105.

15  Did you prepare this document?

16  A.    One of my staff did.

17  Q.    And, again, in your role as EnergySolutions' CFO, are

18  you responsible for pricing of customer contracts for low

19  level radioactive waste disposal?

20  A.    No, I'm not.

21          MR. SCHWARTZ:  No further questions.  Thank you.

22          THE COURT:  Any redirect?

23          MS. ELMER:  I have no questions, your Honor.

24          THE COURT:  All right.  You may step down, sir.

25  Thank you.

Rogers - direct

1          (Witness excused.)

2          MR. LINDERMUTH:  Your Honor, at this time, the

3    Government calls Mr. Bret Rogers as an adverse party

4    witness.

5                    ... BRET COMER ROGERS, having been

6               duly sworn as a witness, was examined and

7               testified as follows ...

8          MR. LINDERMUTH:  Your Honor, may I approach?

9          THE COURT:  Yes, you may.

10          (Exhibit binder handed to the witness.)

11          MR. LINDERMUTH:  Your Honor, Mr. Rogers is a

12    Senior Vice President at EnergySolutions and his testimony

13    will relate to the competitive effects aspect of this

14    case.

15          THE COURT:  All right.  Thank you.

16          MR. LINDERMUTH:  May I proceed?

17          THE COURT:  Yes, you may.

18                    DIRECT EXAMINATION.

19    BY MR. LINDERMUTH:

20    Q.    Hello, Mr. Rogers.

21    A.    Hello.

22    Q.    I've handed you a binder and a folder.  We'll be

23    referring to that during your examination.  I will let you

24    know if and when we need to do that.

25    A.    Okay.

Rogers - direct

1    Q.     Mr. Rogers, you are the Senior Vice President of

2    Technical Services at EnergySolutions?

3    A.     Yes.

4    Q.     And you have worked at EnergySolutions since 1999?

5    A.     That is correct.

6    Q.     And you support EnergySolutions' business development

7    group?

8    A.     Yes.

9    Q.     And you're involved in developing pricing strategies

10   for waste disposal at Clive; right?

11   A.     Yes.

12   Q.     And you report to Ken Robuck, the president of

13   EnergySolutions' disposal and decommissioning business?

14   A.     Yes.

15           MR. LINDERMUTH:  Your Honor, I will be

16   proceeding to question Mr. Rogers on an analysis that

17   the defendants have designated confidential in its

18   entirety.

19           THE COURT:  All right.  I assume that means we

20   need to clear the courtroom?

21           MS. REINHART:  Yes, your Honor.

22           THE COURT:  All right.  Anyone not under the

23   protective order, I'm going to ask you to exit once again.

24           THE COURT:  All right.

25           ***(The following portion of the transcript is

Rogers - direct

1    **under seal.)**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Rogers - direct

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Rogers - direct

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Rogers - direct

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Rogers - direct

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Rogers - direct

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Rogers - direct

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Rogers - direct

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Rogers - direct

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Rogers - direct

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Rogers - cross

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

353

Rogers - cross

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Rogers - cross

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Rogers - cross

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Rogers - cross

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Rogers - cross

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Rogers - cross

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Rogers - cross

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

360

Rogers - cross

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Rogers - cross

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Rogers - cross

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Rogers - cross

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Rogers - cross

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Rogers - cross

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Rogers - cross

1

2

3

4                    **(End of portion under seal.)**

5    BY MS. REINHART:

6    Q.    Okay.  Mr. Rogers, we were just talking about

7    irradiated hardware.  You had described what it is.  Can

8    irradiated hardware be downblended?

9    A.    No.

10   Q.    Why not?

11   A.    It's very high inactivity.  It's just, the NRC allows

12   some blending to occur, like with resins and more, what they

13   term blendable waste, like resins and soil and things that

14   you can mix.  Irradiated hardware is more metal, so they

15   call them discrete items, and because of the significant

16   inactivity, you can't -- you can't blend those down, no.

17   Q.    And have you heard of something called concentration

18   averaging?

19   A.    Yes.

20   Q.    What does that mean?

21   A.    Concentration averaging is a process by where you take

22   higher activity waste and you do something to it to add more

23   volume.  Blending, for example, is an example of that.  And

24   then by increasing the volume, you actually lower the

25   concentration, so you average that little bit of high

Rogers - cross

1    concentration or high activity piece to a lot of low

2    activity piece and put that in one package, thereby lowering

3    the overall concentration package.

4            And the Nuclear Regulatory Commission has put

5    out documents that explain how you are supposed to do that

6    and the boundary conditions.  There's no way you average

7    everything.  You've got to be within certain limitations on

8    doing that.

9    Q.    So I think you said that blending is one form of

10   concentration averaging?

11   A.    Yes.

12   Q.    Is shredding a form of concentration averaging?

13   A.    Well, shredding is a way to make something blendable,

14   so if I take a filter that's more of an object, like this,

15   and I put it in a shredder, then it ends up being more fine

16   particles.  It becomes like small cloth papers or a little

17   bit of other items in there.  Basically, they can be mixed.

18   By shredding, you're making a blendable waste string.

19   Nondiscrete item.

20   Q.    Then besides the blending that you've talked about, is

21   there any other form of concentration averaging that

22   EnergySolutions undertakes?

23   A.    No.  It's for resins.  Well, we do resins at our Erwin

24   facility.  Primarily what we do there and then we do the

25   filter shredding.

Rogers - cross

1    Q.    All right.  Have you heard the term sort and

2    segregation?

3    A.    Yes.

4    Q.    What does that mean?

5    A.    So sort and segregation is done primarily by

6    processors, and what they do is a generator that generates

7    the waste, they typically, you know, don't want to spend the

8    time, the dose in handling that waste, so they'll ship it to

9    a processor, and then the processor will inspect or sort and

10   segregate the waste to ensure that it's compliant for

11   disposal.

12   Q.    Have you heard the term segmentation?

13   A.    Yes.

14   Q.    What does that mean?

15   A.    Entirely different than sort and seg.  Segmentation is

16   where, like in a D&D, decommissioning activity, you are

17   going into the nuclear reactor and you're actually

18   segmenting or cutting the highest part, the highest activity

19   of that reactor.  So it's a totally different operation.

20   You're doing that at the plant.

21   Q.    Okay.  And so a decommissioning contractor, for

22   example, would segment the parts of the reactor to separate

23   Class A waste from Class B/C waste?

24   A.    Yes.

25   Q.    Okay.

Rogers - cross

1    A.    Typically what you want to do in a decommissioning is

2    you're trying to be very smart about the type of waste that

3    you are generating or going to generate, and you have to

4    balance that though because you don't want to spend a lot of

5    time over here cutting something up or taking a lot of dose

6    doing it when you've got a whole project scheduled.  You've

7    got to consider all of the life cycle risks, the life cycle

8    costs.  So typically, when you go into a D&D activity,

9    you're going to balance that.  But what you are trying to do

10   is, to the best you can, remove or segment out those hottest

11   pieces that you would then package and ship as irradiated

12   hardware, Class B and C waste.

13   Q.    To the extent that segmentation is done during

14   decommissioning, where does that irradiated hardware go?

15   A.    That would either be stored or it would be shipped to

16   a facility for Class B/C waste.

17   Q.    Are you suggesting that a utility would store waste

18   during a decommissioning?

19   A.    Well, they can.  Usually, you have a period of time

20   that you are decommissioning, so if you chose to store it,

21   you could, but typically, for a decommissioning, you really

22   don't want to do that.  You want to get the waste out

23   because your end state goal is to try and decommission the

24   plant, get all the waste removed.

25   Q.    Are you familiar with any situation in which B/C waste

Rogers - cross

1    was stored during a decommissioning?

2    A.    Well, yes.  When we, EnergySolutions, one of Zion's

3    solutions project, and so when we looked at that project and

4    looked at the type of Class B and C waste that would be

5    generated, we actually had some estimates done and worked

6    with WCS on disposal pricing, and that pricing initially

7    came in extremely high, and so we actually decided, part of

8    that negotiation, to say we'll just wait and ship it at the

9    end of the project.

10                And as we went through that negotiation, the

11    price basically went from $18,000 a cubic foot down to

12    $12,000 a cubic foot.  We kept saying, look, we'll wait and

13    ship it at the end of the project.  And then we finally

14    negotiated a price that was what we would be willing to pay.

15    About $6,000 a cubic foot.

16    Q.    So for the Court's benefit --

17                MR. LINDERMUTH:  Objection, your Honor.  This

18    examination has gone well beyond the scope of my examination

19    of an adverse party witness that defendants dropped from

20    their witness list.

21                THE COURT:  All right.  I mean, I thought that

22    you were doing combined examination, so I apologize if I let

23    this go beyond the scope.  I assumed that was the whole

24    purpose of doing a friendly cross with the adverse

25    witnesses, so I don't know how much longer you plan to

Rogers - cross

1    go.

2                  MS. REINHART:  Your Honor, my questions actually

3    were going to the pricing elements of the model that counsel

4    had questioned the witness about, but I will certainly wrap

5    this up just very briefly.

6                  THE COURT:  All right.

7                  MR. LINDERMUTH:  Thank you, your Honor.

8    BY MS. REINHART:

9    Q.    Just for the Court's benefit, could you explain what

10   Zion is?

11   A.    Yes.  Zion is a nuclear power plant that was owned by

12   Exelon, one of the largest utilities in the country, and

13   they had decided to shut down that nuclear reactor.  And so

14   EnergySolutions worked with Exelon to go in and basically

15   take over the responsibility to decommission it in return to

16   manage the decommissioning fund.

17                  And so we provided a service there to say, look,

18   well we'll let you walk away because what you do is generate

19   power.  That's your focus.  We are the waste guys.  We know

20   how to manage these decommissioning projects.  We'll come in

21   and manage that for you for the decommissioning fund.  And

22   so we call it Zion Solutions, but it was originally part of

23   the Zion Nuclear Power Plant.  It's part of that

24   decommissioning.

25   Q.    And just two quick followup questions.  To the extent

Rogers - cross

1    that segmentation of those irradiated hardware pieces is

2    done during a decommissioning, do companies other than

3    EnergySolutions provide that service?

4    A.    Oh, yes.  Absolutely.

5    Q.    Who, for example?

6    A.    Sybil Camp is another -- there are other companies

7    that can come in and segment.

8    Q.    Okay.  Is one of the strategies of utilities to do

9    what they can to minimize the amount of Class B/C waste that

10   has to be disposed of?

11   A.    Yes, absolutely.  I mean, utilities have actually done

12   a very good job over the years of being more conscious, and,

13   again, if you remember back, I said this earlier.  In 2008

14   and prior to that actually, Barnwell announced that they

15   were closing to out-of-state compact generators, and so

16   generators for years have been trying to reduce waste.

17   The whole concept of what's called waste minimization,

18   trying to reduce how much waste that you generate.  But

19   absolutely.      So when they had to start storing that

20   waste onsite, they got into a very serious mode of, let's

21   not, you know, let's not generate as much B and C waste.

22              MS. REINHART:  Thank you, Mr. Rogers.

23              THE COURT:  All right.  Redirect.

24              MR. LINDERMUTH:  Just a few questions on

25   redirect, your Honor.

Rogers - redirect

1              THE COURT:  Sure.

2              MR. LINDERMUTH:  May I proceed?

3              THE COURT:  Yes, you may.

4                      REDIRECT EXAMINATION

5    BY MR. LINDERMUTH:

6    Q.     Mr. Rogers, you spoke with Ms. Reinhart about life of

7    plant contract?

8    A.     Yes.

9    Q.     All of EnergySolutions' contracts, even life-of-plant

10   contracts, have renewal periods; right?

11   A.     Yes.

12   Q.     And not all of EnergySolutions' customers have

13   life-of-plant contracts; is that right?

14   A.     That is correct.

15   Q.     And some low level radioactive waste fall outside of

16   the life of plant contract exclusivity terms; is that

17   right?

18   A.     Yes.

19   Q.     And some low level radioactive waste, like, for

20   instance, large components, that's bid outside of the life

21   of plant contract; is that correct?

22   A.     In some cases.

23   Q.     And you also spoke with counsel about processor

24   customers.

25   A.     Yes.

374

Weismann - deposition designations

1   Q.    Processors are customers of EnergySolutions; is that

2   correct?

3   A.    Yes.

4   Q.    And processors lack disposal facilities; is that

5   correct?

6   A.    No, that's not adequate -- not an adequate

7   characterization of that.  Processors have the ability, like

8   Toxco, for example, to do what's called bulk survey for free

9   release, so most of the waste that Toxco takes in in

10  Tennessee, they bring it in, sort it, inspect it and qualify

11  it to go to the Tennessee landfill for exempt waste.

12  Q.    You're not suggesting that Toxco owns those landfills

13  in Tennessee?

14  A.    No.  Toxco doesn't own.  They just subcontract with

15  them.

16              MR. LINDERMUTH:  Nothing further.

17              THE COURT:  All right.  You may step down, sir.

18  Thank you very much.

19              THE WITNESS:  You're welcome.

20              (Witness excused.)

21              MS. ELMER:  Your Honor, our next witness will be

22  Mr. Joseph Weismann by videotaped deposition, and he is the

23  Vice President of US Ecology.

24              The video includes both plaintiff's and

25  defendants' designations, and because of the extent of

1    confidentiality designations, we will ask that the courtroom

2    be closed to those not allowed access to such information

3    under the protective order.  And we also note that it's

4    quite a lengthy video.  About three hours in total.

5              THE COURT:  All right.  Well, at 1:00, whoever

6    is in charge can stop it at the end of a question, certainly

7    not in the middle of one, and we'll take our lunch break and

8    then continue.

9              Those of you who are not on the protective

10   order, you have a nice leisurely lunch.  We'll let you know

11   when you come back.

12             MS. ELMER:  Thank you, your Honor.

13             MR. BECKWITH:  Pardon us, your Honor.  We have

14   one other issue.

15             THE COURT:  Sure.

16             MR. BECKWITH:  What that was, your Honor, as an

17   accomodation, we agreed that in-house counsel would step out

18   for this video.

19             THE COURT:  Oh, all right.

20             MS. ELMER:  May we proceed?

21             THE COURT:  Yes, you may.  Can you wait just a

22   minute while we're getting our --

23             MS. ELMER:  Absolutely.

24             THE COURT:  Our exhibits.

25             (Pause.)

1              THE COURT:  All right.

2              (The videotaped deposition of Joseph James

3     Weismann was played as follows.)

4              "Question:  Could you please state your name for

5     the record?

6              "Answer:  Yes.  Joseph James Weismann.

7              "Question:  You are currently the vice president

8     of radiological programs at US Ecology, correct?

9              "Answer:  Correct.

10             "Question:  How long have you been in that

11    position?

12             "Answer:  Five years.

13             "Question:  What do you do in that position?

14             "Answer:  I have responsibility for all

15    radiological operations for the company as well as

16    regulatory affairs.

17             Question:  What do you do in your daily job?

18             "Answer:  Wow.  I support all of our sites that

19    have radiological capabilities.  I'm in charge of regulatory

20    compliance, training, political affairs, and supporting our

21    sites in any way that -- whatever they need from us.

22             "Question:  How long have you been involved in

23    radioactive waste disposal business?

24             "Answer:  Most of my career.  Probably between

25    15 and 20 years.

Weissmann - deposition designations

1            "Question:  What is your university degree in?

2            "Answer:  Nuclear engineering.

3            "Question:  Do you have an advanced degree?

4            "Answer:  Yes.

5            "Question:  What is that in?

6            "Answer:  I have a Master's of business

7    administration.

8            "Question:  I'm going to mark as LIT 2, a

9    two-page document that is from usecology.com.  I've handed

10   you a document that is headed 'Radioactive waste services.'

11           "Do you see that?

12           "Answer:  Answer:  I do.

13           "Question:  Do you recognize this two-page

14   document?

15           "Answer:  I do.

16           "Question:  Is it indeed a printout from the US

17   Ecology website?

18           "Answer:  Yes.

19           "Question:  If you look on the second page of

20   USE LIT 2, you'll see that the brochure says, 'With over

21   60 years of industry experience, US Ecology has pioneered

22   cost-effective, secure and reliable disposal options for

23   radioactive waste.'

24           "Do you see that?

25           "Answer:  I do.

Weismann - deposition designations

1          "Question:  And you agree with that?

2          "Answer:  Yes.

3          "Question:  Okay.  You also see that the

4    brochure says that 'Our turnkey radiological services also

5    include' and then lists three bullets; do you see that?

6          "Answer:  Yes.

7          "Question:  Okay.  Turnkey services include

8    on-site waste acceptance criteria compliance?

9          "Answer:  Yes.

10         "Question:  What is that?

11         "Answer:  That is where we will supply a -- a

12    field services personnel to assist our customers to ensure

13    that all shipments leaving a site will be compliant when

14    they leave.

15         "Question:  And the turnkey services also

16    include waste packaging and manifesting.

17         "Do you see that?

18         "Answer:  Yes.

19         "Question:  What does that mean?

20         "Answer:  That means we assist our customers

21    with packaging the waste to make sure it's compliant with

22    all Department of Transportation regulations, and we also

23    help them with the manifesting of that waste.

24         "Question:  Okay.  The turnkey services also

25    include transportation and logistics coordination; is that

379

Weismann - deposition designations

1    correct?

2              "Answer:  That's correct.

3              "Question:  And what is involved in the

4    transportation?

PORTION
UNDER SEAL

5

6

7

8

9

10             "Question:  So would you agree that turnkey

11   service means providing the aspects of service that the

12   customer needs from collection, transportation, manifesting,

13   packaging, and disposal?

14             "Answer:  Yes.

15             "Question:  Okay.  This brochure at the bottom

16   of the page under locations also says, 'At US Ecology Idaho,

17   you specialize in debris and large component handling and

18   disposal.'

19             "Do you see that?

20             "Answer:  I do.

21             "Question:  Is that an advantage to customers?

22             "Answer:  It can be.

23             "Question:  Why would it be an advantage?

PORTION
UNDER SEAL

24

25

380

Weismann - deposition designations

1

2

3

4          "Question:  So US Ecology does not have to put

5     waste into packages before it can go into the rail cars; is

6     that correct?

PORTION
UNDER SEAL

7

8

9

10          "Question:  That's an advantage for a customer

11     because it takes out potentially an extra step, correct?

12          "Answer:  Correct.

13          "Question:  And that savings money; is that

14     right?

15          "Answer:  It can, yes.

16          "Question:  Let me also mark a document as USE

17     LIT 3, which is Bates-labeled USE-ATR-00000145.

18          "Mr. Weismann, I've handed you what has a cover

19     sheet with a Bates number on it and it's a PowerPoint

20     presentation headed 'US Ecology introduction and0

21     capabilities.'

22          "Do you see that?

23          "Answer:  I do.

24          "Question:  And your name is on the bottom of

25     that?

381

Weissmann - deposition designations

1          "Answer:  Yes.

2          "Question:  Do you recognize this document?

3          "Answer:  I do.

4          "Question:  Is it a presentation that was given

5     to a customer?

6          "Answer:  Most likely, yes, or a potential

7     customer.

8          "Question:  Is this presentation a common format

9     that you prepare when you're giving talks to customers?

10         "Answer:  Yes.

11         "Question:  And what's the purpose of this kind

12     of a presentation?

13         "Answer:  It's to provide our capabilities and

14     to show what kind of services we can provide.

PORTION
UNDER SEAL    15

16

17

18

19

20

21

22

23

24

25

382

Weismann - deposition designations

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15          "Answer:  That is correct.

16          "Question:  What is E-Waste?

17          "Answer:  It was a term that we were -- we had

18   heard about WCS's exempt waste program.

19          "Question:  And BSFR is?

20          "Answer:  Bulk survey for release.

21          "Question:  And there are BSFR sites in

22   Tennessee; is that correct?

23          "Answer:  Correct.

24          "Question:  And they dispose of exempt waste; is

25   that correct?

383

Weismann - deposition designations

1          "Answer:  Correct.

2          "Question:  Okay.  One of the advantages

PORTION
UNDER SEAL   3

4

5          "Do you see that?

6          "Answer:  I do.

7          "Question:  What does that mean?

PORTION
UNDER SEAL   8

9

10          MR. CHAPMAN:  Apologies.  Your Honor, we have

11   copies of the DTX exhibits.  May I approach?

12          THE COURT:  Sure.

13          (Mr. Chapman handed exhibits to the Court.)

14          THE COURT:  And you know what, I think we're

15   just going to take a break while we get organized at this

16   end, so we'll take our lunch break now.  Half-an-hour.

17   Well, actually make it until 1:00 o'clock so that we can get

18   organized and then we can start off efficiently.  All right?

19   So lunch until 1:00 o'clock.

20          MS. REINHART:  Thank you, your Honor.

21          (Luncheon recess taken.)

22                    -  -  -

23          Afternoon Session, 1:00 p.m.

24          THE COURT:  All right.  I assume you can

25   proceed.

384

Weismann - deposition designations

PORTION
UNDER SEAL

1

2

3                  "Answer:  That is correct.

4                  "Question:  What is E-Waste?

5                  "Answer:  It was a term that we were -- we had

6   heard about WCS's exempt waste program.

7                  Question.  And BSFR is?

8                  "Answer:  Bulk Survey For Release.

9                  "Question:  And there are BSFR sites in

10  Tennessee, correct?

11                 "Answer:  Correct.

12                 Question.  And they dispose of exempt waste; is

13  that correct?

14                 "Answer:  Correct.

15                 "Question:  Okay.  One of the advantages listed

PORTION
UNDER SEAL  16

17                 "Do you see that?

18                 "Answer:  I do.

19                 "Question:  What does that mean?

PORTION
UNDER SEAL  20

21

22

23

24                 "Question:  And why do you consider that an

25  advantage?

Weismann - deposition designations

PORTION UNDER SEAL

1

2          "Question:  Can you explain that?

PORTION UNDER SEAL

3

4

5

6          "Question:  So that gives the customer more

7   certainty that there will be compliance; is that right?

8          "Answer:  That's our understanding.

PORTION UNDER SEAL

9

10

11   see that?

12          "Answer:  I do.

13          "Question:  What does that mean?

PORTION UNDER SEAL

14

15

16

17

18

19   correct?

20          "Answer:  That is correct.

21          "Question:  And that's an advantage for

PORTION UNDER SEAL

22

23

24

25          "Answer:  That is correct.

Weismann - deposition designations

PORTION
UNDER SEAL    1

2

3          "Answer:  Yes.

4          "Question:  What does that mean?

PORTION
UNDER SEAL    5

6

7

8

9

10

11

12

13

14

15          "Question:  Is that true for waste that's

16    shipped to WCS, to your knowledge?

17          "Answer:  To my knowledge, but I'm not

18    100 percent sure.

PORTION
UNDER SEAL    19

20

21          "Answer:  I do.

PORTION
UNDER SEAL    22

23

24

25          "Answer:  That is correct.

387

Weismann - deposition designations

1          "Question:  And that's an advantage because it

PORTION
UNDER SEAL     2

3

4          "Answer:  Yes.

PORTION     5
UNDER SEAL

6

7          "Answer:  Yes.

PORTION     8
UNDER SEAL

9

10

11

12

13

14

15

16

17

18

19    correct?

20          "Answer:  That is correct.

21          "Question:  Okay.

22          "The next bullet touting the advantages says

PORTION     23
UNDER SEAL

24

25

Weismann - deposition designations

1

2

3

4    "Answer:  That is correct.

5    "Question:  What's the basis for that --

PORTION
UNDER SEAL 6

7

8

9

10

11    "Answer:  That is correct.

12    "Question:  What's the alternative to shipping

13 in bulk?

14    "Answer:  Containerized waste.

15    "Question:  And someone has to put the stuff in

16 the containers before it can be shipped; is that right?

17    "Answer:  That's correct.

18    "Question:  That adds cost, correct?

19    "Answer:  It can.

PORTION
UNDER SEAL 20

21

22 just had?

23    "Answer:  Yes.

24    "Question:  Okay.  The following bullet says,

PORTION
UNDER SEAL 25

Weismann - deposition designations

1    provide?

PORTION
UNDER SEAL   2

3

4              "Question:  Is that something US -- US Ecology

5    does?

6              "Answer:  Yes.

7              "Question:  And when you say bundled, do you

8    mean a contract that contains terms of service from picking

9    up, packaging, to disposal?

PORTION
UNDER SEAL   10

11             "Question:  Okay.

PORTION
UNDER SEAL   12

13

14

15

16             "Question:  To your knowledge, WCS does not

17   provide rail cars, correct?

18             "Answer:  I do not know that.

19             "Question:  The final advantage listed in these

PORTION
UNDER SEAL   20

21

22             "Answer:  Correct.

PORTION
UNDER SEAL   23

24

25

Weismann - deposition designations

1

2          "Question:  Pardon me.  Disposed of.  Let me be

3     more accurate.

4          "So US Ecology does compete with Energy

5     Solutions and WCS for the disposal exempt waste, correct?

6          "Answer:  Exempt waste, yes.

7          "Question:  Now, the company in the ordinary

8     course of its business analyzes others in the industry; is

9     that right?

10          "Answer:  Yes.

PORTION
UNDER SEAL   11

12

13

14

15

16

17          "Question:  And others that dispose of exempt

18     waste, correct?

19          "Answer:  Correct.

20          "Question:  Let me mark as USE 4 a document that

21     is Bates-labeled USE-DOJ-0000238, and it runs through

22     USE-DOJ-0000329.

23          Mr. Weismann, do you recognize what has been

24     marked as USE LIT 4?

25          "Answer:  I do.

Weissmann - deposition designations

1          "Question:  It's a document that's titled 'US

2    Ecology 2015 strategy planning presentation November 18,

3    2015'; correct.

4          "Answer:  Correct.

5          "Question:  What is this document?

6          "Answer:  I believe this is the master slide

7    deck for our strategic planning conference.

8          "Question:  Just go back to page 243, if you

9    will.  It's one of the very early pages.

10          "Answer:  Okay.

11          "Question:  There's a page headed 'Strategic

12   positioning today'; do you see that?

13          "Answer:  Yes.

PORTION
UNDER SEAL   14

15

16

17          "Answer:  I do.

PORTION
UNDER SEAL   18

19

20   correct?

21          "Answer:  According to this bullet, I would say

22   yes.

23          "Question:  This is a presentation that is

24   used in an annual strategic planning meeting.  Is this

25   something -- you would tell the truth in this presentation,

392

Weismann - deposition designations

1    correct?

2                    "Answer:  Certainly.

PORTION
UNDER SEAL    3

4

5                    "Answer:  Yes.

6                    "Question:  In fact, let's go back to what was

7    marked as Exhibit 3.

8                    "Answer:  Oh.

9                    "Question:  If you look on the very first slide

PORTION      10
UNDER SEAL

11

12                   "Answer:  Correct.

13                   "Question:  Two pages later it describes US

14   Ecology's role in the radioactive marketplace; do you see

15   that?

16                   "Answer:  I do.

PORTION      17
UNDER SEAL

18

19                   "Answer:  Correct.

PORTION      20
UNDER SEAL

21

22                   "Answer:  At the time of this presentation,

23   that's correct.

24                   "Question:  Has that changed?

25                   "Answer.  I believe we're slightly lower now.

Weismann - deposition designations

1          "Question.   Okay.   And at the time the company

PORTION
UNDER SEAL    2

3          "Answer:   That is correct.

4          "Question:   Disposal as we've discussed is not

5     the only service that US Ecology offers related to exempt

6     waste, correct?

7          "Answer:   Correct.

8          "Question:   US Ecology offers transportation,

9     correct?

10         "Answer:   Correct.

PORTION
UNDER SEAL    11

12

13    correct?

14         "Answer:   That is correct.

PORTION
UNDER SEAL    15

16

17         "Answer:   Correct.

PORTION
UNDER SEAL    18

19

20         "Answer:   Correct.

PORTION
UNDER SEAL    21

22

23

24

25

Weissmann - deposition designations

1          "Question:  You consider that to be an efficient

2    process?

3          "Answer:  Yes.

PORTION
UNDER SEAL  4

5

6          "Answer:  That is correct.

PORTION
UNDER SEAL  7

8          "Answer:  That is correct.

9          "Question:  What is a gondola?

10          "Answer:  It is a bulk rail car that can hold up

11    to a hundred cubic yards of waste.

12          "Question:  And so that allows waste to be

13    dumped into the gondola, transported to US Ecology,

14    transferred to --

15          "Answer:  To end dump trucks.

16          "Question:  -- end dump trucks and then set up

17    for disposal, correct?

18          "Answer:  That is correct.

19          "Question:  Okay.  No packaging is necessary in

20    that instance?

PORTION      21
UNDER SEAL

22

23          "Question:  Understood.  No need to ship waste

24    in bags if you use the gondola, right?

PORTION      25
UNDER SEAL

Weismann - deposition designations

1

2          "Question:  But the advantage of having the

3    gondola is that waste can be dumped into the cars; is that

4    correct?

5          "Answer:  That's correct.

6          "Question:  Okay.  And, to your knowledge, WCS

7    does not have a rail fleet, correct?

8          "Answer:  I do not know that.

9          "Question:  Now, you agree that it's more

10   efficient for a customer to work with a company like US

11   Ecology that can arrange for the transportation in gondolas

12   than to work with a company that does not have that

13   capability, correct?

14         "Answer:  I think that's an overgeneralization,

15   but it can be true in certain circumstances.

16         "Question:  Well, certainly if -- if a disposal

17   vendor does not have its own rail fleet, then that means an

18   additional company needs to get involved in the

19   transportation, correct?

20         "Answer:  That would be correct.

21         "Question:  And if a company does not have

22   gondolas but some other forms of cars, then the waste cannot

23   necessarily be dumped into the cars, correct ?

24         "Answer:  Well, if they don't own gondolas, then

25   they can't ship in gondolas.

396

Weismann - deposition designations

1          "Question:  There's a slide about five pages

PORTION
UNDER SEAL    2

3

4          "Answer:  I do.

5          "Question:  There's a pie chart there that shows

PORTION
UNDER SEAL    6

7

8

9          "Question:  Help me understand what the division

10    is between your radioactive business and all other types of

11    disposal.

12          "Answer:  At our -- as a company as a whole?

13          "Question:  Yes, sir.

PORTION
UNDER SEAL    14

15

16

17

18

19

20          "Answer:  That's correct.

21          "Question:  You're familiar with the term

22    'decommissioning,' correct?

23          "Answer:  I am.

24          "Question:  What does that mean?

25          Answer:  In a general sense, a site that needs

Weismann - deposition designations

1   to be cleaned up in order to terminate a license or to end

2   its regulation by an agency.

3              "Question:  Okay.  Utilities engage in

4   decommissioning?

5              "Answer:  They do.

PORTION
UNDER SEAL    6

7

8

9

10

11

12             "Answer:  We can, yes.

13             "Question:  And you have?

14             "Answer:  We have.

15             "Question:  Okay.

PORTION
UNDER SEAL    16

17

18             "Answer:  That is -- that is correct.

PORTION
UNDER SEAL    19

20             "Answer:  Not -- no, not in a large sense, no.

21             "Question:  Do -- do you perform it on a small

22   sense?

23             "Answer:  On a case-by-case basis, our field

24   services staff could help our customers on -- with a project

25   of that type.

398

Weismann - deposition designations

1          "Question:  Are you aware that that has

2   happened?

3          "Answer:  Yes.

PORTION
UNDER SEAL    4

5

6

7

8

9          "Answer:  Yeah.  Yes.

10          "Question:  Okay.

PORTION
UNDER SEAL    11

12          "Question.  Okay.  And then you also can take

13   care of transportation, correct?  We've talked about that

14   before?

15          "Answer:  That is correct.

PORTION
UNDER SEAL    16

17

18

19          "Answer:  That is correct.

20          "Question:  What is that project?

PORTION
UNDER SEAL    21

22

23

24

25

399

Weismann - deposition designations

1

2

3

4

5

6

7

8              "Answer:  That is correct.

PORTION
UNDER SEAL    9

10

11              "Answer:  All waste that was -- that met the

12    exemptions was disposed of by US Ecology.

13              "Question:  I am going to send you back to

14    Exhibit 3 again, please.  There's a page in the slide deck

PORTION
UNDER SEAL    15

16              "Do you see that?

17              "Answer:  I do.

PORTION
UNDER SEAL    18

19

20              "Answer:  I do.

21              "Question:  Do you know what that means?

PORTION
UNDER SEAL    22

23

24              "Question:  When you say total waste volume, you

25    mean whether it was exempt, Class A, Class B or Class C,

400

Weismann – deposition designations

1    correct?

2              Answer:  That's correct.

3              "Question:  And US Ecology also has provided

PORTION
UNDER SEAL    4

5    correct?

6              "Answer:  Correct.

7              "Question:  Did you compete for that job?

8              "Answer:  We did.

9              "Question:  Who did you compete with?

PORTION
UNDER SEAL    10

11             "Question:  You said this in response to a

PORTION
UNDER SEAL    12

13

14

15

16

17

18

19

20

21

22

23             "Answer:  That is correct.

PORTION
UNDER SEAL    24

25

401

Weismann – deposition designations

1          "Answer:  Correct.

2          "Question:  Does that always happen?

3          "Answer:  No.

4          "Question:  Are there occasions when the utility

5    will contract with a prime contractor that engages various

6    subcontractors?

7          "Answer:  Yes.

PORTION
UNDER SEAL    8

9

10

11

12

13          "Question:  And when you say markups, you mean

14    the markups that would occur when a prime contractor engages

15    subcontractors?

16          "Answer:  Or just covering their own overhead

17    and SG&A, et cetera.

18          "Question:  Understood.

19          Going back to Exhibit 3, there is a page headed

PORTION
UNDER SEAL    20

21          "Answer:  Yes.

PORTION
UNDER SEAL    22

23

24          "Answer:  Correct.

PORTION
UNDER SEAL    25

Weismann - deposition designations

1

2

3          "Answer:  At the time this was created, that's

4  correct.

5          "Question:  And since then, waste is being

6  shipped to other disposal vendors?

7          "Answer:  Correct.

PORTION
UNDER SEAL 8

9          "Answer:  Correct.

PORTION
UNDER SEAL 10

11          "Answer:  Correct.

12          "Question:  Any others?

13          "Answer:  Not that I'm aware of.

PORTION
UNDER SEAL 14

15

16

17

18

19          "Answer:  Yes.

PORTION
UNDER SEAL 20

21

22

23

24          "Answer:  Yes.

25          "Question:  You agree that the bulk of the waste

Weismann - deposition designations

1    that comes out of a decommissioning project is indeed exempt

2    waste, don't you?

PORTION
UNDER SEAL    3

4

5

6

7

8

9    correct?

10              "Answer:  Correct.

11              "Question:  Okay.  And there are other RCRA

12    sites besides the Idaho site, correct?

13              "Answer:  Correct.

14              "Question:  Other companies have RCRA sites,

15    right?

16              "Answer:  Right.

17              "Question:  And those companies could seek and

18    get the exemption and also dispose of waste coming out of

19    the decommissioning projects, correct?

20              "Answer:  Correct.

PORTION    21
UNDER SEAL

22

23    that?

24              "Answer:  Yes.

PORTION
UNDER SEAL    25

404

Weismann - deposition designations

1

2

3

4

5

6

7

8

9

10          "Question:  Let me take you to Exhibit 4.  Thank

11     you.

PORTION
UNDER SEAL  12

13

14

15          "Answer:  I do.

PORTION
UNDER SEAL  16

17

18          "Answer:  Correct.

PORTION
UNDER SEAL  19

20

21     reading that correctly?

22          "Answer:  I believe so, yes.

PORTION
UNDER SEAL  23

24

25          "Answer:  Yes.

405

Weismann - deposition designations

PORTION
UNDER SEAL

1

2

3

4

5

6          "Question:  Let me show you what we are going to

7    mark as USE LIT 5.  This is a document that is

8    Bates-numbered USE-ATR-00000568 ending in USE-ATR-00000575.

9          "Do you recognize this document, sir?

10          "Answer:  I do.

PORTION
UNDER SEAL

11

12

13

14          "Answer:  Correct.

15          "Question:  What is this document?

16          "MR. FISHKIN:  Joe, would you like to take a

17    minute to look at it?

18          "THE WITNESS:  Yes, I would.

19          "MS. REINHART:  Apologies sir, please take your

20    time.

21          "(Witness reviewing document.)

22          "Question:  Okay.  What is this document?

PORTION
UNDER SEAL

23

24

25

406

Weismann - deposition designations

1          "Question:  Who prepared this document?

2          "Answer:  I believe I did.

3          "Question:  For what purposes did you prepare

4    the document?

5          "Answer:  To communicate the process to our

6    customers and also to our staff.

7          "Question:  So is this a document that US

8    Ecology provides to customers?

9          "Answer:  I believe we have, yes.

PORTION
UNDER SEAL    10

11

12

13

14

15          "Answer:  I do.

PORTION
UNDER SEAL    16

17

18

19

20

21

22

23

24

25

407

Weismann – deposition designations

1

2              "Answer:  Correct.

PORTION
UNDER SEAL    3

4     correct?

5              "Answer:  Correct.

6              "Question:  If you look on page 69, the document

PORTION       7
UNDER SEAL
8

9

10

11             "Answer:  I do.

12             "Question:  And that is a true statement,

13    correct?

PORTION  14
UNDER SEAL
15

16

17

18

19

20

21

22             "Question:  Okay.  It's not the first time we've

23    seen the word 'leader' in these documents; right?

24             "Answer:  I'm sensing a trend.

PORTION  25
UNDER SEAL

Weismann - deposition designations

1

2

3

4

5

6

7                 "Do you see that, sir?

8                 "Answer:  I do.

9                 "Question:  You wrote that, correct?

10                "Answer:  Or in conjunction with our sales

11     staff, yes.

12                "Question:  Okay.  And that is a true statement,

13     correct?

PORTION
UNDER SEAL    14

15

16

17                "Question:  Does US Ecology bid on every

18     decommissioning job that comes up?

PORTION
UNDER SEAL    19

20

21

22

23                "Question:  We've talked about how sometimes a

24     prime contractor will put together a team of subcontractors

25     to bid; do you recall that?

Weismann - deposition designations

1          "Answer:  Uh-huh.  Yes.

2          "Question:  Has US Ecology bid as part of a team

3    like that before?

PORTION    4
UNDER SEAL

5

6

7          "Answer:  Correct.

PORTION    8
UNDER SEAL

9

10         "Answer:  Correct.

11         "Question:  Disposal is just one component of a

12   decommissioning project, right?

13         "Answer:  Yes.

PORTION    14
UNDER SEAL

15

16         "Answer:  That is correct.

17         "Question:  A lot of those pieces are large

18   dollar amounts of work, correct?

19         "Answer:  They can be, yes.

20         "Question:  Okay.  And so there are a number of

21   components of work in which a disposal vendor is not the

22   company that is bidding, right?

PORTION    23
UNDER SEAL

24

25

Weismann - deposition designations

8         "Question:  So when a utility puts out bids for

9  decommissioning projects, they're not required to award the

10  disposal work to the team -- a team that has bid?  In other

11  words, if you, US Ecology, are bidding against a team, the

12  utility does not have to award the contract to a team,

13  right?

PORTION UNDER SEAL

18         "Question:  In your experience, there have been

19  instances where a utility has chosen to contract directly

20  with the disposal vendor instead of the disposal vendor

21  that's under the prime contractor, right?

PORTION UNDER SEAL

24         "Question:  And a utility could do that if it

25  did not like the terms of service that were being offered by

Weismann - deposition designations

1    the particular vendor, correct?

PORTION UNDER SEAL    2

3

4              "Question:  And so if the utility thought that

5    the price of disposal was too high, they could pull that

6    piece out of a prime contract and award it directly, right?

PORTION UNDER SEAL    7

8              "Question:  Or the utility could force their

9    prime contractor to switch out the disposal vendor and put

10   in one that is less expensive, right?

PORTION UNDER SEAL    11

12

13             "Question:  Is there a better word to use?

PORTION UNDER SEAL    14

15

16             "Question:  Let's mark use LIT 6, which is

17   USE-ATR-00000724.  Mr. Weismann, let me know when you're

18   ready to proceed.

19             "(Witness reviewing document.)

20             "Answer:  Okay.

21             "Question:  Mr. Weismann, have you seen this

22   document before?

23             "Answer:  I have.

24             "Question:  Okay.  When have you seen it?

25             "Answer:  Within the last few days.

412

Weismann - deposition designations

1               "Question:  Okay.  Do you recognize this as an

2    e-mail from Chad Hyslop to Steve Welling?

3               "Answer:  I do.

4               "Question:  On December 10, 2015?

5               "Answer:  Yes.

6               "Question:  So the subject line of this e-mail

PORTION UNDER SEAL

7

8

9               "Answer:  Yes.

PORTION UNDER SEAL

10

11

12

13

14              "Answer:  That is correct.

PORTION UNDER SEAL

15

16

17              "Answer:  Yes.

PORTION UNDER SEAL

18

19

20

21

22

23              "Answer:  That is correct.

PORTION UNDER SEAL

24

25

413

Weismann - deposition designations

1

2          "Answer:  That's also correct.

3          "Question:  Were you involved in that process?

4          "Answer:  Indirectly.

5          "Question:  How?

PORTION   6
UNDER SEAL

7

8

9

10          "Question:  This e-mail that's marked as use

11   LIT 6 is a summary from Mr. Hyslop of a conversation he

12   :

13   correct?

14          "Answer:  Correct.

15          "Question:  Okay.  According to Mr. Hyslop's

PORTION   16
UNDER SEAL
17

18          "Answer:  Correct.

PORTION   19
UNDER SEAL
20

21

22

23          "Do you see that?

24          "Answer:  I do.

PORTION   25
UNDER SEAL

414

Weismann - deposition designations

1

2

3

4                 "Answer:  I do.

5                 "Question:  And we just talked about the options

6       that utilities have if they don't like a price for disposal

7       that they were offered as part of the team package, correct?

8                 "Answer:  Yes.

9                 "Question:  And these are the options that they

10      have that we discussed, correct?

PORTION    11
UNDER SEAL
           12

           13

           14

           15

           16

           17

           18

           19

           20

           21

           22

           23

           24

           25

Weismann - deposition designations

15    see that, sir?

16            "Answer:  Oh.  My apologies.  I didn't see that.

17            "Question:  Now, utilities are large and

18    sophisticated customers, correct?

19            "Answer:  They are.

20            "Question:  In your experience they -- they

21    understand the different ways they can drive down costs when

22    they're bidding out projects like this, right?

23            "Answer:  Yes.

24            "Question:  And, in fact, they do in your

25    experience take steps that they can to make sure they do

416

Weismann - deposition designations

1    drive the price down, correct?

2             "Answer:  I believe it's their mission to keep

3    their costs as low as possible.

PORTION
UNDER SEAL    4

5

6

7             "Question:  Let's mark Exhibit 7, use LIT 7,

8    which is USE-ATR-00000589 -- pardon me -- 583.

9             "Mr. Weismann, do you recognize what has been

10   marked as use LIT 7?

11            "Answer:  I do.

PORTION
UNDER SEAL    12

13

14            "Answer:  It is.

15            "Question:  This is signed by Mr. Hyslop,

16   correct?

17            "Answer:  Correct.

PORTION
UNDER SEAL    18

19

20

21

22

23

24            "Answer:  I do.

25            "Question:  And that was correct at the time

417

Weismann - deposition designations

1    that this was written?

PORTION
UNDER SEAL

14              "Answer:   Correct.

PORTION
UNDER SEAL

19              "Answer:   I do.

PORTION
UNDER SEAL

24              "Answer:   I do.

PORTION
UNDER SEAL

Weismann - deposition designations

1

2    that?

3              "Answer:  I do.

4              "Question:  That's something we've talked about

5    a couple times today; do you recall that?

6              "Answer:  Yes.

PORTION
UNDER SEAL    7

8

9              "Answer:  Correct.

PORTION
UNDER SEAL    10

11

12

13              "Answer:  Correct.

14              "Question:  Then if you turn to the page ending

PORTION
UNDER SEAL    15

16    see that?

17              "Answer:  Are you referring to the two bullets

18    at the bottom of the page?

19              "Question:  Well, let's start at the top of the

20    page.

21              "Answer:  Oh, I'm -- I see now, yes.

PORTION
UNDER SEAL    22

23

24

25              "Answer:  I would.

419

Weissmann - deposition designations

1          Question:  The company's been in business for

2     60 years, correct?

3               "Answer:  Correct.

4               "Question:  It's a financially stable company?

5               "Answer:  Correct.

6               "Question:  Financial strength and long term

7     stability is important to your customers, correct?

8               "Answer:  I believe it is.

9               "Question:  Part of the reason is that these

10    decommissioning projects can go on for quite a while,

11    correct?

12              "Answer:  Correct.

PORTION
UNDER SEAL  13

14

15

16              "Answer:  I do.

PORTION
UNDER SEAL  17

18

19

20

21

22

23              "Answer:  Correct.

PORTION
UNDER SEAL  24

25

Weismann - deposition designations

1

2

3

4

5

6

7

8            "Question:  Okay.  What does it mean to take

9   responsibility for the license at the facility?

10           "Answer:  It's a term called license stewardship

11  where a contractor will assume all responsibility from the

12  utility for a decommissioning project and they also take

13  receipt of the commissioning trust fund.

14           "Question:  When you say 'all responsibility,'

15  what does -- what do you mean, 'all responsibility'?

16           "Answer:  Achieving license termination.

17           "Question:  And what does it mean to take

18  responsibility for the fund?

19           "Answer:  Well, the utility hands over the

20  decommissioning funds that have been collected from its rate

21  payors to fund the decommissioning project and under a

22  licensing stewardship agreement the contractor is given

23  the fund as well as the liability for completing the

24  project.

25

PORTION
UNDER SEAL

Weismann - deposition designations

1

2

3     decommissioning jobs aren't stable over the -- year over

4     year, are they?

5                    "Answer:  Well, they all have a timeline

PORTION
UNDER SEAL     6

7

8                    "Question:  But so you may get a lot of revenue

9     in one year and the following year it may be a lot less; is

10    that right?

11                   "Answer:  If a project ends or if their shipping

12    schedule is not consistent, yeah, that -- that could be the

13    case.

14                   "Question:  So just going to the life of a

15    decommissioning project from the time that a utility

16    identifies the site as potentially going into

17    decommissioning, that can be a very long process, correct?

18                   "Answer:  Yes.  Some sites are multiple years.

19                   "Question:  In fact, the bidding process for the

20    decommissioning can take multiple years, correct?

21                   "Answer:  Correct.

22                   "Question:  And the bidding schedule can alter

23    frequently, correct?

24                   "Answer:  If the -- if the customer chooses to

25    change the RFP or the terms of the contract, I would say

Weismann - deposition designations

1    it's possible, yes.

2            "Question:  And you can think of instances where

3    the bidding process has taken longer than originally

4    planned?

5            "Answer:  Yes.

6            "Question:  In fact, it can add a couple years

7    or more, correct?

PORTION          8
UNDER SEAL
                 9

10

11            "Question:  Okay.  Let's talk about the actual

12    bidding process that the utility is running.  That's what

13    I'm talking about.

14            "Answer:  Okay.

15            "Question:  So the bidding process run by the

16    utility can become elongated, correct?

17            "Answer:  It can be.

18            "Question:  There -- you've seen that happen,

19    correct?

20            "Answer:  On some projects.  Sometimes it's out

21    of their control, they have regulatory issues or other --

22    other milestones that need to be met.

23            "Question:  And then there's also the

24    possibility that the decommissioning work, even though it's

25    contracted, won't start, correct?

Weissmann - deposition designations

1          "Answer:  Correct.

2          "Question:  In fact, it may be delayed for

3    several years after the contracts have been awarded,

4    right?

5          "Answer:  That can happen.

6          "Question:  Does that happen in your experience?

7          "Answer:  If -- if a customer has problems with

8    funding or if they have uncertainties about the site, then,

9    yeah, there could be delays.

10         "Question:  And you can think of instances where

11   that's happened?

12         "Answer:  That happens in our industry, yes.

13         "Question:  A facility can be put into something

14   called safe store, right?

15         "Answer:  That's correct.

16         "Question:  What is safe store?

17         "Answer:  It's an option the NRC allows

18   utilities to take after they shut down to delay when active

19   decommissioning has begun.

20         "Question:  Companies do engage in the safe

21   store process, correct?

22         "Answer:  Utilities do, yes.

23         "Question:  Okay.  In your experience when a

24   company chooses to go into safe store, what happens?

25         "Answer:  Well, most of the time a utility will

1    enter into safe store to allow their decommissioning trust

2    fund to grow because at the time of -- they may shut down

3    earlier than what they had planned.  So their

4    decommissioning fund isn't fully funded yet.  And they also

5    utilize radioactive decay so that the plant becomes cooler

6    at the time of decommissioning so it's less worker dose when

7    they start dismantling the plant.

8                "Question:  So at that point, the utility

9    already has identified contractors to do the decommissioning

10   work?

11               "Answer:  At the time they announce safe store?

12               "Question:  Yes.

13               "Answer:  No.

14               "Question:  Okay.  So the contracting comes

15   after safe store has ended?

16               "Answer:  Or when they choose to go into active

17   decommissioning.

18               "Question:  And the safe store process can add

19   five, ten years to the process for decommissioning?

20               "Answer:  Current NRC guidance is 30 years, I

21   believe.  Up to 30 years.  The utility can choose whenever

22   they like to go into active decommissioning.  Excuse me.

23   Safe store may actually be 60 years.  I'm trying to remember

24   from memory what the actual limit on NRC is.  It's either 30

25   or 60.

425

Weismann - deposition designations

1          "Question:  That number, whether it's 30 or 60,

2     can be found in the NRC regulations; is that right?

3          "Answer:  That's correct, yeah.

PORTION
UNDER SEAL

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18          "Question:  So you are taking steps to -- let me

19     back up.

PORTION
UNDER SEAL

20

21

22

23

24

25          "MS. BHAGAT:  Objection, foundation.

426

Weismann - deposition designations

PORTION
UNDER SEAL

1

2

3

4

5

6

7

8

9

10

11          "Question:   That -- that is one of the goals of

12     what you're doing, correct?

PORTION
UNDER SEAL

13

14

15

16

17

18

19

20

21

22

23

24

25

427

Weismann - deposition designations

1

2

3

4

5

6

7

8

9

10

11          "Question:  By the way.  US Ecology has a RCRA

12    facility in Texas, correct?

13          "Answer:  We do.

14          "Question:  It's called the Robstown facility;

15    is that correct?

16          "Answer:  Correct.

17          "Question:  The State of Texas actually has

18    authority from the NRC to grant exemptions, correct?

19          "Answer:  Within the State of Texas, they do.

20          "Question:  That's right.  And so your facility

21    as at Robstown could potentially get an exemption from

22    Texas, correct ?

PORTION     23
UNDER SEAL

24          "Question:  Have you ever asked the Texas

25    authorities whether they would be willing to give you an

428

Weismann – deposition designations

1    **exemption?**

PORTION   2
UNDER SEAL
          3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22            **"Answer:   That's correct.**

PORTION   23
UNDER SEAL
          24

25

Weismann - deposition designations

1

2

3

4            "Question:  Okay.  Let's go ahead and mark use

5    lit eight, which is a document Bates-numbered USE

6    LIT-0001210 through use LIT-0001215.

7            "(Witness reviewing document.)

8            "BY MS. BHAGAT:

9            "Question:  Mr. Weismann, have you had a chance

10   to look at what has been marked as use LIT 8?

11           "Answer:  Yes.

12           "Question:  Do you recognize this document?

13           "Answer:  I do.

14           "Question.  What is it?

PORTION      15
UNDER SEAL
             16

17

18

19

20

21

22

23

24

25

Weismann - deposition designations

1

2

3

4

5

6

7

8

9

10

11

12

13        "Answer:   Correct.

14        "Question:   Is that a similar license to a

15    license that would be required in Texas for you to start

16    disposing waste in your Robstown facility?

17        "Answer:  Answer:  No.

PORTION
UNDER SEAL    18

19

20

21

22

23

24

25        "Question:   The e-mail that occurs at the top of

Weismann - deposition designations

PORTION
UNDER SEAL    1

2

3

4     "**Answer:  I do.**

PORTION
UNDER SEAL    5

6

7

8

9

10    "**Answer:  It is.**

11    "**Question:  Okay.  And you say at the end of**

PORTION
UNDER SEAL    12

13

14    "**Answer:  I do.**

PORTION
UNDER SEAL    15

16

17

18

19

20

21

22

23

24

25

Weismann - deposition designations

1

2

3

4

5

6

7

8

9

10          "Answer:   That would be the goal of the project.

PORTION    11
UNDER SEAL
12

13

14

15

16

17    is that correct?

PORTION    18
UNDER SEAL
19

20          "Question:   Okay.

21          "(USE LIT Exhibit 11 was marked as requested.)

22          "MS. REINHART:

23          "Question:   Okay.   So then let me know you what

24    has been marked as USE LIT 11, which is a document Bates

25    numbered USE LIT 000984 through USE LIT 001014.

433

Weismann - deposition designations

1          "Mr. Weismann, do you recognize what's been

2    marked as USE LIT 11?

3          "Answer:  I do.

PORTION     4
UNDER SEAL
5

6          "Answer:  It is a portion of the application.

7          "Question:  What else goes with the document

8    that's been marked as Exhibit 11?

PORTION     9
UNDER SEAL
10

11

12

13

14

15          "Answer:  I do.

PORTION     16
UNDER SEAL
17

18

19

20

21

22

23

24

25

434

Weismann – deposition designations

1

2

3

4

5

6

7

8

9

10

11

12            "Question:   Thank you.

PORTION      13
UNDER SEAL
             14

15

16

17

18

19

20

21

22

23            "Answer:   Yes.

PORTION      24
UNDER SEAL
             25

435

Weismann - deposition designations

1    aware of that?

PORTION
UNDER SEAL    2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

436

Weismann - deposition designations

1

2

3

4

5

6

7

8

9

10          "Question:   Okay.

PORTION
UNDER SEAL     11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Weismann - deposition designations

1

2

3

4

5

6

7           "Question:  So let -- let's mark as -- mark as

8     one Exhibit USE LIT 13.  It's an e-mail and attached

9     spreadsheet running from USE-ATR-00000102 through

10    U.S.-ATR-00000107.

11              "(Witness reviewing document.)

12              "MS. REINHART:

13              "Question:  Mr. Weismann, do you recognize what

14    has been marked as USE LIT 13?

15              "Answer:  I do.

PORTION
UNDER SEAL   16

17

18

19

20              "Answer:  Correct.

PORTION
UNDER SEAL   21

22

23

24

25

438

Weismann - deposition designations

1

2          **"Answer:  Correct.**

PORTION
UNDER SEAL   3

4

5          **"Answer:  That is correct.**

PORTION
UNDER SEAL   6

7

8

9

10

11

12         **"Answer:  Yes.**

PORTION
UNDER SEAL   13

14

15

16

17

18

19

20

21

22

23

24         **"Answer:  No.**

25         **"Question:  Okay.  So the first e-mail in**

439

Weismann - deposition designations

1    **Exhibit USE LIT 13 is from you and it's attaching the**

PORTION
UNDER SEAL    2

3

4

5            **"Answer:  I do.**

PORTION
UNDER SEAL    6

7

8

9            **"Answer:  Correct.**

PORTION
UNDER SEAL    10

11

12

13

14            **"Answer:  I do.**

PORTION
UNDER SEAL    15

16

17

18

19

20

21

22

23

24

25

440

Weismann - deposition designations

1

2          "Answer:  Correct.

3          "Question:  That's -- okay.

PORTION
UNDER SEAL    4

5

6

7

8

9

10

11

12

13

14    saying that correctly?

PORTION      15
UNDER SEAL
16

17

18

19

20

21

22

23

24

25

Weismann - deposition designations

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

442

Weismann - deposition designations

1

2

3

4

5

6          "Question:  Okay, Mr. Weismann, thank you.  We

7     are now looking at USE LIT 14; is that correct?

8               "Answer:  That's correct.

9               "Question:  Okay.  Do you recognize this as an

10    e-mail from you dated April 23, 2015?

11              "Answer:  I do.

12              "Question:  Just looking at the item marked two

PORTION
UNDER SEAL    13

14

15              "Answer:  I do.

PORTION       16
UNDER SEAL

17

18

19

20

21

22

23

24

25

Weismann - deposition designations

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21         "MS. BHAGAT:   Objection, mischaracterizes prior

22    testimony.

PORTION   23
UNDER SEAL

24

25

444

1

2

3

4

5

6

7

8

9

10

11

12

13          "Question:  And you personally participated in

14    the effort for US Ecology?

15          "Answer:  Yes.

16          "Question:  You were a principal evaluator of

17    the situation, right?

18          "Answer:  Yes.

PORTION  19
UNDER SEAL

20

21

22

23

24

25          "Answer:  That is correct.

445

Weismann - deposition designations

PORTION
UNDER SEAL

1

2

3

4

5

6

7

8          "Question:  And the company that US Ecology had

9     acquired was called EQ?

10          "Answer:  Yes.  The Environmental Quality

11     Company.

PORTION
UNDER SEAL

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Weismann - deposition designations

1

2

3          "Question:  Okay.  Well, let's go ahead and mark

4   a document, then, as USE LIT 16 would be USE-ATR-00000677,

5   ending in USE-ATR-00000686.

6          "Mr. Weismann, this is an e-mail string with two

7   attachments.  Let me know when you are ready.

8          "(Witness reviewing document.)

9          "BY MS. REINHART:

10         "Question:  Mr. Weismann, do you recall the

11  e-mail string that begins at USE-ATR-00000677?

12         "Answer:  Yes.

13         "Question:  Okay.  And this is an e-mail string

14  with the most recent e-mail dated April 22, 2014, and you

15  are brought into part of this e-mail discussion, but you're

16  not in all of the e-mails, correct?

17         "Answer:  That is correct.

18         "Question:  Okay.  So the first one I wanted to

19  ask you about is on the page ending in number 78, and it's

20  from Steve Welling to Jeff Feller, Matt Dahl, Simon Bell and

21  Eric Gerratt dated April 17.  Do you see that at the bottom

22  of the page?

23         "Answer:  I do.

PORTION
UNDER SEAL   24

25

447

Weismann - deposition designations

1          "THE REPORTER.   I'm sorry.

2          "BY MS. REINHART:

PORTION
UNDER SEAL    3

4

5

6          "Answer.   I do.

PORTION
UNDER SEAL    7

8

9

10

11

12

13

14

15

16          "Answer:   I -- I do not.

PORTION
UNDER SEAL    17

18

19

20          "Question:   Is there public information about

21    that?

22          "Answer:   Yes.

PORTION
UNDER SEAL    23

24

25

Weissmann - deposition designations

1

2          "Answer:  Yes.

PORTION    3
UNDER SEAL
4

5          "Answer:  I do.

6          "Question:  And when you say the numbers are

7     pretty bleak, you meant that the company was losing a fair

8     amount of money?

PORTION    9
UNDER SEAL
10

11

12

13

14         "Answer:  Correct.

PORTION    15
UNDER SEAL
16

17         "Answer:  I do.

PORTION    18
UNDER SEAL
19

20

21

22

23

24

25

449

Weismann - deposition designations

1            "Answer:  Yes.

2            "Question:   Are you aware that happened?

PORTION
UNDER SEAL

450

Weismann – deposition designations

1               "**Answer:  Yeah.**

PORTION
UNDER SEAL  2

3

4

5

6

7               "**Answer:  I do.**

PORTION
UNDER SEAL  8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

451

Weismann - deposition designations

1

2          "Answer:   That is correct.

PORTION     3
UNDER SEAL
            4

5

6

7

8          "Answer:   Yes.

PORTION     9
UNDER SEAL
            10

11         "Answer:   That is correct.

PORTION     12
UNDER SEAL
            13

14

15

16

17

18

19

20         "Answer:   Yes.

PORTION     21
UNDER SEAL
            22

23         "Answer:   That's --

PORTION     24
UNDER SEAL
            25

Weismann - deposition designations

1

2

3

4

5

6

7              "(USE LIT Exhibit 17 was marked. )

8              "BY MS. REINHART:

9              "Question:  Let's mark as USE LIT 17 a document

10   Bates numbered USE-DOJ-0000064 ending at 65.

11             "(Witness reviewing document.)

12             "BY MS. REINHART:

13             "Question:  Mr. Weismann, do you recall the

14   document that's been marked as USE LIT 17?

15             "Answer:  Yes.

16             "Question:  Do you recognize this as an e-mail

17   string with the most recent e-mail dated August 20, 2015,

18   communications between various executives at US Ecology?

19             "Answer:  Yes.

20             "Question:  And you're on part of this e-mail

21   string, but not all of it, correct?

22             "Answer:  Correct.

23             "Question:  Okay.  Do you see here that

PORTION
UNDER SEAL   24

25

Weismann – deposition designations

1

2

3

4

5          **"Answer:  I do.**

PORTION    6
UNDER SEAL
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25          **"Question:  Is NORM low level radioactive waste?**

454

Weissmann - deposition designations

1          "Answer:  No, it is not.

2          "Question:  What does NORM stand for?

3          "Answer:  Naturally Occurring Radioactive

4     Material.

5          "Question:  Why isn't NORM low level radioactive

6     waste?

7          "Answer:  Because NORM is not regulated under

8     the Atomic Regulatory Act.

9          "Question:  What about TENORM?  What is TENORM?

10         "Answer:  It's Technologically Enhanced

11    Naturally Occurring Radioactive Material.

12         "Question:  And is TENORM considered LLRW?

13         "Answer:  By federal law, no.

14         "Question:  Why no?

15         "Answer:  It's not related to the Atomic Energy

16    Act.

17         "Question:  So we've been talking a little bit

18    about exemptions.  What types of exemption processes exist?

19         "Answer:  There are two major types.  There are

20    what are called general exemptions in the Code of Federal

21    Regulations, which would apply to all members of the public

22    if certain criteria are met, and then there are specific

23    exemptions where you apply for them and that's like we've

24    discussed earlier today under ten C.F.R. 20.2002.

25         "Question:  And what are the items that are

455

Weissmann - deposition designations

1   typically generally exempt?

2           "Answer:  An example of a generally exempt item

3   would be a commercially available smoke detector that you

4   buy at a store.  Those generally have a very small source of

5   radioactive material in them and the NRC has determined that

6   the beneficial use to society for those outweighs the

7   potential licensure of that for members of the public.

8           "Question:  Can generally exempt materials be

9   disposed of at any landfill in the United States?

10          "Answer:  Yes, they may.

11          "Question:  You also mentioned that there is a

12  specific exemption, correct?

13          "Answer:  Correct.

14          "Question:  And one of those specific exemptions

15  is the 10 C.F.R. 20.2002 exemption, correct?

16          "Answer:  20.2002 is an authorization.  It's the

17  ability for a licensee to pursue alternate disposal.  It is

18  not in and of itself an exemption.

19          "Question:  But one way waste can be exempt is

20  through a 20.2002 process?

21          "Answer:  Correct.

22          "Question:  Can you describe to me the 20.2002

23  exemption process?

24          "Answer:  Yes.  It's a -- the NRC has provided

25  guidance to licensees that they can follow.  Typically the

Weismann - deposition designations

1    application would be a description of the waste, it would be

2    the type, soil, debris, the type of radionuclides present,

PORTION
UNDER SEAL

3

4

5

6

7

8            "Question:  And who asks for the exemption?

9            "Answer:  US Ecology Idaho asks for the

10    exemption.  The licensee asks for the authorization to

11    pursue alternate disposal.

12            "Question:  And who does the licensee seek the

13    20.2002 exemption from?

14            "Answer:  From their regulator, either an

15    agreement state or the USNRC.

16            "Question:  Is it true that a customer -- or,

17    rather, a licensee using the 20.2002 process must get that

18    exemption approved for each project?

19            "Answer:  Yes.

20            "Question:  Can you explain that?

21            "Answer:  Yes.  The alternate disposal

PORTION
UNDER SEAL

22

23

24

25

457

Weismann - deposition designations

1

2

3

4                "Question:  And historically, how long has it

5    taken for a 20.2002 exemption to -- or authorization to be

6    granted?

PORTION
UNDER SEAL    7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Weismann - deposition designations

1

2

3

4

5

6                    "Question:   And so I just want to make sure I

7     understand what you're telling me.   US Ecology Idaho has a

8     Waste Acceptance Criteria; is that correct?

9                    "Answer:   That is correct.

10                    "Question:   And the NRC's authorization is lower

PORTION
UNDER SEAL

11

12

13

14

15

16

17

18

19

20

21

22                    "Question:   So it is my understanding that US

23     Ecology has five disposal facilities in the United States.

24     Is this understanding correct?

25                    "Answer:   It is correct.

Weissmann – deposition designations

1         "Question:  And it is my understanding that

2 those disposal facilities are US Ecology Washington, which

3 is in Richland, Washington.  US Ecology site in Idaho, which

4 is in Grandview, Idaho; US Ecology site in Michigan, which

5 is in Belleville, Michigan; US Ecology site in Texas, which

6 is in Robstown, Texas.  And you US Ecology Nevada, which is

7 in Beatty, Nevada.  Is that understanding correct?

8         "Answer:  That is correct.

9         "Question:  Let's talk about US Ecology's site

10 in Belleville, Michigan.  Is US Ecology's site in

11 Belleville, Michigan licensed to accept LLRW?

12         "Answer:  No.

13         "Question:  Is US Ecology's site in Belleville,

14 Michigan a RCRA facility?

15         "Answer:  Yes, it is a RCRA subtitle C hazardous

16 waste landfill.

17         "Question:  And what is a RCRA subtitle C

18 hazardous waste landfill?

19         "Answer:  Under the Resource Conservation and

20 Recovery Act, subtitle C of that act outlines the

21 requirements for hazardous waste landfills.

PORTION
UNDER SEAL    22

23

24

25

460

Weismann – deposition designations

1          "Question:  And you testified earlier that all

2     landfills in the United States can dispose of certain

3     radioactive materials under a general exemption.  Is that

4     correct?

5          "Answer:  That is correct.

6          "Question:  Can US Ecology's landfill in

7     Belleville, Michigan dispose of low activity radioactive

8     waste under the specific exemption?

PORTION
UNDER SEAL    9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

461

Weismann - deposition designations

8    that?

PORTION
UNDER SEAL

13                    "Question:  And it's my understanding that US

14    Ecology's Nevada landfill is a RCRA landfill; is that

15    correct?

16                    "Answer:  That is correct.

17                    "Question:  And for your RCRA landfill, can that

18    landfill dispose of low activity radioactive waste under an

19    exemption?

PORTION
UNDER SEAL

23                    "Question:  And to be clear, those general

24    exemptions allow any landfill in Nevada to dispose of those

25    items contained therein?

462

Weismann - deposition designations

1          "Answer:  That's correct.

2          "Question:  Can US Ecology's landfill in Beatty,

3   Nevada dispose of low activity radioactive waste under a

4   specific exemption?

PORTION
UNDER SEAL    5

6          "Question:  How about in the future?

PORTION
UNDER SEAL    7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23          "Question:  And it's also my understanding that

24   US Ecology's landfill in Robstown, Texas is a RCRA landfill.

25   Is this understanding correct?

Weismann - deposition designations

1      "Answer:  It is correct.

PORTION
UNDER SEAL

10      "Question:  Can US Ecology's landfill in

11   Robstown, Texas dispose of low activity radioactive waste

12   under an exemption?

PORTION
UNDER SEAL

14      "Question:  And which exemption is that?

PORTION
UNDER SEAL

18      "Question:  Are the exemptions that you're

19   referring to in federal -- in the federal statutes general

20   exemptions?

21      "Answer:  Yes.

22      "Question:  And are the exemptions you're

23   referring to in the Texas statutes also general exemptions?

24      "Answer:  They are, but TCEQ has defined

25   exemptions for other materials not regulated by the federal

464

Weismann - deposition designations

1    government.   For example, NORM and TENORM.   There are

2    exemption levels defined in TCEQ regulations that our

3    Robstown can use for disposal.

4              "Question:  But any landfill in Texas can

5    dispose of the materials discussed in the Texas general

6    exemption; is that correct?

7              "Answer:  That is correct.

8              "Question:  And can US Ecology's landfill in

9    Robstown, Texas dispose of low activity radioactive waste

10   under a specific exemption?

PORTION
UNDER SEAL

11

12

13

14

15

16             "Question:  Did US Ecology ever consider using a

17   specific exemption under Texas state equivalent of 10 C.F.R.

18   of 20.2002 on behalf of a customer?

PORTION
UNDER SEAL

19

20

21

22

23

24

25             "Question:  And are there any other reasons?

465

Weismann - deposition designations

PORTION
UNDER SEAL

1

2

3

4

5

6

7

8

9

10

11          "Question:  Let's talk a little bit about US

12   Ecology's Grandview, Idaho site.  You testified that the US

13   Ecology site in Grandview is not licensed to accept LLRW; is

14   that correct?

15          "Answer:  That is correct.

16          "Question:  And is it true that US Ecology's

17   landfill in Grandview, Idaho accepts a low activity

18   radioactive waste under a specific exemption?

19          "Answer:  Yes.

20          "Question:  And that exemption is the 20.2002

21   specific exemption; is that correct?

22          "Answer:  That is correct.

23          "Question:  And it's true that the 20.2002

24   exemption is granted by the NRC because Idaho is not an

25   agreement state?

466

Weissmann - deposition designations

1          "Answer:  That is correct.

2          "Question:  And you talked a little bit about

3    this, but do you understand the term in-house exemption?

4          "Answer:  Yes.

5          "Question:  And what does that mean?

6          "Answer:  My understanding is that it would be

7    the ability to apply an exemption on a pre-approved program

8    locally without having to go to regulator on a

9    project-by-project basis.

10          "Question:  And this type of in-house exemption

11   is a specific exemption that is used at WCS; is that right?

12          "Answer:  My understanding that that is correct,

13   yes.

14          "Question:  And Bulk Survey For Release also

15   uses a similar specific exemption; is that correct?

16          "Answer:  That is correct.

PORTION   17
UNDER SEAL

18

19

20

21          "Question:  So what are the characteristics of

22   commercial customers seeking to send waste to US Ecology

23   under a 20.2002 exemption ?

PORTION   24
UNDER SEAL

25

Weismann - deposition designations

1

2

3          "Question:  Does US Ecology's site in Idaho

4    accept wastes from nuclear power plants that produce -- that

5    produce low activity radioactive waste on an operational

6    basis?

PORTION
UNDER SEAL    7

8

9

10

11

12

13

14

15

16

17

18          "Question:  Have other types of customers -- let

19    me rephrase.  Have other types of commercial customers tried

20    to send waste to US Ecology using the 20.2002 exemption for

21    their operational waste?

PORTION
UNDER SEAL    22

23

24

25

468

Weismann - deposition designations

1

2

3

4

5

6

7

8

9

10

11

12    "Answer:  That is our experience, yes.

13    "Question:  And why is that?

PORTION   14
UNDER SEAL
15

16

17

18

19

20

21

22

23

24

25    "Answer:  Yes.

469

Weissmann – deposition designations

1          "Question:  Have you heard the term WAC or Waste

2   Acceptance Criteria before?

3          "Answer:  Yes.

4          "Question:  And what does that mean?

5          "Answer:  The Waste Acceptance Criteria for a

6   facility is the guidelines and requirements and limits of

7   the type of waste that they can receive.

8          "Question:  And can you describe for me briefly

9   the US Ecology's waste acceptance criteria?

10          "Answer:  Which facility of US Ecology are you

11   referring to?

12          "Question:  Can you describe for me briefly

13   US Ecology's Waste Acceptance Criteria at its Idaho

14   facility?

PORTION
UNDER SEAL   15

16

17

18

19

20

21

22          "Question:  I'm handing you what will be marked

23   as USE LIT 24.  Exhibit USE LIT 24 is a document that was

24   pulled from US Ecology's website.  Do you recognize this

25   exhibit?

470

Weismann - deposition designations

1          "Answer:  I do.

2          "Question:  Mr. Weismann, do you believe that

3     this document is incomplete?

4          "Answer:  It is a -- it is a portion of our --

5     of our larger permit, but the portion that's provided is

6     the portion that applies directly to the radioactive

7     program.

8          "Question:  And does the exhibit as marked

9     contain a complete portion of the Waste Acceptance Criteria

10    for your US Ecology Idaho site?

11         "Answer:  Yes.  Section C3 and C4 of our permit

12    apply to the radioactive waste program.

PORTION
UNDER SEAL     13

14

15

16

17

18

19

20

21

22

23         "Question:  I'm handing you what has been marked

24    as USE LIT 25.  Exhibit USE LIT 25 is a document with the

25    Bates stamps use-ATR-0014 through use-ATR-000565.  We are

Weismann - deposition designations

1   providing you two copies of the document, the native and the

2   Bates-stamped version.  Do you recognize this exhibit, USE

3   LIT 25?

4              "Answer:  Yes.

5              "Question:  And what is that exhibit?

PORTION
UNDER SEAL   6

7

8

9

10             "Question:  And who created this Exhibit, USE

11  LIT Exhibit 25?

12             "Answer:  I did.

13             "Question:  And did you create this exhibit, USE

14  LIT 25, as part of your responsibilities at US Ecology

15  Idaho?

16             "Answer:  Yes.

17             "Question:  And you created this exhibit, USE

18  LIT Exhibit 25, as part of US Ecology Idaho's ordinary

19  business?

20             "Answer:  Yes.

21             "Question:  Does US Ecology Idaho contract

22  directly with a utility for the disposal of -- of waste

23  under a 20.2002 process?

PORTION
UNDER SEAL   24

25             "Question:  For which projects ?

Weismann – deposition designations

PORTION
UNDER SEAL

1
2
3
4
5
6
7

8            "Question:  And has US Ecology Idaho entered

9    into a teaming arrangement to dispose of waste in connection

10   with a 20.2002 process in the last five years?

PORTION
UNDER SEAL

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

473

Weismann - deposition designations

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

474

Weismann - deposition designations

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23          "Question:  Did WCS receive any shipments --

24  actually, I'm going to withdraw that question.

25          "Can you describe to me briefly PG&E's Humboldt

Weismann - deposition designations

1    Bay decommissioning project?

PORTION
UNDER SEAL

8            "Question:  And when did US Ecology Idaho win

9    the Humboldt Bay work?

PORTION
UNDER SEAL

11           "Question:  And who did you compete with to win

12   the Humboldt Bay Decommissioning Project?

PORTION
UNDER SEAL

14           "Question:  Did you compete with WCS?

PORTION
UNDER SEAL

Weismann – deposition designations

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18          "Answer:  No.

19          "Question:  Can you explain?

PORTION
UNDER SEAL   20

21

22

23

24

25

Weismann - deposition designations

1

2

3

4

5          "Answer:  I do.

6          "Question:  What did you mean by that?

PORTION
UNDER SEAL

7

8

9

10

11

12

13

14

15

16

17

18

19          "Question:  Okay.  Did US Ecology Idaho submit a

20   bid either individually or as part of a teaming arrangement

PORTION
UNDER SEAL

21

22

23          "Question:  Did US Ecology Idaho submit a bid,

24   either individually or as part of a teaming arrangement, for

PORTION
UNDER SEAL

25

Weismann - deposition designations

1

2              "Question:  Did US Ecology Idaho submit a bid

3     either individually or as part of a teaming arrangement for

PORTION          4
UNDER SEAL

5

6              "Question:  Did US Ecology Idaho submit a bid

7     either individually or as part of a teaming arrangement for

PORTION          8
UNDER SEAL

9

10             "Question:  Did US Ecology Idaho submit a bid

11    either individually or as part of a teaming arrangement for

PORTION         12
UNDER SEAL

13

14             "Question:  Did US Ecology Idaho submit a bid

15    either individually or as part of a teaming arrangement with

PORTION         16
UNDER SEAL

17

18             "Question:  Did US Ecology Idaho submit a bid

19    either individually or as part of a teaming arrangement for

20    the Pilgrim Entergy project?

21             "Answer:  No.

22             "Question:  Has US Ecology Idaho submitted a bid

23    either individually or as part of a teaming arrangement for

PORTION         24
UNDER SEAL

25

Weismann - deposition designations

1          "Question:  Did US Ecology Idaho submit a bid

2     either individually or as part of a teaming arrangement for

PORTION
UNDER SEAL

18          "Answer:  Yes.

PORTION
UNDER SEAL

480

Weismann - deposition designations

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

481

Weismann - deposition designations

1

2

3

4

5

6

7

8

9

10

11

12          "Question:  Are there any commercial D&D

13    projects -- let me rephrase.

PORTION
UNDER SEAL    14

15

16

17

18

19          "Question:  What is license stewardship?

20          "Answer:  As I understand it, it is a

21    contractual agreement between the utility -- or a licensee

22    and a contractor where the licensee would transfer the

23    license for the site as well as the decommissioning trust

24    fund to the contractor with the intent of accomplishing

25    license termination.

482

Weismann - deposition designations

PORTION
UNDER SEAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20          "Answer:  That is correct.

21          "Question:  Can you compare and contrast WCS's

22    E-Waste program with your 20.2002 exemption program at

23    Grandview?

PORTION
UNDER SEAL    24

25

483

Weismann - deposition designations

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23          "Question:  Are there any other differences

24    between WCS's exempt cell and your facility at Grandview?

PORTION
UNDER SEAL          25

484

Weismann - deposition designations

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

485

Weismann - deposition designations

1

2

3

4

5

6

7

8

9

10

11

12          **"Question:  In the ordinary course of its**

13   **business, does US Ecology put together future growth**

PORTION
UNDER SEAL

14

15

16

17

18          **"Question:  And who is typically involved in**

19   **these types of plans?**

20          **"Answer:  On the radioactive waste program, I**

21   **would be involved, but also our executive team go, like**

22   **Mr. Steve Welling, Mr. Simon Bell.  Chad Hyslop, who sells**

23   **into the radioactive program, he has a lot of market**

24   **knowledge on that program.  Those are the typical people who**

25   **would be involved.**

486

Weismann - deposition designations

1

2

3

4

5          "Answer:  That is correct.

PORTION
UNDER SEAL     6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

487

Weismann – deposition designations

1

2

3

4

5

6

7

8          **"Answer:  Yes.**

PORTION
UNDER SEAL        9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

488

Weismann - deposition designations

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

489

Weismann - deposition designations

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Weismann - deposition designations

1

2

3

4

5

6

7

8

9

10

11          "Answer:  That is correct.

12          "Question:  I'm handing you what has been marked

13     as USE LIT 26.  Exhibit USE LIT 26 is a two-page document

14     with the Bates stamp USE LIT 001440 and has another page USE

15     LIT 001441.

16          "What is Exhibit USE LIT 26?

17          "Answer:  It is an authorization for

18     expenditure.

19          "Question:  And who prepared this exhibit,

20     Exhibit 26?

21          "Answer:  I did.

22          "Question:  And why did you prepare this

23     exhibit, Exhibit 26?

24          "Answer:  In order to get approved for capital

25     expenditures in our company, we have to do -- submit to a

491

Weissmann – deposition designations

1    process where we justify that the capital that we are

2    investing is going to have a return on investment.

3            "Question:  And does US Ecology Idaho use

4    authorizations for expenditure as part of its regular

5    practice?

6            "Answer:  Our capital policy is any investment

7    over $5,000 is subject to our capital program.

8            "Question:  And US Ecology Idaho has kept this

9    exhibit in the ordinary course of its regularly conducted

10   business activities; is that correct?

11           "Answer:  That's correct.

PORTION
UNDER SEAL
12

13

14

15

16

17

18

19

20

21

22           "Question:  And is that something that US

23   Ecology Idaho has pursued?

PORTION
UNDER SEAL
24

25

492

Weismann - deposition designations

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Weismann - deposition designations

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Weismann - deposition designations

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25          **"Question:   And after those initial**

495

Weismann – deposition designations

1    conversations, what happened next?

PORTION
UNDER SEAL

11                "Answer:   That is correct.

12                "Question:   And what happened after that?

PORTION
UNDER SEAL

Weismann – deposition designations

PORTION
UNDER SEAL

1

2

3

4          "Answer:  No.

5

6

7

8

9

10

11

12

13

14

15

16          "Question:  I'm handing you what has been marked

17    as USE LIT 27.  It is an e-mail string between Jeff Feller

18    and Mat Dahl dated at the top September 30, 2015.  It has

19    the Bates stamp USE-DOJ-0000066 and it ends with Bates stamp

20    USE-DOJ -0000067.  Did I describe this exhibit, USE LIT 27,

21    accurately?

22          "Answer:  Yes.

23          "Question:  And do you recognize this exhibit,

24    USE LIT 27?

25          "Answer:  I do.

Weismann - deposition designations

1           "Question:  And what is USE LIT 27?

2           "Answer:  It is a summary e-mail from Mat Dahl,

3    our vice president of business development, to Jeff Feeler,

PORTION
UNDER SEAL    4

5

6           "Question:  And Jeff Feller is the CEO of US

7    Ecology; is that correct?

8           "Answer:  That is correct.

9           "Question:  Okay.  And do you see where -- and

10   whose Mat Dahl again?

11          "Answer:  Mat Dahl is our vice president of

12   business development.

13          "Question:  And do you see where Matt Dahl

14   writes on the portion of this string for September 30, 2015,

PORTION
UNDER SEAL    15

16

17

18

19

20

21

22          "Answer:  Yes.

23          "Question:  What is your understanding of the

PORTION
UNDER SEAL    24

25

Weismann - deposition designations

15             "Question:   And what do you understand Jeff

PORTION
UNDER SEAL

17             "Answer:   I believe he's just acknowledging what

18  Matt has written in his e-mail below.

PORTION
UNDER SEAL

23  USE-DOJ-000017 and it is two pages.

24             "Do you recognize this exhibit, USE LIT 28?

25             "Answer:  Yes.

499

Weismann - deposition designations

1          "Question:  What is it?

PORTION
UNDER SEAL
2
3
4

5          "Question:  And as US Ecology's 30(b)(6)

6    designee, are you qualified to discuss the information

7    contained in this exhibit, USE LIT 28?

8          "Answer:  Yes.

PORTION
UNDER SEAL
9
10

11         "Answer:  Yes.

PORTION
UNDER SEAL
12
13
14
15
16
17
18
19

20         "Answer:  No.

21         "Question:  And why do you say that?

PORTION
UNDER SEAL
22
23
24
25

500

Weismann - deposition designations

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16          "Question:  I'm handing you what is marked USE

17     LIT 29.  It is an e-mail from mat -- well, an e-mail -- it

PORTION
UNDER SEAL  18

19

20     and it begins with the Bates stamp USE-DOJ-0000019, and it

21     is two pages long.

22          "Do you recognize this exhibit, USE LIT 29?

23          "Answer:  I do.

24          "Question:  What is this Exhibit, USE LIT 29?

PORTION  25
UNDER SEAL

501

Weismann - deposition designations

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18          -

19          "Answer:  No.

20          "Question:  I am handing you what has been

21 marked as USE LIT 30.  It is an e-mail from Mat Dahl to Jeff

22 Feller, Simon Bell, and Steve Welling.  It is dated Friday,

PORTION
UNDER SEAL 23

24

25          "Did I describe that exhibit, Exhibit USE LIT

502

Weismann – deposition designations

1    30, correctly?

2              "Answer:  Yes.

3              "Question:  Do you recognize USE LIT 30?

4              "Answer:  I do.

5              "Question:  What is it?

PORTION
UNDER SEAL    6

7

8

9

10             "Question:  And as US Ecology's 30(b)(6)

11   designee, are you qualified to discuss the contents

12   contained in USE LIT 30?

13             "Answer:  Yes.

PORTION
UNDER SEAL    14

15

16

17

18

19             "Answer:  Yes.

20             "Question:  And do you see where it says in the

PORTION
UNDER SEAL    21

22

23

24

25

503

Weismann - deposition designations

1

2

3

4

5

6

7

8

9

10

11     what do you mean by that?

PORTION
UNDER SEAL     12

13

14

15

16

17

18

19

20

21

22

23

24

25

504

Weismann - deposition designations

1

2

3

4

5

6

7

8

9

10

11

12          "Question:   What was US Ecology's reaction when

PORTION
UNDER SEAL    13

14

15

16

17

18

19

20

21

22

23          "Question:   Earlier this afternoon, you received

24    a list of decommissionings with counsel; do you recall that?

25          "Answer:   Yes.

Weismann - deposition designations

1                "Question:  Some of those projects have not yet

2    been awarded; is that correct?

3                "Answer:  That's my understanding, yes.

4                "Question:  Even after those projects are

5    awarded, the generator can contract directly with US Ecology

6    to dispose of volumes related to that project, correct?

7                "Answer:  It's their option if they choose to do

8    that, yes.

9                "Question:  You've seen generators do that,

10   correct?

11               "Answer:  Correct.

PORTION      12
UNDER SEAL
             13


14               "Answer:  Correct.

15               "Question:  Earlier this afternoon, you

16   identified Toxco, Babcock, Omega and Energy Solutions as

17   companies that operate bulk surveys for free release

18   programs; correct?

19               "Answer:  Correct.

20               "Question:  You understand that those companies

21   engage in various forms of processing of materials for their

22   customers, correct?

23               "Answer:  Correct.

24               "Question:  They receive the materials and they

25   perform one of many possible forms of processing for the

Weismann - deposition designations

1    purpose of figuring out the most cost-effective means of

2    disposal, correct?

3                    "Answer:  I believe that's correct.

4                    "Question:  So they sort and segregate the

5    materials they receive, correct?

6                    "Answer:  Correct.

7                    "Question:  And they do that to separate the

8    various classes, correct?

9                    "Answer:  Correct.

10                    "Question:  You're aware that processors also

11    engage in downblending to take material from Class A to

12    exempt, correct?

13                    "Answer:  BSFR I would understand that to be

14    true.

15                    "Question:  You understand that they shred

16    materials so that they can be disposed of with a lower

17    classification of waste, correct?

18                    "Answer:  They shred materials usually for

19    volume reduction purposes.

20                    "Question:  And they cut materials into pieces

21    so that they can be disposed of more efficiently, correct?

22                    "Answer:  Correct.

23                    "Question:  You understand that the processors

24    that engage in these activities do so to ensure that the

25    disposal is as cost effective as possible, right?

507

Weissmann - deposition designations

1          "Answer:  Right.

2          "Question:  And that means putting as much

3    materials into BSFR programs as they can, correct?

4          "Answer:  Into BSFR landfills, yes.

5          "Question:  You agree with that.  You're also

6    aware that for many years, the NRC has encouraged the

7    industry to expand the use of exemptions and BSFR in

8    particular, correct?

9          "Answer:  Alternate disposal, non-licensed

10   disposal, yes.

11         "Question:  I also want to turn to what had been

12   marked as Exhibit 26.

13         "Answer:  Okay.

14         "Question:  Can you turn to the next page, the

15   page" --

PORTION
UNDER SEAL   16

17

18

19         "Question:  Can you turn to that next page, the

20   page with the last four digits 1441.

21         "Answer:  Okay.

PORTION
UNDER SEAL   22

23

24

25

508

Weismann - deposition designations

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18          (End of videotaped deposition.)

19          MS. ELMER:  Your Honor, plaintiff moves to admit

20   the exhibits used in the parties' joint video deposition

21   clip of Mr. Weismann, and I will read out for both sides

22   with the conversion for the deposition exhibit numbers.

23          That would be PTX-365, which is USE LIT 24.

24   PTX-28, which is USE LIT 25.  PTX-297, USE LIT 27.  PTX-302,

25   which was USE LIT 28.  PTX-263, which was USE LIT 29.

Weismann - deposition designations

 1   PTX-298, which was USE LIT 30.   PTX-301, which was USE LIT
 2   26.
 3              For the defendants, DTX-347, USE LIT 2.
 4   DTX-348, USE LIT 3.   DTX-123, USE LIT 4.   DTX-082, which was
 5   USE LIT 5.   DTX-132, which was USE LIT 6.   DTX-138, which
 6   was USE LIT 7.   DTX-75, which was USE LIT 8.   DTX-340, USE
 7   LIT 9.   DTX-349, USE LIT 11.   DTX-074, which was USE LIT 13.
 8   DTX-066, which was USE LIT 14.   DTX-022, which was USE LIT
 9   16.   And DTX-083, which was USE LIT 17.
10              THE COURT:   All right.   Thank you very much.
11              (The above-reference exhibits were admitted into
12   evidence.)
13              THE COURT:   I truly am not confident I knew, I
14   was listening to this, what you wanted me to take away from
15   this vis-à-vis what I understand going on in this case,
16   so to help me out, I'm going to give you a homework
17   assignment.
18              By tomorrow morning I want to you each to give
19   me just five bullet points in ordered priority of what you
20   think I should have taken away from this three-plus hour
21   deposition.
22              Thank you.   I will see you tomorrow morning at
23   9:00.
24              (Court recessed at 4:03 p.m.)
25                   -   -   -