1                  - PORTIONS UNDER SEAL -

2                      - VOLUME 6 -

3            IN THE UNITED STATES DISTRICT COURT

4            IN AND FOR THE DISTRICT OF DELAWARE

5                       - - -

6
     UNITED STATES OF AMERICA,      :   CIVIL ACTION
7                                   :
                    Plaintiff,      :
8                                   :
         vs.                        :
9                                   :
     ENERGY SOLUTIONS, INC.,        :
10   ROCKWELL HOLDCO, INC.,         :
     ANDREWS COUNTY HOLDINGS,       :
11   INC., and WASTE CONTROL        :
     SPECIALISTS LLC,               :
12                                  :
                    Defendants.  :   NO. 16-01056-SLR
13

14                       - - -

15                            Wilmington, Delaware
                              Monday, May 1, 2017
16                            9:00 o'clock, a.m.

17                       - - -

18   BEFORE:  HONORABLE SUE L. ROBINSON, U.S.D.C.J.

19                       - - -

20   APPEARANCES:

21           JENNIFER LYNNE HALL, ESQ.,
             Assistant United States Attorney
22

23                   -and-

24
                              Valerie J. Gunning
25                            Official Court Reporter

```
 1    APPEARANCES (Continued):

 2

 3                    UNITED STATES DEPARTMENT OF JUSTICE
                      BY: PATRICIA SINDEL, ESQ.,
 4                        JULIE S. ELMER, ESQ.,
                          AARON COMENETZ, ESQ.,
 5                        TRAVIS R. CHAPMAN, ESQ.,
                          JOHN D. LINDERMUTH, ESQ.,
 6                        VITTORIO COTTAFAVI, ESQ.,
                          JENNIFER WAMSLEY, ESQ. and
 7                        IAN HOFFMAN, ESQ.
                          (Washington, D.C.)
 8

 9                        Counsel for Plaintiff
                          United States of America
10

11                    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                      BY:  PAUL J. LOCKWOOD, ESQ.
12

13                            -and-

14

15                    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                      BY: JOSEPH O. LARKIN, ESQ.,
16                        TARA L. REINHART, ESQ.,
                          KENNETH B. SCHWARTZ, ESQ.,
17                        STEVEN C. SUNSHINE, ESQ.
                          PAUL ECKLES, ESQ.,
18                        JOHN THORNBURGH, ESQ. and
                          CHARLES CRANDALL, ESQ.
19                        (Washington, D.C.)

20                        Counsel for Defendants
                          EnergySolutions Inc. and Rockwell Holdco,
21                        Inc.

22

23                    MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                      BY:  DONALD E. REID, ESQ.
24

25                            -and-
```

1    APPEARANCES (Continued):

2

3              BAKER BOTTS LLP
               BY:  JOSEPH OSTOYICH, ESQ. and
4                   HUGH M. HOLLMAN, ESQ.
                    (Washington, D.C.)
5

6                      -and-

7              BAKER BOTTS LLP
               BY:  VAN H. BECKWITH, ESQ.
8                   (Dallas, Texas)

9

10             Counsel for Defendants
               Andrews County Holdings, Inc.,
               and Waste Control Specialists LLC
11

12                      -  -  -

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2

 3               (Proceedings commenced in the courtroom,

 4    beginning at 9:00 a.m.)

 5

 6               *** (REPORTER'S NOTE:  The transcript contains

 7    portions under seal.)

 8

 9               THE COURT:  I understand there's an issue to be

10    addressed before the witness retakes the stand?

11               MR. BECKWITH:  Your Honor, Van Beckwith.  Good

12    morning, your Honor.

13               We did have an issue last night regarding

14    closing the courtroom.  I'm not sure if your Honor wants to

15    take it up now while Mr. Baltzer is not on the stand.  It

16    will not be an issue with respect to my questioning of Mr.

17    Baltzer, and I believe the Government plans to close the

18    courtroom for a portion of Mr. Baltzer's testimony, and I

19    don't believe there's any objection on that part either.

20    But later today there will be some witnesses, and

21    apparently, there is going to be a dispute about the breadth

22    and depth of where we can close the courtroom.  Two

23    witnesses are the Chief Financial Officer of Valhi and the

24    Chairman of the Board of Valhi.  I have prepared both of

25    them.  I'll be putting them on.
```

```
 1              I can tell your Honor, in my preparation it
 2    looks to be about ten percent of my time, and it all relates
 3    to forward-looking statements for this public company as
 4    well as, remember there's an alternate parent company that's
 5    parent that's owned by the two daughters, Lisa and Serena,
 6    the two daughters of Mr. Summons, and that private company's
 7    personal finances we would asked to be closed as well, your
 8    Honor.  Those are really the major issues.
 9              The final one would be any implications with the
10    regulate at the TCEQ and any specific implications with
11    respect to specific employees.  Now, on that I don't believe
12    the Government has any objection.  I got an e-mail from
13    Mr. Chapman last week confirming that.  But that is the
14    dispute.  As you frame it up, that is the issue of where we
15    draw that line.
16              THE COURT:  All right.
17              MS. ELMER:  And, your Honor, we, as Mr. Beckwith
18    pointed out, we don't have any objection to closing the
19    courtroom regarding a specific employee.
20              Mr. Beckwith has outlined his scope in a
21    different way or a limited manner in which we were given to
22    believe he would be requesting closure of the courtroom.
23              We do object to closing the courtroom for large
24    portions of Mr. Graham and Mr. Samper's testimony because
25    the defendants have put the financial health of WCS into --
```

1    as a key issue in this case.

2              If he does intend to limit it to just ten

3    percent of these witness' testimony, we will not object on

4    that basis.  I was given to believe that WCS would be moving

5    to close the courtroom for large portions of these witness'

6    testimony.  However, there are two documents which have some

7    substantial redactions, and we do object to the closure of

8    the courtroom regarding the discussions of those two

9    documents and any testimony relating to those two documents.

10   One of them is PTX-249, and it is an estimate of, earlier

11   preliminary estimate of the closure costs of WCS, and that

12   document has been completely or nearly completely redacted

13   by the defendants.  We have copies of those for your Honor

14   to review in-camera if you so desire.

15             And then the other one is PTX-608.  We only

16   would want to discuss portions of that document.  It is a

17   cover e-mail and attachment to WCS's regulator.  It is our

18   position that defendants should not be able to use the

19   failing firm defense as a sword and a shield.  They should

20   not be able to get the benefit of that testimony and these

21   documents in the courtroom yet shield that or hide that from

22   their regulators and the public.

23             THE COURT:  It has been my practice over the

24   years to redact very little of my written decisions.  In

25   fact, I can't even recall a handful of times when I agreed

1   with agreement of the parties to redact very limited

2   portions of any of my decisions.  So I guess I'm a little

3   confused about the debate here.

4           Is the debate about having an open courtroom or

5   is the debate about my relying on information that I'm not

6   going to relate in my opinion?  I don't think, because as

7   far as I'm concerned, when parties bring disputes to me, my

8   opinions are public, so I don't know which of those concerns

9   or both are really what is at stake here.

10          MR. BECKWITH:  So, your Honor, first of all, we

11  back up and we look at the Merger Guidelines.  The Merger

12  Guidelines do not suggest there's any exhaustion of a parent

13  company's finances, and so to answer your question

14  specifically, my expectation is what we're talking about is

15  closing the courtroom for very limited time to talk about

16  parent company's finances.

17          The closing plant is important --

18          THE COURT:  You're talking about closing the

19  courtroom.

20          MR. BECKWITH:  I don't anticipate that your

21  Honor is going to feel restrained in terms of writing her

22  opinion about how this merger should proceed or not with

23  respect to specific dollars and cents that might be in a

24  closure plan, or specific people that might or might not

25  lose their job or specific information that has to be shared

1    or not with TCQ.  I don't envision that.  So to me, the

2    issue really is more of limited amount of time closing the

3    courtroom to the few members of the public who have been

4    here.

5              MS. ELMER:  And, your Honor, it's our position

6    that the representations that WCS has made through its

7    regulators and the cost to its parents to actually close WCS

8    are items of information that the public has a right to

9    know.

10             THE COURT:  That's a very broad statement.  I'm

11   not confident I agree that the public has a right to know

12   everything if it's not necessarily relevant to the end game.

13   And, of course, I don't know at this point what exactly

14   we're talking about.

15             So if you want to hand up the documents, I will

16   take a look at them, and if I have questions about their

17   actual relevance and whether I'm actually going to have to

18   rely on them to make my decision, I will bring that up with

19   you on your time before they are presented.

20             With respect to closing the courtroom, it's my

21   understanding that the anticipation is it will be limited.

22   Once again, it's hard to tell whether it's going to be ten

23   percent at the outset, so we'll take that as we go, and if

24   it turns out that it's more extensive than anticipated by

25   the Government, we will have another review of that

```
 1   midstream.

 2             MS. ELMER:  Thank you, your Honor.  May I

 3   approach with the documents?

 4             THE COURT:  Yes, you may.

 5             (Ms. Elmer handed documents to the Court.)

 6             THE COURT:  And before we get started again,

 7   I've had the opportunity to think about the question we

 8   ended with last week, and that is how we proceed when the

 9   presentation of evidence is complete.

10             I believe that in this instance, unlike in most

11   instances, closing arguments would be helpful.  I am

12   anticipating that you will present a closing argument that

13   identifies the evidence that you are relying on and expect

14   me to rely on in supporting your respective positions.  I

15   think had your demonstratives in that regard would be

16   helpful, and so I would expect you to prepare them knowing

17   that I will be reviewing them.

18             I think at that point we will leave the record

19   open so that we have a chance to review the materials, and

20   if we have specific questions, we will send them out to you

21   and expect written responses, all of this in lieu of formal

22   briefing so that we can move ahead on this with some

23   expedition.

24             I will give you time to think about it, and if

25   you have any concerns about that proposed process, you can
```

Baltzer - cross

1   raise them with me, but expect, unless I hear otherwise,

2   expect to use some of your time for closing -- trust me when

3   I say if your closings are more than two hours, I will stop

4   listening after two hours.  I think I've imposed that limit

5   on my lawyers in front of jurors and my attention span is

6   not much better than that.

7              All right.  Having said that, unless there's

8   something else, we should get our witness on the stand.

9              I will remind him that he is still under oath

10  and we will continue with the cross-examination.

11                  ... ROD BALTZER, having been previously

12                  duly sworn as a witness, was examined and

13                  testified as follows ...

14                  CROSS-EXAMINATION, Continued.

15  BY MS. ELMER:

16  Q.    Good morning, Mr. Baltzer.

17  A.    Good morning.

18          MS. ELMER:  Your Honor, may I approach?

19  A.    Yes, you may.

20          (Ms. Elmer handed binders to the witness.)

21  BY MS. ELMER:

22  Q.    Mr. Baltzer, I've handed you two binders which we may

23  refer to during your examination.

24              Sir, you became convinced some time in 2014 that

25  WCS as a standalone entity is a failing firm; is that

Baltzer - cross

1  correct?

2  A.    Correct.

3  Q.    And the following year, in 2015, you became CEO of the

4  company; is that correct?

5  A.    Correct.

6  Q.    And in 2016, WCS filed an application with the Nuclear

7  Regulatory Commission for the interim storage of spent

8  nuclear fuel?

9  A.    Correct.

10  Q.    And spent nuclear fuel is a high level radioactive

11  waste?

12  A.    It is.

13  Q.    And it's much more radioactive than the low level

14  radioactive waste that we have been discussing in this

15  trial?

16  A.    It's a different class of waste.  Some of the dose

17  rates may actually be similar.

18  Q.    And WCS filed its application a year ago from your

19  direct testimony, on April 28th, 2016?

20  A.    Correct.

21  Q.    When WCS filed its interim storage application,

22  you made a public announcement on the same day; is that

23  correct?

24  A.    We did.  We held a press event.

25  Q.    And that announcement was video recorded and posted on

Baltzer - cross

1  WCS's website?

2  A.     It was.  We post almost all of our stuff on that

3  website.

4           MS. ELMER:  Your Honor, plaintiff moves to admit

5  Plaintiff's Exhibit 511, which is a video recording of that

6  announcement, published on WCS's website into evidence.

7           MR. BECKWITH:  Is there a new notebook?  I'm not

8  sure, or is an old notebook, because I don't have that in

9  mine.

10          MS. ELMER:  That particular exhibit is not in

11  the notebook because it was listed on our exhibit list and

12  it's a video and we can't put it in a notebook.

13          MR. BECKWITH:  I don't have any objection to

14  that.  I'm just not clear over the weekend whether they sort

15  of reloaded the notebooks because I didn't get a new

16  notebook.

17          MS. ELMER:  The notebooks are the same.

18          THE COURT:  Notebooks are the same, the video

19  not in it.  No objection.

20          MS. ELMER:  Mr. Beaton, can we play the first

21  two minutes.

22          (Videotape played as follows.)

23              "A little more than a year ago in this very

24        room we announced that we had filed a notice of

25        intent to apply for a license to construct and operate

Baltzer - cross

1    the consolidated interim storage facility for

2    spent nuclear fuel in response to the country's

3    biggest nuclear waste problem.  We informed the

4    Nuclear Regulatory Commission at that time that we

5    would be submitting a license application in early

6    2016, and I am proud to stand before you today,

7    alongside our valued partners, AREVA and NAC

8    International, to tell you that we submitted the

9    application this morning.  Specifically, we're

10   applying for an initial 40-year license to store

11   40,000 metric tons of used nuclear fuel.

12            "The facility  will be built in eight

13   phases.  Each of the eight phases will be able to

14   accommodate 5,000 metric tons.  We anticipate asking

15   for 20-year renewals after the initial 40-year license

16   period.  We've also told our community that that could

17   be 60 to a hundred years, so they understand interim

18   storage could be for a long period of time.

19            "So here's the benefit of our proposal.

20   We have the ideal location.  We have the experience

21   and we have a consent based site.  Let me start with

22   that last point, because frankly, that's the most

23   important.  We've got a proven record of ongoing

24   community support for our low level operations and

25   facilities out in West Texas, and we were able to

Baltzer - cross

1    secure strong support for storing high level

2    radioactive waste before we filed our notice of intent

3    last year.

4              "If we didn't get that strong community

5         support, we would not have filed a license application

6         today.

7              "WCS has partnered with AREVA and NAC

8         International on the license application."

9              (End of video clip.)

10   BY MS. ELMER:

11   Q.    Mr. Baltzer, you made the announcement that is in

12   Plaintiff's Exhibit 511 over a year after you had concluded

13   that WCS as a standalone entity was a failing firm.

14   A.    We did.

15   Q.    Please turn to tab PTX-421 in your binder.

16        And do you recognize Exhibit 421?  I will give

17   you a moment.

18   A.    I do.

19   Q.    And it's an e-mail dated April 28th, 2016, to you and

20   others for the large attachment?

21   A.    It is.

22        MS. ELMER:  Your Honor, plaintiff moves to admit

23   Plaintiff's Exhibit 421 into evidence.

24        MR. BECKWITH:  No objection, your Honor.

25        THE COURT:  Thank you.

Baltzer - cross

1    (Plaintiff's Exhibit No. 421 was admitted into

2    evidence.)

3    BY MS. ELMER:

4    Q.    I would like to turn to the thirteenth page of this

5    document.  The Bates number of the bottom of that document

6    ends in 573, in the bottom right corner.

7    And this is the cover page of WCS's application

8    for a license for a consolidated interim spent fuel storage

9    facility; is that correct?

10    A.    It is.

11    Q.    And you signed this application on April 19, 2016; is

12    that correct?

13    A.    I did.

14    Q.    And you swore to the best of your knowledge,

15    information and belief that the statements made in the

16    application were true?

17    A.    I did.

18    Q.    And you signed WCS's application over a year after you

19    had concluded that WCS as a standalone entity is a failing

20    firm?

21    A.    Yes.  As I've said, we tried to bring in any other

22    revenue streams we could possibly think of.

23    Q.    Scott Kirk was the WCS employee responsible for

24    preparing and pursuing this application?

25    A.    He was.

Baltzer - cross

1    Q.    And then after Mr. Kirk left WCS, you hired Michael

2    Ford to continue pursuing the application?

3    A.    We did.

4    Q.    Let's look at what WCS told the NRC in its application

5    filed a year ago Friday.  Let's go to the twenty-first page

6    of the exhibit, and the Bates number at the bottom corner of

7    that document ends in 581.

8              And you see Section 1.6, "Financial

9    Qualifications and Financial Assurance"?

10   A.    Hang on.  I do.

11   Q.    It says, "This section demonstrates that WCS's

12   financial qualifications are adequate to carry out the

13   activities for which the license is sought in accordance

14   with the applicable regulations and to meet other financial

15   assurance requirements specified in ten C.F.R. 72.30.  WCS

16   has invested over $300 million in licenses, buildings,

17   equipment and improvements at the current radioactive waste

18   disposal facility in Andrews County, Texas.

19              "In addition, its owner has invested additional

20   capital to fund other cash needs.  The investments made to

21   date demonstrate the strong commitment that WCS and its

22   owner have to the current and future facilities."

23              And that's what you told the Nuclear Regulatory

24   Commission a year ago?

25   A.    That's what we wrote.

Baltzer - cross

1   Q.    And when you talk to your regulator, you tell the

2    truth?

3   A.    We do.

4   Q.    WCS has filed a number of supplements and updates to

5    this application, including one on March 2016, 2017;

6    correct?

7   A.    Correct.

8   Q.    And that March 2016, 2017 revised application contains

9    the same Section 1.6 financial qualifications and financial

10    assurance, as the original application; is that correct?

11   A.    I believe it does.

12   Q.    And the update to the application that WCS filed on

13    March 2016, 2017, was a milestone for WCS?

14   A.    That was Revision 1, so it included responses to the

15    Nuclear Regulatory Commission, and I guess a summary of what

16    had gone on for the previous almost year before that.

17   Q.    And a month later, on April 18, 2017, you notified

18    the NRC that WCS was temporarily suspending its application?

19   A.    Yes.  When the license got docketed in January 2017,

20    the Nuclear Regulatory Commission informed WCS that the

21    review fees for that, for just the review fees would be

22    seven-and-a-half million dollars.  That was more than double

23    what we expected, and we had already exhausted the agreement

24    we had with one of our partners to pay those NRC review

25    fees.

Baltzer - cross

1    We engaged in discussions with that partner,

2    from January until April, approximately two weeks ago, and

3    they were unwilling to expand that, to continue that, and we

4    did not have the cash resources to continue that, so we

5    suspended it.

6    Q.    Let's look back at Plaintiff's Exhibit 159, which was

7    admitted into evidence on Friday.

8         Do you have that in your binder?

9    A.    The first tab is 161.  They're not in order?

10   Q.    I don't think they are.

11   A.    I do have 159.

12   Q.    And if we could, let's turn to slide 33 of that

13   presentation.  You will need to follow along the version in

14   your binder that is unredacted, because apparently, the

15   contents are confidential, so we posted a redacted copy on

16   the screen here.

17   A.    This is the timeline?

18   Q.    Yes, sir.

19   A.    Thank you.

20   Q.    And so page 33 contains the timeline for interim

21   storage that you presented to the NRC, the TCEQ and others

22   during a site visit in October 2016; is that correct?

23   A.    Correct.

24   Q.    And this timeline was also discussed at your

25   deposition on March 20th, 2017.

Baltzer - cross

1   Do you remember discussing that?

2   A.    I am sure we did.

3   Q.    And you knew that discovery in this case closed the

4   very next day; correct?

5   A.    I'm not sure.

6   Q.    Do you recall that at your deposition, you stated that

7   only one change needed to be made to the timeline that is on

8   slide number 33?

9   A.    I think I stated that the December 2020 operations

10  began should change to January 2021.

11  Q.    And that all the other dates remain correct?

12  A.    They all remain correct at the time.

13  Q.    And you were in the courtroom for opening statements

14  in this case; is that correct?

15  A.    I was.

16  Q.    And you heard Ms. Reinhart during her statement say

17  that WCS had pulled its spent fuel application?

18  A.    I did jot a note down that we actually suspended it.

19  We did not withdraw it.

20  Q.    And that withdrawal, I'm sorry, temporary

21  suspension -- thank for correcting me -- occurred almost a

22  month after discovery in this case closed, didn't it?

23  A.    That is the way the negotiations with our partner

24  wound up being.

25  Q.    And, in fact, that temporary suspension occurred the

1234

Baltzer - cross

1  same day as the pretrial conference in this case, didn't

2  it?

3  A.    I'm not sure.

4  Q.    April 18th, 2017?

5  A.    I believe that was the date of our withdrawal letter.

6  Q.    Mr. Baltzer, your been here in the courtroom for most

7  of the trial; is that correct?

8  A.    I have been.

9  Q.    And we have heard about the community of Andrews,

10 Texas?

11 A.    We have.

12 Q.    And on Friday you testified that your relationship

13 with Andrews is very important?

14 A.    It is.

15 Q.    And that WCS has broad community support in Andrews?

16 A.    We believe we do.

17 Q.    And WCS is really dependent on community support?

18 A.    We are.  We wouldn't be there without them.

19 Q.    So you wouldn't lie to the people of Andrews, would

20 you?

21 A.    No.

22 Q.    If you tell them something, it's true?

23 A.    When I called them to talk about the suspension and

24 why we did that, they understood that we just did not have

25 the cash to proceed with that license review.

Baltzer - cross

1    Q.    And on March 15th, you told the people of Andrews,

2    Texas at a public meeting that WCS is a healthy company.

3    A.    I don't remember using those words.

4    Q.    You delivered prepared remarks at a public meeting

5    hosted by the NRC in Andrews, Texas on March 15th.

6    A.    I did provide public comments, yes.

7    Q.    And you delivered the same prepared remarks two days

8    earlier to the people of Hobbs, New Mexico, at a similar

9    public meeting; is that correct?

10   A.    They were generally the same remarks.

11   Q.    And the prepared remarks that you delivered to the

12   people of both Hobbs and Andrews are posted on the WCS

13   website; correct?

14   A.    They are.

15            MS. ELMER:  Your Honor, may I approach?

16            THE COURT:  Yes, you may.

17            (Ms. Elmer handed an exhibit to the witness.)

18   BY MS. ELMER:

19   Q.    Mr. Baltzer, do you recognize the document I've just

20   handed you as your prepared remarks that were delivered

21   March 13 and March 15?

22   A.    I did.

23   Q.    And I'd like to look at the sentence that spans from

24   page 2 to 3.

25            And it says, "A healthy company like WCS that is

Baltzer - cross

1   not oil and gas dependent is beneficial to diversify the

2   local economies and provide higher paid professional jobs

3   for our children."

4            And that's what you told the people of Andrews

5   and Hobbs in March of this year; is that correct?

6   A.    I really think you need to back up a sentence and

7   read, "This will help WCS diversify our business and more

8   fully utilize the entire facility."  That would enable WCS,

9   as it says in the next line, a healthy company like WCS,

10  that would enable WCS to be a healthy company.

11  Q.    But that's now -- I'm sorry.

12  A.    Without this, we wouldn't be a healthy company.

13  Q.    But that's not what it says, is it?

14  A.    I probably should have had somebody proofread that.

15  But what this is intended to say was that we needed interim

16  storage to diversify our business so that we could be a

17  healthy company, because that would be beneficial for the

18  company.

19  Q.    And you did not tell the communities of Hobbs and

20  Andrews that concrete trucks would come to cap the WCS

21  disposal facility if this merger did not go through, did

22  you?

23  A.    No, we have not made any decisions on what the next

24  step is if this merger does not go through.

25  Q.    I'd like to talk about some instances of competition

1237

Baltzer - cross

1  that involve information that your attorneys have designated

2  confidential.

3          MS. ELMER:  Therefore, your Honor, we'll need to

4  close the courtroom for just a short while.

5          THE COURT:  All right.  Those of you who are not

6  on the protective order need to leave for a short while.

7  And I'm assuming someone is policing these voluntary

8  withdrawal participants here.

9          MS. ELMER:  Yes, your Honor.

10          THE COURT:  All right.

11          ***(The following portion of the transcript is

12  sealed.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Baltzer - cross

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1239

Baltzer - cross

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1240

Baltzer - cross

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1241

Baltzer - cross

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1242

Baltzer - cross

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1243

Baltzer - cross

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Baltzer - redirect

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1245

Baltzer - redirect

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1246

Baltzer - redirect

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1247

Baltzer – redirect

1

2

3

4

5

6

7

8                    ***(End of portion under seal.)

9    BY MR. BECKWITH:

10   Q.    Now, Mr. Baltzer, there's some talk about when you

11   took over as president and when you decided that you were

12   struggling.

13              First of all, I want to make clear.  When did

14   you hear of the term failing firm?

15   A.    I did not hear that term until this Department of

16   Justice litigation.

17   Q.    And did you have a chance to review the Merger

18   Guidelines to see what the Government says about failing

19   firm being a defense in cases like this?

20   A.    I have not.

21   Q.    And are you a lawyer?

22   A.    I am not.

23   Q.    When you think of failing firm back in 2014 or even

24   today, May 1st, 2017, what do you think of?

25   A.    You know, WCS has had a long history and developed

Baltzer - redirect

1  over a long period of time, and what I thought of was

2  eventually, once we get all of our operating facilities up

3  and running, we'll make a profit.

4           So in 2012, we opened a compact facility.  In

5  2013, we owned a federal facility.  2014, we opened an

6  exempt facility, and at that point, we should have been

7  profitable and we were not.

8  Q.   So what happened?

9  A.   So we tried to find a buyer for WCS.  We weren't able

10  to stand alone.  That wasn't successful.  We continued at

11  that time.  Interim storage became a hot topic, I guess I

12  would call it.  We found partners.  We paid for the majority

13  of the licensing costs associated with that.  So we pursued

14  that until we couldn't pursue that any further.

15  Q.   Have you done everything possible that you can think

16  of to increase revenue?

17  A.   Everything I'm aware of.

18  Q.   So let's break that down.  NorthStar.  Teaming with

19  NorthStar.

20           What has actually happened with respect to

21  dollars in the door from NorthStar's teaming that you've

22  done?

23  A.   I'm not aware of any revenue coming in from NorthStar

24  at this moment.

25  Q.   Zero dollars in the door?

Baltzer - redirect

1   A.    Yes.

2   Q.    All right.  And NorthStar is the one that wants to

3   team up with you for possible future D&D projects; is that

4   correct?

5   A.    That is correct.

6   Q.    And these are, these are projects you're going to have

7   to compete for.  Is that the way this works, the D&D

8   projects?

9   A.    Yes.  Every D&D job is going to go out and have a

10  solicitation.  The dollars are very large, and you'll get

11  several, what I call prime contractors who are interested in

12  that work, and they will compete those out.  And they will

13  also compete against their decommissioning trust funds.  A

14  lot of them have limited money in there, and so if they

15  can't get a decommission in that time, then they'll just use

16  SAFSTOR.

17  Q.    Would you also compete with SAFSTOR?

18  A.    Yes, absolutely.

19  Q.    And how long is SAFSTOR?

20  A.    Sixty years, total.

21  Q.    So we heard about Vermont Yankee.  Would the State of

22  Vermont have to approve before you ever saw a dime from

23  Vermont Yankee?

24  A.    They do.  They call it a Certificate of Public Good,

25  something like that, and so the State of Vermont does have a

Baltzer - redirect

1    say on if that decommissioning project would be eligible

2    under NorthStar and be able to proceed on that timeline.

3    Q.    Has Vermont approved?

4    A.    Not that I'm aware of.

5    Q.    Would the NRC have to approve?

6    A.    They would.  They've got to grant the license

7    transfer.

8    Q.    And would you have to have NRC approval before you saw

9    a dime of revenue?

10   A.    Yes, we would.

11   Q.    Now, with respect to decommissioning, if you did get

12   the decommissioning, would you get all of the money?

13   A.    No.  We would only get the disposal piece.  Under

14   NorthStar, we're responsible for disposal, transportation of

15   packaging, but we would subcontract out the packaging and

16   transportation pieces, so we would only really get the

17   disposal and margins associated with that.

18   Q.    So would Vermont Yankee put you on the road to

19   success?

20   A.    No.  Every revenue stream is helpful, but that would

21   not turn around the financial situation at WCS.

22   Q.    Are there very real questions in the nuclear business

23   about whether to decommission all plants?  Is that an

24   issue?

25   A.    Yes.  I think decommissioning is very uncertain at

Baltzer - redirect

1    this point.

2    Q.    Okay.

3    A.    I think we've seen plants come on and then get bought

4    by somebody else.  We've seen legislation to keep them

5    around due to carbon, new carbon, and we've seen new plants

6    come on.

7    Q.    Have you seen local folks in the towns where these

8    plants are have opinions both for and against

9    decommissioning?

10   A.    Yes.  Particularly local towns, you know, there's a

11   loss of jobs once that plant closes, and so they don't want

12   the plants to close.

13          Then you also have others who just don't like

14   nuclear and want those removed at any price.

15   Q.    Have you seen that nuclear power provides a stable

16   portion of our nation's grid?

17   A.    That's approximately 20 percent of the power across

18   the U.S.

19   Q.    Have you seen information that suggests that

20   decommissioning may be substantially delayed?

21   A.    We have seen some of the trust funds and things are

22   what I call underfunded, and it may require them to be in

23   SAFSTOR while those trust funds catch up with the actual

24   estimated costs.

25   Q.    There seems to be some confusion on your

Baltzer - redirect

1    cross-examination about these names.  Pilgrim.  Tell us,

2    what's the status of when you expect to get money from

3    Pilgrim.

4    A.    Pilgrim is expected to decommission.  If the NorthStar

5    timeline is right, then that would start approximately

6    2021.

7    Q.    How about Palisades?

8    A.    So that one is still being considered as well.  It's

9    not one, but if the NorthStar timeline is right on that, I

10   think it's like 2025.

11   Q.    Have you won Pilgrim, your team?

12   A.    No.

13   Q.    Have you won Palisades?

14   A.    No.

15   Q.    Then I heard Kewaunee.  Did I say that right?

16   A.    You did.

17   Q.    And what's going on with Kewaunee?

18   A.    Not much that I'm aware of.  They've announced

19   decommissioning, but I'm not aware of any active pursuit of

20   actually decommissioning that.

21   Q.    Is NorthStar any guarantee of revenue over the next

22   five years?

23   A.    We don't believe so.  We hope that timeline holds, but

24   there are a lot of regulatory and financial constraints that

25   you've got to work through to actually get that done, and

Baltzer - redirect

1  what we see in the nuclear industry is it always takes a

2  little longer and costs a little more.

3  Q.    How about Westinghouse?  Westinghouse, are they part

4  of this decommissioning effort?

5  A.    We were on a team with Bechtel and Westinghouse to

6  pursue the SONGs opportunity.  We did not win that project,

7  but we were with Westinghouse on that.

8  Q.    How about US Ecology?  Are they part of this

9  decommissioning possibility?

10  A.    US Ecology has taken the vast majority of waste out of

11  the decommissioning projects.  We have not seen them on a

12  team, but we do expect them to be a player.

13  Q.    There were some questions about people coming,

14  knocking on your door, buying you dinner, talking to you

15  about maybe buying WCS.  Has Westinghouse any made any

16  overture at all, verbal or oral or written?

17  A.    Westinghouse was part of the 2014 Wunderlich process,

18  but after they dropped out of that process, they have not

19  returned.

20  Q.    And how about US Ecology?  Has US Ecology come and

21  made an oral offer to WCS?

22  A.    No.  Once that process ended in 2015, they have not

23  come back.

24  Q.    So let's talk about this interim fuel storage.  Why in

25  2016 did you go off and give a speech at the National Press

Baltzer - redirect

1  Club about interim fuel storage if you thought WCS was

2  struggling financially?

3  A.    We thought interim storage would help WCS

4  tremendously.  If we could get additional facilities,

5  additional operations, do something other than just low

6  level waste disposal at our facility and use the

7  infrastructure and other things we had in place, that would

8  really help our cost structure and bring in additional

9  revenue.  So we were optimistic about it.

10 Q.    All right.  So when you gave -- you went out to Hobbs

11 and Andrews and gave this speech back in, when was it,

12 March 15, 2017?

13 A.    Yes.

14 Q.    So, first of all, has the business continued to

15 deteriorate since March 2017?

16 A.    We continue to struggle.  We continue to have net

17 losses.

18 Q.    So in this speech, it says, our partners, AREVA, TN

19 and NAC are global leaders in spent fuel storage and

20 transportation.

21        We've heard some about AREVA, but tell me, where

22 are they located?

23 A.    AREVA has facilities I will say across the globe.

24 Columbia, Maryland is their U.S. center of operations, and

25 Paris, France was their corporate headquarters.

Baltzer - redirect

1    Q.    They are a French company, a French nuclear company?

2    A.    They are.

3    Q.    Have they declared bankruptcy?

4    A.    They're undergoing a restructuring.  I don't think

5    they've declared bankruptcy.

6    Q.    And how about NAC?  What is that company?

7    A.    They're a dry cask fuel storage company based out of

8    Atlanta, Georgia in the U.S., and they're owned by a

9    Japanese company.

10   Q.    Were you accurate in your speech when you said you

11   were hopeful that this would diversify WCS?

12   A.    Yes.

13   Q.    What did you mean by that?

14   A.    Just that it would add additional revenue and take

15   demand of the costs and infrastructure items that we've got

16   in place.  We've already got environmental monitoring, so

17   add additional revenue for limited costs.

18   Q.    Did you mean to trick or mislead anybody by suggesting

19   WCS was healthy?

20   A.    No.  When I wrote the speech, I meant to imply that

21   this would help us diversify and be a healthy company,

22   because we were not -- I think our community leaders know

23   that we are not.

24   Q.    So let's talk about spent fuel.  Did you withdraw that

25   application in that exhibit that I showed you on direct

Baltzer - redirect

1  examination?

2  A.     We did not withdraw it.  We suspended the license

3  application.

4  Q.     Do you know what the accounting effect of suspending

5  that application is?

6  A.     Our CFO told us that that provided too much

7  uncertainty and that we will have to write off those costs

8  of the application in this court.

9  Q.     How much is that?

10  A.     It was a little over $2 million.

11  Q.     So we talked about this opportunity, this spent fuel

12  opportunity.  Did AREVA back you up and actually send the

13  money from France to let you pay the NRC so you could

14  continue?

15  A.     No, they did not.

16  Q.     Did you ask them to?

17  A.     We did.

18  Q.     Did you write them a letter and say, look, sign this

19  letter and we will keep this application open, AREVA?

20  A.     We did.

21  Q.     All right.  And do you know of anything that you filed

22  with the TCQ or the NRC that requires WCS to stay in

23  business?

24  A.     I'm not aware of anything that requires us to stay in

25  business and continue to lose money.

Baltzer - redirect

1   Q.      What is the one requirement WCS has?

2   A.      The one requirement?  That's to be in compliance.

3   Q.      And how about when you leave?  What's the requirement

4   then?

5   A.      We still have to be in compliance.  We do have closure

6   obligations and things like that, but, you know, we've got

7   to protect the public environment and human health and

8   safety.

9   Q.      Is your owner required to stay in business?

10  A.      Not that I'm aware of.

11  Q.      There were some questions about pricing, and I just

12  want to ask you a few questions about pricing.

13          How can you ultimately know what percent of

14  Class B, C, A, any kind of waste, can ultimately go into

15  your landfill?

16  A.      We just base that on history.

17  Q.      Would you test the waste before it is deposited in the

18  landfill?

19  A.      Oh, absolutely.  We do have stringent requirements for

20  what is acceptable, and we do know what it is before we

21  dispose of it.

22  Q.      Has the exempt landfill been wildly successful?

23  A.      No.  I mean, it's not enough to make WCS profitable.

24  The values have increased there, but it is not changing

25  WCS's financial structure or situation.

Baltzer - redirect

1    Q.    Well, have you received waste from many different

2    customers?

3    A.    No.   We've got, I will say, a handful of customers

4    that regularly ship to the exempt landfill, but we have not

5    seen any nuclear power plants ship.

6    Q.    Were you hoping having an exempt cell would actually

7    cause people to give you whatever B/C waste they might

8    have?

9    A.    We thought that if we had a wider service offering, we

10   had other services to provide, then maybe they would, I will

11   say, think we're the easy option and ship us all of their

12   waste, Class A, B and C, et cetera, and that just hasn't

13   turned out.

14   Q.    How has that worked out for you?

15   A.    Not at all.   It just hasn't worked out that well.

16   Q.    Is the exempt cell now at or near capacity?

17   A.    It is.

18   Q.    Can you keep exempt cell open without putting more

19   money in it?

20   A.    We cannot.

21   Q.    We saw this document earlier where you were listing

22   some of your personal concerns with EnergySolutions.

23            Do you remember that document?

24   A.    I do.

25   Q.    I don't think you had a chance to fully explain

Baltzer - redirect

1    yourself.  What was the context of that document, of listing

2    some of the things you were concerned about?

3    A.    We were in litigation with EnergySolutions at the

4    time, and that was a document assisting with the litigation

5    and settlement discussions.

6    Q.    Was that a document that was provided ultimately to

7    your lawyers?

8    A.    It was.

9    Q.    Was it provided as part of a mediation with this

10   customer dispute with EnergySolutions?

11   A.    I think it did do a mediation.

12   Q.    Had EnergySolutions purchased a company known as

13   Semprasafe?

14   A.    They did.

15   Q.    And was WCS under contract with Semprasafe for B/C

16   waste?

17   A.    We were.

18   Q.    And is that what led to the filing of the West Texas

19   lawsuit?

20   A.    It was.  We had basically said that that change of

21   control I will say invalidates the contract and there was a

22   dispute on that.

23   Q.    And so you prepared a list as part of that lawsuit

24   effort?

25   A.    We did.

Baltzer - redirect

1    Q.    So that list goes back to 1999.  And were any of those

2    1999 complaints turned into lawsuit complaints?

3    A.    The 1991 was, yes.

4    Q.    And what about 2000?  Did the 2000 complaint wind up

5    in a lawsuit?

6    A.    Do you have the exhibit number?

7    Q.    Sure.  It's 85.  Sure.  PTX-85.  It's in your

8    plaintiff's binder.  Feel free to look at it.

9    A.    PTX which?

10   Q.    85.

11   A.    Okay.

12   Q.    So, for example, 199, there was some land purchased.

13   Did you wind up in a lawsuit with energy over that?

14   A.    We did.

15   Q.    Did that get resolved?

16   A.    It did.

17   Q.    Did that have anything to do with the dispute here

18   today?

19   A.    No.

20   Q.    How about in 2000:  Suspected of starting an

21   anti-campaign --

22   A.    That really didn't have anything to do with WCS.

23   Q.    How about hiring Adam Greenwood?  What was that about?

24   A.    That did not result in a lawsuit.  I mean, that was

25   about claims of water around, and we did a media tour, but

Baltzer - redirect

1    that resolved --

2    Q.    Okay.

3    A.    -- with EnergySolutions.

4    Q.    How about 2014?  Brokers and processors doing sort and

5    seg and then shipping to WCS.  Do those processors ship to

6    WCS?

7    A.    We have three of the four that ship to WCS.

8    Q.    How about APS, threatening them about shipping B/C

9    waste?  Did APS ship some B/C waste when they weren't

10   storing it in place?

11   A.    They did.

12   Q.    How about Zion?  Did you actually get some waste from

13   EnergySolutions related to Zion?

14   A.    We did.

15   Q.    How about this reference to casks?  I guess the

16   Nuclear Regulatory Commission was concerned with some

17   out-of-compliance casks.  Did you get into the cask business

18   at WCS to try and find these resources?

19   A.    We did.

20   Q.    How did that work out for you?

21   A.    We specifically hired Robatel to develop a type B cask

22   for us.  Those casks are utilized in less than five percent

23   of the time.

24   Q.    Has that been a profitable business segment for you,

25   cask rental to customers?

Baltzer - redirect

1    A.    Not at all.

2    Q.    Have you actually lost money by trying to start your

3    own cask rental business?

4    A.    We have.

5    Q.    Let's look at Defendants' 30 in your defendants'

6    binder, if you would, and let's talk about Wunderlich really

7    quickly.

8    A.    Okay.

9    Q.    Look at page 40 of Defendants' 30.

10         Wunderlich is your investment banker, and they

11   prepared some revenues.  I want you to look at that revenue

12   slide.

13   A.    Page --

14   Q.    Do you see that?

15   A.    Page 41?

16         MR. BECKWITH:  So let's blow up the, James, the

17   revenue.  Here you go.

18   BY MR. BECKWITH:

19   Q.    So you see total revenue, $27.8 million?  Do you see

20   what I am reading?

21   A.    I do.

22   Q.    And then 2013 revenue, 39.  Are those actual revenues,

23   the 2012 and 2013?

24   A.    They are.

25   Q.    So how about the 2014, '15, '16, '17 and '18, what are

Baltzer - redirect

1    those?

2    A.    Those were the planned at the time, so that was our

3    2014 through 2019 plan.

4    Q.    And so in 2014 through 2019, you were planning 85

5    million, 108 million, 134 million, 165 million and 207 in

6    revenue?

7    A.    That is what we had in our plan, yes.

8    Q.    Was that revenue provided to these would-be purchasers

9    that we saw in the Andrews -- I'm sorry, in the slide from

10   the Stephens Investment Bank?

11   A.    It was.

12   Q.    So, for example, U.S. Ecology, did they see these

13   revenues?

14   A.    They should have.

15   Q.    Westinghouse?

16   A.    They should have.

17   Q.    AREVA?

18   A.    They should have.

19   Q.    Lindsay Goldberg?

20   A.    They should have.

21   Q.    EnergySolutions?

22   A.    They should have.

23   Q.    What written offers did those purchasers make when

24   they saw those robust revenues?

25   A.    We did not receive offers from any of them.

Baltzer - redirect

1  Q.      There was just a question.  Look at PTX-166 back in

2  your other binder.  I'm sorry to make you do the gymnastics

3  up there, but it's part of the job you have today.  That was

4  the letter of termination that you all wrote to Wunderlich

5  Securities.

6           So, first of all, let's look at date:

7  August 29, 2014.  It's important not to take things out of

8  context, so let's talk about the context.

9           By August 29, 2014, had Wunderlich already

10 engaged in advanced negotiations and discussions with

11 Lindsay Goldberg?

12 A.      Yes.

13 Q.      US Ecology?

14 A.      Yes.

15 Q.      AREVA?

16 A.      Yes.

17 Q.      Roark, the vulture find you told us about?

18 A.      Yes.

19 Q.      And was this sent after -- this letter sent after all

20 of them had signed and received the -- signed the

21 nondisclosure agreement and received the confidential

22 information memorandum?

23 A.      Yes.

24 Q.      Was this sent after you had advance negotiations with

25 Lindsay Goldberg?

Baltzer - redirect

1   A.    Yes.

2   Q.    Did this letter have any impact at all on those

3   interested parties looking at those robust revenues deciding

4   whether to purchase WCS or make an investment in it?

5   A.    No, none whatsoever.

6   Q.    So, for example, did Lindsay Goldberg, when they heard

7   about this letter, stop the negotiations?

8   A.    No.  We continued robust dialogue with them for

9   several weeks after this.

10  Q.    In fact, was this letter written precisely because WCS

11  management was upset that Wunderlich was inserting itself

12  too much in those Lindsay Goldberg negotiations?

13  A.    That was the entire purpose.  We did not want Lindsay

14  Goldberg to, or, I'm sorry, Wunderlich to interfere with

15  that direct communication.

16  Q.    So let's talk about these other people.  If this

17  merger is not allowed to close, you got a GMail from

18  somebody named Sean McCabe.  Have you heard that name?

19  A.    I have.

20  Q.    Is he in the waste business today?

21  A.    He's not.

22  Q.    What business is he in today?

23  A.    I think he's doing high speed rail projects in Texas.

24  Q.    Is there a high speed rail in Texas?

25  A.    Not much.

Baltzer - redirect

1    Q.    Does it have anything to do with Andrews, Texas at

2    all?

3    A.    No.  It will not go there.

4    Q.    From what you know, is he a real viable buyer of WCS?

5    A.    No.

6    Q.    Has he ever, ever made a verbal offer?

7    A.    No, Sean McCabe has not made a verbal offer.

8    Q.    All right.  Any sort of indication of interest, a

9    hint, a whisper?

10   A.    No.  We have not gotten any offers, written or verbal,

11   for any amounts of money to buy WCS from anyone.

12   Q.    Does Sean McCabe seem like the type who actually could

13   buy WCS?

14   A.    No, I don't believe so.

15   Q.    Now, you were asked a question about bankruptcy

16   restructuring and there was some reading of your deposition.

17            Were you crystal clear in your deposition that

18   bankruptcy restructuring was not an option?

19   A.    I don't know if it was crystal clear in the

20   deposition, but bankruptcy reorganization is not an option.

21   Q.    So how about closure?  Have you started the process of

22   modeling the cost of closure?

23   A.    We have.

24   Q.    And would closure include capping the site, pouring

25   the concrete, closing the facility?

Baltzer - redirect

1   A.    It would.

2   Q.    Who has the closure responsibility?

3   A.    WCS has the closure responsibility.

4   Q.    So let's wrap up with this, sir, and I it will take a

5   little bit of time.  I want to make sure again we're

6   crystal-clear in communicating with each other.

7         There was some talk about leases, and I want

8   to make sure we have not lost the legal structure of your

9   site.

10        So let's put the map of the site back up, if

11  that's okay with you, Mr. Baltzer.

12  A.    Sure.

13  Q.    And let's talk about a couple of things.  I want to

14  talk about three things:  The bond package.

15  A.    Okay.

16  Q.    Bond repayment and leasehold legalities.  Okay?  Can

17  we talk about those topics?

18  A.    Sure.

19  Q.    So, first of all, what's the total acreage out there

20  in Andrews, Texas that WCS purchased?

21  A.    Approximately 14,000 acres.

22  Q.    And how many acres are dedicated to landfills?

23  A.    Less than 400.

24  Q.    And I heard somewhere a reference to 1300.  What's the

25  1300 acres?

Baltzer - redirect

1    A.    The 1313 acres is the extent of our Resource

2    Conservation Recovery Act permits.

3    Q.    What do we see on Defendants' Exhibit 30 on the map

4    that's shown in front of Judge Robinson today?  How many

5    acres?

6    A.    Within that rail loop is approximately 600 acres.  The

7    1300 would be approximately the size of that photo.

8    Q.    And do the 14,000 provide a buffer for this nuclear

9    waste landfill?

10    A.    Yes.

11    Q.    For the public?

12    A.    It does.

13    Q.    Okay.  So tell me where -- and we talked about, the

14    first topic was the State of Texas leaks, and there seemed

15    to be some suggestion the State of Texas wanted to take this

16    place over.  So tell me, where on this map is the state of

17    Texas lakes?

18    A.    The lot number eight, kind of small rectangle on the

19    right-hand side.

20    Q.    So right here?

21    A.    Yes.

22    Q.    All right.  And during the legislation -- is that

23    approximately two acres?

24    A.    No.  That's approximately 30, 40 acres, something like

25    that.

Baltzer - redirect

1    Q.      And that a compact waste facility?

2    A.      It is.

3    Q.      So this is the compact waste facility?

4    A.      It is.

5    Q.      And during the legislation and the licensing issuance

6    process, was part of the plan for WCS to be the licensee who

7    operated the facility until the end of the facility's useful

8    life?

9    A.      In the legislature, the plan was to find an operator

10   who would be the licensee.  It wasn't specifically WCS.

11   Q.      Okay.  That's fair.

12           And was WCS ultimately chosen as the operator

13   instead of an operator for the useful life of this facility?

14   A.      We were chosen to be the operator, but our license is

15   only through September of 2024.

16   Q.      And would you then apply for a re-license or an

17   extension of your license?  What's the word you would use

18   for that?

19   A.      We do have the opportunity to apply for a license

20   renewal at that point.

21   Q.      Is it the expectation that WCS would be the license

22   renewed party, assuming all the financial issues work

23   themselves out?

24   A.      Assuming all the financial issues work themselves out,

25   we would intend to renew that until the Texas nuclear power

Baltzer - redirect

1    plants would eventually decommission.

2    Q.    And was it part of the legislative process and the

3    licensing process to provide the public with some assurance

4    that the State of Texas would be the backup for the legal

5    liability of owning the actual waste in the ground?

6    A.    The State of Texas owns that facility and we lease it

7    back from them and they are responsible for taking title to

8    that waste, and that's why those facilities are so robust.

9    Q.    And so for this, just this number 1 labeled number 8,

10   the State of Texas owns that land?

11   A.    Correct.

12   Q.    And does WCS then lease back that same compact waste

13   facility number 8 on this chart to operate it?

14   A.    We do.

15   Q.    Was the purpose of that structure, WCS buys the land,

16   WCS conveys it to the State, WCS then takes it back in a

17   lease back so that the people of Texas could be assured that

18   Texas would have ultimate ownership of the waste that's

19   buried there?

20   A.    It is.

21   Q.    Was that the purpose of the lease with the State of

22   Texas?

23   A.    It is.

24   Q.    So look at Exhibit Number 243 with me, PTX-243.   Is

25   this the State of Texas lease?

Baltzer - redirect

1   A.    It is.

2   Q.    So let's look at some of the page numbers here.  I

3   mean, page number one, the first whereas clause.

4            On September 10, 2009 -- blow that up.  Thank

5   you, James.  Issued the license.  Is that about what

6   happened at that time?

7   A.    It is.

8   Q.    Look at number 4.  Was there an indemnity provided by

9   WCS to the State of Texas for any liability imposed on the

10  state?

11  A.    We did.

12  Q.    Look at number 5 and 6.  Did then WCS convey the land

13  that it purchased to the State of Texas?

14  A.    We did.

15  Q.    And number 7.  Did WCS then lease back the land and

16  indemnify again the State of Texas?

17  A.    We did.

18  Q.    Now, look at Section 3.1, lease term.

19  A.    Okay.

20  Q.    Was the lease term matching with the license term?  In

21  other words, they are the same length of time?

22  A.    It is.

23  Q.    And does the lease allow termination in paragraph 3.2

24  by WCS?  If you look at the last sentence, WCS will have no

25  write to terminate.

Baltzer - redirect

1    A.    It does not appear WCS has the right to terminate.

2    Q.    And what does WCS have to do under this lease if it

3    wants to exit?

4    A.    I think we'd have to close the facilities.

5    Q.    And does the State of Texas have a right to operate

6    the facility?  Do they have a license?

7    A.    No, they do not have a license.

8    Q.    Does the County of Andrews have a license to operate

9    the facility?

10   A.    No, they do not.

11   Q.    Does the town of Andrews have a license to operate the

12   facility?

13   A.    No, they do not.

14   Q.    Does WCS --

15   A.    We are the only licensee in the State of Texas.

16   Q.    In fact, on planet earth, does anybody have a license

17   to operate that facility other than WCS?

18   A.    No.

19   Q.    And does WCS have the exclusive control over the

20   compact waste facility, that figure number 8 we saw on the

21   map?

22   A.    We do.

23   Q.    Look at paragraph 4.4 of this lease, plaintiff's 243.

24   Is that clear that WCS shall have the exclusive control,

25   possession, occupancy and management of the premises, the

Baltzer - redirect

1    improvements, and the new improvements?

2    A.    It does.

3    Q.    Does WCS maintain the obligation to decommission and

4    close the site?

5    A.    We do.

6    Q.    Is that Section 6.4 that you were pointing out on

7    cross-examination?

8    A.    It is.

9    Q.    And would WCS in going forward with decommissioning

10   and closure have to file an application or an updated

11   licensure with the Texas Commission on Environmental

12   Equality?

13   A.    We would.

14   Q.    Okay.

15             MR. BECKWITH:  So now let's go back to the map,

16   James, if we would.

17   BY MR. BECKWITH:

18   Q.    Once you got the license, once WCS received the

19   license from the Texas Commission on Environmental Quality,

20   the legislature approved it, did you have to find money to

21   build the site?

22   A.    We did.

23   Q.    And did you do what some people would call a

24   rent-to-own transaction?

25   A.    We wound up doing that with Andrews County.

Baltzer - redirect

1    Q.    All right.  In finding the money, was an agreement

2    reached with Andrews County to issue bonds for the

3    construction?

4    A.    There was.

5    Q.    So let me see if I got it right.  The way this worked

6    was, you went out and bought 14,000 acres of land; is that

7    right?

8    A.    Correct.

9    Q.    Then you gave the State of Texas 30 acres for the

10   compact waste facility?

11              MS. ELMER:  Objection.  Leading.

12              THE WITNESS:  We --

13              THE COURT:  It is leading.

14              MR. BECKWITH:  Okay.  I was just trying to

15   summarize.

16              THE COURT:  I know you were, and I more or less

17   understand who is giving testimony here, but it would be

18   more compelling testimony if it came from the witness.

19              MR. BECKWITH:  Fair, your Honor, and I'm just

20   trying to be brief.  I apologize.

21   BY MR. BECKWITH:

22   Q.    All right.  So let's start over.  With respect to the

23   Andrews County facility, was there this rent-to-own

24   transaction?

25   A.    Yes.  Sale leaseback.

Baltzer - redirect

1  Q.    So let's look at paragraph 242.  Is that the lease

2  with Andrews County?

3  A.    It is.

4  Q.    And so let's look at recital number one.  The landlord

5  intends to issue bonds -- do you see that?

6  A.    I do.

7  Q.    -- of the landlord to fund the purchase of the leased

8  assets.

9          Do you see that?

10 A.    I do.

11 Q.    Okay.  The bonds are anticipated to be in an amount

12 not to exceed $75 million payable over a 25-year term, the

13 bonds.

14          Do you see that?  And we've unredacted this.

15 A.    I do.

16 Q.    Now, did WCS convey its land to Andrews County as part

17 of this?

18 A.    We did.

19 Q.    In exchange for conveying the land, did WCS receive

20 the bond proceeds so it could build the facilities?

21 A.    We did.

22 Q.    How long did the lease term last?

23 A.    I think it was approximately 25 years.

24 Q.    Look at Section 1.3.  How long did the lease term last

25 under Section 1.3?

1    A.    25 years.

2    Q.    And how long were the bonds going to take to repay?

3    A.    25 years.

4    Q.    Now, you were asked a question on cross-examination

5    that was something like, so if WCS becomes insolvent or

6    declares bankruptcy, Andrews County can terminate the lease

7    and take possession of the Andrews site.  I want to explore

8    that with you, if that's okay with you.

9    A.    Okay.

10   Q.    First, was it ever contemplated that Andrews County

11   would operate this site?

12   A.    No.

13   Q.    Was it ever contemplated that Andrews County wanted to

14   own the site into perpetuity?

15   A.    No.  They much prefer just to get their rental

16   payments back.

17   Q.    And rental payments, is that --

18   A.    Payment --

19   Q.    How does that relate to bonds?

20   A.    It's the exact -- their cash that they use to pay the

21   bonds, principal and interest is the same amount of cash I

22   paid them for the lease of the land.

23   Q.    Does the rent pay the bonds?

24   A.    It does.

25   Q.    Section 1.4(c) at page 4 would you look at that

Baltzer - redirect

1    section and confirm that you've seen that before.

2    A.    I have.

3    Q.    What does that communicate to you?  What do you

4    understand it to do?

5    A.    What we just discussed, the lease payments that we pay

6    paid for the bonds.

7    Q.    As soon in 25 years as the bonds are repaid, does the

8    lease terminate?

9    A.    It does, and reverts back to WCS.

10   Q.    Who owns the land when the bonds are repaid?

11   A.    WCS.

12   Q.    And so let's look at Section 10.2.  What is the title

13   of Section 10.2?

14   A.    "Reconveyance to tenant of lease assets."

15   Q.    What did you understand that to mean?

16   A.    Basically, once the bond is paid off, then we get all

17   of the land back.  There's no payments or anything and it

18   converts automatically.

19   Q.    So there was a suggestion in the questioning that if

20   you default, that somehow Andrews County takes the land and

21   operates the site.  I want to explore that with you for a

22   moment.

23         Look at 10.2(b).  "In the event there is a

24   default by the tenant under this lease and landlord

25   exercises its remedies under the guarantee or the Contran

Baltzer - redirect

1      pledge agreement and recovers funds or other collateral

2      sufficient to defease or pre-pay the bonds in full in

3      accordance with the terms of and timing provided by the

4      bonds, this lease shall terminate and landlord shall convey

5      the leased assets to tenant."

6           Do you see where I read?

7      A.     I do.

8      Q.     And what is the guarantee of the Contran pledge

9      agreement?

10     A.     There were multiple guarantees with this bond package,

11     and so if any of these guarantees had stopped, other things

12     pledged to this, if that paid off a lease, then WCS would

13     still get the money back or still get the property back.

14     Q.     If WCS defaults, what happens to the bonds?

15     A.     The bonds would still get paid off.  There are lots of

16     guarantees on those.

17     Q.     And what happens to the ownership of the land at that

18     point?

19     A.     It would go back to WCS.

20     Q.     What would WCS then have to do with respect to capping

21     and closing the facility?

22     A.     We would still be required on our license to cap and

23     close it even if we were to no longer operate.

24     Q.     Now, there were some questions about -- I think the

25     first question was, do you recall that it was that you

Baltzer - redirect

1    worked at Contran, not WCS, and you work under a services

2    agreement?

3    A.    I do.

4    Q.    Turning your attention to that topic.

5    A.    Yes.

6    Q.    If the merger does not close, do you have a job at

7    Contran?

8    A.    I don't think -- I don't think there's a role for me.

9    Contran had layoffs earlier last year and, you know, they

10   have -- there's nothing I would be able to do for Contran.

11   There is no ongoing position there.

12   Q.    As the leader of WCS at that meeting when you went out

13   last week and saw the employees, did you communicate to them

14   that you would, so to speak, go down with the ship?

15   A.    I did not use that language.  We hope this ship sails.

16   We hope this acquisition gets approved, but, yeah, I told

17   them, I've chosen WCS.  Whatever path WCS goes down, I'm

18   with it.

19              MR. BECKWITH:  Nothing further, your Honor.

20              THE COURT:  All right.  You may step down, sir.

21   Thank you.

22              THE WITNESS:  Thank you.

23              (Witness excused.)

24              MR. LOWENSTEIN:  Your Honor, the defendants are

25   going to call Kim Murchison from Talan Energy, which is a

1    utility customer.  This will be done by video.  It is brief,

2    16 minutes and 2 seconds.  And the testimony relates to the

3    lack of competitive effects in this case.

4                   (The videotaped deposition of Kimberly J.

5    Murchison was played as follows.)

6                   "Question:  Can you please state your full name

7    for the record?

8                   "Answer:  Kimberly Jean Murchison.

9                   "Question:  And can you please state your

10   business address?

11                  "Answer:  769 Salem Boulevard, Berwick,

12   Pennsylvania, 18603.

13                  "Question:  So I'd like to go through some

14   questions about your individual background.

15                  "What is your current position at Talen Energy?

16                  "Answer:  I'm the radioactive material shipper.

17                  "Question:  And how long have you been in this

18   position?

19                  "Answer:  Three years, January.

20                  "Question:  And what are your duties and

21   responsibilities in this position?

22                  "Answer:  I take care of all the radioactive

23   material and waste on-site and make sure it gets -- the

24   disposition of it is within regulations.

25                  "Question:  Can you please briefly describe

Murchison - deposition designations

1    Talen Energy as a company and what you do?

2              "Answer:  Well, we provide the surrounding area

3    with safe, reliable power and make sure that that's done in

4    a, obviously a safe manner.

5              "That's really the gist of it.

6              "Question:  And how many nuclear operating

7    facilities toss Talen Energy own and operate?

8              "Answer:  We own -- we have two units and

9    they're both at the same location.

10             "Question:  And what is that location?

11             "Answer:  769 Salem Boulevard, Berwick,

12   Pennsylvania.

13             "Question:  And what's the name of that

14   facility?

15             "Answer:  Susquehanna Nuclear, LLC.

16             "Question:  And how large is that facility

17   compared to other nuclear operating facilities?

18             "Answer:  It's quite large.  It's

19   1300 megawatts, and generally speaking, other plants are a

20   thousand or less.

21             "Question:  And are its operations similar to

22   those at other nuclear operating facilities?

23             "Answer:  Yes.

24             "Question:  Does Talen, does it generate low

25   level radioactive waste through the operation of the

Murchison - deposition designations

1  Susquehanna facility?

2          "Answer:  Yes.

3          "Question:  And are you aware of the different

4  classes of low level radioactive waste?

5          "Answer:  Yes.

6          "Question:  And can you please tell me what

7  those classifications are?

8          "Answer:  For the most part, we generate only

9  Class A waste.  We have Class B and Class C that's stored

10  in our spent fuel pool, which we remove on a periodic

11  basis.

12          "Question:  What types of material does Talen

13  generate?

14          "Answer:  We generate what we consider plant

15  trash, which is a Green is Clean definition of -- it's the

16  exempt material we were just speaking of.

17          "We have DAW, which is dry active waste.  And

18  that is greater than the plant material that we generate

19  that we can ship to an exempt facility.  And then we also

20  have resins, a different variety of resins, which are our

21  plant filters for water.

22          "And we have also filters, mechanical filters

23  that we generate.  All of these are within Class A limits.

24          "And we have sludge that we take out of our

25  sumps, which is very similar to the resin material.

Murchison - deposition designations

1   "Question:  Anything else?

2           "Answer:  Large components, where we do large

3   component removal.  This outage we did three feed water

4   heaters, which are large components.

5           "Question:  And you said Talen also generates

6   spent fuel as well?

7           "Answer:  Spent fuel, correct, and we store that

8   on-site.

9           "Question:  Okay.  So just so I understand, you

10  told me that dry active waste, that is shipped as exempt,

11  correct?

12          "Answer:  We have two, two classifications.  The

13  Green is Clean, which we call GIC, G-I-C.  And that is

14  exempt material.

15          "And then the DAW is the greater than the Green

16  is Clean definition and it goes to a disposal site.  So that

17  would be -- that would be a Class A material, the DAW's

18  material.

19          "Question:  And you told me that all of Talen's

20  resins and filters are Class A?

21          "Answer:  So far, yes.  We haven't had anything

22  break that limit, other than what's in the spent fuel pool.

23  Anything generated within the spent fuel pool would be

24  possibility of a Class B material.

25          "Question:  And you have to manage this waste,

Murchison - deposition designations

1    correct?

2            "Answer:  Correct.

3            "Question:  And who makes the decisions at Talen

4    about how this waste is managed?

5            "Answer:  I do.

6            "Question:  And how do you make those decisions?

7            "Answer:  With the regulations and through

8    training that I receive and industry peers.

9            "Question:  Can you generally describe the

10   different options that you have for managing the waste

11   generated at Talen?

12           "Answer:  Sure.

13           We have processing capability, send it to a

14   processor.  There are a couple out there.  Currently we have

15   contracts with EnergySolutions and a disposal site, WCS.

16   We're only currently shipping to EnergySolutions for

17   processing.  I do not ship direct to burial as of this time.

18   We don't have the capability to process that material for

19   direct ship to burial.

20           "Question:  And that would be direct burial at

21   WCS?

22           "Answer:  Correct, which would currently go

23   through a processor.

24           Question:  So you told me that Talen generates

25   the Green is Clean waste and then waste that is greater than

Murchison - deposition designations

1    Green is Clean is dry active waste and that you send for

2    disposal, is that correct?

3                "Answer:  Correct.  It goes to processing and

4    then they dispose of it from there, or incinerate.

5                "Question:  And can you describe that process to

6    me?

7                "Answer:  We receive shipping containers into

8    our facility, generally a 20-foot Sealand or drums of trash

9    and we seal it up and send it out on the truck to the Bear

10   Creek facility.

11               "Question:  And what is the Bear Creek facility?

12               "Answer:  That is where our DAW trash goes,

13   which would be Class A.

14               "Question:  And who owns the Bear Creek

15   facility?

16               "Answer:  EnergySolutions.

17               "Question:  And what is your understanding of

18   what happens to the waste at Bear Creek?

19               "Answer:  There's a couple of things.

20   They generally take out what's metal, what's incinerable

21   and separate and then they Philadelphia HIC with the

22   material that's left over and then bury it at their Clive

23   facility.

24               "Question:  So would these be processing --

25               "Answer:  Yes.

Murchison - deposition designations

1    "Question:  -- services occurring at Bear Creek?

2    "Answer:  Yes.

3    "Question:  And then you said that after the

4    waste is processed at Bear Creek, it's sent to Clive --

5    "Answer:  Yes.

6    "Question:  -- for burial?

7    "Is there anywhere else that this waste could be

8    sent for disposal, other than Clive?

9    "Answer:  WCS.

10   "Question:  And do you send any of this waste

11   for disposal at WCS?

12   "Answer:  We have only sent two Sealands full

13   of material for processing and then disposal at WCS last

14   year.

15   "Question:  Sorry.  Other than sending this

16   waste to Bear Creek for processing, do you send it anywhere

17   else to be processed?

18   "Answer:  No.

19   "Question:  Do you use any other processors?

20   "Answer:  No.

21   "Question:  Are there other processors that you

22   could send this waste to?

23   "Answer:  Yes.

24   "Question:  And who, who might those be?

25   "Answer:  Unitech Services, Alaron Services.

Murchison - deposition designations

1    Toxco does filters.

2            "That's all that I'm aware of right now.

3            "Question:  And so why do you send the waste to

4    Bear Creek instead of these other potential processors?

5            "Answer:  We used Alaron and WCS last year as

6    kind of a trial run to see if we would switch.  And some of

7    the material ended upcoming back to us.  It wasn't -- it

8    wasn't able to be disposed of there.

9            "We don't really separate our universal waste

10   streams, and EnergySolutions takes care of it on their end.

11   And it wasn't known to us that that wouldn't happen with the

12   WCS facility.

13           "So when they received our containers at Alaron

14   and separated everything out, that material couldn't be

15   disposed of from there.

16           "Question:  So why, why did you send the waste

17   to Alaron first?

18           "Answer:  For processing for burial at WCS.

19           "Question:  Could WCS have processed this waste?

20           "Answer:  Not that I'm aware of.

21           "Question:  And do you know the volume of these

22   two containers of waste that you tried to send to WCS?

23           "Answer:  They were both ten 40-cubic foot.  So

24   1,040 cubic feet.  Two Sealand containers both at that size.

25           "Question:  So can you just explain a little bit

Murchison - deposition designations

1    more about this process of trying to send these two

2    containers to WCS last year?

3            "Answer:  Well, we filled them during our outage

4    last year and then realized we didn't have a NUPIC audit for

5    the facility that we were sending it to.  NUPIC is industry

6    standard for waste disposal audits.

7            "And then we had to send a person ahead of our

8    waste going to WCS, and his availability was small, so it

9    took us a while to get to that point.  And when we finally

10   got them out of our facility and to Alaron, it was kind of a

11   longer period than we would normally have waste on-site.

12           "And then once they got to Alaron and that

13   was -- everything was separated, received a phone call

14   saying that some of the material was not acceptable for

15   disposal at WCS and that I would have to find another

16   solution for it, whether it came back to us or Alaron

17   disposed of it for us at a price.

18           "Question:  And do you know why the waste was

19   not acceptable for --

20           "Answer:  It was a -- yes.

21           "Question:  -- disposal?

22           "Answer:  Sorry.

23           "Yes, it was a universal waste, which isn't --

24   kind of makes it a different class.  It's a hazardous waste,

25   but it's not a hazardous waste.  It's universal.

Murchison - deposition designations

1     "Question:  So what amount of this waste came

2   back to you then?

3     "Answer:  I don't recall.  I'm sorry.  I don't

4   honestly know that we got it back.  I think he's still at

5   Alaron.

6     "Question:  So you're not aware of what's

7   happened to this waste?

8     "Answer:  No.

9     "Question:  And so out of all of the dry active

10  waste, last year you only shipped those two containers to

11  WCS or you only attempted to ship those two containers?

12    "Answer:  For active dry waste, yes.  We did

13  send three large components to WCS.

14    "Question:  Would you try to send dry active

15  waste to such as those two containers to WCS again in the

16  future?

17    "Answer:  I don't see it happening.

18    "Question:  And why not?

19    "Answer:  The -- currently, the way we segregate

20  our trash, it would be another extra added step for us.  And

21  we don't have the room.

22    "Question:  Can you explain what you mean by

23  another added step?

24    "Answer:  As I mentioned, the universal waste

25  that we can't clear from the plant for radioactive reasons

1    goes to EnergySolutions for disposal.  And right now we, we

2    don't separate that out.  It stays with our regular trash

3    streams, waste stream.  So it would be -- it would require

4    us to find another storage facility for this material.  And

5    then another disposal option for it as well.

6              "Question:  Did you bring these concerns up with

7    WCS at the time?

8              "Answer:  Yes.

9              "Question:  And what was their response?

10             "Answer:  That Alaron could process it through

11   their facility.  But, again, that would be a higher price.

12             "Question:  Did you raise this issue inside

13   Talen?

14             "Answer:  I spoke about it with my boss, but it

15   was the same outcome that I had, that I wasn't going to send

16   any more.

17             "Question:  And earlier you testified that when

18   you sent those two containers of dry active waste to WCS,

19   you had issues with the waste not meeting -- not being

20   acceptable for disposal at WCS, that the price seemed right,

21   but wasn't, and that you had to use Alaron for processing.

22             "Is that correct?

23             "Answer:  Correct.  In a sense.  We used Alaron

24   per our contract for processing.  We didn't use them because

25   of the waste.

Murchison - deposition designations

1    "Question:  But WCS couldn't have processed the

2    waste itself?

3                 "Answer:  No.

4                 "Question:  And do you believe that these types

5    of issues you encountered when trying to ship waste to WCS,

6    would those circumstances change if EnergySolutions and WCS

7    merged?

8                 "THE WITNESS:  I mean, I ship to EnergySolutions

9    now because I know their processes.  I can't imagine them

10   being any different if they took over WCS.

11                "BY MS. BARTHOLOMEW:

12                "Question:  From your perspective, is

13   EnergySolutions well positioned to run WCS?

14                "THE WITNESS:  I do believe so, yes.  As long as

15   I've been in the industry, there's only been a few that have

16   been able to do this kind of running of a facility of that

17   size.  And I would want somebody that's knowledgeable to do

18   it, so I don't know who else that would be.

19                "BY MS BARTHOLOMEW.

20                "Question:  Other than EnergySolutions?

21                "Answer:  Other than EnergySolutions.

22                "Question:  And do you think that there would be

23   benefits to Talen if EnergySolutions acquired WCS?

24                "Answer:  For disposal options, yes.

25                "Question:  Okay.  And you had mentioned earlier

Murchison - deposition designations

1   this morning that you had sourced WCS.

2           "Did I understand that correctly?

3           "Answer:  Yes.

4           "Question:  And what did you mean by that?

5           "Answer:  To find out what their options are for

6   disposal and processing of our materials.

7           "Question:  And why were you doing that?

8           "Answer:  I was asked by my boss to see if we

9   could lower rates on any of our waste streams.

10          "Question:  And do you have all the necessary

11  information, as you sit here today, to know if the final

12  price for WCS disposal is more or less expensive than

13  EnergySolutions for those two DAW Sealands?

14          "Answer:  No.  It's still currently with Alaron.

15  It has not been shipped to burial yet.

16          "Question:  And do you believe that if

17  EnergySolutions acquires WCS, there would be efficiencies

18  for you in terms of processing and disposal?

19          "THE WITNESS:  Yes.

20          "BY MS BARTHOLOMEW.

21          "Question:  Can you explain that a bit?

22          "Answer:  For Class A -- for our resins to stay

23  Class A, we have to pull it from the system earlier than we

24  would if we were allowed -- we were to allow it to become

25  Class B/C resin.  And I currently don't have an option for

Case 1:16-cv-01056-SLR    Document 226    Filed 06/08/17    Page 79 of 285 PageID #: 5860
1293
Murchison - deposition designations

1   processing Class B or C resin unless we were to send it to

2   direct disposal for -- to WCS.

3            "So for me to be able to let our resin run until

4   a Class B and C resin, and then send it to process through

5   EnergySolutions who would then send it on to WCS would be a

6   better option for us financially.

7            "Question:  So the experience that you had in

8   trying to send these two containers to WCS, would you

9   attempt to send waste such as those containers to WCS again

10  in the future?

11           "THE WITNESS:  It's cumbersome, so probably not,

12  no."

13           (End of videotaped deposition.)

14           MR. BECKWITH:  Your Honor, I believe that's the

15  end of the video.  Defendants call Amy Samford, the CFO.

16           THE COURT:  All right.

17                ... AMY ALLBACH SAMFORD, having been

18                duly sworn as a witness, was examined and

19                testified as follows ...

20           MR. BECKWITH:  Your Honor, Ms. Samford is the

21  Chief Financial Officer of WCS.  She's also the controller

22  of WCS's parent, Valhi, Inc.  She will testify regarding

23  WCS's history of losses, its attempts to reduce costs and

24  its projected future losses.

25           She is also here to testify about the borrowings

Samford - direct

1  that have occurred from Valhi and in closed court from

2  Contran, how those relate to each other.  All of those

3  relate to findings of fact Section 1, Subsection B, and

4  Section 9(b) through F, your Honor.

5                         DIRECT EXAMINATION

6  BY MR. BECKWITH:

7  Q.     Would you, Ms. Samford, introduce yourself to Judge

8  Robinson.

9  A.     Sure.  My name is Amy Samford.  I am a graduate of

10  Texas Christian University.  I've been a CPA since 1999, and

11  I'm the Executive Vice President of WCS and the Chief

12  Financial Officer as well.

13  Q.     Where do you live?

14  A.     I live in Dallas.

15  Q.     And your current role at WCS -- I know you did that

16  quickly -- what's your current role at WCS?

17  A.     I'm the Executive Vice President and the Chief

18  Financial Officer.

19  Q.     And have you ever testified in court before?

20  A.     I have not.

21  Q.     Well, welcome.

22  A.     Thank you.

23  Q.     When did you start the Chief Financial Officer

24  process?

25  A.     I was appointed Chief Financial Officer in November of

Samford - direct

1    2014.

2    Q.    And prior to becoming the CFO of WCS, what was your

3    position?

4    A.    I was the assistant controller of Valhi and Contran.

5    Q.    Let's just start with an overview.  Are you aware of

6    WCS's finances as its Chief Financial Officer?

7    A.    I am intimately aware of our finances.

8    Q.    And how would you describe WCS's financial

9    performance?

10    A.    Dismal.

11    Q.    And does WCS operate with high fixed costs or high

12    variable costs as an entity?

13    A.    The disposal cost model that WCS is forced to operate

14    under because of our regulatory requirements because of the

15    minimum staffing that we have to have in order to meet and

16    maintain and comply with those regulatory requirements

17    requires us to have a minimum level of staffing and services

18    available if I accept one barrel or I accept a million

19    barrels of waste, and so that by definition a fixed cost.

20    It's extremely high.  Ninety percent of our costs are fixed.

21    Q.    So would you describe WCS then as high fixed costs or

22    low fixed costs?

23    A.    Extremely high fixed costs.

24    Q.    As a finance person, what does having high fixed costs

25    mean to a business?

Samford - direct

1   A.     It gives me significantly less flexibility in how I

2   run and operate the business.  I can't flex up and flex down

3   when I look at sales coming in or not coming in.  I'm stuck.

4   I can't move my denominator.  I can only move my numerator

5   in sales.

6   Q.     As you think about the formula for profitability as a

7   finance person, what do you think of?

8   A.     Revenue minus expenses equals net income.

9   Q.     And a high fixed entity that you just described, how

10  do you impact it as the CFO?

11  A.     There's some tinkering around the edges that we've

12  done on some of the fixed costs, but for the most part, we

13  can't move those costs.  The only thing that we can change

14  is to try to drive more revenue into the facility, because

15  every dollar I drive in in revenue is a dollar less I'm

16  losing.

17  Q.     So let's talk about the back side of the formula for a

18  second.  Then we'll talk about the front.

19         On the decreased costs, have you taken steps at

20  WCS to decrease costs?

21  A.     We have cut to the bone.  We have cut to the point

22  where we would endanger our license to cut further because

23  we wouldn't be able to meet the regulatory requirements.

24  Q.     So, for example, when a person leaves a job, is that

25  job automatically refilled?

Samford - direct

1    A.    No.  We look at every job as it comes open and we

2    decide if we can go with or without that position and that

3    function.

4    Q.    So then let's look at the front side of the formula,

5    the profitability.  Revenue minus costs equals profitability

6    or loss.  So let's look at revenue.

7              On the revenue side, what has WCS done to

8    increase its revenue?

9    A.    We've done anything and everything we can think of.

10   We have, in 2014, we obtained the certification to accept

11   low level activity waste into our existing RCRA cell,

12   thinking that would offer a better complement of services

13   that might drive the B and C revenue that we need to operate

14   the facility in.

15             We have --

16   Q.    Let's talk about that real quickly.

17   A.    Sure.

18   Q.    The Judge has heard about the exempt cell.  Is that

19   the same as the RCRA cell you just mentioned?

20   A.    It's a RCRA permitted cell that can accept exempt

21   waste.

22   Q.    Has that, opening an exempt cell helped solve the

23   revenue problem for WCS?

24   A.    No.  Running full out, we could never generate enough

25   income to make up the delta on the loss.

Samford - direct

1    Q.      Did WCS get into the cask business?

2    A.      Yes.   There were some availability issues with cask

3    in 2013.   We purchased three of our own casks that are

4    licensed to take B and C, radioactive waste.   We received

5    those in the mid-2014.   We paid about $10 million for them

6    and they have individually been used less than a dozen times

7    apiece.

8    Q.      So has that worked out for you, the cask business?

9    A.      That has not worked out.

10   Q.      And what other revenue sources have you tried to

11   drive?

12   A.      We entered into some teaming agreements with different

13   partners as they've gone to bid on projects.   Unfortunately,

14   we have not won many of those.

15           We've also signed agreements with certain

16   third-party processors to try to offer what we call a sort

17   and seg line of business, which would be, because we are not

18   permitted by our license to actually do this process

19   on-site, to have A waste be sorted into things that go to

20   the exempt cell versus things that would have to go into the

21   compact facility and come at a bulk price for them.

22   Q.      How has that worked out?

23   A.      To date, we have had minimal to no shipments under

24   those contracts.

25   Q.      So does WCS under your direction prepare financial

1299

Samford - direct

1    statements?

2    A.    We do.

3    Q.    All right.  And who is the preparer of those financial

4    statements?

5    A.    I am.

6    Q.    As the assistant controller of Valhi, do you also have

7    some roles with respect to WCS's past financial segments?

8    A.    In my role as assistant controller at Valhi, I've

9    reviewed every financial statement since I've been with the

10   company.

11   Q.    And is that a job you still have today, assistant

12   controller of Valhi?

13   A.    No.  I'm currently the controller of Valhi.

14   Q.    Controller.  Okay.  Let's go on and --

15             MR. BECKWITH:  Your Honor, may I approach the

16   witness with a couple of binders?

17             THE COURT:  Yes, you may.

18             (Mr. Beckwith handed binders to the witness.)

19   BY MR. BECKWITH:

20   Q.    Here you are.  Here's what I'm going to try to do,

21   your Honor, which is, we have a stack of financial

22   statements that I need to put in, and I'm going to work

23   through them together in bulk and then present them to the

24   Court, if that's all right with your Honor.

25             THE COURT:  All right.

Samford - direct

```
 1              MR. BECKWITH:  Meaning I'm going to try to take

 2    six years and put them in at once, if that's possible.

 3    We'll give it a run at least.

 4              THE COURT:  All right.

 5    BY MR. BECKWITH:

 6    Q.    All right.  So as the Chief Financial Officer, would

 7    you turn to Defendants' 186.

 8    A.    Yes.

 9    Q.    AND can you identify W -- I'm sorry.  Can you identify

10    Defendants' 186 for the record?

11    A.    These are the audited financial statements from 2011

12    for Waste Control Specialists.

13    Q.    And would you turn to the next tab, to 187.

14    A.    These are Waste Control Specialists' audited 2012

15    financial statements.

16    Q.    Can you turn to 188.

17    A.    These are Waste Control Specialists' audited 2013

18    financial statements.

19    Q.    And can you turn to one 189.

20    A.    These are Waste Control Specialists' audited 2014

21    financial statements.

22    Q.    Can you turn to 190?

23    A.    These are Waste Control Specialists' audited 2015

24    financial statements.

25    Q.    And can you turn to 357.
```

Samford - direct

1    A.    These are Waste Control Specialists' audited 2016

2    financial statements.

3    Q.    Are those true and correct copies, Defendants'

4    186 through 190 and 357, of the financial statements of

5    WCS?

6    A.    Yes, they are.

7              MR. BECKWITH:  Your Honor, we offer Defendants'

8    186, 187, 188, 189, 190 and 357.

9              THE COURT:  Any objection?

10             MR. HOFFMAN:  No objection, your Honor.

11             THE COURT:  Thank you.

12             (Defendants' Exhibit No.  186, 187, 188, 189,

13   190 and 357 were admitted into evidence.)

14             MR. BECKWITH:  May I approach?

15             THE COURT:  Yes.

16             (Mr. Beckwith handed exhibits to the Court.)

17             MR. BECKWITH:  Thank you.

18   BY MR. BECKWITH:

19   Q.    Now, do these financial statements that we've just

20   entered into evidence, 186 through 190 and 357, show revenue

21   for WCS?

22   A.    Yes, they do.

23   Q.    Do they also show costs for WCS?

24   A.    Yes, they do.

25   Q.    Do they show either profits or losses for WCS?

Samford - direct

1    A.    Unfortunately, they show exclusively losses for WCS.

2    Q.    Has WCS ever made a profit in its history?

3    A.    WCS has never made an operating profit in its history.

4    Q.    So let's look at slide 1.  Have you prepared slide one

5    to assist the Judge in understanding WCS's losses?

6    A.    Yes.

7    Q.    Can you walk us through -- first of all, what do you

8    mean by, on the left-hand side, historical?

9    A.    These are the actual losses that we incurred in the

10   years 2012 through 2016.

11   Q.    So, for example, could you look at 2014 for me in the

12   exhibits in front of you and find that historical loss.

13   A.    Yes.

14   Q.    That would be in 189?

15   A.    189.

16   Q.    All right.

17   A.    That would be on the statement of operations, page 5.

18   Q.    And where does that show on page 5?

19   A.    That shows the net loss line is $8,123,000.

20   Q.    Was that WCS's best year?

21   A.    This is our high watermark, an $8 million loss.

22   Q.    Or low watermark?

23   A.    A low watermark.

24   Q.    Has WCS in the past tried to then project its future

25   either gains or losses, profits or losses?

Samford - direct

1    A.    We have an annual planning process where we try to

2    plan for the following fiscal year, but also for the four

3    years after that, so a five-year operating plan that we use,

4    kind of judge where we are, and more importantly, so I can

5    communicate to the parent company, because we are not

6    self-sustaining, what type of cash we'll require to maintain

7    operations.

8    Q.    Let's look at the past losses.  In 2012, what was the

9    past loss, approximately?

10   A.    32 million, it looks like.

11   Q.    In 2013, what was the approximate loss?

12   A.    29 million.

13   Q.    2014?

14   A.    That was the $8 million low watermark.

15   Q.    2015?

16   A.    $32 million.

17   Q.    2016?

18   A.    $32 million.

19   Q.    Now, how do you go through this planning process?

20   Would you explain that to the Judge.

21   A.    Sure.  So we have in the past and historically very

22   good at estimating what our cost structure is.  As I

23   mentioned, it's largely fixed costs.  So I know with a

24   pretty high degree of certainty what my costs are going to

25   be for the year.  What I don't know is my revenue.

1304

Samford - direct

```
 1              And so we have, as we've been open and as we
 2     have continued to fall far below initial projections, we
 3     have tried to refine the process so we could get better,
 4     because as I mentioned, every dollar I get in is a dollar
 5     less I have to borrow from my parent, but every dollar that
 6     I say I'm going to get in but I don't have is an unexpected
 7     loss and I'm asking my parent to absorb.
 8     Q.    So let's look at the comparisons to plan.  Who in
 9     your department is responsible for building up these
10     projections?
11     A.    The cost side, my group builds up, and Dan Burns, our
12     head of business development, bills up the sales side.
13     Q.    So let's look at Defendants' Exhibit No. 9 in the
14     binder in front of you.  And I believe these are in order.
15     I tried to put them in order for you, so they should be here
16     in front.
17     A.    Are they --
18     Q.    So we just did 357; right?
19     A.    Yes.
20     Q.    I tried to be efficient and not confuse you.  I know
21     it's a little confusing.  I'm sorry.  And then Defendants'
22     9?
23     A.    Yes.
24     Q.    Okay.  So what is Defendants' No. 9?
25     A.    Well, the older I get, the smaller the print is.
```

Samford - direct

1    Sorry.

2                    This is our 2017 operating plan, which includes

3    projections out through 2021.

4    Q.    I'm sorry.  2017 or 2013?

5    A.    I'm sorry.  You're right.  This is the 2012 plan that

6    includes projections out to 2017.

7    Q.    All right.  And then what about Defendants' No. 11?

8    Can you turn to that one?  It's the next tab.

9    A.    Yes.

10   Q.    What is that?

11   A.    That is the 2013 plan, or 2014 plan, sorry, that have

12   projections out to 2018.

13   Q.    What is the next tab?  What is that, 2015 plan,

14   Defendants' Exhibit 48 and 49?

15   A.    This is the 2015 plan.  It includes projections out to

16   2019.

17   Q.    And then, last, look at Defendants' Exhibit 153.  What

18   is Defendants' Exhibit 153?

19   A.    This is the 2015 plan that it includes projections out

20   to 2020.

21   Q.    Are Defendants 9, 11, 48, 49 and 153 true copies of

22   the plans from your files?

23   A.    Yes.

24                    MR. BECKWITH:  Your Honor, we move for

25   Defendants' 9, 11, 48, 49 and 153 to be admitted into

Samford - direct

1    evidence.

2                    MR. HOFFMAN:  No objection.

3                    THE COURT:  Thank you.

4                    (Defendants' Exhibit 9, 11, 48, 49 and 153 were

5    admitted into evidence.)

6    BY MR. BECKWITH:

7    Q.    Have you prepared a demonstrative to show how plan

8    appears up against actual?

9    A.    I have.

10                    MR. BECKWITH:  Would you put up slide 2,

11   James.

12   BY MR. BECKWITH:

13   Q.    So let's break this down.  We're looking at WCS 2013

14   plan for sales versus historical experience.

15                    So, first of all, explain to me what the yellow

16   dotted lines are.

17   A.    Well, as I mentioned before, we talked about the cost

18   structure at WCS is fixed for the most part.  So when I look

19   at the cash cost I need to cover these operating expenses,

20   then I am needing at least 65 million, and that's with no

21   capital spending, so no expansion of facilities, no purchase

22   of equipment, I need $65 million to cover my operating, my

23   regular operating expenses.

24                    With facility expansions, with equipment

25   replacement, then I need up to $80 million to cover -- just

Samford - direct

1    to be self-sustaining for a full year.

2    Q.    So is that what you are trying to describe?

3    A.    Yes.  That's the --

4    Q.    With the gold lines?

5    A.    The gold lines -- so I need to be over the lower gold

6    line.  Preferably, if this was a well operating business, I

7    would be over the second gold line, too, but I need to be at

8    least at that bottom gold line in order just to break even

9    on the cash flow basis.

10   Q.    And where, when you prepared this chart for the Judge,

11   did you put the bottom goal line?

12   A.    That is operating expenses with no capital spending.

13   Q.    How much money is that?

14   A.    $65 million.

15   Q.    All right.  And then the blue bars in the background,

16   what are the blue bars intended to show?

17   A.    These are what our projections were when we did our

18   plan, our five-tier plan in 2013, what we were projecting as

19   revenue for 2013, 2014, 2015 and 2016.

20   Q.    So according to the Defendants' Exhibit 9 in evidence

21   in front of you, what was the revenue that WCS planned for

22   the period 2014 through 2016?

23   A.    That was about 65 million in 2013.

24   Q.    How about 2014?

25   A.    About 90 million.

Samford - direct

1    Q.    How about 2015?

2    A.    About 120 million.

3    Q.    And 2016?

4    A.    About 138 million.

5    Q.    Did WCS meet its revenue goals in 2013?

6    A.    Not even close.

7    Q.    What does the red bar show in 2013 that looks like

8    it's trying to get up by 40 million?

9    A.    That is actual income, so actual revenue, actual focus

10   2013.

11   Q.    And where would we find that in the documents that

12   have been introduced?  Would that be in the financial

13   statements?

14   A.    They would be in the financial statements.

15   Q.    How about 2014?  How did you do that year?

16   A.    That is our best year ever.  We were right at 65

17   million in sales, and we were still 30 percent below our

18   plan.

19   Q.    How about 2015?

20   A.    2015, we were about $45 million in sales, less than

21   half of our goal.

22   Q.    If you had your best year ever in 2014, we called it

23   either low or high watermark, how did you react to CFO to

24   2015?

25   A.    You know, it's frustrating and it's disappointing, and

Samford - direct

1    it's -- you know, you are banging your head against the wall

2    trying to get good information from your parent company

3    because I'm the one that has to go in and keep asking for

4    money, and I'm trying to get good and reliable information

5    on what revenue is going to be, and it's not available, it's

6    not there.  We have consistently underestimated what we can

7    perform at.

8    Q.    So what did you do about that?

9    A.    When we started putting the 2016 plan together in the

10   fall of 2015, I went to the sales meeting where they talked

11   about goals, and I stood up in front of a sales group and

12   team as a whole and told them that you do me a disservice,

13   you do WCS a disservice when you give me these

14   pie-in-the-sky estimates that we will never hit.  I have

15   got to know with a degree of precision how much revenue is

16   going to come in because that directly impacts our cash

17   shortfall.

18          So for 2016, for instance, I know we're not

19   there yet, we had lowered our sales.  We had taken out kind

20   of some of the -- assuming that we won every project, we had

21   taken out, we tried to get a little bit better on that.

22          The revenue estimate had come in lower.  We had

23   projected $9 million in borrowings from the parent.  It

24   wound up being $23 million.  I'm off by 150 percent.  Well,

25   I've got to walk into our President's office every two or

Samford - direct

1   three weeks, and say you, know what, I'm going to need

2   another 2 or $3 million, and that's painful.

3   Q.    So look at Defendants' 153.  You suggested this.  I

4   want to go to at.

5          153 is what?  It's already in evidence, but what

6   is that document?

7   A.    That is the 2016 operating plan.

8   Q.    And what did you -- you went to this meeting, talked

9   to the salespeople.  What did you do as a result of talking

10  to the salespeople?

11  A.    We came in with -- if you will notice on this

12  demonstrative, the original 2013 projection for 2016 is

13  almost $140 million.  Right now we've come down to

14  $68 million.

15  Q.    Let's put that up there.  So you revised the plan to

16  be how much?

17  A.    $68 million.

18  Q.    And that is shown in Defendants' 153?

19  A.    Yes.

20  Q.    How did WCS do in 2016?

21  A.    $45 million revenue.

22  Q.    And --

23  A.    So we were still under our lower estimate, but still

24  30 percent short.

25  Q.    Did WCS produce new revenue projections each year?

Samford - direct

1    A.    Yes.

2    Q.    And did you also have a way internally of sort of

3    halving and halving it again?

4    A.    Right.  We are cash poor, we are cash strapped.  In

5    order to stay in business every week, I've got to figure out

6    where the money is coming from.  And so we have a weekly

7    cash forecast process where I have a staff member, and

8    that's most of his job, is to project cash for me.  And

9    every Monday I get a report, and he takes what is in

10   accounts receivable, what we know we have to pay in bills,

11   and then he takes the projections for sales going out for

12   the 12-week period to estimate what revenues are going to be

13   and see where we are each week as far as borrowing needs and

14   where we are over the next couple months so I can give some

15   early warning to my parent company.

16        And in the fall of 2016, because we were

17   consistent -- I mean, at this point I had blown through my

18   $9 million.  I'm over $18 million.  I said, stop.  We can't

19   take the sales forecast anymore.  We started cutting them by

20   50 percent in order to estimate cash needs.

21   Q.    So look at Defendants' 156 in the binder in front of

22   you.

23        THE COURT:  And I actually don't I think I got

24   copies any way of 9, 11, 48, 49 and --

25        MR. BECKWITH:  That is exactly right.  That is

Samford - direct

1   my fault.  May I approach?

2              THE COURT:  Yes.

3              (Mr. Beckwith handed exhibits to the Court.)

4              MR. BECKWITH:  I apologize for that, your Honor.

5   BY MR. BECKWITH:

6   Q.    Now, looking at Defendants' 156 in front of you, what

7   is that document?

8   A.    This is a budget to actual variance report for

9   December of 2011.

10  Q.    Why is that document prepared?

11  A.    This is internal mark.  We've got to not only kind of

12  keep forward about where we are, but figure out where we

13  thought we would be to see what went wrong.

14             MR. BECKWITH:  Your Honor, we offer Defendants'

15  156.

16             THE COURT:  Any objection to 156?

17             MR. HOFFMAN:  I'm sorry.  No objection.

18             (Defendants' Exhibit No. 156 was admitted into

19  evidence.)

20             MR. BECKWITH:  May I approach?

21             THE COURT:  Yes.

22             (Mr. Beckwith handed exhibits to the Court.)

23  BY MR. BECKWITH:

24  Q.    Now, is this document comparing WCS's actual

25  performance from 2011 through 2015 to plan?

Samford - direct

1  A.    This is comparing 2011 to 2011 plan.

2  Q.    And then how about on the next couple of pages?  Does

3  that take us through 2015?

4  A.    Oh, yes.  2012, '13, '14 and '15, yes.

5  Q.    What does this document show WCS revenue to miss, for

6  example, in 2015 to be?

7  A.    In 2015 we had plan revenue of $95 million and we had

8  actual revenue of $45 million.

9  Q.    How did WCS do in 2016, Ms. Samford?

10 A.    We had a forecast revenue projection of $68 million.

11 We actually -- disposal revenue was less than $40 million.

12 It was another 20 percent decline from the 2015.

13 Q.    Okay.  Let's look at Defendants' 342 in your binder.

14 What is Defendants' 342?

15 A.    This is the statement of cash flows for 2016 and a

16 2015 -- sorry.  I think this was a 2016 month-by-month

17 actual results.

18           MR. BECKWITH:  Your Honor, we offer 342.

19           THE COURT:  Any objection?

20           MR. HOFFMAN:  No objection, your Honor.

21           THE COURT:  All right.

22           (Defendants' Exhibit No. 342 was admitted into

23 evidence.)

24 BY MR. BECKWITH:

25 Q.    What is a flash report, Ms. Samford?

1    A.    So we -- a couple days, usually within a week after

2    the end of the month we put together what we call a flash

3    report, because it's real quick, it's dirty.  We don't have

4    necessarily all of the accounts reconciled, all of the

5    accruals booked, but it is to give us a good idea of where

6    the month is shaping up before -- on a quick basis before we

7    finally finish all the reconciliations.

8    Q.    What does this show about WCS's actual revenue for

9    2016 versus plan?

10   A.    That we had preliminaries of 47 million.  That would

11   include transportation revenue, which is a hundred percent

12   cost passthrough.  I don't have a transportation company, so

13   that shows that 47 million on the back transportation, 39

14   million of disposal revenue.  According to plan, 68 million.

15   So we were $21 million off of plan.

16   Q.    What was your response to these revenue misses year

17   over year over year?

18   A.    Again, it's frustrating.  I feel like I lose

19   credibility when I have to keep going into Bob O'Brien or

20   Rob Graham and keep asking for more money than we said we

21   would need, and so we can't keep kind of doing the same

22   thing, expecting a different result.

23            So we sat down again at the end of 2016, in the

24   fourth quarter.  We were starting to plan for 2017.  And,

25   again, you're doing me a disservice by giving me numbers

Samford - direct

1  that we cannot meet.  I have got to know what I can rely on

2  in revenue, so let's change the approach for forecasting

3  revenue again.

4          We forecast revenue for customers that we had

5  contracts with, that have told us that they have waste that

6  they're going to dispose of.  We do not forecast for things

7  that we are not licensed to take.  We do not forecast for

8  projects that have not been funded or awarded.  We forecast

9  on what we know is out there.

10  Q.   So look at Defendants' 335 in front of you.

11          THE COURT:  And actually, I think we are going

12  to hold that off until after our morning break.  So

13  15 minutes.

14          MR. BECKWITH:  Thank you, your Honor.

15          (Short recess taken.)

16                      -  -  -

17          (Proceedings resumed after the short recess.)

18          MR. BECKWITH:  May I proceed?

19          THE COURT:  Yes, you may.

20          MR. BECKWITH:  Thank you, your Honor.

21  BY MR. BECKWITH:

22  Q.   Ms. Samford, would you look at Defendants' 335 in the

23  binder in front of you.

24  A.   Okay.  This is our 2017 operating plan?

25  Q.   Is that a true copy of that operating plan?

Samford - direct

1    A.    It is.

2              MR. BECKWITH:  Your Honor, we would we offer

3    Defendants' Exhibit 335.

4              THE COURT:  Any objection?

5              MR. HOFFMAN:  No objection.

6              THE COURT:  Thank you.

7              (Defendants' Exhibit No. 335 was admitted into

8    evidence.)

9    BY MR. BECKWITH:

10   Q.    So looking at 335, what were you trying to accomplish

11   in building defendants' 335, the 2017 plan?

12   A.    We are trying to get a realistic estimation of the

13   cash needed at WCS for the next five years.

14   Q.    And so what do you predict to be the net loss of WCS

15   for 2017 through 2021?

16   A.    2017, we would lose $20 million.  2018, $40.5 million.

17   2019, $41.4 million.  2020, $35.8 million.  And 2021, we

18   would lose $54 million.

19   Q.    So have you prepared slide 1, the demonstrative that

20   captures that exact same information?

21   A.    I have.

22   Q.    Let's put that back up there.

23              And so the information on the right, 2017 plan

24   projections, you just read those numbers.  Roughly 30

25   million, 40 million.  Is that what's being shown on the

Samford - direct

1    right-hand side from 2017 through 2021?

2    A.    Yes.

3    Q.    Now, if WCS is losing money year over year, how does

4    it stay in business?

5    A.    The absolute only way that WCS has been able to keep

6    their doors open for any period of time is through funding

7    from the parent company.

8    Q.    And the parent company is what company?

9    A.    The immediate parent is Andrews County Holding

10   Company.  That is a 100 percent subsidiary of Valhi, Inc.

11   Q.    And where do you borrow the money when you are

12   borrowing?  Is it from Valhi?

13   A.    It's from Valhi.

14   Q.    Okay.  So how often does WCS need to borrow money from

15   Valhi?

16   A.    In a good month, maybe once or twice.  Maybe not at

17   all.  But consistently and regularly, every few weeks we are

18   coming hat in hand, asking for more money.

19   Q.    So walk us through the process.  How is WCS's need to

20   borrow money communicated internally?

21   A.    My financial manager out in Andrews prepares the

22   weekly cash forecast.  He sends that to me every Monday.  It

23   includes all the cash needs for the week, what is in the

24   bank and what we expect to collect from customers during

25   that week.  If it's positive, I kind of breathe a sigh of

Samford - direct

1   relief.  If either negative -- unfortunately, we run very

2   thin on surpluses, so even if it looks like I'm going to be

3   okay that week, if I've got customers that don't pay on

4   time, I may be in a position where I'm still having to

5   borrow.  So every morning, if we get closer to the end of

6   the week, we write checks on Friday.  I am asking, have

7   payments for X come in, has so and so paid?  Where are we

8   where we thought we were on Monday?

9           So typically, we borrow on Fridays when the

10  checks run and I'm informed that I'm still out, and I bring

11  it to the president and CEO of Valhi, Bob O'Brien and now

12  Rob Graham, and tell him the funds that we need to make our

13  payments that week.

14  Q.    So is that what you referred to earlier as operating

15  WCS on a weekly cash flow basis?

16  A.    Yes.

17  Q.    Do you do this with any other Valhi company, operate

18  on a weekly cash flow basis?

19  A.    There is no other company in the Valhi Group that is

20  on such thin operating capital.

21  Q.    Look at Defendants' 164.  Defendants' 164 is an e-mail

22  from David Henderson to you, April 7, 2015, with some charts

23  attached?

24  A.    Yes.  This is the weekly e-mail that I get from David.

25  This is an example of what I receive.  He is reviewing what

Samford - direct

1   our cash needs are for the week, where we think the money is

2   going to come from and where we are at the end of the week,

3   if we need to borrow, and then he attaches the schedule that

4   he has prepared each week that forecasts out for a rolling

5   12 weeks.

6           MR. BECKWITH:  Your Honor, we offer 164,

7   Defendants' 164.

8           MR. HOFFMAN:  Your Honor, I believe this is

9   Defendants' Exhibit 64, not 164.

10          MR. BECKWITH:  You're exactly right.

11          MR. HOFFMAN:  Other than that, no objection.

12          MR. BECKWITH:  I appreciate my esteemed

13  colleague helping me, sincerely.  Defendants' 64, your

14  Honor, I offer.

15          THE COURT:  All right.  Admitted without

16  objection.

17          (Defendants' Exhibit No. 64 was admitted into

18  evidence.)

19  BY MR. BECKWITH:

20  Q.    Now, this Exhibit 64 is April 7, 2015.  How is that

21  date in relation to the EnergySolutions deal work here

22  before Judge Robinson?

23  A.    This is approximately six months prior to that.

24  Q.    And so let's read what -- and is David Henderson the

25  person you were referring to?

Samford - direct

1    A.    Yes.

2    Q.    Your personnel in Andrews?

3    A.    Yes.

4    Q.    It says here, "We have already gotten 555K this week.

5    Another 1.5 million might come in this week from Exelon and

6    Zion.  Calls and e-mails have gone to them."

7              What was being communicated to you through

8    that?

9    A.    That was our collections for the week, but then we are

10   still owed money from Exelon and Zion.  And as I mentioned,

11   we operate on such thin margins, that if somebody doesn't

12   pay me on time, then that kind of increases what I've got to

13   borrow that week.  And so in this time frame, as I recall,

14   Exelon was not paying promptly due to some contracting

15   issues.

16   Q.    It also says we've been pushing out CapEx purchase

17   requests until we are more fluid.  What's a CapEx purchase

18   request?

19   A.    That's the capital spending that I referenced earlier

20   in regards to where our base level cash needs are.  That's

21   equipment purchasers, new equipment, new vehicles that we

22   would need for operation, that we had put all of them on

23   hold due to the cash flow situation in April.

24   Q.    So look at Defendants' 409 in front of you.  What is

25   409?

Samford - direct

1   A.    This is another cash forecast report from July of

2   2015.

3   Q.    From David Henderson to you?

4   A.    Yes.

5              MR. BECKWITH:  Your Honor, we offer Defendants'

6   409.

7              MR. HOFFMAN:  No objection, your Honor.

8              THE COURT:  Thank you.

9              (Defendants' Exhibit No. 409 was admitted into

10   evidence.)

11   BY MR. BECKWITH:

12   Q.    Were there times, Ms. Samford, where your cash updates

13   actually impacted payroll?

14   A.    Right.  So we pay every other week on Thursday, and

15   that is one of our biggest expense line items.  As I

16   mentioned, our payroll runs about 625 to 640,000 a payroll

17   period.  So that money gets drafted on Thursdays, so we've

18   got to have at least that in the back so people can get

19   paid.

20   Q.    It says about six paragraphs down, "I estimate the

21   borrowing at 1.5 million if we receive no customer money.

22   It will be needed on Thursday to cover the payroll

23   deduction."

24              Do you see where I've read?

25   A.    Yes.

Samford - direct

1    Q.    What are you communicating there, or, excuse me, what

2    is Mr. Henderson communicating to you?

3    A.    So he is communicating that if we don't receive any

4    more payments on our outstanding receivables, that we've got

5    to have a million-and-a-half not on Friday, but on Thursday,

6    or we can't pay our employees.

7    Q.    Look with me next at Defendants' 209 in the binder in

8    front of you.  What is 209?

9    A.    This is a cash flow forecast from April 2016.

10   Q.    From David Henderson to Amy Samford, you?

11   A.    Yes.

12             MR. BECKWITH:  Your Honor, we offer Defendants'

13   209.

14             MR. HOFFMAN:  No objection, your Honor.

15             THE COURT:  Thank you.

16             (Defendants' Exhibit No. 209 was admitted into

17   evidence.)

18   BY MR. BECKWITH:

19   Q.    How much does Defendants' 209 say you will need to

20   borrow this week?

21   A.    A-million-four on Thursday, in order to meet our bond

22   deadlines.

23   Q.    What does that mean, meet bond deadlines?

24   A.    We have surety bonds to fulfill some of our financial

25   assurance operations with the State of Texas.  We have in

Samford - direct

1  the form of a surety bond with an insurance company.  A

2  part of our negotiations with that insurance company is we

3  had to fund a trust fund as collateral for those bonds, and

4  so we make quarterly payments of about $1.2 million each

5  quarter into this trust fund for the benefit of the bonding

6  company.

7  Q.   Is that another example of high fixed cost?

8  A.   Yes.  And we are not flexible on those.  We have to

9  have that in order to maintain it to comply with our

10  license.

11  Q.   Look at Exhibit 205 in the binder in front of you.

12  A.   This is a cash flow forecast from March of 2016.

13  Q.   From David Henderson to you?

14  A.   Yes.

15          MR. BECKWITH:  Your Honor, we offer 205.

16          MR. HOFFMAN:  No objection your Honor.

17          THE COURT:  Thank you.

18          (Defendants' Exhibit No. 205 was admitted into

19  evidence.)

20  BY MR. BECKWITH:

21  Q.   How much money does 205, Defendants' 205 show that WCS

22  is going to have to borrow that week?

23  A.   $3.3 million.

24  Q.   Look with me at Defendants' 271 in front of you.  What

25  is 271?

Samford - direct

1    A.    The e-mail from David to me in August of 2016 with a

2    cash flow forecast.

3                MR. BECKWITH:  Your Honor, we offer Defendants'

4    271.

5                MR. HOFFMAN:  No objection, your Honor.

6                THE COURT:  Thank you.

7                (Defendants' Exhibit No. 271 was admitted into

8    evidence.)

9    BY MR. BECKWITH:

10   Q.    Defendants' 271, Ms. Hanford, in front of you, speaks

11   about ISA payments continuing to be deferred.  What does

12   that mean?

13   A.    All of the contracting companies have an

14   intercorporate services agreement, because a substantial

15   portion of our corporate staff is actually employed by

16   Contran, and the companies reimburse Contran for the expense

17   of paying for the corporate employees.  WCS gets an ISA

18   charge like all the other Contran companies and for WCS,

19   it's approved by the Valhi Board of Directors, the

20   independent members of the board of directors.

21                I should clarify that.  We are charged -- last

22   year I believe the charge was about $5 million a year, so we

23   cannot pay it, and so in order to preserve cash at WCS, the

24   beginning of 2015, I made the decision along with Greg

25   Swalwell and Bob O'Brien to suspend payments of the

Samford - direct

1    intra-corporate payment charge to WCS, so I have essentially

2    been working for them for free for the last couple years.

3    So have all the Contran employees.

4    Q.    So as of today and from 2015, how much money has WCS

5    paid for ISA or the intercompany work that you and others

6    do?

7    A.    Nothing.

8    Q.    Was that an effort to try to conserve cash at WCS?

9    A.    It was an effort to conserve cash at the WCS level.

10    Q.    Do other Valhi entities not pay for the services you

11    provide?

12    A.    WCS is the only operating company that does not pay

13    the ISA charge.

14    Q.    And how much money needs to be borrowed according to

15    Defendants' 271 for that week?

16    A.    We would need $1.7 million.

17    Q.    There's a reference to the rest of the capital

18    spending, except licensing continues to be on hold.  Is that

19    generally the state at WCS, capital spending on hold?

20    A.    We have spent as little as possible.  Our equipment is

21    nearing the end of a lot of it -- of its useful life.  I've

22    describe that we are running on spit and duct tape right now

23    because literally, we're holding some of our seat cushions

24    on our trucks with duct tape.  We do not have the money to

25    replace equipment.

Samford - direct

1   Q.    Look at Defendants' 283 in front of you.  What is

2   that?

3   A.    This is another cash flow update from David Henderson

4   to myself in October of 16.

5          MR. BECKWITH:  Your Honor, we offer Defendants'

6   283.

7          MR. HOFFMAN:  No objection, your Honor.

8          THE COURT:  Thank you.

9          (Defendants' Exhibit No. 283 was admitted into

10  evidence.)

11  BY MR. BECKWITH:

12  Q.    What does Defendants' 283 show that you need to borrow

13  in October of 2016 for the week?

14  A.    $1.6 million.

15  Q.    How much in total has WCS borrowed over the last five

16  years?

17  A.    Over the last five years, it's in excess of $125

18  million.

19  Q.    And does WCS's projected losses also come with some

20  projections on borrowing?

21  A.    Yes.

22  Q.    Have you prepared the slide number 3, WCS cash

23  deficits, for the Judge?

24  A.    Yes.

25  Q.    And to the extent you need to look, Defendants' 335

Samford - direct

1  that we already put in front of you and is in evidence has

2  the expected borrowings.  Let's look at slide 3 and see if

3  that refreshes.

4          What does this slide 3 show with respect to

5  WCS's cash deficits?

6  A.    So this shows actual borrowing from 2012 to 2016, and

7  what we project on our most recent 2017 plan we would need

8  to borrow for the next five years.

9  Q.    Okay.  So let's take the left side, funding from

10  parent.  How much has been borrowed from 2012 to 2016?

11  A.    About 125, $150 million.

12  Q.    And it looks like 2014 turned out to be a good year in

13  blue.  You got some money back?

14  A.    Well, unfortunately, the aberration in 2014 was not

15  related to WCS's operations.  I mentioned a minute ago that

16  we fund another collateral trust fund for the closure

17  obligations, assurance of the TCEQ.  In 2014, we were able

18  to renegotiate the funding mechanism for the closure

19  obligations, and as a result, the State of Texas returned to

20  us $18 million.  At the end of the year though -- every

21  dollar essentially that WCS has borrowed, Valhi has had to

22  borrow, too.  So we return that money up to Valhi to lower

23  their outstanding debt, lower the Valhi interest payments.

24  And at the end of the year, the $18 million that had come

25  back to WCS, only $10 million was a net return to Valhi for

Samford - direct

1   the year.  So they had burned through 8 million of that 18

2   million.

3   Q.     How about the projected cash deficits?  Where would we

4   find those projections?

5   A.     Those are on the 2017 operating plan.

6   Q.     Defendants' 335?

7   A.     Yes.

8   Q.     Double-check that for me, if you will.

9   A.     I'm working on it.  Sure.  You can see it on the cash

10  flow excerpt, line 11, on the front page.

11  Q.     And if WCS stayed in business, what would you project

12  the cash deficit to be by the end of the 2021 for that 2017

13  to 2021 period?

14  A.     That WCS needs over $150 million over the next five

15  years to stay in operation.

16  Q.     Now, let's switch gears and talk about auditors.  Who

17  is the auditor?

18  A.     PricewaterhouseCoopers is our independent auditor.

19  Q.     And has PricewaterhouseCoopers issued an opinion on

20  WCS's financial statements?

21  A.     They have.

22  Q.     Can you explain to the Court what a going concern

23  qualification on an audit opinion is?

24  A.     Sure.  So under the accounting literature, we assume a

25  business is going to continue in operations and that is a,

1    that is at a going concern.  Otherwise, it's not going to

2    continue in operations, you have to change your business

3    basis of accounting.  You have to move your liquidation

4    accounting.  And so our -- part of the required auditing

5    procedures that PricewaterhouseCoopers has to perform is

6    that they have to assess on a standalone basis -- that is

7    what they're opining on.  They are opining the WCS financial

8    statements the likelihood that WCS could remain in business

9    for another year.

10            If they were to determine that we would not be

11   likely to stay in business another year, they would then

12   issue a qualified opinion that has going concern language in

13   it.  We call that a going concern opinion, which says they

14   express substantial doubt about our ability to continue to

15   operate.

16   Q.   What impact would receiving a going concern memorandum

17   have on WCS?

18   A.   That would put us in default on our bond obligation

19   with the county.  It would also put us in violation of our

20   license requirements with the TCEQ.

21   Q.   And what impact would it have on the Valhi group of

22   companies?

23   A.   That would trigger the indemnifications and also the

24   guarantees that Valhi, Valhi Holding Company has made on

25   WCS's behalf.

Samford - direct

1    Q.    As the CFO of Valhi -- I'm sorry.  As the CFO of WCS,

2    have you tried to do your best to avoid receiving a going

3    concern finding on your audit?

4    A.    It's critically important that we do not receive a

5    going concern audit opinion because I would not be able to

6    operate under my licenses if I have an unclean opinion.

7    Q.    And if you could -- if WCS could no longer borrow

8    money from Valhi, what do you expect WCS would have with

9    respect to its audit?

10   A.    WCS is dead in the water without Valhi borrowings.

11   There is no -- there is no path, there's no scenario where

12   WCS has been self-sustaining and that TWC would agree to be

13   self-sustaining.

14   Q.    Well, let's be clear.  Does WCS have sufficient

15   resources to meet its financial obligations?

16   A.    Outside of the loan from Valhi, WCS has no financial

17   resources.

18   Q.    Look with me at Defendants' 358 in front of you.  What

19   is Defendants' 358?

20   A.    This is a going concern audit -- sorry.  This is a

21   going concern memo that I wrote to PricewaterhouseCoopers in

22   support of your 2016 audit report.

23                MR. BECKWITH:  Your Honor, we offer Defendants'

24   358.

25                MR. HOFFMAN:  No objection, your Honor.

Samford - direct

1          THE COURT:  Thank you.

2          (Defendants' Exhibit No. 358 was admitted into

3  evidence.)

4  BY MR. BECKWITH:

5  Q.    What kept PricewaterhouseCoopers from issuing any sort

6  of going concern warning?

7  A.    We had intense communications with them.  This is not

8  a process that you undergo for a healthy company.  The

9  reason we are doing this is because this company is

10  financially distressed and PricewaterhouseCoopers has

11  substantial doubt that we can alleviate our concern to their

12  ability to continue to operate for another year.

13  Q.    So, for example, do the other Valhi umbrella companies

14  have to go through this going concern process?

15  A.    No, they do not.

16          So I wrote this memo to address the concerns

17  that PricewaterhouseCoopers had that we could continue to

18  operate a year from their audit opinion.  So as of March of

19  2018, with, and ultimately based on our forecast, which has

20  got negative EBITDA, without the parent support we had to

21  increase the credit facility of $85 million.  Without that

22  increase in the credit facility, PriceWaterhouse would not

23  issue --

24  Q.    And did you promise PricewaterhouseCoopers that WCS

25  would stay in business indefinitely?

Samford - direct

1  A.    No.   I promised to PricewaterhouseCoopers that WCS

2  would be able to meet its financial obligations for

3  12 months.   I didn't promise what form or how those

4  financial obligations would be fulfilled, but WCS had

5  the back end to meet those financial obligations for

6  12 months.

7  Q.    And do you know how long under the license with the

8  State of Texas WCS has to operate to stay operational before

9  beginning a cap enclosure plan?

10  A.    My understanding is that it's 12 months.

11  Q.    I want to shift gears and talk about Valhi, Inc.   What

12  is Valhi, Inc?

13  A.    Valhi, Inc. is a publicly traded company.   It's traded

14  on the New York Stock Exchange.   Its ticker symbol is VHI.

15  It's a holding company that operates through a subsidiary.

16  Q.    And what is Valhi, Inc.'s ultimate ownership of WCS?

17  A.    Valhi, Inc. owns a hundred percent of WCS.

18  Q.    Do you have any positions at Valhi, Inc.?

19  A.    I'm the controller of Valhi.

20  Q.    And does Valhi, Inc. file statements with the SEC?

21  A.    Yes.

22  Q.    What is your role in preparing the what are called

23  10K's for Valhi, Inc.?

24  A.    I prepare the 10Ks for Valhi, Inc.

25  Q.    So let's look at Defendants' 390.   Can you identify

Samford - direct

```
 1    390 for the record?

 2    A.    This is our 2100 10K filing.

 3    Q.    Can you identify 391?

 4    A.    This is our 2012 10K filing.

 5    Q.    Can you identify 392?

 6    A.    This is our 2013 10K filing.

 7    Q.    Can you identify 393?

 8    A.    This is our --

 9    Q.    I realize they're giant documents.

10    A.    I know, right.  This is the 2014 10K filing.

11    Q.    Can you identify 394.

12    A.    This is the 2015 10K filing.

13    Q.    And Defendants' 395.

14    A.    This is the 2016 10K filing.

15              MR. BECKWITH:  Your Honor, defendants offer 390,

16    Defendants' 391, Defendants' 392, Defendants' 393,

17    Defendants' 394 and Defendants' 395.

18              MR. HOFFMAN:  No objection, your Honor.

19              THE COURT:  Thank you.

20              (Defendants' Exhibit 390, Defendants' Exhibit

21    391, Defendants' Exhibits 392, Defendants' Exhibit 393,

22    Defendants' Exhibit 394 and Defendants' Exhibit 395 were

23    admitted into evidence.)

24              MR. BECKWITH:  I need a wheelbarrow.

25              THE COURT:  And you know what, I don't need any
```

Samford - direct

1     more up here unless there's a specific page that is actually

2     mentioned.

3                MR. BECKWITH:  You probably don't want these

4     filed.

5     BY MR. BECKWITH:

6     Q.    All right.  Let's look at Defendants' 395, which is

7     the 2016 10K.

8                These are pretty thick documents.  Who writes

9     these?

10    A.    I do.

11    Q.    Okay.  So let's look at on Exhibit 395, Defendants'

12    395, page 17 of the exhibit.  You can see those little

13    numbers at the bottom of the exhibit to help us, and see

14    what you wrote.

15               Does this section on page -- and I'm going to

16    use the pages on the bottom of the exhibit to avoid

17    confusion -- page 17 of Defendants' 395 describe the waste

18    management segment of the business?

19    A.    Yes.

20    Q.    And what does the waste management segment of the

21    business mean?

22    A.    Under generally accepted accounting principles, you

23    are required just to aggregate your information and under

24    the SEC rules, you're required to discuss each reportable

25    segment.  A reportable segment would be an entity that's

Samford - direct

1   dissimilar to other entities understand your umbrella, that

2   that comprises more than ten percent of your sales.  And so

3   this is our discussion as to kind of the how and the what's

4   of WCS.

5   Q.    Are there any other companies in your waste management

6   segment at Valhi?

7   A.    No.

8   Q.    Look at page 25.  Again, the document page, Exhibit

9   page 25 of 395.  It says, "Risk factor."

10              Do you see that?

11  A.    Yes.

12  Q.    What is a risk factor?

13  A.    A risk factor is an SEC requirement.  We're required

14  to communicate to our investors things that have not

15  happened yet, but are things that management is concerned

16  about that are out on the horizon, but not currently

17  reflected in our financial statements.

18              So these are not remote things.  Those are

19  things that may or may not happen, but the horizon is within

20  the next year to two years.

21  Q.    You wrote under risk factor, "We may not be successful

22  in obtaining new business to a level sufficient to generate

23  positive operating results or cash flows."

24              Why did you write that?

25  A.    We are trying to be as painfully blunt as possible.

1    This business is troubled and we need our investors to

2    understand and know that, this business is troubled, and

3    that we are not making money and we may never make money,

4    and we don't know if we ever will make money.

5    Q.    You see that's on page 26 of the document at the

6    bottom of the first paragraph, "We do not know"?

7    A.    Yes.

8    Q.    Is that what you wrote?

9    A.    Yes.

10   Q.    All right.  Now, how about on -- let's go to page

11   35.

12             Does page 35 show WCS's selected financial data

13   year over year from 2012 to 2016?

14   A.    It does.

15   Q.    And is that similar to the data we've already seen or

16   is this different?

17   A.    It's similar.

18   Q.    Where do you show either the operating gain or loss

19   for WCS on this slide?

20   A.    This is the operating loss for WCS, so it is the third

21   blue line under operating losses.  This is before taxes and

22   interest expense.

23   Q.    So where it says waste management negative 6.8,

24   negative 22.6, et cetera, all the way to negative 26.2?

25   A.    Yes.

Samford - direct

1   Q.   No.   That's the total.

2            MR. BECKWITH:   Can you highlight it, James.

3   Waste management, right above.

4            THE WITNESS:   Right.   So that second blue line

5   in this excerpt.

6   BY MR. BECKWITH:

7   Q.   And what are chemicals and component products?   Those

8   are other --

9   A.   Those are other segments.

10  Q.   So for your other segments, how are they doing?

11  A.   Well, you can see the chemicals income, that's our

12  largest segment, has been very volatile for the last several

13  years and our component products is a small segment.   It has

14  been relatively consistent.

15  Q.   Has any other operating income or loss occurred at

16  these segments other than waste management?   In other words,

17  has any other operating segment had year-over-year-over-year

18  losses?

19  A.   No, not consistent operating losses.

20  Q.   Then it says on page 64 of your 10K, again, using the

21  pages for the exhibit, "WCS's primary source of liquidity

22  currently consists of intercompany borrowings."

23            Why did you write that?

24  A.   It's important for investors to know where the money

25  is coming from and how these intercompany borrowings under

Samford - direct

1    the consolidation rules of the county are not shown in the

2    consolidated financial statements for Valhi as a whole, but

3    that this is a relevant fact, a pertinent fact if you are

4    evaluating the performance of Valhi, to know that Valhi is

5    sending money down on a consistent basis to WCS.

6    Q.    There seems, Ms. Samford, to be, and I want to turn

7    your attention to this idea of cash.  There seems to be a

8    suggestion that somehow you are sitting on a pile of cash

9    that can all be diverted to WCS's business, so let's talk

10   about that topic.

11           How much cash is on Valhi's books, according to

12   this 2016 10K?

13   A.    Sure.  So if you were to turn back a page to page 63,

14   then you would see this is cash, restricted cash, and

15   cash equivalent by entity at Valhi.  And you would see that

16   when I aggregate these categories, that Valhi has

17   $204.5 million.

18   Q.    And is all of that $204.5 million available to WCS?

19   A.    It is not.

20   Q.    Now, is this the most recent 10K, this Exhibit No.

21   395?

22   A.    Yes, it is.

23   Q.    How has the cash situation at Valhi changed since this

24   filing?

25   A.    If you look at this filing, what you can see is that

Samford - direct

1    Valhi itself has only got about $300,000 at the end of the

2    year.  That's consistently with where our 3301 performance

3    is as well.

4    Q.    And how about Valhi, Inc.

5    A.    Valhi, Inc. has -- 3/31 is proved in the Kronos

6    segment.  Those funds are not available to Valhi.

7    Q.    And 3/31/17, those would be the end of the first

8    quarter?

9    A.    Yes.

10   Q.    Have you prepared a demonstrative showing Valhi's cash

11   situation?

12   A.    I have.

13              MR. BECKWITH:  Let's bring that up, James.

14   Slide 4, I believe.

15   BY MR. BECKWITH:

16   Q.    Now, again, there has been a suggestion that you can

17   move money around at Valhi.  Is this chart, based on the 10K

18   from 2016, representative of the cash available?

19   A.    It is.  It's representative of the total cash for the

20   consolidated Valhi group, but, more importantly, it

21   represents where that cash is located.

22   Q.    So --

23   A.    We operate through our subsidiaries.  Do you want to

24   go through those?

25   Q.    Yes.  Let me ask you about those.  So let's just start

1340

Samford - direct

1    with Kronos.  What's Kronos?

2    A.    Kronos is a chemical company that makes base paint.

3    It's a publicly traded company with an independent board of

4    directors.

5    Q.    So where it says NYSE:  KRO, what's that?

6    A.    That is Kronos' ticker symbol.  It is traded on the

7    New York Stock Exchange.

8    Q.    So why can't Kronos take $52.4 million that it's

9    sitting on and send it to WCS?

10   A.    Kronos has an independent Board of Directors that has

11   a fiduciary obligation to work in its best interests.

12   Q.    How about CompEx?  What is CompEx?

13   A.    Sure.  CompEx is a private company that operates

14   primarily in securities.  CompEx is a publicly traded

15   company with the ticker symbol CIM.  And CompEx is not

16   direct.  We own CompEx through another industry.  That

17   industry is the owner of CompEx.

18   Q.    How about NL Industries, New York Stock Exchange:  NL.

19   It looks like they've got $65 million in cash.  Could they

20   send that cash over to WCS?

21   A.    NL Industries is also a publicly traded company with

22   an independent board of directors.  And more importantly, NL

23   Industries is under a billion dollar judgment in California

24   related to their lead paint liabilities, so NL right now

25   underlying all obligation does not pay dividends.  They've

Samford - direct

1   stopped paying different tends and cannot spend send money

2   to Valhi.

3   Q.     How about BMI Landwell?  They've got $22.7 million in

4   cash.  Could they send that to WCS?

5   A.     BMI Landwell is a company that we have a two-third

6   ownership interest in.  And the Wayne Development Company in

7   Las Vegas, they have independent directors that sit on their

8   board of directors as well.

9   Q.     So that leaves us with two places to look.  Valhi,

10  9.5 million.  Why can't Valhi send 9.5 million of its money

11  over to WCS?

12  A.     Valhi has cash obligations of its own, and in

13  addition, approximately half of that balance, a little over

14  $5 million, is at our Captive Insurance Company in Vermont

15  and requires insurance reserves for the State of Vermont.

16  Q.     Well, how about WCS's twenties 21.6 million?  Why

17  doesn't that solve everything?

18  A.     Well, we talked about the financial assurance funding

19  under the collateral trust value.  That funding, that cash

20  is not available to us.

21  Q.     So let's look at, in 2016, a was Valhi cash flow

22  positive as an entity, VHI?

23  A.     No.

24  Q.     Is that your understanding of what's in that 2016 10K

25  that we've been looking at?

Samford - direct

1    A.    Yes.

2    Q.    Let's look at demonstrative slide 5.  Have you

3    prepared this slide for the Judge?

4    A.    Yes.

5    Q.    What does this show?  Let's start with the left-hand

6    side.  Cash in flows.  What does that show on the left-hand

7    side where it says 47.6 million?

8    A.    Well, the model for Valhi and for holding companies in

9    general is to take in money from your subsidiaries, pay your

10   holding company expense, and then distribute money to your

11   shareholders.

12            So Valhi in 2016 took in $47.6 million.  A

13   substantial portion of that came from Kronos.  BMI had

14   almost a $10 million dividend last year.  Contran has a line

15   of credit with a pledged shared products that we own as

16   collateral on that line.  We collected $1.2 million from

17   them.

18            And we have than an agreement with the

19   Amalgamated Sugar Company and Snake River Company.  They

20   have debt.  The net of those transactions is $1.8 million.

21   And then here you can see our $20 million dividend from

22   NL was suspended in 2014 due to the litigation in

23   California.

24   Q.    And then so the cash comes in to Valhi, Inc. as

25   dividends from companies it owns and then it goes out.  So

Samford - direct

1    what happened to the cash?

2    A.    We have a dividend that we pay to our shareholders.

3    We also have expenses at the holding company level, and as

4    the debt at Valhi grows, the interest expense number has

5    become quite significant at the Valhi level.

6    Q.    So I think you were asked some questions in your

7    deposition.    The Government's questions are why not just

8    stop paying dividends to Valhi, Inc.'s, New York Stock

9    Exchange shareholders?

10   A.    Part of the Valhi, the valuation of Valhi stock is on

11   the dividend paying aspect of the stock.    It's an

12   income-producing stock.    So if we were to cut the dividend,

13   then we would substantially cut the value of the Valhi stock

14   for the shareholders.

15          In addition, I don't know why we continue to

16   send money to WCS.    There's no path forward there.    That's

17   throwing more money down a hole.

18   Q.    Do publicly traded companies like Valhi, Inc. try to

19   change up their dividend on a regular basis or do they try

20   to keep it steady?

21   A.    The goal is always to keep it steady and consistent

22   because it causes a big swing in stock valuation when you

23   change your dividend.

24   Q.    What has happened to Valhi stock?

25   A.    When Mr. Simmons passed at the ends of 2013, it was

Samford - direct

1    right around $20 a share.  We've been under $2 a share.

2    We're back up to about three-and-a-quarter, three-and-a-half

3    right now.

4    Q.    What does the red box in the middle summarize?

5    A.    Valhi is cash flow negative.

6    Q.    And --

7    A.    And this is before we fund out to WCS.  So Valhi

8    itself is cash flow negative.  WCS is asking us to fund in

9    addition to our own cash flow problems.

10   Q.    Does Valhi have any incentive to keep WCS open?

11   A.    WCS is a drain on the Valhi business model.

12   Q.    And somebody said, I heard them say WCS was

13   consolidated under Valhi/Contran only for federal tax

14   purposes; is that true?

15   A.    In 1959, the Accounting Research Board passed the

16   generally accepted accounting principle on consolidation

17   standards, which required any entity that's is more than

18   50-percent owned by another entity to be considered in their

19   consolidated financial statements.

20   Q.    So not just for federal tax purposes?

21   A.    Well, you know, 60 years ago, that was settled gap.

22   Q.    And then I heard somebody say WCS's accounting losses

23   provide Valhi enormous tax benefits.  Do you feel that

24   way?

25   A.    Well, I will tell you what.  They need to give me a

Samford - direct

1    dollar.  I could give you 30 cents, and we could do that 20

2    million more times this year, and we could do that 20

3    million more times next year and the year after and the year

4    after and the year after that.  And at the end of that time,

5    I can look at my pile of dollars and feel a lot better than

6    you feel about that pile of dimes.

7    Q.    Well, we'd run out of dollars anyway.

8              So how about those tax benefits?  Are they any

9    justification for keeping WCS open from your perspective?

10   A.    I think so.

11   Q.    And just the opposite of tax benefits, have you had to

12   plan to write down some asset value because of the

13   abandonment of the interim storage facility?

14   A.    Right.  In April --

15   Q.    Or the pause of it?

16   A.    So in April we sent a letter to the NRC asking to

17   suspend our application.  We -- under the accounting rules

18   for direct costs that I've paid to, in order to pay a

19   license, I've capitalized those under our balance sheet.

20   These are NRC fees.  These are environmental studies.  But

21   the definition of an asset is something with a future

22   probable economic benefit.  And when I pulled the -- and I

23   suspended this license, I am no longer -- there's no longer

24   a probability that there's a future economic benefit there.

25   Therefore, in the draft of the 10Q that I had prepared, we

Samford - direct

1  have announced that we are going to take a three-and-a-half

2  million dollar write-off of all the costs that we've

3  capitalized related to interim storage in April of 2017.

4  Q.    Does Valhi have any debt of its own?

5  A.    Valhi does have debt.

6  Q.    Approximately how much?

7  A.    Over 300 million.

8  Q.    How has that changed over the last five years?

9  A.    It has doubled.

10  Q.    Has funding Valhi's nonprofitable subsidiary WCS

11  played a role in that doubling?

12  A.    It is substantially 75 percent of the debt balance has

13  increased at Valhi.

14  Q.    Let's look at slide 6.  Have you prepared a slide to

15  show this to the Judge?

16  A.    Yes.

17  Q.    And is this based on the 10K and other documents?

18  A.    It is.

19  Q.    So what does this show about Valhi's publicly known

20  debt?

21  A.    That Valhi's debt has doubled from 2012 to 2016, and

22  that 128 million of that $170 million in debt is because of

23  the funding of WCS.

24  Q.    And so the 75.5 percent of new debt that has gone to

25  WCS down at the bottom, where would we find that?

Samford - direct

```
 1    A.     You would find it in the liquidity section of the

 2    Valhi 10Ks.

 3                 MR. BECKWITH:  Your Honor, at this point I would

 4    ask to close the courtroom.

 5                 THE COURT:  All right.

 6                 MR. BECKWITH:  To discuss confidential

 7    information.

 8                 THE COURT:  All of you not on the protective

 9    need to leave for a moment.

10                 ***(The following portion of the transcript is

11    under seal.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1348

Samford - direct

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1349

Samford - direct

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1350

Samford - direct

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Samford - direct

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1352

Samford – direct

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1353

Samford - direct

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1354

Samford - direct

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Samford - direct

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Samford - direct

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Samford - direct

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1358

Samford - cross

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Samford - cross

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1360

Samford - cross

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1361

Samford - cross

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1362

Samford - cross

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1363

Samford - cross

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Samford - cross

1

2

3

4

5

6

7

8

9

10

11                    ***(End of portion under seal.)

12    BY MR. HOFFMAN:

13    Q.    Now, Ms. Samford, I wanted to ask you about one of the

14    demonstratives exhibits that Mr. Beckwith showed you.  It is

15    Exhibit No. 6, the Valhi 2016 cash flow.

16                    MR. BECKWITH:  Do you want us to put that up

17    there?

18                    MR. HOFFMAN:  Yes, please.  Thank you.

19                    MR. BECKWITH:  Is that what you want?

20                    MR. HOFFMAN:  No.  This is 7.  This one.

21    BY MR. HOFFMAN:

22    Q.    I just want to understand what this is showing, so

23    maybe you can help me out a little bit.

24                    The idea is that cash flows into Valhi from the

25    left-hand side; is that right?

Samford - cross

1    A.    Yes.

2    Q.    And then cash flows out of Valhi on the right-hand

3    side; is that right?

4    A.    Yes.

5    Q.    And in total, there's more cash flowing out of Valhi

6    than flowing in; is that right?

7    A.    Yes.

8    Q.    Okay.  And it looks like some of the money goes to

9    holding company expenses; is that right?

10   A.    Yes.

11   Q.    And I don't think Mr. Beckwith asked you about holding

12   company expenses, so I will.  What are holding company

13   expenses?

14   A.    These are salaries.  These are director's fees.  These

15   are SEC filing fees.  These are anything at parent company

16   level.  These are legal fees related to this litigation.

17   These are expenses that no other entity bears, holding

18   company.

19   Q.    Okay.  So when you say that they're in part salary, do

20   they include Mr. Graham's salary?

21   A.    As I mentioned during my conversations with

22   Mr. Beckwith, every entity place an ISA charge.

23   Mr. Graham's salary is through an ISA charge.

24   Q.    Okay.  So is the entirety of Mr. Graham's salary

25   including this holding company's expenses?

1    A.    No.

2    Q.    What portion of Mr. Graham's salary is included in

3    this?

4    A.    I don't know.

5    Q.    Okay.  But Mr. Graham makes $2.6 million; is that

6    right?

7    A.    I don't know what his salary is.  I'm not privy to

8    Valerie information.

9    Q.    Okay.  And is Mr. Swawell's salary included in this

10   holding company expense?

11   A.    A portion of the salary is.

12   Q.    Okay.  And you don't know what portion?

13   A.    I do not know what portion.

14   Q.    And Mr. Swalwell makes $2.3 million; is that right?

15   A.    I don't know.

16   Q.    Okay.  And is Betty Lutmer's salary included in the

17   holding company expenses?

18   A.    Kelly Lutworth?

19   Q.    Yes.

20   A.    A portion of her salary.

21   Q.    And do you know the portion of her salary?

22   A.    I do not.

23   Q.    Okay.  But Ms. -- is it Ms. Lutworth?

24   A.    Ms. Lutmer.

25   Q.    Ms. Lutmer makes $2 million; is that right?

Samford - cross

1  A.    I don't know.

2  Q.    Okay.  Now, talking about the shareholder dividend

3  box, it looks like $28.3 million flows out of Valhi due to

4  shareholder dividends; is that right?

5  A.    That's correct.

6  Q.    Okay.  And as I understand it, Valhi pays two cents

7  per quarter per share; is that right?

8  A.    That is down from five cents per quarter per share.

9  It was cut.  We took a 60-percent reduction trying to

10  conserve cash after the NL was suspended due to the

11  California litigation, and we currently pay eight cents a

12  year or two cents per quarter.

13  Q.    Okay.  So Valhi is not averse to cutting its dividend

14  when necessary; is that correct?

15  A.    We have cut our dividend in response to some of the

16  adverse positions that we are weathering the storm on.

17  Q.    Okay.  And if we did it on a per year basis rather

18  than on a per quarter basis, we could say that Valhi pays

19  eight cents per share per year; is that right?

20  A.    Valhi pays eight cents per share per year.

21  Q.    Okay.  And shareholder dividends are roughly

22  $28 million?

23  A.    28.3.

24  Q.    28.3.  And negative cash flow of Valhi is 7 million,

25  $7.6 million; is that right?

Samford - cross

1    A.    In 2016, yes.

2    Q.    So effectively, and this is going to be rough math,

3    but effectively, if Valhi were to cut the shareholder

4    dividend from eight cents a year to six cents a year, Valhi

5    would be roughly cash flow neutral; is that correct?

6    A.    Those are things that we're looking at.

7    Q.    All right.  And I appreciate that, but my question is:

8    If Valhi were to cut its dividend from eight cents a year

9    per share to six cents per share per year, then Valhi would

10   be roughly cash flow neutral; is that correct?

11   A.    Depending on the year and the holding company

12   expenses, that could work.

13   Q.    Okay.  Thank you.

14          And, finally, I wanted to ask you about where

15   the shareholder dividends go.  And as I understand it, Valhi

16   is a publicly held company; is that right?

17   A.    Yes.

18   Q.    And seven percent of Valhi, Inc. is traded in -- is

19   traded publicly; is that right?

20   A.    The non-controlling flow is about 7.4 percent, I

21   believe.

22   Q.    7.4 percent.  So 92.6 percent belongs to Lisa Simmons

23   and Serena Simmons Connelly; is that right?

24   A.    No.  It belongs to Contran.

25   Q.    Okay.  And who owns Contran?

Samford - cross

1   A.      Contran is owned by a trust fund and, in addition, I

2   think there's some individual holdings as well.

3   Q.      What is that trust fund that owns Contran?

4   A.      It's for the benefit of Lisa Simmons and Serena

5   Simmons Connelly.

6   Q.      All right.  So this 92.6 percent of Valhi that's owned

7   by Contran, if we follow it up the chain, ultimately, that's

8   owned by Lisa Simmons and Serena Simmons Connelly?

9   A.      I don't think that's a fair statement at all.  Contran

10  has its own obligations and responsibilities that it has to

11  pay before anything can get returned to Lisa and Serena.

12  Q.      Okay.  So Contran receives these dividends then; is

13  that right?

14  A.      Yes.

15  Q.      All right.  And then what does Contran do with the

16  dividends?

17  A.      Again, Contran has its own liabilities that it has to

18  service.

19  Q.      And do those -- Contran is owned by the Dixie Rice

20  Agricultural Company, LLC; is that right?

21  A.      I actually think it's the other way around.  I think

22  Contran owns Dixie Rice, but I would have to look at a chart

23  to see that.

24  Q.      All right.  Ultimately, do these dividends flow up to

25  the family trust or not?

Samford - cross

1    A.      Ultimately, the dividends flow to Contran.  Contran

2    itself is running cash flow negative, so, no, nothing is

3    flowing up to the cash flow trust.

4    Q.      All right.  Thank you.

5            Now, we talked about this a little bit, but I

6    want to make sure that I understand the structure of Waste

7    Control Specialists as it relates to the other company.

8            Waste Control Specialists is owned by a company

9    called Andrews County Holdings; is that correct?

10   A.      That's correct.

11   Q.      And then Andrews County Holdings is in turn owned by

12   Valhi, Incorporated; is that right?

13   A.      That's correct.

14   Q.      And Valhi holds other companies.  We've talked about

15   some.  NL Industries and Kronos worldwide; is that correct?

16   A.      As well as CompEx and BMI as well.

17   Q.      All right.  And we talked about seven percent of Valhi

18   is publicly held; right?

19   A.      Seven-and-a-half percent.

20   Q.      Seven-and-a-half.  Right.  That's why Valhi files 10K

21   reports?

22   A.      Right.  We have a filing requirement on the New York

23   Stock Exchange.

24   Q.      Okay.  And then either Valhi is held by Dixie Rice, or

25   Valhi is held by Contran.  You are not really sure?

Samford - cross

1   A.      Valhi is held by Valhi Holding Company.  I believe

2   Dixie Rice is a held by Contran, and Contran is the ultimate

3   parent company.

4   Q.      And then Contran is held by the Harold Simmons family

5   trust; is that right?

6   A.      It is owned by the trust.

7   Q.      All right.  And you, Ms. Samford, work for Contran; is

8   that correct?

9   A.      I work for Contran.

10  Q.      All right.  And your salary comes from Contran; is

11  that right?

12  A.      Yes.

13  Q.      Okay.  And you talked, when Mr. Beckwith asked you

14  about your salary, you said something about working for

15  free; is that right?

16  A.      He asked me about my salary as it relates to WCS.  WCS

17  has not made any reimbursements for my salary to Contran, so

18  with regards to my work for Contran, myself, Rod Baltzer,

19  the IT department, the tax department, we're all working for

20  free for WCS.

21  Q.      Okay.  But, and I appreciate that.  My question is

22  though, every two weeks, are you still able to cash a

23  paycheck?

24  A.      I do cash a paycheck every two weeks.

25  Q.      Okay.

Samford - cross

1  A.    As do the employees at WCS.

2  Q.    Right.  So just to make sure there's no confusion,

3  people at WCS and at Contran are still being paid.  It's

4  not that they're volunteering their services; is that

5  right?

6  A.    WCS is not bearing its full cost that it takes to run

7  that company.  That is my point.  WCS is not bearing the

8  cost of any of the management and any of the IT, any of the

9  tax work.  WCS is not bearing that cost.  Contran is bearing

10  that cost for them.

11  Q.    Okay.  But I just wanted to clear up that confusion,

12  that you still are being paid; is that correct?

13  A.    I am being paid.  WCS is not able to reimburse me for

14  my time.

15  Q.    All right.  Thank you.

16        Now, you have other titles at other Contran

17  companies; is that right?

18  A.    Yes.

19  Q.    And you are the vice president and controller at

20  Valhi, Inc.?

21  A.    I am.

22  Q.    And you are the vice president and controller at NL

23  Industries; is that right?

24  A.    I am.

25  Q.    You are also the vice president and controller at

Samford - cross

1    Andrews County Holdings; is that right?

2    A.    Yes.

3    Q.    And, finally, you're the executive vice president and

4    Chief Financial Officer at WCS?

5    A.    Yes.

6    Q.    Is that right?

7    A.    Yes.

8    Q.    All right.  And on an annual basis, you devote more of

9    your time to WCS duties than any of your other positions; is

10   that right?

11   A.    Yes.

12   Q.    And you as a Contran employee are not the only Contran

13   employee who works for other Contran owned companies; is

14   that right?

15   A.    All the Contran employees work for Contran-owned

16   companies.

17   Q.    Okay.  And, in fact, none of WCS's management

18   committee are even WCS employees; right?

19   A.    The management committee is composed of myself, Rob

20   Graham, who is the chairman of WCS, and Rod Baltzer, who is

21   the president and CEO of WCS.

22   Q.    And all of those management employees are Contran --

23   all of management company members are Contran employees;

24   right?

25   A.    They are.  We are all paid by Contran.

Samford - cross

1    Q.    Okay.  And WCS is VP of legal affairs and general

2    counsel are Contran employees too; right?

3    A.    Yes.

4    Q.    And Contran employees provide most of WCS's IT and tax

5    services; is that correct?

6    A.    Yes.

7    Q.    And these all come through the inter-corporate

8    services agreement that you talked about; is that right?

9    A.    Yes.

10   Q.    And that's also known as the ISA?

11   A.    Yes.

12   Q.    And there are other inter-corporate connections, too.

13   For example, Contran leases the Dallas building where you

14   work, but WCS employees work in that building as well; is

15   that right?

16   A.    Fewer and fewer as attrition has really cut down our

17   workforce.  I think we're down to five WCS paid employees

18   now in the Dallas office.

19   Q.    And then Mr. Beckwith asked you some questions about

20   WCS's taxes.

21         Just to confirm, WCS's taxes are filed as part

22   of Contran's consolidated tax return; is that right?

23   A.    Under the federal tax rule, any subsidiary that's more

24   than 80 percent owned is required to file a return with the

25   parent company.

Samford - cross

1   Q.    All right.  And that is true also for the State of

2   Texas tax purposes; is that right?

3   A.    You know, I believe Texas is a unit -- a uniform tax

4   filer, or unitary tax filer, I'm sorry, with a prior

5   consolidated return.  Some states are not unitary.  I don't

6   know which states are.  I'm not a tax expert.

7   Q.    Okay.  Fair enough.  I'm not either.

8           The credit facility that WCS has comes through

9   Andrews County Holdings; is that correct?

10  A.    That's correct.

11  Q.    But ultimately, the money comes from Valhi,

12  Incorporated; right?

13  A.    Yes.

14  Q.    And that credit facility's limit is $85 million; is

15  that right?

16  A.    Right now, it's $85 million.

17  Q.    And that credit facility doesn't expire until

18  March 31st, 2018; is that right?

19  A.    I would say that that credit facility does expire

20  on March 31st -- I'm looking at seven -- six, seven months

21  now.

22  Q.    It expires on March 31st, 2018?

23  A.    Right.  So about eight months from now.

24  Q.    All right.  We've talked about the intra-company

25  relationship.  Now I would like to get a feel for the size

1376

Samford - cross

1  of these companies.

2           If you could turn in your binder to PTX-406.

3  A.    Okay.

4  Q.    And you recognize this document as Valhi's most recent

5  10K; is that right?

6  A.    Yes.

7           MR. HOFFMAN:  So, your Honor, I move to admit

8  PTX-406.

9           MR. BECKWITH:  Your Honor, just in the interests

10  of Court, I'm not sure we need to admit the 10K twice.  This

11  is the same as Defendants' 394, I believe.

12           MR. HOFFMAN:  I think it is.  The only reason

13  I'm doing this is so that Ms. Raybar can manipulate the

14  document.

15           THE COURT:  All right.

16           MR. BECKWITH:  I have no objection.  I'm at the

17  Court's pleasure.  I just wanted to make sure we weren't

18  double admitting an exhibit.

19           THE COURT:  All right.  What is the defendants'

20  number?

21           MR. BECKWITH:  394.

22           THE COURT:  I certainly don't need extra paper

23  in my record, so as long as she's where it is, we're going

24  to pretend it's really Defendants' Exhibit 394 that has

25  already been admitted.

Samford - cross

1    MR. HOFFMAN:  Okay.  Thank you, your Honor.

2    If we can just pull it up, would you don't need

3    to admit it, but I would like Ms. Raybar to be able to

4    highlight it.

5    THE COURT:  Sure.

6    MR. HOFFMAN:  Thank you.

7    BY MR. HOFFMAN:

8    Q.    I'd ask you to look at page 33 of this 10K, please.

9    A.    My 33 or your 33?

10   Q.    It's --

11   A.    My 33?

12   Q.    33 right up here?

13   A.    Yes.

14   Q.    And at the top of the page, it says, item 6, selected

15   financial data.

16        Do you see that?

17   A.    I do.

18   Q.    And for all of Valhi's companies, net sales were $1.57

19   billion in 2016?

20   A.    That is true.  As we went through, we operate through

21   publicly traded companies.  We -- we do not have access to

22   revenue.  We are -- our only cash flow is from the dividend

23   of our subsidiary.  And I will just point out that on page

24   58, we're very explicit about the fact we do not have

25   complete access to cash flow.

Samford - cross

1    Q.     All right.  But my question is:  Net sales for Valhi

2    companies in 2016 were 1.57 billion; is that right?

3    A.     The consolidated sales total, that's true.  I'm not

4    really sure how that's relevant to WCS's financial

5    performance.

6    Q.     Okay.  And if we look at WCS's line up above, WCS only

7    accounts for 4.7 million of the 1.57 billion in sales; is

8    that right?

9    A.     It's clearly ironic that such a small company can be

10   so damaging to the parent, yes.

11   Q.     Okay.  I appreciate that, but my question is:  WCS

12   accounts for $47 million of sales; is that right?

13   A.     In 2016.

14   Q.     All right.  Now I would ask you to turn to page F-19

15   of the same document.

16          Do you see that?

17   A.     Yes.

18   Q.     Okay.  Thank you.

19          Now, looking near the bottom of the only

20   paragraph on that page, there is a sentence that reads:

21   "Due to, among other things, the size of our WCS business

22   relative to our other businesses in terms of both net sales

23   and asset size, the disposal of WCS would not constitute a

24   strategic shift that would have a major effect on our

25   consolidated operations and financial results under the

Samford - cross

1    guidance in ACS 205-20."

2            Did I read that correctly?

3    A.    Yes.

4    Q.    Okay.  Thank you.

5            So we've talked about the relationship of

6    Contran, Valhi and WCS.  Now I would like to focus on WCS.

7            And Mr. Beckwith asked you a lot of questions

8    about WCS's cost structure, so I will skip those for the

9    most part.

10           But it's true, isn't it, that you got to the

11   point where whatever you can do to make the cost structure

12   as low as possible at WCS, you've done it; is that right?

13   A.    The cost structure is as low as we can get it.

14   Q.    Okay.  And if WCS were sold to EnergySolutions, that

15   would not change the fixed cost nature of the Andrews County

16   facility, would it?

17   A.    It wouldn't change the fixed cost nature of the

18   Andrews County facility, but certainly, they don't need two

19   CFOs, they don't need two presidents, they don't need two

20   accounting groups.

21           I don't work for EnergySolutions.  I don't know

22   what their plans are, but they're -- you don't have to

23   maintain two sets of corporate overhead.

24   Q.    So whatever efficiencies EnergySolutions may have in

25   mind, you're not privy to those; right?

Samford - cross

1    A.    I'm not privy to those.

2    Q.    Okay.  Thank you.

3          Moving on from WCS's cost structure, I would

4    like to ask you about disclosures WCS has made about its

5    finances, and you talked about going concern memo in your

6    direct examination; right?

7    A.    Yes.

8    Q.    And a going concern memo is different from a going

9    concern opinion; is that right?

10   A.    Well, you're writing the going concern memo as trying

11   to avoid a going concern payment.

12   Q.    Okay.  Thank you.

13         And you have written three going concern memos

14   since you've been a controller at WCS; is that right?

15   A.    Since I've been the CFO of WCS.

16   Q.    CFO.  Thank you.  CFO.  And those are in 2015, 2016

17   and 2017; is that correct?

18   A.    In support of the prior year audit.  So for the '14,

19   '15 and '16 audit.

20   Q.    Right.  And you wrote those memos about WCS, but you

21   wrote them in your capacity as a Valhi office-holder; is

22   that right?

23   A.    I wrote them prior to my being the CFO of WCS.  The

24   prior CFO wrote the memos.

25   Q.    Okay.  Maybe I didn't phrase the question right.  When

Samford - cross

1    you wrote those going concern memos, you wrote them on Valhi

2    letterhead; is that right?

3    A.    They are written in support of the standalone WCS

4    audit on behalf of WCS.

5    Q.    All right.

6              MR. HOFFMAN:  Your Honor, I would ask to pull up

7    the going concern memo.  It has already been admitted.  We

8    have it as a different number.  If we could put it on the

9    screen?

10             THE COURT:  Yes.  Just give me the number as

11   soon as you admit it so I can follow at some point.

12   Actually, I think I have it.  It's 358, DTX-358.

13             MR. HOFFMAN:  I think this is okay to use the

14   redacted version if it's okay with you.

15             MR. BECKWITH:  It's okay.

16   BY MR. HOFFMAN:

17   Q.    So my question was:  This was written under Valhi,

18   incorporated letterhead in the upper left-hand corner; is

19   that right?

20   A.    It's written for the benefit of WCS, for the WCS

21   standalone financial.  There's not a question about Valhi's

22   ability to continue with the going concern.  This is the

23   relevant Valhi financial statement.  This is written for the

24   WCS standalone unit.

25   Q.    I appreciate that, but my question is:  Is it written

Samford - cross

1   on Valhi, Incorporated letterhead?

2   A.    I thought what you're asking me, if it's written for

3   the benefit of Valhi.  The answer is no.  Is it on Valhi

4   letterhead?  It's on an internal WCS part of the Valhi

5   group.  It's on internal correspondence letterhead.

6   Q.    And when you wrote this going concern memo to

7   PricewaterhouseCoopers, it had the intended effect that you

8   were hoping; is that right?

9   A.    Boy, it was hard to get PWC to this memo, but it is

10  critically important that we don't trigger default, so we

11  had to do it.  PWC had to go to the national office and

12  control.  We had to make some modifications.  We had to up

13  the credit line more than I hoped to in order to get it

14  through the national office, but without a memo that PWC

15  agrees to, then I'm not operating tomorrow.  In default of

16  my license, my business is dead.

17  Q.    Right?

18              THE COURT:  I think I lost the actual answer to

19  the question.  Do you want to ask the question again?

20              MR. HOFFMAN:  Yes, your Honor.

21  BY MR. HOFFMAN:

22  Q.    The question was:  Ultimately, this letter was

23  successful and PWC did not issue a going concern opinion; is

24  that correct?

25  A.    PWC doesn't rely solely on this letter.  They do their

Samford - cross

1  own analysis.  But this letter in combination with their

2  analysis went to their national office, and the PWC national

3  office gave approval for them not to issue a going concern

4  opinion.

5  Q.   All right.  Thank you.

6        Now, in this letter, PWC informed -- excuse me.

7  In this letter, Valhi informed PWC that WCS has a credit

8  facility with Andrews County Holding; is that right?

9  A.   Yes.

10  Q.   This is the credit facility we've been talking about

11  today; right?

12  A.   This has been the only source of liquidity for WCS for

13  years, yes.

14  Q.   Right.  And Valhi said that the credit facility was

15  for $85 million; is that right?

16  A.   The credit facility is for $85 million, that's true.

17  Q.   Okay.  And Valhi told PWC that the credit facility was

18  good through March 31st, 2018; is that right?

19  A.   The credit facility expires on March 31, 2018.

20  Q.   And Valhi told PWC that it expected WCS to borrow less

21  than the full amount of the credit facility this year; is

22  that correct?

23  A.   WCS told PWC that they expected to borrow less than

24  the full amount of the credit facility.

25  Q.   All right.  Now if we could turn to the third page of

Samford - cross

1    this document, and I'm going to ask you to refer to your

2    binder because the defendants have designated this

3    information as confidential.

4    A.    It's the next tab?

5    Q.    Yes.

6    A.    Okay.

7    Q.    Do you see the unredacted chart in your binder?

8    A.    Yes.

9    Q.    Okay.  Looking at this chart, you can see that it was

10   reported to PWC that WCS's operating cash flow improved from

11   2015 to 2016; is that right?

12   A.    I mean, that's a relative term.  I mean, a

13   million-and-a-half less of a loss isn't much of an

14   improvement.

15   Q.    Okay.

16   A.    I mean, they had the $12.2 million operating, negative

17   operating --

18            THE COURT:  This is supposed to be confidential,

19   so if you can't answer it without clearing the courtroom,

20   we'll clear the courtroom.  All right?

21            MR. BECKWITH:  We have unredacted this, your

22   Honor.

23            THE COURT:  Oh, okay.

24            MR. BECKWITH:  That's why there was this

25   opportunity to put the unredacted version up on the screen.

Samford - cross

1       THE COURT:  All right.  Sorry.

2       MR. HOFFMAN:  Yes.  Let's do that.

3       MR. BECKWITH:  There it is.

4       THE COURT:  All right.  Good.

5       MR. HOFFMAN:  Okay.  Thank you.

6       THE WITNESS:  So we went from a negative $12.2

7    million in operating cash to negative ten point $7 million.

8    That's not an improvement.  That's just a little bit less

9    bad.

10   BY MR. HOFFMAN:

11   Q.    So you would say a smaller cash flow deficit year over

12   year is not an improvement; is that right?

13   A.    I would say it's less bad.

14   Q.    Okay.  And Valhi also reported -- excuse me, also

15   reported to PWC what WCS's operating cash flow would improve

16   from 2015 to 2017; is that right?

17   A.    WCS is anticipating a lower operating cash flow loss

18   in 2017 than we had in 2016.  As you can see in the 2016

19   plan, I also thought I was going to make almost $30 million

20   in operating cash flow, so I will leave it when I see it.

21   Q.    Okay.  Well, let's talk about that.  I know

22   Mr. Beckwith asked you about predictions of revenues in your

23   direct examination.

24       You said that in 2016 you got tired of

25   pie-in-the-sky predictions; right?

Samford - cross

1    A.    Well, I got tired of them in 2015, too.

2    Q.    Sure.  Fair enough.

3          And then you said when you were making 2017

4    projections, you again went back to the people who collect

5    revenues and told them they needed to be even better at

6    estimating; is that right?

7    A.    Well, I went back and gave them some parameters that I

8    told them they had to estimate, which were not things we're

9    not licensed for, not things we don't have regulatory

10   approval for, not things that have not -- projects that have

11   not been funded or approved yet.  Things that we have

12   contracts with customers for or we can get contracts with

13   customers for, and that we had talked to customers of known

14   quantity.

15   Q.    So as I understood it, you went back to the people who

16   give you the information to make your revenue estimates two

17   years in a row; is that right?

18   A.    Well, so Dan Burns does the revenue estimate because

19   he compiles all of that.

20   Q.    All right.  And the 2017 estimates are based on things

21   that were hard and fast rather than a little looser in

22   previous years; is that right?

23   A.    You know, I sure hope so, because we can't keep being

24   off by 30, 40, 50 percent every year.  We're trying to get

25   better because I need to know with that cash flow from

Samford - cross

1  financing, that's a plug.  That's money I'm going to give to

2  my parent.  I have got to know what that money, what that

3  number is with some degree of predictability.

4  Q.    Right.

5  A.    We've made a concerted effort to get back on that

6  because it's really hard to plan for cash at the Valhi level

7  when WCS is running behind 130, hundred 40 of what cash they

8  may need.

9  Q.    Right.  So these 2017 numbers are based on lowered

10  expectations; is that right?

11  A.    They're based on lowered expectations and I hope that

12  '17 is obtainable.

13  Q.    And they're based on lowered expectations and they are

14  your best estimate of what the operating cash flow will be

15  in 2017; is that right?

16  A.    This is current me my best estimate.

17  Q.    And to be clear, the best estimate is a negative cash

18  flow of $2.5 million; is that right?

19  A.    The best estimate is negative operating cash flow.

20  Q.    All right.  And in this same memo, Valhi made a

21  prediction about -- excuse me.

22  A.    WCS.

23  Q.    WCS made a prediction about its 2017 EBITDA; is that

24  right?

25  A.    Yes.

Samford - cross

1    Q.    And we have that highlighted.  And the prediction for

2    2017, using these lowered expectations, is that EBITDA will

3    be positive; is that right?

4    A.    About break-even, yes.

5    Q.    But positive; is that right?

6    A.    Slightly positive.

7    Q.    Thank you.

8              And, finally, in this memo to PWC, WCS

9    contemplated what would happen if this transaction did not

10   go through; is that right?

11   A.    Can you refer me to that memo?

12   Q.    Sure.  I will refer you to page 5 of this document.

13              Do you see the final --

14   A.    Yes.

15   Q.    -- sentence on this page that reads:  "F such pending

16   sale transaction were not to be successfully closed, we

17   would in the future continue to consider and evaluate

18   various other alternatives with respect to our waste

19   management segment."

20   A.    Yes.

21   Q.    Did I read that correctly?

22   A.    Yes.

23   Q.    Okay.  And this memo was written less than two months

24   ago; is that right?

25   A.    Yes.

Samford - cross

1   Q.    Okay.  All right.  We discussed disclosures that were

2   made to PWC.

3          Now I'd like to ask you about disclosures that

4   Valhi, Inc. made to the SEC and investors, so I'm going to

5   ask that the 10K be pulled up again.

6   A.    All right.  We're going back to the last exhibit?

7   Q.    Yes.

8          MS. ELMER:  As a housekeeping matter, your

9   Honor, I think this is Defendants' Exhibit 395 instead of

10  394, which may have been said earlier.

11         MR. BECKWITH:  That is right.  It is 395.

12         THE COURT:  Oh, all right.

13         MR. BECKWITH:  Sorry I misspoke.

14         THE COURT:  All right.  Thank you.

15  BY MR. HOFFMAN:

16  Q.    Okay.  You recognize this as Valhi's 2016 form 10K; is

17  that right?

18  A.    Yes.

19  Q.    And you prepared it; right?

20  A.    Yes.

21  Q.    And you signed it?

22  A.    I did.

23  Q.    And you filed it with the SEC?

24  A.    We did.

25  Q.    And to the best of your knowledge, it's correct;

Samford - cross

1    right?

2    A.    It was accurate as written.

3    Q.    All right.  And I'm going to ask you to turn to the

4    bottom of page 36, please.

5              And I will let you get there.  Sorry.  And can

6    we highlight the portion that I'm referring to?

7              "Valhi predicts here on page 36 that Valhi

8    shareholders should expect higher net income in 2017 as

9    opposed to 2016:  Is that right?

10   A.    Yes.

11   Q.    And nowhere in this 10K does Valhi suggest that WCS

12   may lose its licenses to store or dispose of nuclear waste;

13   is that right?

14   A.    I'm not sure why -- looked at the steps that we have

15   at this point obtained a clean opinion for PWC, which we are

16   required to maintain our license.

17             We have commitments to continue to fund the

18   collateral trust, which we are required to maintain the

19   license, and we have committed to WCS that we would fund --

20   we would fund operations that we need for personnel to

21   continue to operate.

22   Q.    Okay.  Let me ask you about some other disclosure that

23   Valhi made to the SEC and to investors in this 2016 10K.  If

24   we could turn to page 16 of the document, Ms. Raybar.

25             It says on the bottom of page 16 that Valhi has

Samford - cross

1  applied for a license to store spent nuclear fuel; is that

2  right?

3  A.    Well, we had applied for the license.  As I mentioned,

4  we have suspended that application because we cannot afford

5  to pay for the licensing fee once it is not extended.

6  Q.    And that's a temporary extension; right?

7  A.    It is not my intention to restart that.  I do not have

8  the cash to do it.  If the transaction closes,

9  EnergySolutions can make their own decision.

10 Q.    But the letter that was sent to the Nuclear Regulatory

11 Commission said it was a temporary suspension; is that

12 right?

13 A.    Said it was a suspension until after the completion of

14 the acquisition.  After the completion of the acquisition,

15 that is someone else's decision.

16 Q.    Okay.  But basically, my question was:  Did they say

17 it was a temporary suspension?

18 A.    Until the completion of the acquisition.

19 Q.    Okay.

20 A.    If the acquisition is not completed, then that is our

21 decision, and my decision is that we don't have the money to

22 pay for this.

23 Q.    Okay.  One more time because I think we're not

24 communicating:  Did the letter say that it was a temporary

25 suspension?

Samford - cross

1    A.    The letter asked them to temporarily suspend it until

2    completion of the acquisition.

3    Q.    Okay.  Thank you.

4          Now I would ask you to turn to page 17 of this

5    document, please.

6          Do you see the sentence here that says, "We

7    believe our broad range of permits for the treatment,

8    storage and disposal of exempt waste, LLRW and mixed LLRW

9    streams may position us better than our competitors and are

10   a key element of our long term strategy to provide one-stop

11   shopping for exempt waste, LLRW and mixed LLRW."

12   A.    Yes.

13   Q.    And Valhi filed this statement with the SEC describing

14   the long-term strategy for WCS just six weeks ago; is that

15   right?

16   A.    Well, there's certainly a representation that the

17   long-term strategy is never going to change.

18   Q.    Okay.  Let me ask the question again:  Valhi filed

19   this statement with the SEC describing its long term

20   strategy for WCS just six weeks ago; is that right?

21   A.    We had had a licensing effort at the end of 2004 to

22   obtain a variety of licenses.  We believed that having a

23   full complement of services would make our facility, our

24   landfill valuable, and as we have borne out year over year

25   since the facility has been opened, that has not been the

Samford - cross

1    case.

2              THE COURT:  And was this filed six weeks ago?

3              THE WITNESS:  It was filed six weeks ago.

4              THE COURT:  That's the only question.  Thanks.

5              MR. HOFFMAN:  Okay.  Thank you.

6              Now, I would like to ask about PTX-608.  I don't

7    know if it's confidential any more or not.

8              (Pause while counsel conferred.)

9              MR. BECKWITH:  I don't think there's a problem,

10   your Honor.

11             THE COURT:  All right.  It's 1:00 o'clock, so if

12   it's going to be a short question, that's fine.  Otherwise,

13   we'll take our half-an-hour lunch break.

14             MR. HOFFMAN:  I think now might be a good time

15   to take a break, your Honor.

16             THE COURT:  All right.  Good.  Half-an-hour for

17   lunch.

18             (Luncheon recess taken.)

19                        -  -  -

20             Afternoon Session, 1:30 p.m.

21             THE COURT:  You may continue.

22             MR. HOFFMAN:  Thank you, your Honor.

23   BY MR. HOFFMAN:

24   Q.    Ms. Samford, good afternoon.

25   A.    Good afternoon.

1   Q.    I had one more question about SEC filing that Valhi

2   has made.  On April 6th of this year, Valhi, Incorporated

3   filed a proxy statement with the SEC.  Are you familiar with

4   that?

5   A.    I've not prepared proxy statements.  I have filed

6   proxy statements.

7   Q.    Okay.  Thank you.

8            Now, when we left off, I think I had asked you

9   to turn to PTX-608.

10  A.    Yes.

11  Q.    Do you see that document?

12  A.    I have it.

13  Q.    Okay.  And do you recognize this as the cover letter

14  for disclosures to Valhi Holding Company recently filed with

15  the TCEQ?

16  A.    This is the financial assurance submittal that was

17  filed on March 31st with the TCQ.

18  Q.    I know there's a difference between Valhi,

19  Incorporated and the Valhi Holding Company.  Were these

20  financial assurances filed by the Valhi Holding Company?

21  A.    Valhi Holding Company, yes.

22  Q.    Okay.  These were filed on March 31st, 2017?

23  A.    Yes.

24  Q.    Okay.

25            MR. HOFFMAN:  Your Honor, I would move to admit

Samford - cross

1    PTX-608.

2            MR. BECKWITH:  Your Honor, we reached an

3    accommodation with the Government on PTX-608 to allow them

4    to show in open court two pages.  The rest of it we would

5    ask to be redacted, because as your Honor can see, this is

6    confidential under Texas State law.  With that, I have no

7    objection.

8            THE COURT:  Are you good with that?

9            MR. HOFFMAN:  Yes.  Yes, your Honor.

10            THE COURT:  All right.  So in terms of the

11    public record and in terms of what I am looking at, really,

12    the only relevant pages that I'm going to be looking at for

13    purposes of the record are the two pages that we're going to

14    discuss now?

15            MR. HOFFMAN:  Yes, your Honor, plus the witness'

16    testimony.

17            THE COURT:  Right.  Okay.  Good.  Thank you.

18            (Plaintiff's Exhibit No. 608 was admitted into

19    evidence.)

20            MR. HOFFMAN:  Your Honor, I think I failed to

21    deliver documents to you.  If I could approach, I would do

22    that now if you want them.

23            THE COURT:  Because I have unredacted copies of

24    608, I'm going to give them back to you, so we're going to

25    have an exchange.

Samford - cross

1    MR. HOFFMAN:  Yes, your Honor.  May we publish

2    the cover letter of PTX-608?

3    THE COURT:  Yes, although I've still got an

4    unredacted copy of 608.

5    MS. RAYBAR:  The exhibit is marked as wholly

6    confidential, so there's no blacked-out redactions.

7    THE COURT:  All right.  Okay thank you.

8    BY MR. HOFFMAN:

9    Q.    Ms. Samford, you are the person who prepared these

10   disclosures on behalf of Valhi Holding Company's behalf;

11   right?

12   A.    Yes.

13   Q.    And these disclosures cover three of the licenses that

14   the TCEQ grants to WCS; is that right?

15   A.    Right.  The three licenses that are listed on the

16   cover.

17   Q.    And for each of these licenses, the Valhi Holding

18   Company needs to show that it meets a financial test

19   established by the TCEQ; is that right?

20   A.    To be eligible to make the guarantee, they have to

21   meet a test as established by the TCEQ.

22   Q.    And the Valhi Holding Company certifies in these

23   documents that it meets all of the requirements of TCEQ's

24   financial test for each of these licenses; is that right?

25   A.    Yes.

Samford - cross

1    Q.    And as part of meeting TCEQ's financial test, the

2    Valhi Holding Company certifies that it has not received a

3    going concern qualification from an independent auditor; is

4    that right?

5    A.    That's correct.

6    Q.    And as we talked about earlier, no going concern

7    qualification means that the Valhi Holding Company auditors

8    believe that it will be in business 12 months from now; is

9    that right?

10   A.    Twelve months from the date of the report.  I'm not

11   sure what the date of the report is.  At the end much

12   March-ish.

13   Q.    Okay.  Thank you.

14         Now I'm going to ask you to turn to the very

15   last page of this document, and it does not have page

16   numbers, but the Bates number ends with the numbers 554.

17   A.    Okay.

18   Q.    Do you see that?

19   A.    Yes.

20   Q.    So as part of these disclosures to the TCEQ, the

21   executive vice president and Chief Financial Officer of the

22   Valhi Holding Company wrote a letter to the TCEQ; is that

23   right?

24   A.    The TCEQ, yes.

25   Q.    And in this letter, the Chief Financial Officer of the

Samford - cross

1    Valhi Holding Company confirms that it has provided the TCEQ

2    with all relevant, significant financial information;

3    correct?

4    A.    Yes.

5    Q.    Okay.  Thank you.  You can put that document aside.

6                Before our break, we spoke about WCS's long-term

7    strategy that Valhi described to the SEC.  Now I would like

8    to ask you just a few more questions about WCS's investments

9    in the future.

10               You prepared WCS's annual budget; is that right?

11   A.    Yes.

12   Q.    And the budget is approved by the members of the

13   management committee; is that right?

14   A.    Yes.

15   Q.    And the 2017 WCS budget allocates funds for capital

16   expenditure; is that correct?

17   A.    I wouldn't call it allocation.  There is a plan in

18   there to, for capital spending, but it is at our discretion

19   whether or not we actually do any of that spending.

20   Q.    Okay.  So in the 2017 budget, there is a line item for

21   capital expenditures; is that right?

22   A.    There's a line item for capital expenditure.

23   Q.    Okay.  And that line item for capital expenditure is

24   for $6.7 million in 2017; is that right?

25   A.    That sounds right.

1399

Samford - cross

1    Q.    And the largest part of those expenditures are to

2    expand WCS's RCRA cell; is that correct?

3    A.    It's about four-and-a-half million dollars.

4    Q.    All right.  You anticipated my next question.  And the

5    budget contemplates expanding the RCRA cell in mid-2017; is

6    that correct?

7    A.    If we were to keep the cell open and operational, we

8    would need to begin the expansion in 2017.

9    Q.    Okay.  And in addition to money for the RCRA cell,

10   there's a million or so dollars budgeted for large pieces of

11   equipment; is that right?

12   A.    Yes.

13   Q.    And in addition to capital expenditure, WCS's current

14   budget also allocates fund for capitalized permit costs;

15   right?

16   A.    Yes.

17   Q.    And the 2017 budget allocates $800,000 of capitalized

18   permit costs for studies that will be used to obtain spent

19   fuel interim, a spent full interim storage license; is that

20   right?

21   A.    Right.  We've pulled that application, so we will not

22   be spending money on those things.

23   Q.    And when I took your deposition in Dallas, that was

24   about six weeks ago; is that right?

25   A.    About six -- a little less, I think.

1   Q.    What?

2   A.    A little less, I think.  Five weeks ago.

3   Q.    All right.  Five weeks ago.  At that time, we talked

4   about this $800,000 allocation for the spent fuel project;

5   is that right?

6   A.    Right.

7   Q.    And at that time there hadn't been the temporary

8   suspension; right?

9   A.    At that time, we were still negotiating with AREVA for

10  AREVA to pick up the NRC fees.  When AREVA declined to do

11  that, we were stuck with the NRC fees.  That's an additional

12  750,000.  That is my whole 800,000, and I'm out of money.

13  Q.    Right.  And in addition to the $800,000 that the WCS's

14  five-year budget allocates for the spent fuel project in

15  2017, it also allocated $800,000 in the subsequent four

16  years; right?

17  A.    Right.  So that would be on hold as well.

18  Q.    Right.  So when the 2017 five-year plan was made, it

19  was contemplated at least then that WCS would spend a total

20  of $4 million on the spent fuel project; is that right?

21  A.    It was four years at 800, so that's 3.2 million.

22  Q.    Well, plus 2017; right?

23  A.    2017.  It's only four years.

24  Q.    It's --

25  A.    The plan the five years, but there was only four years

Samford - redirect

1   of spending in that plan under the license.

2   Q.    Okay.  So that that five-year plan allocated three

3   point $2 million to the spent fuel project; is that right?

4   A.    Yes.

5   Q.    But six days before trial, WCS informed the NRC that

6   it had temporarily suspended the application for the spent

7   fuel license; is that right?

8   A.    After AREVA declined to continue to finance their

9   portion of the NRC fees, WCS reached a conclusion, because

10  the NRC is spending at a rate of about $250,000 a month,

11  that's $3 million this year.  We do not have those funds.

12  The lack of participation from AREVA drove that decision.

13  Q.    And that letter was issued six days prior to trial; is

14  that right?

15  A.    That letter was issued two days after AREVA declined

16  to continue to participate, which also happened to be six

17  days before the trial.  But the driver was AREVA declining

18  to continue to participate.

19  Q.    Okay.  Thank you.  I have no further questions.

20          THE COURT:  All right.  Redirect.

21                    REDIRECT EXAMINATION

22  BY MR. BECKWITH:

23  Q.    Ms. Samford, do the financial assurances that we just

24  saw in that letter to TCQ mean that Valhi, Inc. and Valhi

25  Holding will pay for any approved capped enclosure plan if

Samford - redirect

1    WCS cannot?

2    A.    The financial assurances assure TCQ that someone

3    besides WCS is standing behind the closure obligation.

4    Someone from Valhi Holding will assure their capital

5    enclosure is completed.

6    Q.    And, similarly, will someone make sure those bonds are

7    repaid?

8    A.    Yes.

9    Q.    When will you have to take the write-off for what has

10   been referred to as the temporary suspension?

11   A.    I've already recorded it.  I recorded it in April.

12              MR. BECKWITH:  Nothing further, your Honor.

13              THE COURT:  All right.  You may step down.

14   Thank you very much.

15                   (Witness excused.)

16              MS. REINHART:  Your Honor, the defendants are

17   calling Carol Peterson from Exelon.

18              Ms. Peterson is here today to testify about the

19   benefits of this deal to the nuclear industry and also

20   decommissioning options and their lack of competitive

21   effects.

22              THE COURT:  All right.  Thank you.

23                   ... CAROL PETERSON, having been duly

24                   sworn as a witness, examined and testified as

25                   follows ...

Peterson - direct

**DIRECT EXAMINATION**

1

BY MS. REINHART:

2

Q.    Good afternoon, Ms. Peterson.  You work at Exelon

3

Generation; is that right?

4

A.    Correct.

5

Q.    Just give the Judge a general understanding of the

6

breadth of the business, of the company.

7

A.    Okay.  Exelon Generation is -- and I'm specifically in

8

the nuclear division, of Exelon Generation.  We own and, or

9

own and operate 23 nuclear units.  Two additional we own a

10

piece of, but don't operate.  We're the largest nuclear

11

power operator in the country.

12

        I've been in the industry for 36 years now.  My

13

current position is senior vice president of strategy and

14

planning for the nuclear group.  I'm responsible for project

15

management, business planning, new venture, decommissioning,

16

and special, allow special projects of the nuclear group.

17

Q.    Now, do any of your current responsibilities relate to

18

the management of low level radioactive waste?

19

A.    I specifically don't have the responsibility over the

20

operations of radwaste operations in our company, but I'm on

21

the senior team.  I'm part of the senior executive team over

22

the overall business unit, and in that role, I have a

23

decision -- I'm involved in the decisions associated with

24

our partnerships and our different services and such that we

25

Peterson - direct

1   use at the company.

2   Q.    So, for example, related to decommissioning, what do

3   you do?

4   A.    Okay.  My group is in strategy and planning, is

5   responsible for decommissioning planning.  We would be

6   making strategic decisions around whether or not, once we

7   shut a nuclear power plant down, what we would do from that

8   point on.  My group makes that decision.  We're responsible

9   for all the licensing activities associated with that.  And

10  then we would ultimately be responsible for the execution of

11  whatever strategy we embarked on for a shutdown unit.

12  Q.    Do you also have involvement in the decisions about

13  what sorts of structures to construct that relate to

14  radioactive waste?

15  A.    Oh, structures.  Facilities, you mean?

16  Q.    Yes.

17  A.    Facilities.  Yes.  In cases where we would need to --

18  part of my group is project management, and where we would

19  need to build or construct something to deal with

20  radioactive waste, whether it's low level waste or up to

21  spent fuel, my group would construct -- would manage the

22  project that we construct those facilities.

23  Q.    Do you have any involvement in the technology related

24  to waste at all?

25  A.    I'm not sure I understand that.

1   Q.    New technologies?

2   A.    Yes.  Our group would be exploring all different new

3   technologies of anything associated with the nuclear group.

4   Q.    Okay.  So you said you've been in the industry for

5   35 years.  How are things going in the nuclear industry?

6   A.    So it has been a challenging last few years for

7   commercial nuclear power plants that are in merchant

8   markets.  So we have kind of two different arrangements in

9   the nation around nuclear power plants.  Some of the nuclear

10  power plants are located in regulated markets where you

11  might be familiar with regulated utilities that produce the

12  power all the way to sell it to you at your house.  Those

13  regulated markets, their pricing is a cost basis, so

14  whatever it costs to produce the power, that's what the rate

15  payers pay.

16          In the merchant markets, where we deregulated

17  generation from the transmission and distribution system, we

18  are in a more competitive market to sell our power.  So all

19  of Exelon's nuclear plants are in the merchant market, and

20  we sell to -- we sell -- we compete against all other types

21  of generation power.

22          Since gas has become so abundant due to fracking

23  in the United States, and the price of gas has dropped

24  dramatically since 2008 or so, it has been very challenging

25  for us.  That's driving the price down of energy, and it has

Peterson - direct

1    been very challenging for us running nuclear plants to make

2    a profit on those plants.

3              So if the price of gas comes down, the price of

4    energy comes down, electrical energy, and we have to compete

5    against gas that produces electric energy as well as wind

6    and solar and all other sources of power.

7    Q.    Are there categories of vendors that supply

8    specifically the nuclear industry?

9    A.    Yes.

10    Q.    Okay.

11    A.    Yes.

12    Q.    How are they doing?

13    A.    They're just as challenged as we are.  So we have,

14    since we're all in a merchant power market, we have been

15    driving to try and contain our costs to drive it as low as

16    possible.  So we have a lot of partnerships with our vendors

17    and supply services and product, and we try to work together

18    to keep those costs down, so that's very challenging for

19    them, too.

20    Q.    So has Exelon decided recently to shut down any of its

21    nuclear plants given the situation you just described?

22    A.    We have one plant that we've announced to shut down

23    on, and that is the Oyster Creek plant and it will shut down

24    at the end of 2019.  We made that announcement in 2009, and

25    that was the case of the combined economics associated with

Peterson - direct

1   the plant as well as that plant will have operated for

2   50 years in 2019.

3   Q.     Al right?

4   A.     There are other utilities that are more challenged

5   that have announced shutdowns.  As a matter of fact, there

6   will be 11 nuclear units shut down between 2013 and 2021, so

7   that, and by and large, the main reason for the shutdowns is

8   economic.

9   Q.     So --

10  A.     We were faced --

11  Q.     I'm sorry.  I was just going to ask you a little bit

12  more about the Oyster Creek shutdown.  I apologize if I

13  interrupted.  Feel free to finish your answer if you would

14  prefer.

15  A.     Okay.  I would just add one more thing, and that is,

16  that we were, at the middle of last year, through the fourth

17  quarter of last year, we had announced we were going to shut

18  down our Clinton, which is one unit, and Quad City, which is

19  two units in Illinois.

20          And we had worked with the legislature in

21  Illinois to create the Clean Energy Program to recognize the

22  clean benefits of noncarbon, nuclear power.  So we've got a

23  program in place now to keep those plants running for ten

24  more years.

25  Q.     Okay.

Peterson - direct

1   A.    We had some plants, but we changed them.

2   Q.    Okay.  Thank you for that.  We'll take each in turn at

3   this point.  But you had mentioned that Oyster Creek had

4   announced a shutdown in 2009 and yet you're just shutting it

5   down for 2019.  Do I understand that correctly?

6   A.    That's right.

7   Q.    So is it unusual for a utility to announce a shutdown

8   so far in advance from when it does shut down?

9   A.    It has been.

10  Q.    Okay.

11  A.    We have a license life of our plants, so the original

12  license plant was 40 years for a nuclear plant.  We've

13  since extend extended almost all of them an additional

14  20 years.

15        So there's definitely an end of life for a

16  nuclear power plant unless we continue to renew those

17  licenses.  So we made the decision to not renew -- we have

18  renewed the Oyster Creek license, could operate it in 2029,

19  but made the decision to shut it down at the end of 2019.

20        Many other plants shut down emergently.  They'll

21  announce that it's six weeks away.  And even with the

22  Clinton plant, announced last June, we were going to shut it

23  down in June of this year, so that would have only been a

24  one-year horizon.

25  Q.    So what kinds of things factor into a decision to

Peterson - direct

1    decide to shut down a plant so far in advance of shutting it

2    down?

3    A.    For the case of Oyster Creek, we were faced with a new

4    environmental requirement that would have mandated us to put

5    a -- publicly mandated us to put a cooling tower at the

6    site.  That would have been something very expensive,

7    something on the order of $800 million.

8                So faced with that choice or working and saying,

9    we'll just have a shutdown of Oyster Creek, it was kind of a

10   negotiated settlement with the State of New Jersey.

11   Q.    So let me ask you about the Clinton and Quad Citys

12   facilities.  Where are those located?

13   A.    In Illinois.

14   Q.    If I understand your testimony, Exelon had announced

15   that both of them were shutting down?

16   A.    Correct.

17   Q.    When was that?

18   A.    That was June of last year of 2016.

19   Q.    Did Exelon begin to look for decommissioning options

20   at that point?

21   A.    Yes.  The first action we took was to prepare

22   ourselves for the shutdown.  There's many things you had to

23   do in terms of licensing and regulations in advances of the

24   shutdown that makes shutting the plant down more efficient.

25   We had mobilized teams to do that.

Peterson - direct

1           Then we were in the process of formulating what

2   we would do, our strategy about what we would do after they

3   were shut down.

4   Q.    Okay.  And did you say that was six months ago?

5   A.    June of last year.

6   Q.    June of last year?

7   A.    Yes.

8   Q.    Okay.  And then you've mentioned this, but I want to

9   make sure the Court understands what happened.  How soon

10  after you announced your shutdown did things change for

11  those two plants?

12  A.    December.

13  Q.    Okay.

14  A.    The first week of December.  So as we were preparing

15  to shut them down, we were also working diligently with the

16  legislature in Illinois to be able to provide this program,

17  and it was under a jobs program.

18          The jobs that we have at nuclear power plants

19  are very high paying, high skill jobs, so we appeal to the

20  State to acknowledge and recognize that nuclear power was a

21  clean energy, it would be replaced with something that was

22  probably fossil burning like gas plants.  And so we got

23  credits for the clean energy produced by nuclear power, and

24  we were able to negotiate that at the end or really, the

25  first week of December.

Peterson - direct

1   Q.    And --

2   A.    Of last year.

3   Q.    And what role did the state legislature play in that

4   process?

5   A.    It was -- it was enacted by the legislature.

6   Introduced in the house and then passed by the senate,

7   signed by the Governor.

8   Q.    And then under that, is the State producing any sort

9   of economic incentive to Exelon?

10  A.    The program provides the incentives through the rate

11  payers.

12  Q.    Okay.  Are you familiar with a facility called

13  Fitzpatrick?

14  A.    Yes.

15  Q.    Explain to the Court what Fitzpatrick is.

16  A.    So on March 31st, we, Exelon, acquired the Fitzpatrick

17  plant from Entergy.  Fitzpatrick is located north of

18  Syracuse, New York.

19         Exelon operates three other units up there in

20  that Northern New York area, the Ginna and Nine Mile.  And

21  Entergy had announced they were going to shut down the plant

22  in November of 2015, and we were working in the State of New

23  York also to acknowledge that clean energy supplied by

24  nuclear power plants and the good job and nuclear power

25  plants.  And in the State of New York, we got another zero

Peterson - direct

1    emissions credit program put in place.

2                    So part of that whole process involved

3    Exelon acquiring the Fitzpatrick plant that was going to be

4    shut down by Entergy, and we're going to keep it running for

5    12 more years.

6    Q.    Had Entergy announced they would send the facility

7    into decommissioning once they shut it down?

8                    So now that Exelon has announced the shutdown of

9    Oyster Creek, what are the company's options for that plant

10   for the future?

11   A.    So there's really three options in the regulations for

12   post-shutdown of the nuclear plant.  There's SAFSTOR.

13   There's decommissioning or active decommissioning, and then

14   the third would be entombment.  That is kind of not anything

15   we would use or I want to talk about that, but it is in the

16   regulations.

17                   So we can either put it in SAFSTOR or actively

18   decommission it.  And when a utility or owner has 60 years

19   to complete the radioactive decommissioning of the plant, so

20   any point along those 60 years, you can either put it in

21   SAFSTOR or it can actively be decommissioned.

22   Q.    So does Exelon have to decide any time soon whether

23   it's going to decommission or send the facility to save

24   store?

25   A.    No.  What we'll do, at the end of life, we'll prepare

Peterson - direct

1       for shutting the plant down, and then after the plant is

2       shut down, which is scheduled for the end of 2019, we will

3       permanently defuel the plant, and then we will proceed with

4       plans to put it in SAFSTOR.  And then over the next two to

5       three years, around three years, we will take the fuel out

6       of the spent fuel where it is now and put it into dry cask

7       storage.  That's the first activity.

8              During that time, we make a decision whether or

9       not we would actively decommission the plants after that.

10      And we can change our mind or we can do -- we have the

11      option of decommissioning it any time during the six-year

12      period.

13      Q.   So you mentioned the two to three-year timeline.  Is

14      there any guarantee that during that two to three years, the

15      decision will be finally made to go into active

16      decommissioning?

17      A.   Likely, we will make a decision some time in that time

18      frame.  Depending what conditions are out there, we might

19      change our mind.  We might do something else.

20             The factors that would impact the decision we

21      would make of whether to proceed with active decommissioning

22      of the plant would be whether or not we had adequate funding

23      in the decommissioning trust fund.  If we had adequate

24      funding, we might proceed with active decommissioning.

25      If we didn't, we would put the plant in SAFSTOR, hold it

Peterson - direct

1   there until the trust fund grew to the point where

2   there would be adequate funds to pursue the dismantlement

3   process.

4   Q.    And has Exelon previously put a facility into SAFSTOR

5   so that the trust fund could grow?

6   A.    Yes.   That's what we were doing with the Zion plant.

7   So we shut the Zion plant down, and Zion is located in

8   Illinois.   We shut the plant down in 1998 and we put it in

9   SAFSTOR, and that's where it was for quite some time, until

10  we began the active decommissioning process.

11  Q.    Do you recall when Zion came out of SAFSTOR to go into

12  active decommissioning?

13  A.    It was -- we closed, we sold the plant to

14  EnergySolutions on September, in September of 2010.   So it's

15  between 1998 and when we closed that sale for 12 years.

16  Q.    You said that EnergySolutions was handling the

17  decommissioning for the Zion facility.   How did that come

18  about?

19  A.    The idea was -- came from EnergySolutions and our CEO,

20  Chris Crane -- he wasn't the CEO then, chief nuclear offer

21  at the time -- conceived of the idea that instead of Exelon

22  actively decommissioning the plant and hiring the different

23  services that you need in order to do an active

24  decommissioning, we would engage in selling the plant and

25  all the equipment and all the systems and all the structures

Peterson - direct

1    as well as the trust fund, which would fund the

2    decommissioning.

3             We would sell that all to EnergySolutions, and

4    they talked about that idea somewhere in the 2006 time

5    frame.  The market had -- because of the market crashing,

6    the trust fund had gone down really low, so we didn't think

7    it was really viable.  Then when it came back up again, we

8    decided to close that deal in 2010.

9    Q.    And so has the decommissioning already occurred?

10   A.    It's in the process of being actively decommissioned

11   right now.

12   Q.    Then what happens at the close of decommissioning

13   after all of that waste has been taken away?  What happens

14   to the facility?

15   A.    Well, what will remain at the Zion location will be a

16   spent fuel, dry spent fuel storage installation that we will

17   have to maintain there and watch over until the Department

18   of Energy removes the spent fuel from the site to the

19   ultimate repository.  And the license will be terminated

20   for the production of the, you know, for an active reactor.

21   It will just be a license for storing radioactive material.

22   Q.    And at that point, is there transfer of assets back to

23   Exelon?

24   A.    Yes.  We never sold the fuel to EnergySolutions.  We

25   leased the fuel and leased the land, so when EnergySolutions

Peterson - direct

1    completes the decommissioning of the plant, they will turn

2    the fuel and the land back over to Exelon.

3    Q.     And from that point forward, who has responsibility

4    for any potential liability related to the site and the

5    fuel?

6    A.     Exelon.

7    Q.     So has Exelon -- are there other methods for

8    decommissioning a plant besides the one that you used with

9    EnergySolutions, where they actually had the assets

10   transferred to them?

11   A.     There's a few options.  One of the options would be

12   that an owner of the facility actively decommissioned and

13   hired all of the companies that provided services and

14   materials and, you know, do all of that active project

15   management and planning by the owner themselves, and we

16   could have done that with Zion.

17        The option of selling the plant to

18   EnergySolutions, no one has ever done that before.  Selling

19   the plant solely for the decommissioning activity.  So that

20   was a new concept.

21        There's one step further we could go, and that

22   is sell the fuel and the land and everything.  No one has

23   done that, but there's all sorts of different variations on

24   that same theme of how to execute the decommissioning

25   process.

Peterson - direct

1    Q.    Going back to Oyster Creek, has Exelon the process of

2    talking about potential, for lack of a better phrase, the

3    contractors that would actually handle the decommissioning

4    work?

5    A.    We have.

6    Q.    And where are you in that process?

7    A.    Since we were, last year, mid-year, we were faced with

8    the Clinton/Quad City shutdown, we were trying to decide how

9    did Exelon want to execute on not only shutdown process, but

10   loading of the spent fuel, the dry cask storage system.  So

11   the active decommissioning, we were trying to decide how we

12   wanted to execute that.

13          So there was a lot going on last year.  But

14   since we've gotten the new programs in Illinois and New

15   York, now we just have the Oyster Creek plant to shut down

16   at this point in the near term anyway.  So we're in the

17   process now of discussing those options with different

18   vendors.

19   Q.    And have you talked to any of those companies so far?

20   A.    We've talked to EnergySolutions.  We've talked to

21   NorthStar, Regal, Alliance and Holtec.

22   Q.    Who is Holtec?

23   A.    Holtec is a manufacturer of dry cask storage systems

24   for spent fuel as well as, there's many other structural

25   components that they manufacture.

Peterson - direct

1   Q.    Have you worked with them before?

2   A.    Yes.  We worked with them for a long time.  25 years,

3   probably.

4   Q.    And are you comfortable that they could take on the

5   big project?

6   A.    Yes.  I think we're getting comfortable around that.

7   We're trying to understand what their capabilities would be.

8   No one company can do everything.  It's generally an

9   alliance of several companies, and we would look for one

10  company to be the main -- the main manager of the whole

11  effort, and then they would higher other companies.

12          So Holtec, you know, it is in the mix of our

13  discussions.  We really have not reached any conclusions

14  yet.

15  Q.    Okay.  How about NorthStar?  You said you had a

16  conversation with them?

17  A.    Right.

18  Q.    What do you know about NorthStar?

19  A.    I didn't know them until last summer, when they called

20  on us, knowing that we had some potential shutdown plants in

21  the cue.  They called to introduce themselves to us, to

22  Exelon.

23          So the first conversation was last year,

24  mid-year.  I said, we need to figure out what's going on

25  with Clinton and Quad City, and once we've made that

Peterson - direct

1    decision, or once we determine that, yes, we're going to, in

2    fact, shut them down, or, no, it's going to get reversed,

3    we'll talk to you again.  Recently, we had a conversation

4    with them so they could go over what their capabilities are

5    in decommissioning.

6    Q.    And you had no knowledge of their capabilities before

7    they introduced themselves?

8    A.    Right.  I did not.

9    Q.    As you said, you're also meeting with EnergySolutions

10   as a potential decommissioning contractor.  Can you describe

11   for the Court the relationship Exelon has with

12   EnergySolutions?

13   A.    EnergySolutions is one of our partners.  I would call

14   them.  In our industry, there's not a lot -- in a lot of

15   cases, there's not a lot of companies providing services and

16   products that we need, and we have very deep partnerships

17   and alliances with those suppliers, because it's really

18   critical to us that they are around and that they are

19   capable and that they provide quality services and that they

20   don't go away, so that we have those needed services

21   available to us.  We have a very long relationship with

22   EnergySolutions, well at least since it was called

23   EnergySolutions and even prior to that, its predecessor

24   company.  So they are a very big partner of ours.

25   Q.    Is it important to Exelon that a company that is

Peterson - direct

1  overseeing the decommissioning project is, indeed, a

2  reliable and trustworthy company?

3  A.    Not only is it important to our company, but it's

4  important also to the industry.  So we will also watch all

5  of the decommissioning activity, just like we watch over all

6  major issues or changes associated with our industry,

7  because we're a very small industry.  We all know each

8  other, and we all have to support each other so that we

9  continue to thrive.

10  Q.    So is the financial stability of a company important

11  when you are choosing a decommissioning contractor?

12  A.    It is always important when it's going to be a

13  long-term relationship.  So our relationships with all of

14  our suppliers, main suppliers, suppliers like General

15  Electric, they're long-term relationships, and it's very

16  important that they remain viable, so their financial

17  stability is very important to us.

18  Q.    So as to the three companies that are currently in

19  discussions with Exelon about Oyster Creek, is it a sound

20  thing for any of the three of them to count on revenue

21  streams coming from a decommissioning any time soon?

22  A.    Is it a sound -- I'm sorry.

23  Q.    Would it be a sound business practice for them to

24  forecast with any reliability what is going to come out of

25  that project?

Peterson - direct

1    A.     It is risky to -- because there are all different

2    phases at which you would, you know, execute or engage a

3    contractor in providing those services.

4                 So I think the example that you gave,

5    Fitzpatrick, I mean, that was going to shut down and now

6    it's not shutting down.  Quad City and Clinton, same story.

7    So it's a little unpredictable how many plants will actually

8    go into active decommissioning.  Even though there have been

9    several of them shutting down of late, some of them will put

10   their plants in SAFSTOR so they won't be actively

11   decommissioned.  And then there are a few that actually will

12   effectively be decommissioned.

13   Q.     In your experience, how frequently is a facility put

14   in SAFSTOR?

15   A.     Right after decommissioning?

16   Q.     Yes.

17   A.     I would say about half and half.

18   Q.     So sitting here today, again back to Oyster Creek, is

19   it certain that one of those three companies you were

20   talking about will actually get the Oyster Creek work?

21   A.     No, not at all.  I -- it's not certain -- we have not

22   decided yet what we're going to do, so I would say under no

23   circumstances could anybody, could they say that that is

24   assure thing.

25                 We may decide to go into SAFSTOR, so certainly

Peterson - direct

1   for a vendor that we select to put our dry fuel into, or

2   our spent fuel into dry cask storage system, we're pretty

3   sure that will happen.  But we have not decided whether we

4   will just leave it in SAFSTOR or we will actively

5   decommission.

6   Q.    Is it possible that Exelon itself would decide to

7   handle the project?

8   A.    Absolutely.  That is definitely an option of ours, to

9   oversee, project manage and contract different firms for

10  different parts of the service and do the whole project

11  ourselves.  We wouldn't actually do the services.  I mean,

12  we would need hire someone to tear a building down.  We

13  would need higher someone to do the dry cask storage system.

14  Q.    What are the factors that would lead Exelon to decide

15  to handle it itself?

16  A.    So probably the most impactful part of the decision of

17  whether or not to actively decommission, as I said before,

18  the amount of money that's in your nuclear decommissioning

19  trust fund.

20          Once you shut a plant down, there's no way to

21  generate any revenue from it, so now it's really a liability

22  that you have committed to dismantle.  So we have trust

23  funds for all of our nuclear units, and so to the extent

24  that we would actively decommission would depend on

25  balancing the trust fund.

Peterson - direct

1        Some of the trust funds, if there's any

2   remaining funds per the state negotiated settlement when we

3   deregulate it, we might keep -- the company would be

4   entitled to keep the excess fund.  In other cases in other

5   states, we could return the trust funds.  In either case,

6   the decision of whether or not to decommission would be

7   based on, is there enough funds and what's the opportunity

8   to have the most remaining funds after the decommissioning

9   process is over.

10  Q.    So does Exelon have any other plants that are

11  currently shut down but that are not going into active

12  decommissioning?

13  A.    We have two.  Both of those units, the Dresden unit

14  one and the Peach Bottom unit one unit are co-located with

15  operating plants, so we've put those in SAFSTOR and wouldn't

16  decommission those since we're operating other plants at the

17  same site.

18  Q.    When was Peach Bottom shut down?

19  A.    In the seventies.

20  Q.    In 1970s?

21  A.    1970s.  And then Dresden I think was shut down in

22  early eighties.  So a long time ago those plants were shut

23  down.

24  Q.    Have the materials that eventually will have to be

25  disposed of in low level radioactive waste sites, are those

Peterson - direct

1   materials sitting on the site?

2   A.    We have removed the fuel and all of the fuel in the

3   Dresden Unit 1 is in dry cask storage at the storage site.

4   There are two other units at that site.  And there are some

5   cases where we've removed some of the radioactive material

6   just to get rid of them at the site, but for the most part,

7   the plant is intact, where it's not dismantled.  The

8   generation of the radioactive materials is when you actually

9   tear the plant down.

10  Q.    Do you anticipate that when you are ready to tear the

11  plant down, there will be low level radioactive materials

12  that need to be disposed of?

13  A.    Yes.

14  Q.    So at this point in time, did Exelon have an option

15  to dispose of any of its radioactive waste instead of --

16  sorry, to store instead of dispose of any of its radioactive

17  waste?

18  A.    You asked the question any of its waste.  So we don't

19  have an option to dispose of spent fuel.  That would be

20  nice, but the industry right now doesn't have an option, so

21  all operating plants as well as shutdown plants just have

22  the dry cask option at the individual site.

23        For Class A waste, we can store some of it for

24  some time, but that wouldn't be desirable to store that for

25  a long period of time.

Peterson - direct

1    For Class B and C waste, we can store Class B

2    and C waste for some time.  We can keep materials in our

3    spent fuel pool as well as put them in engineered dry casks

4    at the site and leave them there.

5    So we do have the option of storing at different

6    times.  Our best option is to dispose of it.  Class A, B and

7    C waste, that is the best option.

8    Q.    Are you currently storing waste on-site?

9    A.    We are storing some B and C waste in canisters that we

10   engineer because during the 2008, when Barnwell closed down

11   to out-of-compact utilities, we didn't have any choice.  We

12   didn't have any place to send Class B and C waste, so we had

13   to put them in canisters at our site.  So, yes, we're

14   storing.

15   Q.    How much sites have the storage capabilities right

16   now?

17   A.    We have the option at all of our sites -- in some

18   cases, it's moving the waste to another site, but we have

19   the option for all of our sites to store B and C waste.

20   Q.    So to the extent that you are storing waste currently,

21   why not just go ahead and dispose of it?

22   A.    Well, since -- two things.  Okay.  Since the WCS has,

23   now we have an available to place to send B and C waste, we

24   have been disposing of B and C waste since 2012.  Prior to

25   that, between the 2008 and 2012 time frame when we didn't

Peterson - direct

1    have any place to dispose of it, we put it in canisters at

2    the site.  It was a very expensive process to put it there.

3    It's perfectly safe there.  So we're not inclined to spend

4    any additional money to remove that until we decommission

5    the plant.

6    Q.    So are you making an economic decision by keeping it

7    on-site instead of disposing it right now?

8    A.    Absolutely.

9    Q.    Can you explain that a little bit?

10   A.    So, again, as I said, it was very expensive to take

11   the B and C spent waste out of our spent fuel, shielded

12   underwater storage system and put it into canisters.  As I

13   said, it was an expensive process.  So we've already spent

14   that money to keep it there, so it's perfectly feasible to

15   keep it in those canisters until we're ready to decommission

16   the plant.

17          Now, as more of this type of waste is generated

18   and we put more of the waste in spent fuel pools, now we're

19   clearing out those spent fuel pools and disposing of that

20   type of waste at WCS.

21   Q.    So you had talked a little bit earlier about the

22   relationship with EnergySolutions.  Does EnergySolutions

23   provide services to Exelon besides disposal?

24   A.    Yes.  They have a fuel suite of services in the

25   radioactive waste business, whether it's characterization,

Peterson - direct

1    whether it's transportation services, storing it, the

2    ultimate repository at Clive.  All of those.

3    Q.    Do you know whether WCS provides those services?

4    A.    My understanding is WCS provides the services of

5    bearing Class B and C waste as well as now they have the

6    capability of bearing Class A waste, lower level.

7    Q.    Do you know a lot of the folks over at

8    EnergySolutions?

9    A.    I know many people at EnergySolutions, most of their

10   senior executives.

11   Q.    Okay.  Do you know anyone at WCS?

12   A.    I personally don't know anybody.  I may have met them

13   in the industry, but I don't -- I don't have regular contact

14   with them like I do with most of our alliance partners.

15   Q.    One last question for you related to decommissioning.

16   Are you familiar with the Vermont Yankee site?

17   A.    Yes.

18   Q.    Who owns that site?

19   A.    Entergy right now owns that site.

20   Q.    Okay.

21   A.    Yes.  That was shut down a few years back.  I don't

22   remember when, but a few years back, that site was shut

23   down.

24   Q.    All right.  Are you aware that currently Entergy is

25   attempting to get approval to conduct its decommissioning of

Peterson - direct

1    that site?

2    A.    My understanding -- this is what I am aware of -- that

3    my understanding is that Entergy will off-load the pool,

4    the spent fuel pool, into dry cask storage.  I believe

5    they're actively doing that right now.  And then their

6    intent is to sell the plant to the NorthStar/AREVA joint

7    venture or NorthStar, and then they will actively

8    decommission it as well as own it, similar to Zion.  That's

9    my understanding.

10   Q.    Have you heard about where that project is in the

11   process of getting regulatory approval?

12   A.    I believe they're in the process of obtaining

13   regulatory approval to make that transfer.

14   Q.    Do you have any views about the project based on your

15   experience?

16   A.    You know, all I know about it is when I go to industry

17   meetings and interface with Entergy, people that, you know,

18   it was tight in Vermont.

19            I know that Vermont, once that plant

20   decommissioned, they don't want that plant just to sit there

21   in SAFSTOR.  That is part of the decision process, too.  I

22   didn't say that earlier, but definitely a consideration is

23   what does the local community wants.

24            Once you shut the plant down, if you are in

25   SAFSTOR, there's not a lot of jobs associated with that.  If

Peterson - direct

1    you actively decommission, you not only get rid of the

2    liability and take the plant down, but you also provide some

3    jobs while doing that.

4             I know that Vermont wanted to actively

5    decommission it.  I also understood that Entergy had

6    published that they were -- their trust fund was not as

7    robust as, let's say, Zion or even an Oyster Creek trust

8    fund, and it would be very hard for them to actively

9    decommission it, and they had originally planned on putting

10   it in SAFSTOR.  I understand that NorthStar potentially has

11   a different way of executing the project and now they

12   believe that they can decommission it.

13   Q.    Do you see any risks based on what you know about the

14   project?

15   A.    I think that once they publish that their trust fund

16   was not adequate to do that, to decommission it, it would

17   appear to me that it would be risky from a profitability

18   perspective.

19   Q.    My understanding is you flew in from Chicago this

20   morning on a very early flight so that you could testify

21   here today.  Do you support EnergySolutions' purchase?

22   A.    I do.  I do support this purchase.

23   Q.    Why?

24   A.    The most important thing to Exelon is that we have

25   continued option of being able to dispose of our Class B and

Peterson - direct

1    C waste, and that is more important, probably the most

2    important thing.  And I see that EnergySolutions can bring a

3    higher level of confidence of a long-term viability of WCS

4    if they acquire.

5              In 2008, when Barnwell closed to everybody

6    outside their compact, that was a huge challenge for us, and

7    that cost us a lot of money to put our, some of our waste in

8    dry canisters, and we just -- we don't want to be at that

9    place again.

10   Q.    Why, based on your experience, why aren't you

11   comfortable with WCS continuing to operate as a facility?

12   A.    A couple reasons.  The first one is I think that

13   EnergySolutions has demonstrated to us that they really are

14   a partner of ours.  They really are an alliance.  They meet

15   regularly with us.  They try and understand what's

16   important.

17             They try and work with us on being as efficient

18   as they possibly can.  They are clearly an innovator because

19   they created this idea of having, taking Zion and

20   decommissioning it and they executed well on that project.

21   So we feel very comfortable that they're a well-run company,

22   and when issues come up, we've attacked them and worked with

23   them to get rid of them.

24             WCS, don't know them.  Know that -- now, we know

25   that, you know, that building that asset in Texas was a huge

Peterson - direct

1  investment for the industry and that's fantastic.   The idea

2  that we have, that they took that chance to build not only

3  in-compact waste but out-of-compact waste, that's a huge

4  asset to our industry, but never got the feeling that that

5  was -- that that facility was going to make it in the long

6  run.

7            And specifically, we, Exelon even, back in 2014,

8  we looked at the potential for investing in WCS, and that

9  they had hired an agent to go out and look to see if there

10 would be an investment partner willing to invest it in it.

11 And we did a very detailed analysis of their financials as

12 to whether or not we would invest as a company, and we

13 determined that wasn't the right fit for Exelon, and so we

14 didn't pursue it.  But I certainly walked away from that

15 deal or that evaluation, rather -- it wasn't a deal -- the

16 evaluation thinking that WCS did not have a good forward

17 projection of what their revenue stream looked like and what

18 their profitability would be.

19 Q.    So did you personally participate in that look at an

20 investment in WCS?

21 A.    I did.

22 Q.    Did you see confidential information that WCS had

23 offered to those who were considering an investment?

24 A.    I did.

25 Q.    Is what you know about that subject a nondisclosure

Peterson - direct

1    agreement?

2    A.    It is.

3    Q.    So let's not go there.  But you have seen information

4    in the public as well; is that right?

5    A.    Yes.

6    Q.    Okay.  What do you know about WCS's financial

7    viability?

8    A.    I believe that WCS has not made any profit since

9    they've opened their facility, and that we support them

10   because we send our waste there and we have contracted with

11   WCS, but it's a public company, and you can look at their

12   financials and they're not that -- they are not profitable

13   at all in my understanding of it.

14            And there's even one case of a couple weeks ago,

15   they issued a letter to the NRC.  They had submitted a

16   license application to have a, to be able to store spent

17   fuel at their facility as a centralized interim storage

18   facility and they are applying for a license for that, with

19   the NRC.

20            And they wrote a letter to the NRC that said,

21   you know, could you stop looking at our license submittal.

22   We can't support, financially support that at this time.  So

23   I think there's a lot of information out there that would

24   demonstrate that the company's, their financial position

25   right now is not that strong.

Peterson - direct

1  Q.    You had talked a little bit earlier about the concerns

2  about the continuing, WCS management continuing operating

3  the site.  What do you know about the history of the folks

4  who brought those facilities to fruition?

5  A.    About WCS?

6  Q.    Yes.

7  A.    What I do know, again, this was part of the research

8  that we did back a few years ago, that Harold Simmons had

9  the vision to -- saw that maybe capitalize on the

10 opportunity of the States, you know, having the jurisdiction

11 to store low level waste in their compact.  Saw that as a

12 business opportunity and built a facility.

13        I mean, it's -- it was a huge challenge and

14 spent a lot of, hundreds of millions, I think, of dollars

15 building the facility that it is today.  And the man passed

16 away, so the time that we looked at it, we got the

17 impression that they really wanted to either completely get

18 out of that business or at least get some equity into the

19 business that had been pretty much a major investment for

20 years and years.

21 Q.    Is the fact that Mr. Simmons is no longer with us and

22 therefore no longer involved a concern to you?

23 A.    That was a concern to us at the time we looked at the

24 deal, too.  We believe that he was very influential in the

25 state to be able to have the regulations support the

Peterson - direct

```
 1    facility, and without him having that influence, maybe that
 2    that would be -- the future would be a little challenged
 3    around what the state regulators thought of the facility.
 4    Q.    Okay.  Did you send a letter to the Department of
 5    Justice expressing support for this transaction?
 6    A.    I did.
 7    Q.    And would you turn to Tab DTX-319 in your binder,
 8    please.  Is that the letter that you sent?
 9    A.    It is.
10    Q.    To the Department of Justice?
11    A.    Yes.
12              MS. REINHART:  Your Honor, defendants move the
13    admission of DTX-319.
14              MS.  BRODY:  No objection, your Honor.
15              THE COURT:  Thank you.
16              (Defendants' Exhibit No. 319 was admitted into
17    evidence.)
18              MS. REINHART:  May I approach?
19              THE COURT:  Yes, you may.
20              MS. REINHART:  While we're waiting, we actually
21    don't need to look at it, your Honor.  I am just going to
22    refer the witness to the middle paragraph of her letter.
23    BY MS. REINHART:
24    Q.    One of the sentences says, "The transaction will add
25    complementary capabilities to EnergySolutions' service
```

Peterson - direct

1    offering for the benefit of the nuclear utility operations."

2              Do you see that.

3    A.    Mm-hmm.

4    Q.    What did you mean when you wrote that?

5    A.    I think I said a little of this before and that is

6    that EnergySolutions is kind of -- is a trusted partner of

7    Exelon.  They never had specific facility to bear any B and

8    C waste, so in my view, to have that full complement of

9    disposing of waste regardless of its classification was a

10   benefit, and for us to only deal with one company seemed

11   like a more efficient way to approach samples.

12   Q.    Do you have any concerns about energy owning both the

13   disposal site for Class A waste and also for Class B/C

14   waste?

15   A.    I don't.  In '74, in our business, we have so few

16   suppliers of very critical functions.  We have some plants

17   that only one company will manufacture the fuel for.  We

18   have no options for how to buy the fuel.  If we can't get

19   fuel, we won't be running the plant.

20              So it's -- it's a normal business practice in

21   the nuclear industry to deal with just one company in one

22   particular service area.  Westinghouse, AREVA, GE, these are

23   all large suppliers of ours, but in many cases, they only

24   supply one thing, and even amongst those large companies,

25   they're not competing with each other because they have

Peterson - cross

1    unique services to provide.

2              So we are not uncomfortable with it.  It would

3    be -- everybody would be better off if everybody had lots

4    and lots of choices.  Our biggest concern is to have

5    choices.  I mean, to have the option available and that not

6    having a B and C waste facility would be the worst outcome

7    of all.

8              MS. REINHART:  Thank you, Ms. Peterson.

9              THE COURT:  All right.  Cross-examination.

10             MS. BRODY:  Good afternoon, your Honor.  Janet

11   Brody for the United States, and may I approach?

12             THE COURT:  Yes, you may.

13             MS. BRODY:  May I proceed, your Honor?

14             THE COURT:  Yes.

15                       CROSS-EXAMINATION.

16   BY MS. BRODY:

17   Q.    Good afternoon, Ms. Peterson.

18   A.    Good afternoon.

19   Q.    I've handed you a binder and we may refer to it during

20   your examination, but I will let you know at that time.

21             Ms. Peterson, I want to ask you some questions

22   about the letter in Defendants' Exhibit DTX-319, which is a

23   letter that you sent to the Department of Justice that you

24   just testified about.

25             You sent this letter after receiving a request

Peterson - cross

 1    from EnergySolutions's president, Ken Robuck; is that right?

 2    A.    Correct.

 3    Q.    And Mr. Robuck sent you the first draft of the letter;

 4    is that right?

 5    A.    Correct.

 6    Q.    And when you wrote this letter, you had in mind your

 7    understanding of some WCS financial information that you

 8    said that you had looked at back, was it around the spring

 9    of 2014; is that right?

10    A.    Correct.  Spring, summertime.  Correct.

11    Q.    Okay.

12    A.    Correct.

13    Q.    Now, and since 2014 you have not had any access to

14    confidential information about WCS's or Valhi's business; is

15    that correct?

16    A.    Correct.

17    Q.    And you have no personal knowledge what projects WCS

18    has in its pipeline to grow its business; is that right?

19    A.    Right.  Correct.

20    Q.    You also suggest in your testimony, you said in your

21    testimony that you believed that this merger will lead to

22    some cost savings or some efficiencies.

23          Do you recall that?

24    A.    Yes.

25    Q.    But you have never had access to EnergySolutions'

1   internal analysis of any cost savings from this merger, have

2   you?

3   A.    No.

4   Q.    And if there were any cost savings, you don't know if

5   EnergySolutions intends to keep them as profit instead of

6   pass them onto customers; is that right?

7   A.    I wouldn't know that, no.

8   Q.    Ms. Peterson, in your letter, you said that you think

9   this merger is good for the industry; is that correct?

10  A.    Correct.

11  Q.    But you don't know what prices EnergySolutions is

12  going to charge its customers if it acquires WCS, do you?

13  A.    Not specifically, other than contracts that we have

14  that will transfer.

15  Q.    All right.  But as far as customers in general, you

16  don't have any personal information about what prices

17  EnergySolutions is going to charge other customers; is that

18  correct?

19  A.    Correct.

20  Q.    And you've never been responsible for negotiating

21  Exelon's low level radioactive waste disposal contracts; is

22  that right?

23  A.    I personally have not negotiated those contracts.

24  Correct.

25  Q.    And you have never overseen those negotiations either,

Peterson - cross

1    have you?

2    A.    No, I have not.

3    Q.    In fact, those negotiations are handled by another

4    Exelon business unit separate from yours; is that correct?

5    A.    The -- the negotiations are led by the supply

6    organization, which is a different business unit, and the

7    technical support comes from our business unit.

8    Q.    All right.  But even if you weren't personally

9    involved in negotiating contracts for waste disposal on

10   behalf of Exelon, you are aware that in 2015, Exelon

11   renegotiated its disposal prices with EnergySolutions for

12   Class A waste; is that right?

13   A.    Yes, I'm aware of that.

14   Q.    And Exelon got lower prices for Class A waste disposal

15   as a result of its 2015 renegotiation; is that correct?

16   A.    Yes, I'm aware of that.

17   Q.    And although you testified that you think that the

18   merger will be good for the industry, you aren't speaking on

19   behalf of other utilities or customers today; is that

20   correct?

21   A.    I'm not.

22   Q.    And you have no personal knowledge how other

23   utilities' waste disposal prices from EnergySolutions were

24   affected after WCS entered; is that right?

25   A.    That's right.

1440

Peterson - cross

1    Q.   Ms. Peterson, you testified that Exelon has storage

2    capacity at some of its plants or its sites; is that

3    correct?

4    A.   Correct.

5    Q.   I would like to talk about how Exelon handles its low

6    level radioactive waste for its fleet of operating plants

7    now.

8            When Barnwell closed in 2008, you mentioned that

9    Exelon started storing waste because you had no Class B/C

10   disposal options; is that right?

11   A.   Correct.

12   Q.   And you also talked about the fact that Exelon had to

13   engineer storage canisters to store that waste; is that

14   correct?

15   A.   Correct.

16   Q.   And, in fact, Exelon, or in your testimony, you

17   indicated that those canisters were very expensive to build;

18   is that correct?

19   A.   Correct.

20   Q.   And Exelon had to pay again when you sent that storage

21   off for disposal; is that correct?

22   A.   Actually, we would have to if we did send it off.

23   Most of it is sitting at the site.

24   Q.   At the operating site?

25   A.   Yes.

Peterson - cross

1    Q.    Okay.  So when Exelon stores, it essentially means you

2    have to pay twice to have the B/C disposed of eventually?

3    A.    Correct, for that particular sample of waste.

4    Q.    Yes.  Thank you.

5          And, in fact, in 2012, when WCS entered, Exelon

6    started disposing of Class B and C waste at WCS; right?

7    A.    Yes.

8    Q.    And Exelon currently ships Class B and C waste to WCS

9    for disposal; is that right?

10   A.    Yes.

11   Q.    And your other option for some of your B/C waste is to

12   have it downblended and disposed of at Clive as Class A

13   waste; is that correct?

14   A.    Correct.

15   Q.    And just to be clear, Exelon -- just talking now about

16   Exelon's Class A waste, that is disposed of at

17   EnergySolutions' Clive site; is that correct?

18   A.    Correct.

19   Q.    So if EnergySolutions acquires WCS, Exelon would be

20   left with a single source for its waste disposal of low

21   level radioactive waste; is that right?

22   A.    Correct.

23          MS. BRODY:  Thank you your Honor Ms. Peterson.

24          Thank you, your Honor.  No further questions.

25          THE COURT:  All right.  Thank you.

Graham - direct

1                  Any redirect?

2                  MS. REINHART:  No, your Honor.

3                  THE COURT:  All right.  Thank you very much.

4   You may step down.

5                  (Witness excused.)

6                  MR. BECKWITH:  Your Honor, defendants call

7   Robert D. GRAHAM to the stand.

8                     ... ROBERT D. GRAHAM, having been

9                  duly sworn as a witness was examined and

10                 testified as follows...

11                 MR. BECKWITH:  Your Honor, Mr. Graham is the CEO

12  and chairman of Valhi, Inc.  Mr. Graham will testify

13  regarding the attempts that have been made to find

14  alternative purchasers for WCS, the financial health of WCS

15  and Valhi, and the possibility of any Chapter 11

16  reorganization or liquidation.

17                 He will also testify regarding two highly

18  confidential matters regarding Contran enclosure that we

19  will ask for the Court to close the courtroom on, and it all

20  relates to Section 9 of the findings of fact and conclusions

21  of law.

22                 THE COURT:  All right.  Thank you.

23                     DIRECT EXAMINATION

24  BY MR. BECKWITH:

25  Q.   Mr. Graham, will you introduce yourself to Judge

Graham - direct

1  Robinson, please.

2  A.    Hi.  I'm Rob Graham.  I'm chairman of the board, chief

3  executive officer and president of Valhi.

4  Q.    Do you also have a position at Contran, sir?

5  A.    Yes.  I am president of Contran and I'm also on the

6  board of directors.

7  Q.    Did you go to college, university, sir?

8  A.    Yes.  I went to, I did my undergraduate work at the

9  University of Iowa, got a geology degree there, and then

10  went to the University of Illinois Law School.

11  Q.    When did you get your law degree?

12  A.    In 1979.

13  Q.    When did you join the Contran family of companies?

14  A.    In October 2002.

15  Q.    And what positions have you held since October 2002 at

16  the Contran family of companies or Valhi family?

17  A.    Well, that would take a long time to explain.  I

18  started off as vice president of Contran.  I became a vice

19  president, general counsel of NL Industries and vice

20  president, general counsel of Kronos Worldwide.  They were

21  both New York Stock Exchange companies.

22         I've held other positions with other subsidiary

23  organizations.  A few years ago, I became president of NL

24  Industries, and then chairman of the board and chief

25  executive officer of that company.

Graham - direct

```
 1                  I've held various positions with Kronos

 2       Worldwide and other companies.

 3       Q.      How about WCS, Waste Control Specialists?  Do you have

 4       a position there?

 5       A.      I do now, yes.

 6       Q.      What is that position?

 7       A.      I'm a member of the management committee and maybe the

 8       chairman of the management committee.

 9       Q.      When did you become the CEO of Valhi?

10       A.      In January of this year.  January 20th.

11       Q.      Before January 20th, is that what you said?

12       A.      Yes.  January 20th.

13       Q.      Of 2017, had your role with respect to WCS been

14       primarily a legal role?

15       A.      Yes.

16       Q.      And not just primarily a legal role.  Was it only a

17       legal role?

18       A.      It was, yes, only a legal role.  Yes.

19       Q.      Now, when, I think we heard Mr. Simmons untimely

20       passing was in December 2013?

21       A.      Yes.  Harold Simmons died in December of 2013.

22       Q.      And was he coming to work every day up until that

23       day?

24       A.      Yes.  Yes, he was.

25       Q.      How many CEOs have had the seat at Valhi since his
```

Graham - direct

1    passing?

2    A.    I'm the third.

3    Q.    So who was the first?

4    A.    Steve Watson was the CEO.  Actually, he had been --

5    no.  Yes.  Harold was the CEO until his death, then Steve

6    took over that title.  Then Bob O'Brien took it over in May

7    of last year, and then I have assumed that rule since

8    January.

9    Q.    Bob O'Brien, May of 2016?

10   A.    Yes, May of 2016.

11   Q.    So if we're trying to have a timeline CEOs, we have

12   Steve Watson starting when?

13   A.    That would have probably been around the time of

14   Harold's passing, so that would have been December or

15   January of -- December of 2013 or January of 2014.

16   Q.    And what happened to Steve Watson?

17   A.    He retired in May of last year.

18   Q.    And then in May of 2016, Bob O'Brien?

19   A.    Yes.  Bob O'Brien was the CFO of Valhi and he became

20   the CEO.

21   Q.    Until what day?

22   A.    Until January 20th of 2017.

23   Q.    What happened to Bob O'Brien?

24   A.    He retired.

25   Q.    And so we've been talking a lot about Waste Control

Graham - direct

1    Specialists, the future of Waste Control Specialists.  In

2    many ways, does that feel like it sort of rests on your

3    shoulders?

4    A.    It very definitely rests on my shoulders.

5    Q.    So let's back up, and I won't belabor this because the

6    judge has heard a lot of testimony about it, but let's talk

7    about Wunderlich.  Who is Wunderlich?

8    A.    Wunderlich is an investing banking firm that -- it's

9    just an investing banking firm.

10   Q.    So was that investment banking firm hired to assist

11   Valhi to see if it could even see if it could attract

12   investment in or sell WCS?

13   A.    Yes.  It was really the two investment bankers there

14   that had moved from another firm that Valhi had previously

15   worked for that had expertise in the industry, knew all the

16   contacts in the industry, and so they were hired to find

17   investors for WCS.

18   Q.    Around what time was that?

19   A.    That was beginning in the spring of 2014, and then

20   they worked on a confidential memorandum, and it was in June

21   through the summer, late summer of 2014.

22   Q.    After Mr. Simmons' death, was there an effort to look

23   internally to try to figure out what to do with WCS?

24   A.    Yes.  Harold was a unique individual and he very much,

25   he -- this was contrary to all those other investments in

Graham - direct

1    the sense that it was a startup.

2              He was a deep value investor and he was also

3    very stubborn.  He was a very stubborn man.  He never gave

4    up.  He didn't want to give up on anything, and when he was

5    right, he was going to be right.  So, but in 2014, we had to

6    begin to look at other alternatives.

7    Q.    How old was he when he passed away?

8    A.    He was 82 or 83, I think.

9    Q.    And was there universal agreement between -- let

10   me add one more name.  Bill Lindquist.  Who is Bill

11   Lindquist?

12   A.    Bill was a 35-year employees with Contran.  Steve and

13   Bill joined about the same time, and he was the CEO of Waste

14   Control Specialists for many years.

15   Q.    When did Bill Lindquist leave the company?

16   A.    Bill became ill in the spring, early spring of 2015.

17   He was out ill.  He came back very briefly in the summer of

18   2015, and then he had to take medical -- we made an

19   arrangement so that he could keep his medical coverage and

20   he's technically on the payroll to this day, but he has

21   retired since then.  He had to go through a whole series of

22   things.  He's doing okay now, but he's retired.

23   Q.    So would it be fair to say that Valhi and WCS have had

24   quite a change in management in this last three years?

25   A.    That has been a cause of concern for a lot of people,

Graham - direct

1    including our employees, yes.

2    Q.    Has it been a tough three years?

3    A.    It has been a very tough three years, yes.

4    Q.    Can you think of a tougher three years in your entire

5    career?

6    A.    Nope, no, I really can't.  Just to expand a little bit

7    on that, one of the things, our employees, the Contran

8    employees have -- were -- have been very worried about the

9    changeover, so one of the things, first things I did was to

10   have -- kind of institute some routine meetings with them

11   and had an all-hands meeting to talk to the employees about

12   all the changes and try to reassure them.  I also did that

13   with the waste control people in -- they call it doughnuts

14   with Rob I think is the way they phrased it.

15             So just in the Dallas office, and then Rod and I

16   went and talked to waste control people recently.  So it has

17   been a change of -- it has been a change for a lot of the

18   employees, yes.

19   Q.    And did you also try to relax the atmosphere a little

20   bit?

21   A.    Well, we did.  The other problem we had was, at

22   Contran, we did have last summer, we had never done this

23   before.  But we had -- this was after Steve retired, but we

24   had to institute a reduction in force, which Contran never

25   did.  So we reduced head count by about 15 percent at that

Graham - direct

1    point.  For Contran, that was unheard of.

2    Q.    Did you have to do some things to try to improve

3    morale after that?

4    A.    Yes.  Hence the doughnuts with Rob and breakfast

5    meetings and other things.

6    Q.    Casual day?

7    A.    And casual day, yes.  We instituted casual day.

8    Q.    So let's look at DTX-124.  It has already been

9    admitted.  It's the Stephens presentation.  Do you know the

10   folks at Stephens?

11   A.    Yes.  Both of the investment bankers that worked with

12   us, I've known for years.

13   Q.    So look at page 6.

14   A.    Yes.

15   Q.    What is page 6?

16   A.    That's a pretty standard process overview.  Stephens

17   was retained to give a fairness opinion, so this, they were

18   summarizing the Wunderlich process and the search for

19   additional investments for WCS.

20   Q.    Was there universal thought among Bill Lindquist while

21   he was still among the employees and Steve Watson and Bob

22   O'Brien, yourself, about exactly what to do with WCS?

23   A.    I don't think there was ever full agreement on that,

24   no.

25   Q.    At times, were there differing viewpoints?

Graham - direct

1    A.    Yes.

2    Q.    Did this Wunderlich process beginning it says here in

3    April 2014, Wunderlich securities served as WCS's advisor

4    for strategic and financial alternatives, including a sale

5    of the company.  Did that process in April of 2014 kick off

6    a process to try to sell WCS?

7    A.    Absolutely.  Yes, it did.

8    Q.    Did that process continue really up until today with

9    this trial to approve this acquisition?

10   A.    Yes.  The for sale sign has been out.

11   Q.    So it says, 14 parties were contacted, nine signed an

12   NDA and received a CIM.  What's that?

13   A.    Confidential information memorandum.

14   Q.    And three submitted an IOI.  What is that?

15   A.    An indication of interest.

16   Q.    Despite receiving three IOIs, no potential investors

17   ever submitted an LOI, a letter of intent?  Okay.  Lindsay

18   Goldberg did perform extensive due diligence prior to

19   ultimately dropping out of the process.

20         Were you involved in that Lindsay Goldberg

21   process?

22   A.    The Lindsay Goldberg part of it, I was.

23   Q.    Below that it says, "The uncertainty behind the

24   predictability of future cash flows was the primary reason

25   for all the parties failing to move forward."

1          Had you heard that prior to this process, this

2    Wunderlich process that kicked off this sale process?

3    A.    Yes.

4    Q.    Was that in many ways a good summary of one of the

5    things you're facing at WCS?

6    A.    It's a very good summary of what we're facing at WCS

7    today.

8    Q.    Now, look at page 16 of this Exhibit No. 124.

9    A.    Yes.

10   Q.    I know you're a lawyer.  What kind of law did you

11   practice when you were outside counsel?

12   A.    It was corporate securities, mergers and acquisitions,

13   public offerings.

14   Q.    M&A lawyer?

15   A.    Yes.

16   Q.    As an M&A lawyer, were you and are you familiar with

17   the discounted cash flow analysis method?

18   A.    Yes, I am.

19   Q.    What is that method?

20   A.    It's a standard, it's one of the primary ways that an

21   investment banker or anybody values a business.  You take

22   the projected cash flow of the business, the regular certain

23   cash flow of the business and you discount it to present

24   value, and then you apply multiples to see what the value of

25   those earnings are.

Graham - direct

1   Q.    If you are a finance professional, you can consider

2   comparable sales?

3   A.    Yes.

4   Q.    That's one way to do it?

5   A.    Yes.

6   Q.    IRR?

7   A.    Yes.

8   Q.    And then DCF?

9   A.    Yes.

10  Q.    Okay.  So what did Stephens tell you about the ability

11  to do a DCF on WCS?

12  A.    It's was impossible.  In fact, we talked about this

13  before they gave their presentation to the board, and before

14  they would issue their opinion to see whether they could

15  actually issue their opinion in light of the inability to

16  forecast and prepare a DCF analysis.

17  Q.    Is that what it says there, "In our view, no DCF model

18  can be developed with respect to the business"?

19  A.    Yes.

20  Q.    "To provide a reliable basis for a DCF analysis, it

21  would be useful in estimating the value of this business."

22              Do you see that?

23  A.    Yes.

24  Q.    Is that similar to the language we saw on page 6 of

25  the chart?

Graham - direct

1    A.    Oh, yes.

2    Q.    Is it the same concept?

3    A.    It's virtually the same concept.  Yes, it is.

4    Q.    So ultimately, did Lindsay Goldberg make an offer to

5    purchase the business?

6    A.    No.

7    Q.    Did Lindsay Goldberg go through the process with

8    Wunderlich and WCS and Valhi?

9    A.    Yes.  They went as far as -- as far as anybody would.

10   What they did was, we went ahead based upon the indication

11   of interest.  We began to prepare documents for their

12   investment.  And then what we would do is, they sent in a

13   team to do due diligence to see whether they could support

14   the valuation set forth, and all the work that they did,

15   they couldn't provide any value for the business, and they

16   said they weren't willing to invest at any price.  So they

17   walked away from it.

18   Q.    Lindsay Goldberg, was that a significant player in

19   this industry from your perspective?

20   A.    Yes.  Lindsay Goldberg was an investment, private

21   equity firm that had probably the most experience in the

22   nuclear waste industry.  They had invested in and taken

23   EnergySolutions public previously.  They were well-known in

24   the industry.  Lance heard had served on their Board of

25   Directors for EnergySolutions.  He was well-known in the

Graham - direct

1    industry.

2    Q.    What did you take from the fact that Lindsay Goldberg

3    bowed out?

4    A.    That was a very significant blow.  That was -- that

5    said they could not place a value on the business, any value

6    on the business, and they wouldn't invest in it, so because

7    they were more knowledgeable and we were hoping to bring

8    their expertise to the business after almost $700 million

9    in investment, it was -- it was a very significant blow to

10   us.

11   Q.    All right.  Did you also talk to a company called

12   Roark Capital?

13   A.    I did not personally myself, but I'm aware of that,

14   yes.

15   Q.    And how about Westinghouse?  Did they express an

16   interest?

17   A.    I don't recall.  They dropped out very early on, but

18   they're in bankruptcy right now, so...

19             MR. BECKWITH:  Let me approach the witness, your

20   Honor, with a binder.  Is that all right?

21             THE COURT:  Yes.

22   BY MR. BECKWITH:

23   Q.    Let's me hand you that (handing a binder to the

24   witness.)

25   A.    Sure.

Graham - direct

1   Q.    At some point in time did you terminate the services

2   of Lindsay Goldberg?

3   A.    Lindsay Goldberg?

4   Q.    I'm sorry.  Wunderlich.

5   A.    Yes.  The company did, yes.

6   Q.    Thank you for correcting me.

7          When you terminated Wunderlich, did that have

8   any impact at all on Lindsay Goldberg's desire or not to

9   purchase WCS?

10  A.    None whatsoever, no.

11  Q.    And Lindsay Goldberg, was it interested in purchasing

12  WCS or investing in WCS or considering all types of

13  investments?

14  A.    Lindsay Goldberg was interested in all types of

15  investments.  Frankly, you know, what you tried to do is you

16  tried to get the broadest scope of investment, whether it's

17  a partial investment or a wholesale of the company, so the

18  solicitation was for any investment with the intent of

19  trying to sell the company.  Lindsay Goldberg could do that

20  or could do a partial investment.

21  Q.    Look at Defendants' 144 in the binder in front of you,

22  sir.

23  A.    I'm not sure I see 144.

24  Q.    44.  I did it again.

25  A.    Sorry.

Graham - direct

1    Q.    All right.  Look at Defendants' 44.  Who wrote that?

2    A.    That was Steve Watson.

3    Q.    To whom?

4    A.    That was to Lisa Simmons, Serena Connelly, Sandy

5    Myers, Andy Fleck and Lori Feehan.

6    Q.    December 1, 2014?

7    A.    Yes.

8    Q.    And are you copied on that line?

9    A.    I am.

10   Q.    CC line?

11   A.    Yes.

12          MR. BECKWITH:  Your Honor, we offer Defendants'

13   44.

14          MS. BRODY:  No objection.

15          THE COURT:  Thank you.

16          (Defendants' Exhibit No. 44 was admitted into

17   evidence.)

18   BY MR. BECKWITH:

19   Q.    Steve Watson writes and he says, "The Lindsay Goldberg

20   equity firm has informed us that they have decided against

21   proceeding with their proposed investment in WCS, but they

22   were very complimentary with respect to our business and its

23   potential, as well as the assistance from our WCS team."

24          Do you see that.

25   A.    Yes.

Graham - direct

1    Q.    At that point in time, were you involved as a DOE

2    lawyer working on this deal?

3    A.    On this deal, yes.

4    Q.    The primary issue for them was trying to determine and

5    financially model the future timing of the development of

6    the WCS business"?

7              Do you see that?

8    A.    Yes.

9    Q.    Was that something you learned from your work as a DOE

10   lawyer on this transaction?

11   A.    Yes.

12   Q.    At the bottom of that paragraph, it says, "We have

13   generally only exited business investments that have had low

14   potential or that we were offered a significant premium

15   price for."

16              Do you see that?

17   A.    Yes.

18   Q.    Now, which would WCS fall into, which category?

19   A.    It's closest to low potential, but it's really not

20   making any money, so it really has no potential at that

21   point.

22   Q.    Okay.  And it says, "Below, as noted in our prior

23   update reports, keeping 100 percent of WCS is a viable

24   strategy and, for now we do not know of a better alternative

25   we would recommend."

Graham - direct

1      Do you see that?

2      A.    Yes, I do.

3      Q.    Now, was there disagreement between Steve Watson, Bob

4      O'Brien, Bill Lindquist, Rob Graham and others about

5      precisely how to step forward?

6      A.    I think there was no idea of how to step forward

7      because the process that we were undergoing, Lindsay

8      Goldberg was the only viable alternative at that point.  We

9      were going to continue with the sale process and operate at

10     the same time.  That was the only source of agreement at

11     that point in time.

12     Q.    Did this news from Lindsay Goldberg, which had

13     experience in the LLRW business, was this discouraging to

14     you?

15     A.    It was extremely discouraging to the entire management

16     team.

17     Q.    And was Lindsay Goldberg even considering investing

18     alongside WCS as a partner?

19     A.    It was going to invest alongside, yes, along with

20     Valhi, yes.

21     Q.    Was it even more discouraging to you that they

22     wouldn't even invest some amount of money alongside you?

23     A.    I think that was the big wake-up call for all much us,

24     that that was the -- we needed to continue to, on the sale

25     process to try to figure out if there was any other

1459

Graham - direct

1 alternative to this.

2 Q.    After this date, December 1, 2014, did your efforts

3 continue to try to sell WCS or find some solution to WCS?

4 A.    Yes.

5 Q.    Were you open to offers?

6 A.    Yes.

7 Q.    Look with me at Defendants' 125.  Can you identify 125

8 for the record?

9 A.    That's the purchase agreement and related, related

10 exhibits that we signed with the Rockwell Holding Company.

11 Q.    Which is related to EnergySolutions?

12 A.    Yes.

13 Q.    That's the purchase agreement at issue here today?

14 A.    Yes.

15 Q.    In front of the judge?

16 A.    Yes.

17          MR. BECKWITH:  Your Honor, we offer Defendants'

18 125.

19          MS. BRODY:  No objection.

20          THE COURT:  Thank you.

21          (Defendants' Exhibit No. 125 was admitted into

22 evidence.)

23 Q.    Tell us the context of this agreement.  November 19,

24 2015.  So now we've moved forward about, what, 11 months

25 since Lindsay Goldberg?

Graham - direct

1    A.    Right.

2    Q.    What had happened in that intervening time, from 2014

3    to 2015?

4    A.    Okay.  Well, a number of things happened.  Again, we

5    were in -- I think Steve's e-mail was early December of

6    2014, so now we've got about 11 months here, and in the

7    meantime EnergySolutions continued to express interest in

8    the business, and we undertook other efforts to try to see

9    if there was another buyer interested in that, in that, in

10   WCS.  And even though they turned us down the first time, we

11   went back to US Ecology because we thought that there was

12   some possibility they might be interested in it, and Rod,

13   Steve, Bill -- no.  It was Rod, Steve and Bob, I think, all

14   went up to meet with them in July.

15   Q.    July of?

16   A.    Of 2015.

17   Q.    Okay.  And the "them" is?

18   A.    US Ecology, including their CEO, Jeff Feller.  I did

19   not attend that meeting, but that was an attempt to get them

20   interested in making an investment in WCS.

21   Q.    Were you ever instructed by anybody to lock US Ecology

22   out of any sort of diligence?

23   A.    No.  We wanted US Ecology to participate, and we

24   wanted -- we wanted to get them interested in a transaction.

25   Q.    Well, if EnergySolutions is sort of nipping at your

Graham - direct

1  heel, interested, why would you wanted US Ecology to be

2  involved?

3  A.    For various reasons.  You know, there was -- there was

4  history with the company, between the companies.  Frankly,

5  there had been.  But there was also the fact that we wanted

6  to make sure we had explored every other alternative.  We

7  always knew that EnergySolutions would be a fallback,

8  because they have always expressed interest to try to be

9  there.      So I characterize it as anything but

10  EnergySolutions.  We were on an effort to see if we could

11  acquire anybody out there in the industry.

12         The industry is very small and so we were just

13  trying to see if, even though they passed before, they had

14  done another acquisition, maybe they would have an interest

15  now.

16  Q.    Would a bidding war breaking out between US Ecology

17  and EnergySolutions for WCS have been a good thing?

18  A.    It would have been a great thing.

19  Q.    Now, around this time, November of 2015, had another

20  sort of war broken out?  Had EnergySolutions and WCS gotten

21  involved in litigation against each other?

22  A.    That's true, we are.

23  Q.    Was that litigation involving some customer issues

24  regarding Studsvik?

25  A.    Yes.

Graham - direct

1    Q.    Was the context that we see here in Defendants'

2    Exhibit 125 of this agreement, November 2015, a follow along

3    from a mediation process in that very lawsuit?

4    A.    That is correct.  That was the mediation that occurred

5    in August of 2015.  Bill Lindquist attended that.  That was

6    his last official duties with WCS.

7    Q.    Now, I believe some have said that 2014 was one sales

8    process and 2015 was a different sales process.  You're the

9    chairman; is that right?

10   A.    No.

11   Q.    Why is that wrong?

12   A.    We had gone through this sales process.  The industry

13   is relatively small, and as Stephens outlined, the process

14   continued through that entire period of time, from 2014

15   through -- there's a small gap in months where there was --

16   we were continuing to try to figure outweighs to get

17   additional interest in it.  But the number of -- the number

18   of industry players and even private equity players, they

19   had just seen this.  They already passed on it.  We knew who

20   was potentially interested in it and we were devising

21   strategies to get them interested and keep them interested.

22   And so US Ecology was a continuation of that, and

23   EnergySolutions was -- had always expressed interest through

24   this time period, continually through this time period.

25              So it's a single process.  You are just

Graham - direct

1    narrowing the field down into a very narrow group.

2    Q.    I saw somewhere else somebody referred to this,

3    Defendants' 125, as an unsolicited offer.  Was it an

4    unsolicited offer?

5    A.    No.

6    Q.    Was it part of a mediation process that had continued

7    and a summer mediation that was continuing conversations?

8    A.    Yes.

9    Q.    And were you part of those conversations?

10   A.    Yes, I was.

11   Q.    Does this agreement, Exhibits 125, obligate WCS to not

12   affirmatively solicit third- party offers?

13   A.    WCS and Valhi cannot solicit third-party offers,

14   that's right.

15   Q.    Does that, based on your experience, prohibit a third

16   party from tendering an offer?

17   A.    No.  My experience has been in doing this work for 35,

18   37 years, is any third party that is interested, they could

19   come, they could call me.  They could have called me this

20   morning.  And, frankly, if they have any interest at all,

21   they would have called.

22   Q.    Did anything stop anybody from calling you up and

23   saying, hey, I want to buy you a breakfast, lunch or dinner,

24   cup of coffee, to talk about buying WCS?

25   A.    No.

Graham - direct

1  Q.    And did anything stop anything from somebody sending

2  over an e-mail or letter saying, I would like to buy WCS?

3  A.    No.

4  Q.    Picking up the phone?

5  A.    No.

6  Q.    Did any of those things happen?

7  A.    No, they did not.

8  Q.    Did anybody tender a formal written offer to purchase

9  WCS for cash or something else?

10 A.    No, they didn't.

11 Q.    Now, did you ultimately enter into a Fourth Amendment

12 to the purchase agreement?

13 A.    Yes, we did.

14 Q.    Look at Defendants' 322, please.  What is 322?

15 A.    That's the Fourth Amendment to the purchase agreement.

16          MR. BECKWITH:  Your Honor, we offer Defendants'

17 322.

18          MS. BRODY:  No objection.

19          THE COURT:  Thank you.

20          (Defendants' Exhibit No. 322 was admitted into

21 evidence.)

22          THE COURT:  And because we're going to 4:00

23 today, we probably should take 15 minutes, if for no one

24 else, for Valerie.  So you can choose when you want to take

25 it.  You can choose when you want to take it.

Graham - direct

1    MR. BECKWITH:  Well, your Honor, why don't I

2  wrap up this exhibit and then I will be at a decent stopping

3  point.

4            THE COURT:  All right.

5            MR. BECKWITH:  Would that be good?

6            THE COURT:  Yes.

7  BY MR. BECKWITH:

8  Q.    What are the economics of the Fourth Amendment?  What

9  did it economically do to the agreement that is before the

10 Judge?

11 A.    Well, it improved -- it actually was worse for us.  We

12 gave up the equity component of the, of the purchase price,

13 so that dropped it by $20 million.

14 Q.    So look on page 5 of the agreement.  The Bates number

15 ends in -- actually, page 4 of the agreement, paragraph 5.

16 A.    Yes.

17 Q.    And the page 4 I was reading to you is the one that's

18 at the bottom that is part of the Defendants' Exhibit 322,

19 page 4.

20            Do you see that, paragraph 5?

21 A.    Yes.

22 Q.    It says about eight lines down, that the Series A

23 shares shall not be included as part of the aggregate

24 consideration.

25 A.    Yes, that's correct.

Graham - direct

1    Q.    Did that amount to a decrease in the purchase price

2    for WCS?

3    A.    Yes, it sure did.

4    Q.    Do you have any equity if this deal closes?

5    A.    No.

6    Q.    Has WCS's financial health improved or worsened since

7    this two-year sales effort, 2014, 2015?

8    A.    It has worsened.

9            MR. BECKWITH:  This is a good place to stop,

10   your Honor.

11           THE COURT:  All right.  We'll take 15 minutes.

12           (Short recess taken.)

13                    -  -  -

14           (Proceedings resumed after the short recess.)

15           MR. BECKWITH:  May I proceed, your Honor?

16           THE COURT:  You may.

17   BY MR. BECKWITH:

18   Q.    Mr. Graham, as an outside M&A lawyer for 35 years and

19   an inside M&A lawyer for 35 years -- I don't mean to suggest

20   70 on you -- how many sales processes have you led?

21   A.    Oh, that would be in the hundreds, probably.

22   Q.    When you experienced this sales process from 2014 to

23   2015 and even through today, drawing on that 35 years of M&A

24   experience, did you expect other buyers to emerge?

25   A.    If they were out there, I expected them to emerge.

Graham - direct

1  They have not emerged.  I would have expected something if

2  there was any interest in the company, but I have not seen

3  that.

4  Q.    With all of that experience, what does that tell you

5  about the likelihood of finding another buyer out there?

6  A.    There is none, and frankly, from my standpoint, we

7  have the most interest in finding another buyer if this deal

8  does not go through, but there isn't another one out there.

9  The industry is small.  It's well-known we're for sale.

10 It's also well-known we're under review and that we are in

11 this litigation.  If there was any degree of interest, we

12 would have heard it by now.

13 Q.    Does the impact of you being a non-integrated waste

14 management company have some impact on the ability to

15 sell?

16 A.    I think it has a huge impact.  One of the things that

17 we know about this business is that a single disposal

18 facility, state of the art as it is and unique as it is, it

19 simply is not viable alone.  You have to have a large

20 integrated disposal -- everything from kind of soup to nuts

21 of getting the waste in processed, and we don't have those

22 capabilities and we don't have the resources to develop

23 them.

24 Q.    So let's talk about WCS's financial health and some of

25 the implications that that may have caused you to have as

Graham - direct

1    chairman.

2            We've already heard WCS has not made a profit.

3    Did WCS have a history of struggling with projections?

4    A.    Yes, it did.

5    Q.    And did that history of projections have an impact on

6    you as chairman of the company?

7    A.    It had an enormous impact on me, yes.

8            MR. BECKWITH:  So, James, let's look at slide 1,

9    I think I think it is.

10   BY MR. BECKWITH:

11   Q.    So slide 1 shows the plan sales versus actual sales

12   and the misses.

13           MR. BECKWITH:  And, James, slide 2 as well.

14   BY MR. BECKWITH:

15   Q.    Do you see in 2016, a reduced plan?

16   A.    Yes.

17   Q.    And then the actual?

18   A.    Yes.

19   Q.    Did that have an impact on you as the CEO of Valhi?

20   A.    Yes.

21   Q.    What impact did it have?

22   A.    Well, it showed that we are consistently wrong in

23   projecting our revenues.  That even when we tried to scale

24   them back, the revenues get delayed and pushed out.  We drew

25   a bottom-up analysis of where the revenue is expected to

1469

Graham - direct

1    come from and there's consistent delay.  So even when we try

2    to be conservative, we miss it, and we aren't covering our

3    fixed cost.

4    Q.    So in this period after Mr. Simmons' death, after

5    Mr. Watson's retirement, after Mr. O'Brien's retirement,

6    after Mr. Lindquist's retirement, all of this change, did

7    you ask for a fresh look at WCS?

8    A.    Well, I had to.  I didn't -- I felt as though I had

9    to, yes.  So, yes, I did.  That was one of the first things

10   we began to work on.

11   Q.    And what is bark Berkeley Research Group?

12   A.    Berkeley Research Group is a very highly regarded

13   analytical firm that does -- helps with restructuring all

14   kinds of business analytics.

15   Q.    And whose decision was it higher Berkeley Research

16   Group?

17   A.    It was mine.

18   Q.    Why was Berkeley Research Group hired in January of

19   2017?

20   A.    They were hired primarily -- well, actually, to

21   perform this analysis for us, but they were also hired

22   because the gentleman that we hired specifically,

23   Rich Whitlock, had a background in the nuclear industry, and

24   he was also an expert in restructuring and liquidation as

25   well.

Graham - direct

```
 1   Q.    So did you meet Richard Whitlock, is that his name?

 2   A.    Rich, Rick.

 3   Q.    Rich.  What type of work did rich Whitlock and BRG

 4   perform?

 5   A.    They basically came through.  Rich actually sat and we

 6   gave him Bill Lindquist's old office to work in.  So he

 7   worked in our offices, developed -- talked to all of our

 8   salespeople.  And because of his background in the nuclear

 9   industry, he was already up to speed pretty much with the

10   issues in the industry.

11             He also worked with our financial folks, both at

12   Contran and Valhi as well as WCS.

13   Q.    Was he a quick study?

14   A.    He's a very quick study.  Very sharp guy.

15   Q.    Did you have to teach him what LLRW was or Class A, B,

16   C, exempt?

17   A.    No.  He knew all of that and he was very up to speed.

18   Q.    Exelon?

19   A.    No.  He's got it all down.

20   Q.    Okay.

21   A.    He's very good.

22   Q.    Did he promptly complete his work for you?

23   A.    He did.  He was very quick.  He had actually -- it was

24   a little bit of happenstance, but he was right between -- he

25   had just joined Berkeley Research Group, so he had full
```

Graham - direct

1    availability, so he was able to stay in our offices and just

2    work out of our services for as long as it took to get it

3    done.

4    Q.    So where does he live?

5    A.    You know, I don't know.

6    Q.    But did he fly in and stay with you all?

7    A.    Yes.

8    Q.    So how did Berkeley Research Group, this firm that

9    Mr. Whitlock works for, how did they report out information

10   to you?

11   A.    Well, there were several sort of debriefs, debriefing

12   sessions.  He would get the entire team together, both waste

13   control and Valhi, and kind of evaluate his findings, test

14   them, tall to his financial people.  He had pretty much open

15   access to everybody.

16   Q.    Does your Board of Directors meet on a regular basis,

17   the Valhi, Inc. Board of Directors?

18   A.    It has four regularly scheduled meetings and then it

19   meets as needed.

20   Q.    Did the Board of Directors receive a report from BRG

21   group?

22   A.    It did.

23   Q.    Did you attend that presentation?

24   A.    Yes, I did.

25   Q.    So look with me at the Defendants' 346, sir.

1    A.    Yes.

2    Q.    Would you identify Defendants' 346 for the record.

3    A.    That is the board materials, what we can would call a

4    board book for a special meeting of the Board of Directors

5    for Valhi on February 14, 2015.

6    Q.    Did you call a special meeting on February 14, 2017 of

7    the Board of Directors of Valhi?

8    A.    Yes, I did.

9    Q.    And before a board meeting, do you prepare a board

10   book?

11   A.    Yes.

12   Q.    Is the board book kept by the corporate secretary as

13   part of the corporate records of Valhi?

14   A.    Yes.

15   Q.    Are you one of the custodians of Valhi Inc.'s records?

16   A.    Yes.

17   Q.    And was the records shown in Defendants' 346 a record

18   made at or near the time by people with knowledge, people

19   who were preparing this for the Board of Directors?

20   A.    Yes.

21   Q.    Was this record, 346, kept in the ordinary course of

22   Valhi's business?

23   A.    Yes.

24   Q.    Does it reflect a regularly conducted activity, the

25   board meeting?

Graham - direct

1    A.    Yes.

2    Q.    Did the making of the record, was that part of the

3    regular practice of Valhi, Inc.?

4    A.    Yes.

5              MR. BECKWITH:  Your Honor, we offer Defendants'

6    346.

7              MS. ELMER:  No objection.

8              THE COURT:  Thank you.

9              (Defendants' Exhibit No. 346 was admitted into

10   evidence.)

11   BY MR. BECKWITH:

12   Q.    So let's look at the board book.  First in the board

13   book is their agenda.  Identify for me, there's a bunch of

14   names here.  Barry Feehan, Ms. Fisher, Mr. McElroy, Ms.

15   Tidlund?

16   A.    Yes.

17   Q.    Who are they?

18   A.    They are the members of the Board of Directors.  I

19   could give you a brief synopsis of each one of those if you

20   would like, but you probably don't need that.

21   Q.    No.  As long as they're the members of the board.

22   A.    Yes.

23   Q.    Look on the next page.

24   A.    Yes.

25   Q.    Are these slides that you as the chairman of the board

1    prepared for the board to orient them to the issues that you

2    wanted to discuss in the special meeting?

3    A.    Yes.

4    Q.    Look on page 2 of the special slides, on page DTX,

5    Defendants' Exhibit 346, page 3 down at the bottom.

6    A.    Yes, I see it.

7    Q.    Okay.  It says, "WCS as a business has never made an

8    operating profit."  Was that something the board already

9    knew?

10   A.    Most of the members of the board knew it.  Yes, yes,

11   they would have known it.

12   Q.    By the way, I should have asked you:  One of the

13   members of the board, is that a representative of Ms. Lisa

14   Simmons and Ms. Serena Simmons?

15   A.    Well, it's Serena Simmons Connelly.

16   Q.    Excuse me.

17   A.    Lori Feehan, she's a CPA by training, but she's a

18   business advisor to Lisa Simmons and Serena Simmons

19   Connelly, yes.

20   Q.    So we're now back on this page 3.  It says, "The

21   nuclear waste industry has changed dramatically in the past

22   20 years."

23         Was that something you had personal knowledge of

24   at the time?

25   A.    It's information I had learned, yes, at the time.

Graham - direct

1    Q.    As chairman of --

2    A.    Correct.

3    Q.    Then it says, "WCS has no identified plan or prospects

4    to turn cash flow positive or to operate profitably."

5            Do you see that?

6    A.    Yes.

7    Q.    And had you worked with the finance professionals at

8    WCS to learn whether that was accurate?

9    A.    Yes, I did.

10   Q.    So look with me on page 7 of DTX-346.  In other words,

11   the Exhibit page 7:  "Option.  Continued operation versus

12   suspension and closure."

13   A.    Yes.

14   Q.    Was this something that you wanted to brief the board

15   on?

16   A.    Yes.

17   Q.    Was this ultimately discussed at the Board of

18   Directors meeting?

19   A.    Yes.

20   Q.    This idea of closure?

21   A.    Yes, it was.

22   Q.    The last bullet:  "Given that WCS has no identified

23   plan or prospect to turn cash positive or to operate

24   profitably, management believes that in the event its

25   EnergySolutions' transaction is not completed, proceeding

Graham - direct

1    with a shutdown and closure of the WCS facility would

2    minimize Valhi's cash funding requirements over the long

3    term and achieve greater certainty of annual funding

4    costs."

5              Was that something you wrote to the board that

6    you wanted the board to have front and center as they

7    prepared for this particular February meeting?

8    A.    Absolutely, yes.

9    Q.    And look on the next page.  Had Valhi, Inc. received

10   some bankruptcy advice from a bankruptcy professional,

11   restructuring professional?

12   A.    Yes.

13   Q.    Who was that?

14   A.    Manny Grillo.  He's a bankruptcy restructuring partner

15   in the Baker's Botts' legal office.

16   Q.    One of my partners?

17   A.    Yes, one of your partners.

18   Q.    In the New York office?

19   A.    Yes.

20   Q.    Did you understand Mr. Grillo's expertise was

21   liquidation and restructuring of entities?

22   A.    Yes.

23   Q.    He's a bankruptcy lawyer?

24   A.    He's a bankruptcy lawyer.

25   Q.    Look on the last bullet.  It says, "Based on the BRG

Graham - direct

1   financial analysis and the opinion of restructuring counsel

2   and management team members experienced in restructuring,

3   due to its consistent and substantial negative cash close,

4   WCS is not a candidate for traditional reorganization, or a

5   traditional reorganization plan."

6            Who were the members experienced in

7   restructuring?

8   A.    Well, I am.  I worked on various restructurings over

9   the years, and we had also -- part of this was prior

10  management was also involved.  I mean, Steve Watson and Bob

11  O'Brien also went through a bankruptcy.

12  Q.    Had you, yourself, actually taken a company through a

13  bankruptcy restructuring process?

14  A.    We worked -- I worked on the Keystone bankruptcy and

15  restructuring, reorganization, which is Keystone is owned by

16  Contran.  It's a steel company in Peoria, Illinois, and it

17  went through bankruptcy right after I joined the company.

18  Q.    Was that a successful restructuring?

19  A.    It was a successful reorganization.

20           Also, previously I worked, when I was in private

21  practice, I worked on an old steel merger back in the 1980s

22  between LCD and Republic Steel, and that was under the

23  failing industry doctrine, so I had experience personally

24  there as well.

25  Q.    So based on your experience at Valhi on Keystone and

1    your prior experience as an outside practicing lawyer for

2    35 years on the LTV deal, did you have restructuring

3    knowledge?

4    A.    Yes.

5    Q.    And based on your knowledge of WCS and your

6    experience, did you have a sense of whether WCS was a likely

7    candidate for reorganization?

8    A.    It has no possibility of reorganizing.

9    Q.    Why is that, sir?

10   A.    Because it doesn't have any consistent revenue.  Its

11   level of revenue does not come anywhere close to meeting

12   it's fixed costs, and without that, you can't reorganize.

13   There aren't debts or other things that you can take off

14   that will cover that gap.

15   Q.    Would you have to, as part of a restructuring or

16   reorganization, explain to a Court how it is that the

17   revenues would allow the company to go forward on an

18   operational basis?

19   A.    You would have to try to explain that, but you would

20   not be able to explain it in WCS's case.

21   Q.    And did you provide the board with further pages about

22   the possible bankruptcy options?

23   A.    Yes, we did.

24   Q.    And to be clear, your consideration of the bankruptcy

25   options did not include restructuring?

Graham - direct

1  A.     No.   It was basically a liquidation we were looking

2  at.

3  Q.     Look with me on page 20.

4  A.     Yes.

5  Q.     Did you provide the board with a BRG corporate finance

6  report that had been prepared for Valhi?

7  A.     Yes, I did.

8  Q.     All right.   So on a couple of these pages, let's look

9  at these.

10              On page 23 of the exhibit, Exhibit 346, page 23?

11 A.     Yes, I see it.

12              THE COURT:   And I will just note that I didn't

13 get a copy.

14              MR. BECKWITH:   No.   I'm sorry, your Honor.

15              THE COURT:   So I'm not being able to note what

16 you wanted me to.

17              THE WITNESS:   She can have it.

18              MR. BECKWITH:   No.   That's nice of you.   Thank

19 you.

20              (Mr. Beckwith handed slides to the Court.)

21              THE COURT:   Thanks.

22 BY MR. BECKWITH:

23 Q.     So we're looking at, we've looked at the -- so the

24 first page is the agenda and the second page, page 2 through

25 page, what is it, sir?   It's page -- it looks like 19 is the

Graham - direct

1  PowerPoint that you wanted the board to have and that we

2  were just reading from?

3  A.     Yes.

4  Q.     And then page 20 -- again, I'm using the little page

5  numbers that have been provided for Defendants' Exhibit 346.

6          You start with the BRG report?

7  A.     Yes.

8  Q.     Okay.  So let's look at the executive summary that's

9  provided to the board on page 23.

10  A.     Mm-hmm.

11  Q.     It says, "Executive summary.  The analysis concluded:

12  Losses in the first five years of the forecast will be

13  significant, even in the unrealistic stretch case."

14          Do you see that.

15  A.     Yes.

16  Q.     And what did you take from that as chairman?

17  A.     That we cannot make money with the projected revenues

18  for business in the next five years, and, frankly, even

19  with -- the stretch case is the most optimistic case, and if

20  everything plus some extra things go right, the more

21  realistic you are faced with the threshold, the threshold

22  case or the target case, and you're going to lose a

23  significant amount of money.

24  Q.     So then it says in the next bullet:  "Revenue may

25  improve in the out-years, but solely based on a wave of

Graham - direct

1     nuclear plants decommissionings with highly uncertain timing

2     (forecasts out-years have approximately six week

3     decommissionings occurring simultaneously, up from one

4     expected this year.)"

5           Can you explain what you took away from that,

6     sir?

7     A.    That was probably being even more optimistic than you

8     could possibly be, because these decommissionings tend to

9     delay further out. So six decommissionings have never

10     happened before, things like unknown decommissionings even

11     at that point in time. So it's unrealistic.

12     Q.    It says, "Even if the decommissioning wave

13     materializes, revenue is still unlikely to be able to wind

14     back the significant earlier losses."

15           What did you take away as chairman that BRG was

16     communicating to the board?

17     A.    Well, the basic communication on this is if you are

18     investing a dollar, you're never going to get that dollar

19     back. You're going to lose that dollar and never get a

20     return on investment, not today, five years out, ten years

21     or twenty years from now, you just can never wind it back.

22     You can never earn it back.

23     Q.    And then there's this box down below: "WCS's

24     financial prospects are poor and can only be summarized as

25     highly speculative as they depend on contract awards that

Graham - direct

1    have not proven in the proven reliable."

2              What did you understand BRG communicating to the

3    board there?

4    A.    It's that -- well, it's just that it's a business that

5    is not able to sustain itself.

6    Q.    "Moreover, even in the unpredictable out years, the

7    projections demonstrate (consistent with historical

8    performance) that the company will continue to fail to

9    generate positive cash flows sufficient to sustain a viable

10   business.  WCS will almost certainly require additional and

11   substantial future funding to continue operations."

12             Do you see where I read?

13   A.    Yes.  And that just basically means that we are in the

14   position where Valhi will always be funding and funding

15   substantial amounts of cash to WCS without getting any

16   return on that cash.

17   Q.    Let's look on the next page then, page 24.

18   A.    Yes.

19   Q.    Of Defendants' 346.

20             This box below says, "Revenue is very volatile

21   and tends to be more volatile downwards than upwards."

22             Did that have an impact on you as chairman?

23   A.    Well, yeah.  It sort of confirms what I saw in the

24   history, that the future isn't going to be that much

25   different, but revenue is volatile.  The recurring revenue

Graham - direct

1  is -- is just very small.  So if big projects get delayed,

2  they get delayed a lot, and I've actually seen this over the

3  last few months as well.  Some of these projects that we

4  expect revenue, that we really know are in process are

5  delayed.  And it's -- it's very discouraging.

6  Q.    So what's an example of that?  Can you think of one of

7  the projects?

8  A.    Well, one right before we came to trial was, you know,

9  Gulf Nuclear, a relatively recent customer of hours, and

10 they're supposed to be moving waste to us, one of their

11 cranes broke, but it's an old crane because nobody is

12 maintaining those facilities.

13           They can't find replacement parts, so I'm

14 getting cash requests because the revenue that we are not

15 getting from that project is not going to come in when

16 expected, and it may not come in for months and months

17 because they don't have -- they don't make parts for the

18 crane any more that will allow the customer to even unload.

19 That's just a small example.  There are many, many others.

20           On decommissionings, just everything.  It's

21 everything -- everything moves right, everything moves

22 right.

23 Q.    So for a while did you think, for example, the

24 decommissioning project known as Palisades would be on one

25 day and it turned out to be a later day?

Graham - direct

1   A.    Well, yes.  That was -- that was -- it was announced,

2   I don't know, November something, or maybe it was even

3   earlier this year, and within almost weeks, it was moved out

4   another five years.

5                MR. BECKWITH:  So, James, let's put up slide,

6   demonstrative slide 12 from the DOJ's opening.  I think it's

7   demonstrative 11.

8   BY MR. BECKWITH:

9   Q.    Mr. Graham, I know you were not here during the

10  opening statement.

11  A.    No.

12  Q.    But let me just represent to you, this was shown by

13  the Department of Justice as a future, I guess, wave of

14  $10.9 billion in estimated disposal costs for

15  decommissioning projects.

16               Now, the way it tends to really gain momentum

17  here, around 2034.  Can WCS make it to 2034?

18  A.    No.

19  Q.    And it starts to pick up steam around 2024, right

20  there.  Can you make it to 2024?

21  A.    No.

22  Q.    Well, how about this period here, from 2017 until

23  around 2021?  Based on your current projections, can WCS

24  make it to 2021?

25  A.    No.

1485

Graham - direct

1   Q.      Look with me at Defendants' 350 in your binder, sir.

2   Can you identify Exhibit 350?

3   A.      That is a board book for our meeting for Valhi, our

4   regularly scheduled Board of Directors meeting on March 2nd,

5   2017.

6           MR. BECKWITH:  Your Honor, we offer Defendants'

7   350.

8           MS. ELMER:  No objection.

9           THE COURT:  Thank you.

10          (Defendant's Exhibit No. 350 was admitted into

11   evidence.)

12   BY MR. BECKWITH:

13   Q.      Mr. Graham, does Defendants' 350 include the minutes

14   from the special meeting and Board of Directors of Valhi on

15   February 14, 2017?

16   A.      Yes, it does.

17   Q.      Do you see that at around page 18 of the exhibit?

18   A.      Yes.

19   Q.      Were these minutes prepared by the corporate

20   secretary?

21   A.      They were.

22   Q.      Were they voted in by the board at the meeting?

23   A.      Yes, they were.

24   Q.      And that would have been the meeting of March 2nd?

25   A.      Yes.

Graham - direct

1   Q.    2017?

2   A.    Yes, that's right.

3   Q.    Do these minutes reflect some of the words you shared

4   with the board on February 14, 2017?

5   A.    Yes.

6   Q.    So, for example, did you ask Mr. Whitlock of BRG to

7   present to the board --

8           MR. BECKWITH:  Your Honor, I forgot to hand this

9   up.  May I approach and hand this up?

10          THE COURT:  Yes, you may.

11  BY MR. BECKWITH:

12  Q.    On page 21, does it reflect that Mr. Whitlock made his

13  presentation to the board?

14  A.    Yes.

15  Q.    On page 24, it's minute number 7, page number 7, point

16  4 in your exhibit binder.  Do you see the paragraph says,

17  "Mr. Graham then described"?

18  A.    Yes, I do.

19  Q.    Did you remind the board of the Wunderlich process

20  that started in 2014 and culminated in this transaction that

21  is before Judge Robinson?

22  A.    Yes.

23  Q.    Did you remind the board that EnergySolutions was the

24  only buyer following that process?

25  A.    Yes.

Graham - direct

1    Q.    And then, did you have a conversation with the board

2    about evaluating the possibility of closing the facility?

3    A.    Yes.

4    Q.    Where is that, sir?  Is that the next paragraph?

5    A.    Yes.

6    Q.    So it says, "Mr. Graham stated that Valhi is

7    evaluating closure costs for the WCS facility."

8            Did you commission such a closure cost analysis?

9    A.    Yes.

10   Q.    And likewise in the next paragraph there on page 24,

11   it advises that you had gotten bankruptcy advice and that

12   restructuring was not an option?

13   A.    Yes.

14   Q.    Was that your recollection of what was happening at

15   the meeting?

16   A.    Yes.

17   Q.    Now, there was some reference earlier in some other

18   testimony, I'm not going to represent it to you, but at some

19   point in time did you, as chairman, make the decision that

20   you were not going to continue with pursuing an interim

21   storage application?

22   A.    Yes, I did.

23   Q.    And why did you do that?  Why did you stop something

24   you had started so recently?

25   A.    Well, that's going to require a little explanation.

1    When I took over in late January, we were close to an

2    agreement with AREVA to have them continue to fund the

3    license application.  We had already invested over $2

4    million in an environmental study and they had agreed to

5    pick up the costs of the NRC application process.  They had

6    reached their limit on that under that agreement, and we had

7    a teaming arrangement with them.

8         So I met with Greg Veasey and Jeff Isaacson with

9    Rod to go over the, really, their financial models of how

10   interims were to work and their cost models and revenue

11   projections, because they were seeking a higher revenue

12   share and percentage than we had previously aggrieved upon.

13   Q.    This is AREVA?  Sorry to interrupt.

14   A.    Yes, AREVA.  And so if I get ahead of myself, stop me.

15         But AREVA was going to, in exchange for funding

16   the unexpected costs of the NRC, which was now estimated to

17   be seven-and-a-half million, plus some legal costs of over a

18   million dollars and some other consultant costs, which would

19   bring the total up to about $9 million, we had agreed to

20   change the revenue sharing on the storage fees that we would

21   get from the interim facility.

22         So we thought we had an agreement in principle.

23   We actually had drafted a letter.  We thought we had an

24   agreement.

25         But Mr. Veasey continued to come back with

Graham - direct

1    proposed changes after we thought it was agreed to, and so

2    in early April, we had reached an impasse with them, and

3    toward the end, they came back with another proposal, which

4    involved additional burdens on us.

5              And I advised them that if they did not go back

6    to the original agreement we had, and Rod communicated this,

7    that if we didn't get a decision-maker from AREVA to

8    actually go back and say, this is what the deal is rather

9    than continually change it, we were going to have to suspend

10   or change the license, because we didn't have the funds for

11   it.

12             What happened after that was fairly interesting.

13   We asked Mr. Veasey, did he have the authority to negotiate

14   because it kept changing while we were dealing with them,

15   and if he didn't, please let us know, and he said we he

16   didn't know whether he had the authority.

17             So he came back and he said, I think Frederick

18   D'Agnisti (phonetic) or something, he was the head of their

19   nuclear logistics program out of France, was going to be in

20   D.C., and that he would be available to meet if we were

21   willing to continue to talk, and I said, sure.  So we sent

22   Rod to D.C. to meet with them.

23             This is right before we decided to suspend the

24   application.  And then a few days later, this new proposal

25   came out, and basically we could not get back to the

Graham - direct

1    original term.

2           So we advised them on the 13th, so it was

3    Thursday before the Easter holiday that we would wait until

4    holiday, because Monday was a European holiday, and if they

5    did not go back to the original deal, that we would -- have

6    to be forced to suspend the operation.  We don't have the

7    money for this.

8           Even with the additional sharing arrangement,

9    where it went from five to twelve-and-a-half percent, which

10    should be hundreds of millions of dollars to them,

11    basically, a carried interest.

12           So on the morning, we said we're going to do it

13    on Tuesday, and early that morning I get an e-mail from Mr.

14    D'Agnisti.  Frederick is his first name.  And he said, I

15    want to understand how we can avoid this.

16           So I sent him back a response that said, we can

17    avoid this by going back to the original agreement that we

18    advanced $300,000 toward the NRC fee you were supposed to

19    cover, and sign this agreement that has now been signed by

20    Rod Baltzer.

21           And he said, I will get back to you.  I

22    understand exactly what the situation is.

23           I said, go ahead and we'll wait until early

24    afternoon to send the letter.  I never received a response,

25    so I told him to go ahead and send the response in.

Graham - direct

1         So I think we tried to do everything we could to

2    keep them engaged and to get them to commit and to fulfill

3    the commitments that I thought we had before, but they just

4    weren't willing to do it, and I'm not sure the North

5    American management had the authority to do it.

6    Q.    Did you actually draft up a letter to send over, and

7    did you actually send the letter over to AREVA saying, sign

8    here and we'll fund it?

9    A.    Yes.

10   Q.    We'll advance the funds?

11   A.    Yes.

12   Q.    Did they send it back?

13   A.    No, they did not send it back.

14   Q.    Was there any sort of litigation strategy associated

15   with pulling the spent fuel license application?

16   A.    No.  This was -- this was -- this is one of the

17   hardest things we had to do, is again Waste Control has

18   always had this pattern of trying to try something new to

19   get revenue streams in.  This is just, we had gotten --

20   we've gotten allotted of local jurisdictions that have

21   gotten city council's to pass resolutions, including Dallas.

22   I had a proposal for a 250,000 bare boned PR campaign to try

23   to address that.  That would have included Dallas, San

24   Antonio, and even our good friends from Midland.  The

25   environmental groups --

Graham - direct

1    Q.    Hold on.  You lost me.  What towns passed what

2    resolutions doing what?

3    A.    I'm sorry.  I got ahead of myself.

4          They were trying to ban the transport of the

5    spent fuel rods through, by rail through anywhere in their

6    cities and towns, and --

7    Q.    So --

8    A.    So since this application got filed, the environmental

9    groups not only participated in the public hearings, but

10   they were also going around to all the cities feeding into

11   the Andrews County area that had rail lines to say, look, we

12   do not want these spent fuel rods going to Andrews through

13   these towns, and the city councils, including Dallas, passed

14   a resolution to that effect.

15         So we were getting a lot of backlash.  There's a

16   lot of -- there's -- and, frankly, everybody that was

17   involved with trying to shut Yucca Mountain down kind of

18   re-upped on this one as well.  So it was just becoming very,

19   very difficult and very expensive.

20   Q.    Does the United States have, a nuclear policy in the

21   United States have any spent fuel solution that's commercial

22   external to the Government?

23   A.    No.

24   Q.    Did you get to see sort of a front row seat on why

25   that might be?

Graham - direct

1    A.    Yes.  Yes.

2    Q.    So look at Defendants' Exhibit 395, the 10K.

3    A.    Yes.

4    Q.    For year-ending December 31, 2016.

5          By the way, that decision you had to pull the

6    spent fuel license, did that cost you some dollars in terms

7    of a write-off?

8    A.    Well, yes, and it keeps growing.  The original -- I

9    knew we were going to have to write off the cost of the

10   capitalized expense for the environmental study, and I think

11   that was 225,000, but there were all of these other fees and

12   costs we incurred.  I think it now closer to

13   three-and-a-half million.  That actually occurred now, in

14   April.  Last month, in April.

15   Q.    I asked you earlier if this is kind of falling on your

16   shoulders.  Do you feel some days like you're the person

17   bringing sobriety to the organization?

18   A.    I think -- well, yes.

19   Q.    So we're looking at Defendants' 395.  I want to look

20   at page 26.

21         Do you see what you've described to the public

22   about the situation you find yourself in Waste Control

23   Specialists.  Let's look at the top paragraph.

24         MR. BECKWITH:  James, can we put that up?

25   BY MR. BECKWITH:

1494

Graham - direct

1   Q.      Did you review and approve the 10Ks before they're

2   filed with the Securities and Exchange Commission?

3   A.      I do.

4   Q.      Look at the first paragraph there in the bottom half

5   of it.  Where I want to start is, "Because."

6           "Because many" -- that might not be on the right

7   page.  I'm sorry.  26.  Let's go to page 26.  I'm sorry.

8   A.      This is the exhibit page 26?

9   Q.      Right.  Those little exhibit pages.

10  A.      Yes.

11  Q.      "Because many large commercial generators of waste

12  have chosen to store waste on-site."

13  A.      Yes.

14  Q.      And once you took over, you became this chairman, you

15  started trying to understand what was happening at this

16  business, what impact did storage in place have on you as

17  chairman in trying to decide whether WCS had a viable

18  future?

19  A.      Well, the problem with -- customers wield that power

20  enormously with them.  Until they get whatever price they

21  want, they don't move their waste, so they have this power

22  over you, and I don't care whether it's us or anybody else,

23  they have this, they have this thing, and they just reach

24  out.

25          I mean, and they know how -- it's not -- it's

Graham - direct

1   not a secret that we're in financial distress, and the

2   generators themselves really just don't care.  They are

3   simply going to wait you out until it suits them to transfer

4   that waste.

5         So it makes it less predictable.  We have no

6   bargaining power.  It makes it very uncertain.  And we don't

7   have anything else to offer them.  We just -- we're just a

8   hole in the ground, and so we can't trade other services.

9   We can't -- we don't have our own transportation fleet.  We

10  have to pay for that.  We don't make money out of that.

11  We're just a holding group.

12  Q.   It says, our waste management segment has never been

13  profitable, and throughout it history has required our

14  financial support to maintain its operations.

15        What does that mean, financial support to

16  maintain its operations?

17  A.   On a day-to-day basis, it means that Amy Samford comes

18  in to me and asks for cash that we're never going to get

19  back.

20  Q.   What do you mean, she comes in and asks you for cash?

21  A.   She comes in, and they don't have money to meet

22  payroll.  They don't have money to pay people.  They don't

23  have enough revenues coming in.

24        She comes in.  I have to write, I have to

25  approve those expenditures, so she'll say, I need $900,000,

1    I need a million-two, whatever the number is, and in order

2    for us to stay in business, we have to write those checks,

3    and it's coming from Valhi.

4    Q.    Have you ever had any heated conversations with Ms.

5    Samford over that exact topic?

6    A.    It's not her fault, no, no.  I mean, well --

7    Q.    Well, that's an interesting answer, sir.

8    A.    She -- she knows, when she comes to see me, it's not

9    going to be a pleasant conversation.

10   Q.    Then it says, "We do not know if our waste management

11   segment will ever generate positive operating results or

12   cash flows."

13             Now, as a corporate lawyer, when you write

14   something like that, what are you communicating to the

15   public?

16   A.    That it's a failing business, if you want to know the

17   truth.

18   Q.    So has WCS's financial performance affected Valhi?

19   A.    Very significantly, yes.

20   Q.    What's the biggest cash drain on Valhi?

21   A.    It's the death of the funding of WCS.

22   Q.    How has Valhi's stock performed since Mr. Simmons'

23   death.

24   A.    It has lost -- well, in the last four to five years,

25   it lost probably 60 to 70 percent of its value, market

Graham - direct

1    value.

2    Q.    Look on the same page.  "Our waste management segment

3    is currently subject to a contract to be sold."

4          Do you see that?

5    A.    Yes.

6    Q.    And let's go to the bottom of that paragraph.

7          "If such pending sale transaction were not to be

8    successfully closed, we would continue to consider and

9    evaluate various other alternatives with respect to our

10   waste management segment, including alternatives aimed at

11   minimizing or ultimately discontinuing our continued support

12   of the waste managing segment."

13         Was that something you authorized to be

14   published in the 10K?

15   A.    I did.

16   Q.    And what were you trying to communicate with that?

17   A.    Well, I was trying to be as open and as candid as we

18   can, but indicate to the market without totally destroying

19   confidence in the -- in the waste management segment, that

20   it is very possible that we would close the facility if the

21   transaction doesn't go through.

22   Q.    Does Valhi have any incentive to keep WCS open?

23   A.    No.

24   Q.    What about tax benefits?  Are this there tax benefits

25   to keeping WCS open?

Graham - direct

1   A.    I guess if you think of losses, tax losses as a

2 benefit, but it's not.  You are still losing money, so no,

3 it's no benefit.

4   Q.    Do you try to generate tax benefits through losses at

5 Valhi?

6   A.    No.

7   Q.    And if the letter of credit that is described in the

8 10K is not renewed in the first quarter of 2018, the

9 $43.3 million letter of credit, what happens next?

10   A.    Well, where are we?

11   Q.    Actually, I was just summarizing, sir.  Is there a

12 letter of credit?

13   A.    There's a letter of credit.

14   Q.    If that letter of credit is not renewed in the first

15 quarter of 2018, what would happen next?

16   A.    Oh, it would be gone.

17          THE COURT:  It's 4:00 o'clock, so unless you

18 have a question that needs to be asked?

19          MR. BECKWITH:  I do not have a question that

20 needs to be asked, your Honor.

21          THE COURT:  All right.

22          MR. BECKWITH:  Thank you for asking me that

23 question.

24          THE COURT:  We will recess for the evening.

25          I did build some cushion into my schedule and

Graham - direct

1    I'm going to have to withdraw one of the hours tomorrow.

2    It won't affect the time you have and I don't think it

3    will affect our schedule at all, but I need to start a

4    proceeding at 2:00 tomorrow, another proceeding at 2:00

5    tomorrow instead of 3:00, so unless that creates

6    insurmountable problems, we will end our day at 2:00

7    tomorrow.  All right.

8                    MR. BECKWITH:  It does not for me.

9                    THE COURT:  Thank you very much.

10                    MR. BECKWITH:  It does not for me, your Honor.

11                    (Court recessed at 4:00 p.m.)

12                            -   -   -